AWNK003143

Section 6.6    Method of Accounting.    During the period of time following the Closing in which the Selling Members may be entitled to receive certain post-Closing payments, including the Earn-Out Payments, Buyer shall cause the Company to prepare the Financial Statements in accordance with generally accepted accounting principles for purposes of calculating such post-Closing payments.

Section 6.7    Proceedings.    The Selling Members shall be responsible for the fees and expenses of all Proceedings set forth on **Schedule 3.6** and the Selling Members shall be entitled to any and all recoveries from all such Proceedings.

Section 6.8    Key Employment Agreements.    The Selling Members shall use their good faith efforts to deliver Employment Agreements duly executed by any key employee of the Company who has an annual compensation package of over $100,000 per year, in a mutually agreed upon form (the "**Employment Agreements**").

Section 6.9    Schedule Updates.    The disclosures in any Schedule to the representations and warranties in Article 3 shall qualify the other representations and warranties in Article 3 to the extent it is readily apparent from a reading of the disclosure that such disclosure is applicable to such other representations and warranties in Article 3. At any time during the thirty (30) day period from and after May 31, 2017, the Selling Member Representative shall have the right to deliver to Buyer a supplement or amendment to any Schedule to the representations and warranties in Article 3 (each, a "Schedule Supplement"), and such Schedule Supplement shall be deemed to be the final Schedules to the representations and warranties in Article 3; *provided, however*, that no Schedule Supplement shall be deemed to update any original Schedule to the representations and warranties in Article 3 if such Schedule Supplement sets forth any event or the existence of any fact or condition which would result in (a) a reduction of the Company's EBITDA, taken as a whole, for the twelve month period ending May 31, 2017, by more than $500,000 or (b) Losses to the Company of more than $500,000.

Section 6.10    Business Plan. Intentionally Omitted.

ARTICLE 7

INDEMNIFICATION

Section 7.1    Indemnification.

(a)    Indemnification by the Selling Members. Subject to the limits set forth in this **Article 7**, from and after the Closing, the Selling Members agree, jointly and severally, to indemnify, defend and hold Buyer and its Affiliates (including, after the Closing, the Company) and their respective officers, directors, managers, members, shareholders, employees, agents and representatives (the "**Buyer Indemnified Persons**") harmless (except with respect to claims for indemnification arising from breaches of representations and warranties set forth in **Article 4** or claims for breaches of covenants contained in this Agreement made by a Selling Member, in which case, such Selling Member shall severally indemnify the Buyer Indemnified Parties with respect to such Selling Member's breaches) from and in respect of Losses that they incur or suffer arising out or by reason of, in connection with or due to (i) any breach of any representation or warranty of the Company or any Selling Member contained in this Agreement or any other Seller Document,

{00863216.DOCX;2 }

39

AWNK003144

(ii) any breach of any covenant or agreement of the Company or any Selling Member contained in this Agreement or any other Seller Document, (iii) any of the Excluded Liabilities, (iv) any and all claims of third parties with whom the Company or its agents have had discussions with respect to the disposition of the Company or its Business in connection with or arising out of such discussions, (v) any and all claims relating to the matters set forth on **Schedule 3.6** or any other civil, criminal or administrative suit, action, proceeding, investigation, violation or other Proceeding to the extent based upon or arising from any act, transaction, circumstance, sale or providing of works, material, product or services, state of facts or other condition which occurred or existed, before the Closing Date, whether or not then known, due or payable, or with respect to the operation of the Business prior to Closing, the employment of the Employees prior to Closing or the ownership (or leasing of), operation or use of the assets of the Business prior to the Closing (each to the extent in excess of the amounts covered by the Company's insurance policies), (vi) any and all claims relating to the Owned Intellectual Property, including, without limitation, that such Owned Intellectual Property infringes upon, violates or constitutes the unauthorized use of any of the Intellectual Property or proprietary rights of any Person with respect to the period prior to the closing, (vii) any and all Taxes of any Selling Member whether or not relating to or arising out of the Business; (viii) any and all Taxes of the Company for any Pre-Closing Tax Periods (including the portion of any Straddle Period relating to the Pre-Closing Tax Period, as determined under **Section 6.3(a)**), (ix) any and all Benefit Liabilities of Company relating to the period prior to the Closing; (x) any liabilities with respect to environmental matters (including Losses relating to any remediation for environmental matters disclosed in **Schedule 3.18** with respect to the period prior to the Closing) incurred by the Company); (xi) with respect to services provided by Company before the Closing (A) any claim based on a warranty with respect to services rendered before the Closing and (B) any warranties issued before Closing relating to such services (whether expressed or implied by operation of Law); (xii) the operation of the Company prior to the Closing; (xiii) the Company having failed to duly qualify or obtain a license to do business in all of the jurisdictions in which the nature of the Company's activities required such qualification or licensing with respect to the period prior to the Closing; and (xiv) any Losses or other amounts (including with respect to disability and unemployment) with respect to Employees of the Company (other than to the extent arising out of their employment by Buyer) with respect to the period prior to the Closing.

(b)    Subject to the limits set forth in this **Article 7**, from and after the Closing, Buyer and the Company, jointly and severally, agree to indemnify, defend and hold the Selling Members, and their respective agents and representatives (the "**Seller Indemnified Persons**") harmless from and in respect of any and all Losses that they incur or suffer arising out of or by reason of or in connection with or due to (i) any breach of any representation or warranty of Buyer set forth in this Agreement or any other Buyer Document, (ii) the failure to perform any of the covenants or agreements of Buyer set forth in this Agreement or any other Buyer Document, and (iii) the operation of the Company following the Closing Date.

(c)    <u>Certain Limitations</u>. Anything in this **Article 7** to the contrary notwithstanding:

(i)    neither the Buyer Indemnified Persons, on the one hand, nor Seller Indemnified Persons, on the other hand, shall be entitled to recover pursuant to **Section 7.1(a) or 7.1(b)**, as the case may be, in respect of breaches of representations and warranties (other

261

AWNK003145

than the representations and warranties set forth in **Sections 3.1 (Organization; Due Execution), 3.5 (Capitalization) , 3.10 (Tax Matters), 3.17(b) Permits, 4.1 (Ownership of Interest) and 4.2 (Authority),** and Buyer's representations and warranties set forth in **Section 5.1(b) (Authority)** (all such representations and warranties being herein called "**Specified Representations**")) from the respective other Party hereunder for any Losses, except to the extent that the aggregate amount of any such Losses indemnifiable hereunder exceeds $75,000 (the "**Basket**"), at which point, either the Buyer Indemnified Persons or the Seller Indemnified Persons, as the case may be, will be obligated to indemnify the Party seeking indemnification for all such Losses in excess of the Basket, subject to the other clauses of this **Section 7.1(c)**;

(ii)    (a) neither the Buyer Indemnified Persons, on the one hand, nor Seller Indemnified Persons, on the other hand, shall be entitled to recover for Losses (other than for Losses on account of breaches of the Specified Representations) in an aggregate amount in excess of the Cap and (b) neither the Buyer Indemnified Persons, on the one hand, nor Seller Indemnified Persons, on the other hand, shall be entitled to recover for Losses, including Losses on account of breaches of the Specified Representations, in an aggregate amount in excess of twice the Cap.

(iii)    none of the foregoing limitations on indemnification in clauses (i) and (ii) of this **Section 7.1(c)** shall apply to any claim based on fraud or intentional misrepresentation or willful ignorance;

(iv)    solely for purposes of calculating the amount of Losses incurred arising out of or relating to any breach of a representation, warranty, covenant or agreement (and not for purposes of determining whether or not such a breach has occurred) any reference to "Material Adverse Effect" or any other materiality qualifications in such representation, warranty, covenant or agreement shall be disregarded; and

(v)    the amount which an Indemnifying Party is required to pay to, for or on behalf of any Indemnified Party pursuant to this **Article 7** shall be adjusted (including, retroactively) by any insurance proceeds and any indemnity, contribution, or other similar payment actually recovered by or on behalf of such Indemnified Party in reduction of the related indemnifiable loss (the "**Indemnifiable Loss**"). Amounts required to be paid, as so reduced, are hereinafter sometimes called an "**Indemnity Payment**." If an Indemnified Party shall have received or shall have had paid on its behalf an Indemnity Payment in respect of an Indemnifiable Loss and shall subsequently receive insurance proceeds or other payment in respect of such Indemnifiable Loss, then the Indemnified Party shall pay to the Indemnifying Party the amount of such insurance proceeds or other payment or, if lesser, the amount of the Indemnity Payment. To the extent that any Indemnified Party is entitled to indemnification pursuant to this **Article 7**, the Indemnifying Party shall have rights of subrogation respecting, any rights and remedies (including rights of indemnity, rights of contribution and other rights of recovery) that any Indemnified Party may have to insurance policies or similar contracts with respect to which such Indemnified Party is a beneficiary.

(vi)    Buyer may set off any amount to which it may be entitled from the Selling Members under this Article against amounts payable to the Selling Members pursuant to **Sections 1.3 and 1.4** (provided, however that neither the exercise of, nor the failure to

262

AWNK003146

exercise such right to setoff will constitute an election of remedies or limit Buyer in any manner in the enforcement of any other remedies that may be available to it).

(vii)    The Buyer Indemnified Persons and the Seller Indemnified Persons shall in good faith use commercially reasonable efforts to mitigate Losses in connection with any claim under **Section 7.1(a)** and **Section 7.1(b)**, respectively.

(viii)    Any Losses for which any Indemnified Party is entitled to indemnification under this **Article 7** shall be determined without duplication of recovery to the extent such Indemnified Party has been indemnified or reimbursed for such Loss under any other provision of this Agreement; and

(d)    Survival.

(i)    The representations, warranties and covenants of the Parties contained in this Agreement, any other Seller Document or Buyer Document, as the case may be, or in any instrument delivered pursuant hereto or thereto will survive the Closing and will remain in full force and effect thereafter, except that the representations and warranties of the Parties shall expire twelve (12) months following the Closing; provided, that: (i) such representations and warranties shall survive beyond such period with respect to any breach thereof if written notice thereof shall have been duly given within such period, (ii) the representations and warranties set forth in **Sections 3.10 (Tax Matters) and 3.12 (Employee Benefits)** shall survive the Closing until one (1) month following the lapse of the applicable statute of limitations, and (iii) the representations and warranties set forth in **Sections 3.1 (Organization; Authority; Due Execution), 3.5 (Capitalization), 4.1 (Ownership of Interest), 4.2 (Authority) and 5.1(b) (Authority)** shall survive indefinitely. None of the foregoing limitations on survival shall apply in the case of fraud, intentional misconduct or intentional misrepresentation.

(ii)    Subject to **Section 7.1(d)(i)** above, all other claims for indemnification with respect to Losses incurred by the Buyer Indemnified Parties pursuant to **Section 7.1(a)** shall be asserted within a period of three (3) years following the Closing (and if not asserted within such period shall lapse); provided, however, (1) any claims for indemnification with respect to Losses incurred by the Buyer Indemnified Parties pursuant to **Sections 7.1(a)(vii) or (viii)** may be asserted indefinitely and (2) any claims for indemnification with respect to Losses incurred by the Buyer Indemnified Parties pursuant to **Section 7.1(a)(v)** shall be asserted within a period of four (4) years following the Closing (and if not asserted within such period shall lapse).

(e)    Notice and Opportunity to Defend. The following shall apply:

(i)    If there occurs an event (a "**Covered Proceeding**") which a Party asserts is an indemnifiable event pursuant to **Section 7.1(a) or 7.1(b)**, the Party or Parties seeking indemnification (the "**Indemnified Party**") shall notify the other Party or Parties obligated to provide indemnification (the "**Indemnifying Party**") promptly. If such event involves any claim or the commencement of any action or proceeding by a third person, the Indemnified Party shall give such Indemnifying Party prompt written notice of such claim or the commencement of such action or proceeding; provided, however, that the failure to provide prompt notice as provided herein will relieve the Indemnifying Party of its obligations hereunder only to the extent that such failure prejudices the Indemnifying Party hereunder. In case any such action shall be brought

{00863216.DOCX;2 }

AWNK003147

against any Indemnified Party and after such Indemnified Party has notified the Indemnifying Party of the commencement thereof, the Indemnifying Party shall be entitled to assume the defense thereof, with counsel reasonably selected by the Indemnifying Party and reasonably approved by the Indemnified Party after notice from the Indemnifying Party to the Indemnified Party. The Indemnifying Party and the Indemnified Party agree to cooperate fully with each other and their respective counsel in connection with the defense, negotiation or settlement of any such action or asserted liability.

(ii)    If the Indemnifying Party agrees to assume the defense of a Covered Proceeding, the Indemnified Party shall have the right to participate at its own expense in the defense of such action or asserted liability. If the Indemnifying Party is otherwise entitled to control the settlement of a Covered Proceeding (subject to the requirements and limitations of this **Section 7.1**), the Indemnifying Party will be entitled to control such settlement only if (A) the terms of such settlement require no more than the payment of money (for example, such settlement does not require the Indemnified Party to admit any wrongdoing or take or refrain from taking any action), (B) the full amount of such monetary settlement is fully paid by the Indemnifying Party, and (C) the Indemnified Party receives as part of such settlement a legally binding and enforceable unconditional satisfaction and release of all claimed liabilities or obligations in form and substance reasonably satisfactory to the Indemnified Party.

Section 7.2    <u>Exclusive Remedy</u>. From and after the Closing, Buyer Indemnified Persons and Seller Indemnified Persons' sole and exclusive remedy, whether in any individual, corporate or any other capacity, with respect to any and all Losses arising under this Agreement or the transactions contemplated hereby, regardless of the legal theory under which such liability or obligation may be sought to be imposed, whether sounding in contract or tort, or whether at law or in equity, or otherwise, shall be pursuant to the provisions of this **Article 7**.

Section 7.3    <u>Payments</u>.  Any amounts owed to the Buyer by the Selling Members (or any one or more of the Selling Members) pursuant to the terms of this Agreement, including but not limited to, **Section 1.2, Section 1.5, Section 1.6, Article 7**, shall be paid to the Buyer as a payment by the Selling Members in cash or available funds to an account designated by the Buyer within five (5) Business Days of the final determination of such payment.

# ARTICLE 8

# DEFINITIONS

Section 8.1    <u>Definitions</u>.  For purposes of this Agreement, the following terms used in this Agreement shall have the meanings ascribed to them below:

"**409A Plan**" has the meaning ascribed to such term in **Section 3.10(a)(xv)**.

"**Additional Interim Financial Statement**" has the meaning ascribed to such term in **Section 3.14(a)**.

264

AWNK003148

"**Affiliate**" of any Person means another Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such first Person.

"**Agreement**" has the meaning ascribed to such term in the Preamble.

"**Annual Financial Statements**" has the meaning ascribed to such term in **Section 3.14(a)**.

"**Basket**" has the meaning ascribed to such term in **7.1(c)(i).**

"**Books and Records**" means all operating data and records of the Company which are necessary to and used in the operation of the Business or that are located at the Company's primary offices, in each case including all books of account, ledgers, general, financial, accounting, tax, warranty, shipping records, invoices, management letters from accountants, purchase and sales records and information, customers' records, records pertaining to customer requirements, equipment maintenance and warranty information, customer and prospect lists, correspondence, catalogues, promotion materials, customer contacts, customer invoices, customer returns and vendor product information, credit and collection records, and all other files, records, literature and other documents of the Company, whether in written, electronic or other form.

"**Breaching Party**" has the meaning ascribed to such term in **Section 6.4(c).**

"**Business**" means the business activities, operations and affairs of the Company currently conducted.

"**Business Day**" means any day other than a Saturday, a Sunday or a day on which commercial banking institutions in New York, New York are authorized or obligated by law or executive order to be closed.

"**Buyer**" has the meaning ascribed to such term in the Preamble.

"**Buyer Documents**" has the meaning ascribed to such term in **Section 5.1(b)**.

"**Buyer Indemnified Persons**" has the meaning ascribed to such term in **Section 7.1(a)**.

"**Buyer Prepared Return**" has the meaning ascribed to such term in **Section 6.3(d)**.

"**Cap**" means fifty percent of an amount equal to (i) all amounts paid by Buyer pursuant to **Article 1** less (ii) all amounts paid to Buyer by the Selling Members pursuant to **Article 1.**

"**Closing**" has the meaning ascribed to such term in **Section 2.1.**

"**Closing Accounts Receivable**" has the meaning ascribed to such term in **Section 1.5(f).**

265

AWNK003149

"**Closing Balance Sheet**" has the meaning ascribed to such term in **Section 1.5(a).**

"**Closing Date**" has the meaning ascribed to such term in **Section 2.1.**

"**Closing Date Calculation**" has the meaning ascribed to such term in **Section 1.5(a).**

"**Closing Payment**" has the meaning ascribed to such term in **Section 1.2(a)**

"**Closing Working Capital**" has the meaning ascribed to such term in **Section 1.5(a).**

"**Code**" means the Internal Revenue Code of 1986, as amended. All citations to the Code or to the regulations promulgated thereunder shall include any amendments or any substitute or successor provisions thereto.

"**Company**" has the meaning ascribed to such term in the Preamble.

"**Company Leased Property**" has the meaning ascribed to such term in **Section 3.8.**

"**Company Leases**" has the meaning ascribed to such term in **Section 3.8.**

"**Company Privacy Policies**" has the meaning ascribed to such term in **Section 3.29.**

"**Compensation and Benefits Plans**" has the meaning ascribed to such term in **Section 3.12(a).**

"**Confidential Information**" has the meaning ascribed to such term in **Section 6.4(b).**

"**Consent**" means any consent, approval, authorization, waiver, permit, grant, franchise, concession, agreement, license, exemption or order of, registration, certificate, declaration or filing with, or report or notice to, any Person, including but not limited to any Governmental Entity.

"**Contracts**" or "**Contract**" means all contracts, agreements, leases, licenses, franchises, purchase orders, sale, license or service orders, instruments, commitments, arrangements and understandings (in each case, whether written or oral and including all amendments thereto) to which the Company is a party or by which the Company is bound or under which the Company or the Business has any rights or is entitled to any benefits but excluding therefrom any licenses for "shrink-wrapped-off-the-shelf software".

"**Covered Proceeding**" has the meaning ascribed to such term in **Section 7.1(e).**

"**Disputed Item**" and "**Disputed Items**" has the meaning ascribed to such term in **Section 1.5(d)**.

{00863216.DOCX;2 }

45

AWNK003150

"**Earn-Out Payment(s)**" means either or both of the Period 1 Earn-Out Payment and the Period 2 Earn-Out Payment, as applicable and to the extent earned hereunder.

"**EBITDA**" means earnings before interest, taxes, depreciation and amortization; provided, however that the calculation of EBITDA shall not include any corporate or administrative overhead costs of Buyer or its affiliates that is allocated to the Company.

"**Effective Date**" has the meaning ascribed to such term in the Preamble.

"**Employees**" mean current and former employees and consultants of the Company, including leased and temporary employees, involved in whole or in part in the Business.

"**Employment Agreements**" has the meaning ascribed to such term in **Section 6.8**.

"**Environmental Law**" means any Law, permit, authorization, policy, opinion, common law or agency requirement applicable to the Company relating to: (i) the protection, investigation or restoration of the environment, health and safety, or natural resources or exposure to any harmful or hazardous material, (ii) the handling, use, presence, disposal, release or threatened release of any chemical substance or waste water, or (iii) noise, odor, wetlands, pollution, contamination or any injury or threat of injury to persons or property, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, the Resource Conservation and Recovery Act, the Occupational and Safety and Health Act (solely to the extent related to Hazardous Substances), Clean Water Act and the Oil Pollution Act.

"**ERISA**" has the meaning ascribed to such term in **Section 3.12(b)**.

"**Excluded Earnings**" has the meaning ascribed to such term in **Section 1.6(a)**.

"**Excluded Liabilities**" means any and all of the debts, liabilities, claims and obligations of one or more members of the Company, whether fixed, contingent or otherwise, in each case to the extent existing or accrued or required to be accrued at or as of the Closing, or made, asserted or arising after the Closing but based upon or arising from any act, transaction, circumstance, sale or providing of goods or services, state of facts or other condition which occurred or existed on or prior to the Closing, whether or not then known, due or payable, including, without limitation, the following (but excluding the Qualified Accounts Payable):

(i)     any claims, liabilities or obligations against or of the Company under or arising out of any actual or claimed equity option, equity purchase, equity-based incentive, profit-sharing or similar plan(s), program(s), agreement(s) or arrangement(s) and/or under any and all qualified or non-qualified equity options, grants or awards and/or any other agreement, arrangement or understanding to make a payment to any manager, officer or employee in connection with the sale of the Interests or any transaction described in this Agreement;

(ii)     any and all claims, liabilities and obligations against or of the Company by, of or to any of its present or former direct or indirect shareholders, including any

AWNK003151

arising out of any action by the Company in connection with any of the transactions described in this Agreement;

(iii)    any and all claims, liabilities and obligations in respect of brokerage or finder's fees payable by the Company and all investment banking, legal, accounting and other consulting or similar costs and expenses incurred by the Company in connection with the negotiation, execution and/or consummation of this Agreement and/or any of the transactions described in this Agreement;

(iv)    any and all Transaction Expenses, Indebtedness of the Company and Payables (other than Qualified Accounts Payable) and any and all other liabilities and obligations of the Company to the Selling Member or any Affiliate(s) of the Selling Member (whether current or long-term);

(v)    any and all claims, liabilities and obligations against or of the Company as a guarantor, co-obligor or surety of or with any other Person, or arising by reason of the Company being an Affiliate of a Selling Member or against or of any Affiliate of a Selling Member;

(vi)    any and all claims, liabilities and obligations for or in respect of any and all foreign, federal, state and local Taxes of or imposed on the Company for any Pre-Closing Tax Period);

(vii)    any and all claims, liabilities and obligations against or of the Company on account of Proceedings;

(viii)    any and all claims, liabilities and obligations against or of the Company with respect to any Compensation and Benefits Plans arising out of any events occurring, or circumstances or state of facts existing, prior to the Closing Date, it being agreed and understood that the Company or the Buyer, and not the Selling Member, shall be responsible for all Compensation and Benefits Plans arising out of any events occurring, or circumstances or state of facts existing, after the Closing Date so long as such event is not triggered by the Closing; or

(ix)    any and all claims, liabilities and obligations against or of the Company based on or arising from the presence of any Hazardous Substance on any of the Company Leased Property in violation of applicable Environmental Law, or any Hazardous Discharge on or prior to the Closing Date in violation of applicable Environmental Law, and/or the failure to obtain any license or permit required in connection with any Hazardous Substance or Hazardous Discharge in order to comply with applicable Environmental Law or the retention, disposal, treatment or use thereof, and/or arising out of any, in each case, based on or arising from any act, transaction, state of facts or other condition which occurred or existed before the Closing Date in violation of applicable Environmental Law, on, from, involving or by any of the Company Leased Property, or the Company, or any of its Affiliates, and/or any demand of any government agency or authority or other Person prior to, on or after the Closing Date which is based upon or in any way related to any discharge of any Hazardous Substance, the presence, use, disposal or treatment of a Hazardous Substance in violation of applicable Environmental Law prior to the Closing Date, on, from, involving or by any of the Company Leased Property, the Company or any of its Affiliates.

{00863216.DOCX;2 }

47

AWNK003152

"**Financial Statements**" has the meaning ascribed to such term in **Section 3.14(a)**.

"**First Earn-Out Period**" has the meaning ascribed to such term in **Section 1.3(a)**.

"**GAAP**" means U.S. generally accepted accounting principles, consistently applied.

"**Government Bid**" has the meaning ascribed to such term in **Section 3.19(a)(iv)**.

"**Government Contract**" has the meaning ascribed to such term in **Section 3.19(a)(iv)**.

"**Governmental Entity**" means (a) any supranational, federal, state, local, municipal, foreign or other government; (b) any governmental or quasi-governmental entity of any nature (including any governmental agency, branch, department, official or entity and any court or other tribunal); or (c) any body, authority or agency exercising or entitled to exercise any administrative, executive, judicial, legislative, police, regulatory or taxing authority, including any arbitral tribunal.

"**Hazardous Discharge**" means the use, management, handling, transport, treatment, generation, storage, spill, escape, seepage, leakage, spillage, emission, release, discharge, remediation or clean-up of any Hazardous Substance on or about any of the Company Leased Property or caused by the Company.

"**Hazardous Substance**" means any substance that is: (a) listed, classified or regulated in any concentration pursuant to any Environmental Law, (b) any petroleum product or by-product, asbestos-containing material, lead-containing paint or plumbing, polychlorinated biphenyls, radioactive materials or radon, or (c) any other substance which may be the subject of regulatory action by any Governmental Entity pursuant to any Environmental Law.

"**HIPAA**" has the meaning ascribed to such term in **Section 3.12(b)**.

"**Indebtedness**" means, without duplication, and in each case whether fixed, contingent or otherwise, and to the extent existing or accrued or required to be accrued at or as of the Closing, (a) any indebtedness for borrowed money or issued in substitution for or exchange of indebtedness for borrowed money, (b) any indebtedness evidenced by any note, bond, debenture or other debt security, including "overdraft", (c) all indebtedness for the deferred purchase price of property or a business represented by a note, or earn-out or contingent purchase payment obligation, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all indebtedness secured by a purchase money mortgage or other Lien to secure all or part of the purchase price of the property subject to such mortgage or Lien, (f) all obligations under leases which shall have been or must be, in accordance with GAAP, recorded as capital leases, (g) any credit extended in the nature of banker's acceptances or letters of credit, (h) any obligations (including, but not limited to, interest, fees, penalties and other expenses) under any interest rate swap agreements or instruments, (i) all interest, fees and other expenses owed with respect to the indebtedness referred to above, and (j) all indebtedness and liabilities referred to

{00863216.DOCX;2 }

48

above which is directly or indirectly guaranteed, and, with respect to (a) to (j) above, all premiums, penalties, charges, fees, expenses and other amounts that are or would be due (including with respect to early termination) in connection with the payment and satisfaction in full of such obligations.

"**Indemnifiable Loss**" has the meaning ascribed to such term in **Section 7.1(c)(vi)**

"**Indemnified Party**" has the meaning ascribed to such term in **Section 7.1(e)(i)**.

"**Indemnifying Party**" has the meaning ascribed to such term in **Section 7.1(e)(i)**.

"**Indemnity Payment**" has the meaning ascribed to such term in **Section 7.1(c)(v)**.

"**Independent Auditor**" means a mutually agreeable independent nationally recognized accounting firm who has not then provided services to any Party in the previous two (2) years (a "**Neutral Firm**") that will agree to act as Independent Auditor. If: (i) Buyer and the Selling Member Representative are unable to agree on the selection of an Independent Auditor within fifteen (15) days of the conclusion of the period described above, then each of Buyer, on the one hand, and the Selling Member Representative, on the other hand, shall select one Neutral Firm and those two Neutral Firms together shall appoint a Neutral Firm as Independent Auditor hereunder, and such appointment shall be conclusive and binding on all of the Parties; or (ii) if any Party does not select a Neutral Firm within ten (10) days of written demand therefor by the other Party, then the Neutral Firm selected by the other Party shall act as the Independent Auditor.

"**Intellectual Property**" means any know-how, proprietary rights or other intellectual property, including without limitation, trade secrets, inventions, formulae, processes, patents (including all reissues, divisions, continuations and extensions thereof), patent applications, Trademarks, Trademark registrations, Trademark applications, service marks, service mark registrations, service mark applications, copyrights, copyright registrations, copyright applications, web sites and home pages, uniform resource locators, domain names, all rights to, and all intellectual property used or necessary to, create, publish, modify or maintain, any website or home page, customer and vendor information, lists and data bases, customer files, customer lists, mailing and subscription lists, supplier lists, information not known to the general public, literary works, whether or not copyrightable, ideas, concepts, designs, drawings, discoveries, product and service developments, inventions, improvements, processes, logos, software, source codes and materials, object codes and materials, algorithms, techniques, technology, technical information, research material, prototypes and models.

"**Interests**" has the meaning ascribed to such term in the Preamble.

"**Interim Financial Statement**" has the meaning ascribed to such term in **Section 3.14(a)**.

"**IRS**" has the meaning ascribed to such term in **Section 3.10(a)(vi)**.

"**Law**" or "**Laws**" has the meaning ascribed to such term in **Section 3.17(a)**.

AWNK003154

"**License Agreements**" has the meaning ascribed to such term in **Section 3.13(b)(i)**.

"**Liens**" means, with respect to any property or asset, all liens, mortgages, pledges, security interests, conditional sales agreements, purchase options, rights of first refusal or other encumbrance of like nature in respect of such property or asset.

"**Losses**" means any and all losses, damages, costs, deficiencies and reasonable expenses (including reasonable fees and expenses of counsel incident to any of the foregoing, or incurred in investigating or attempting to avoid the same or to oppose the imposition thereof, or in enforcing any of the obligations of any Indemnifying Party), excluding punitive damages.

"**MAC**" has the meaning ascribed to such term in the definition of "**Government Healthcare Program Contractor**".

"**Material Adverse Effect**" means any change or effect (or any development that is reasonably likely to result in any change or effect) that (a) is materially adverse to the assets, Business, financial condition, or results of operations of the Company, or (b) would materially and adversely impair the ability of the Selling Members to consummate the transactions described in this Agreement; provided however, that "Material Adverse Effect" does not include material adverse changes or effects on the assets, Business, financial condition or results of operations of the Company caused by events, conditions or circumstances that generally affect the economy or the industry in which the Company operate and do not affect the Company disproportionately.

"**Material Contracts**" has the meaning ascribed to such term in **Section 3.19(a)**.

"**Medicaid**" means the need-based health care program established under Title XIX of the Social Security Act.

"**Medical Waste**" means any solid or liquid waste that is generated in the diagnosis, treatment, or immunization of human beings or animals, in research pertaining thereto, or in the production or testing of biologicals, including, without limitation, blood soaked bandages; culture dishes and other glassware; discarded surgical gloves; discarded surgical instruments; discarded syringes and needles used to give shots or draw blood; blood and blood products; cultures, stocks, swabs used to inoculate cultures; removed body organs or other body tissue; human body waste; and discarded lancets.

"**Medicare**" means the health care program for individuals sixty five (65) years of age and over, certain disabled individuals, and certain individuals with end-stage renal disease established under Title XVIII of the Social Security Act.

"**Medicare Advantage**" means the health insurance program for certain individuals sixty five (65) years of age and over established under Part C of Title XVIII of the Social Security Act usually in the form of a coordinated care program and generally administered by non-governmental entities.

"**Minimum Working Capital**" has the meaning ascribed to such term in **Section 1.4(c)**.

{00863216.DOCX;2 }

271

AWNK003155

"**Net Revenue**" means, for any particular period, the sum of (i) the gross revenues generated by the Company and its Subsidiaries for services rendered or products sold less (ii) amounts paid by the Company and its Subsidiaries to physicians and other medical professionals and practices in connection with services that resulted in payments to the Company and its Subsidiaries less (iii) amounts that the Company and its Subsidiaries paid to any Person for payments of commissions and sharing of administrative fees in connection with services that resulted in payments to the Company (iv) less the costs incurred by the Buyer in connection with the acquisition of the Interests.

"**Neutral Firm**" has the meaning ascribed to such term in the definition of "**Independent Auditor**".

"**Objection Notice**" has the meaning ascribed to such term in **Section 1.5(c)**.

"**OCR**" means the Office for Civil Rights of the United States Department of Health and Human Services.

"**OIG**" means the Office of the Inspector General of the United States Department of Health and Human Services.

"**Ordinary Course of Business**" means the ordinary course of business of the Company consistent with past custom and practice (including with respect to frequency and amount).

"**Owned Intellectual Property**" has the meaning ascribed to such term in **Section 3.13(a)**.

"**Party**" or "**Parties**" has the meaning ascribed to such term in the Preamble.

"**Payables**" means all accounts payable, accrued expenses and other amounts payable of the Company, in each case whether fixed, contingent or otherwise, whether invoiced or not, and to the extent existing or accrued or required to be accrued at or as of the Closing Date, determined in accordance with GAAP or consistent with the Company's existing method of accounting and income tax reporting.

"**Pension Plan**" has the meaning ascribed to such term in **Section 3.12(b)**.

"**Period 1 Earn-Out Payment**" has the meaning ascribed to such term in **Section 1.3(a)**.

"**Period 1 Earn-Out Calculation**" has the meaning ascribed to such term in **Section 1.3(c)**.

"**Period 2 Earn-Out Calculation**" has the meaning ascribed to such term in **Section 1.3(c)**.

"**Period 2 Earn-Out Payment**" has the meaning ascribed to such term in **Section 1.3(b)**.

AWNK003156

"**Permits**" has the meaning ascribed to such term in **Section 3.17(b)**.

"**Permitted Liens**" means: (a) inchoate Liens for current taxes not yet due and payable and (b) minor Liens that have arisen in the Ordinary Course of Business (including mechanics', workers', landlords', warehousemen's, bailees', licensor's and other statutory liens (or other liens arising by operation of law) incurred in the Ordinary Course of Business for amounts not in default or being contested in good faith, and deposits or pledges to secure obligations under workmen's compensation or similar laws), which in each case and in the aggregate, are not substantial in amount, do not materially detract from the value of the assets subject thereto or materially impair the operations of the Business.

"**Person**" means an individual, corporation, partnership, limited liability company, trust or unincorporated organization or a Governmental Entity, or any other entity.

"**Personal Data**" means Protected Health Information, as defined in HIPAA.

"**Personal Property**" has the meaning ascribed to such term in **Section 3.7(a)**.

"**Pre-Closing Tax Period**" means any taxable period or portion thereof ending on or prior to the Closing Date.

"**Privacy and Security Laws** " shall mean Laws regarding collecting, accessing, using, disclosing, electronically transmitting, securing, sharing, transferring and storing Personal Data including federal, state or foreign laws or regulations regarding (a) data privacy and information security, (b) data breach notification (as applicable), (c) unfair or deceptive practices relating to data privacy and security and (d) trespass, computer crime and other Laws governing unauthorized access to or use of electronic data.

"**Privacy and Security Regulations**" means HIPAA, Title XIII HITECH, and the related regulations contained in 45 C.F.R. Parts 160 and 164.

"**Proceedings**" has the meaning ascribed to such term in **Section 3.6**.

"**Protected Health Information**" has the meaning set forth in 45 C.F.R. § 160.103.

"**Purchase Price**" has the meaning ascribed to such term in **Section 1.1**.

"**Purchase Price Allocation**" has the meaning ascribed to such term in **Section 6.3(i)**.

"**Qualified Accounts Payable**" has the meaning ascribed to such term in **Section 1.4(a)**.

"**Refundable Payment by a Client**" has the meaning ascribed to such term in **Section 1.6(a)**.

"**Reimbursable Expenses**" mean any and all expenses, including those related to automobiles, telephones, memberships, travel and entertainment, of managers, directors, officers,

{00863216.DOCX;2 }

273

AWNK003157

employees and consultants of the Company that the Company is obligated to reimburse or are of the type that the Company has generally reimbursed.

"**Required Payment**" has the meaning ascribed to such term in **Section 1.6(a)**.

"**Resolution Period**" has the meaning ascribed to such term in **Section 1.5(d)**.

"**Restricted Period**" has the meaning ascribed to such term in **Section 6.4(a)**.

"**Second Earn-Out Period**" has the meaning ascribed to such term in **Section 1.3(a)**.

"**Seller Documents**" means this Agreement and each other agreement, document or instrument to be executed or delivered by the Company, any Selling Member, or the Selling Member Representative pursuant to this Agreement, including the Kelly Employment Agreement.

"**Seller Indemnified Persons**" has the meaning ascribed to such term in **Section 7.1(b)**.

"**Selling Member**" or "**Selling Members**" has the meaning ascribed to such term in the Preamble.

"**Selling Member Representative**" has the meaning assigned to it in the Preamble.

"**Selling Party**" or "**Selling Parties**" has the meaning ascribed to such term in the Preamble.

"**Selling Parties' Knowledge**" means the actual knowledge of the Selling Members, after due inquiry with the appropriate Company personnel.

"**Software**" means any and all (i) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, (ii) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (iii) descriptions, testing scripts, schematics, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, and (iv) all documentation, including user manuals, training materials and functional specifications or similar documentation included as part of any License Agreement, relating to any of the foregoing.

"**Specified Representations**" has the meaning ascribed to such term in **Section 7.1(c)(i)**.

"**Straddle Period**" has the meaning ascribed to such term in **Section 6.3(a)**.

"**Subsidiary**" or "**Subsidiaries**" of any Person means another Person, an amount of the voting securities, other voting rights or voting membership or partnership interests of which is sufficient to elect at least a majority of its board of directors or other governing body (or, if there are no such voting interests, fifty percent (50%) or more of any class or series of capital stock or

274

AWNK003158

other partnership, joint venture, membership or other equity interest of which) is owned directly or indirectly by such first Person.

"**Tax**" or "**Taxes**" means all taxes, including (i) all federal, state, local, provincial or foreign income or franchise taxes; (ii) all gross receipts, ad valorem, value-added, goods and services, excise, real property, personal property, sales, use, transfer, withholding, employment, unemployment, insurance, social security, business license, business organization, environmental (including Taxes under Code section 59A), workers compensation, profits, license, lease, service, service use, severance, stamp, occupation, windfall profits, customs, duties, franchise, net worth, commercial profits and other taxes imposed by any Governmental Entity; (iii) any interest, penalties, assessments or additions to tax resulting from, attributable to or incurred in connection with any items listed in clauses (i) or (ii) of this paragraph; and (iv) any liability in respect of any items described in clauses (i), (ii) and/or (iii) payable by reason of contract, assumption, transferee liability, operation of law or Treasury Regulations section 1.1502-6(a) (or any predecessor or successor thereof or any similar provision under law or otherwise).

"**Tax Benefit**" means any actual reduction in Taxes payable for any year (or period) or increase in Tax refunds received for any year (or other period).

"**Tax Contest**" has the meaning ascribed to such term in **Section 6.3(f)**.

"**Tax Return**" means any return, declaration, report, statement or information return required to be filed with any Governmental Entity with respect to Taxes, including all required Schedules and other attachments thereto, and any amendments thereof.

"**Trademarks**" means all trademarks and service marks (whether registered or unregistered), trade names and designs, together with all goodwill related to the foregoing owned by or licensed to the Company.

"**Transaction Expenses**" means the sum of the fees and expenses of third parties (such as accountants, lawyers, consultants or other outside advisors) incurred by the Company arising or resulting from the transactions described in this Agreement, which remain outstanding as of the Closing Date.

"**Transaction Regulations**" means 45 C.F.R. Parts 160 and 162.

"**Transaction Tax Items**" means any payments relating to (i) the repayment of Indebtedness, (ii) any Transaction Expenses, (iii) any Payables and (iv) any indemnification payments made by the Selling Members under this Agreement.

"**UCC**" has the meaning ascribed to such term in **Section 1.4(b)**.

"**Websites**" has the meaning ascribed to such term in **Section 3.13(g)**.

275

AWNK003159

# ARTICLE 9

## MISCELLANEOUS

Section 9.1    <u>Waiver.</u>  Any failure of any of the Selling Parties to comply with any of their obligations or agreements herein contained may be waived only in writing by Buyer. Any failure of Buyer to comply with any of its obligations or agreements herein contained may be waived only in writing by the Selling Member Representative. No waiver granted hereunder shall be deemed a waiver of any subsequent breach or default of the same or similar nature.

Section 9.2    <u>Notices.</u>  All notices, requests, demands and other communications provided for hereunder shall be in writing and directed to each applicable party at the address set forth hereafter or at such other address as to which such party may inform the other parties in writing in compliance with the terms of this Section:

If to Selling Parties, then to:                    [____]

with a copy (which shall not constitute notice) to:    [____]

    (a)    If to Buyer, then to:        Physicians Healthcare Network
Management, LLC
c/o Robinson Brog Leinwand et al.
875 Third Avenue
9th Floor
New York, New York 10022

with a copy (which shall not constitute notice) to:    Robinson Brog Leinwand et al.
875 Third Avenue
9th Floor
New York, New York 10022
Attention: A. Mitchell Greene, Esq.

Notices shall be deemed properly delivered and received (i) if personally delivered, upon receipt thereof, (ii) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid; or (iii) if sent by a commercial overnight courier for delivery on the next Business Day, on the first Business Day after deposit with such courier for delivery. In this Section, "notice" includes any demand or request permitted or required under this Agreement.

{00863216.DOCX;2 }

276

AWNK003160

### Section 9.3    Appointment of Selling Member Representative.

[____] is hereby appointed, authorized and empowered to act as a representative, for the benefit of the Selling Members (the "**Selling Member Representative**"), as the exclusive agent and attorney-in-fact to act on behalf of each Selling Member, in connection with and to facilitate the consummation of the transactions contemplated hereby, which shall include the power and authority:

(a)    to interpret the terms and provisions of this Agreement;

(b)    to execute and deliver such waivers and consents in connection with this Agreement and the consummation of the transactions contemplated hereby as the Selling Member Representative, in her sole discretion, may deem necessary or desirable;

(c)    to enforce and protect the rights and interests of the Selling Members arising out of or under or in any manner relating to this Agreement, and each other agreement, document, instrument or certificate referred to herein or therein or the transactions provided for herein or therein (including, payments following the Closing, if any, pursuant to **Sections 1.3, 1.4 and 1.**5, and in connection with any and all claims for indemnification brought under **Article 7** hereof) and to take any and all actions which the Selling Member Representative believes are necessary or appropriate under this Agreement for and on behalf of the Selling Members;

(d)    to negotiate and compromise any dispute that may arise under this Agreement or the related agreements, and to sign any releases or other documents with respect to any such dispute; and

(e)    to make, execute, acknowledge, deliver and receive all such other agreements, guarantees, orders, receipts, endorsements, notices, requests, instructions, certificates, stock powers, letters and other writings, and, in general, to do any and all things and to take any and all action that the Selling Member Representative, in its sole and absolute discretion, may consider necessary or proper or convenient in connection with or to carry out the transactions contemplated by this Agreement and all other agreements, documents or instruments referred to herein or therein or executed in connection herewith and therewith.

Buyer shall have the right to rely upon all actions taken or omitted to be taken by the Selling Member Representative pursuant to this Agreement, all of which actions or omissions shall be legally binding upon the Selling Members. The grant of authority provided for herein (i) is coupled with an interest and shall be irrevocable and survive the bankruptcy or liquidation of any Selling Member; and (ii) shall survive the consummation of the transactions contemplated by this Agreement. All decisions and actions by the Selling Member Representative, including without limitation any agreement between the Selling Member Representative and the Buyer relating to indemnification obligations of the parties under this Agreement, including the defense or settlement of any claims and the making of payments with respect hereto, shall be binding upon all of the Selling Members, and no Selling Member shall have the right to object, dissent, protest or otherwise contest the same. The Selling Members shall indemnify the Selling Member Representative with respect to any action taken or suffered by the Selling Member Representative in reliance upon any notice, direction, instruction, consent, statement or other documents believed by it to be genuinely and duly authorized, nor for any other action or inaction with respect to the

{00863216.DOCX;2 }

277

AWNK003161

indemnification obligations of the parties under this Agreement, including the defense or settlement of any claims and the making of payments with respect thereto, except to the extent resulting from the Selling Member Representative's own willful misconduct or gross negligence. The Selling Member Representative may, in all questions arising under this Agreement and the Exhibits, rely on the advice of counsel, and for anything done, omitted or suffered in good faith by the Selling Member Representative, the Selling Member Representative shall not be liable to the Selling Members.

Section 9.4    <u>Governing Law; Consent to Jurisdiction and Waiver of Jury Trial.</u>

(a)    This Agreement shall be governed by and construed in accordance with the internal substantive laws, and not the choice of law rules, of the State of New York.

(b)    Each of the Parties irrevocably submits to the exclusive jurisdiction of the United States District Court for the Southern District of New York located in New York County, State of New York, or if such court does not have jurisdiction, the state courts of the State of New York located in New York County for the purposes of any suit, action or other proceeding arising out of this Agreement or any transaction contemplated hereby. Each of the Parties hereto irrevocably and fully waives the defense of an inconvenient forum to the maintenance of such suit, action or proceeding. Each of the Parties further agrees that service of any process, summons, notice or document to such Party's respective address listed above in one of the manners set forth in **Section 9.2** hereof shall be deemed in every respect effective service of process in any such suit, action or proceeding; provided that with respect to this **Section 9.4(b)** only, any such notice solely sent in accordance with **Section 9.2** shall be deemed given only if and when actually received by the other Party. Nothing herein shall affect the right of any Person to serve process in any other manner permitted by Law. Each of the Parties hereto irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement or the transactions contemplated hereby in either of the courts named in this subsection and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum. The Parties hereto hereby irrevocably and unconditionally waive trial by jury in any legal action or proceeding relating to this Agreement or any other agreement entered into in connection therewith and for any counterclaim with respect thereto. Notwithstanding the preceding, the Parties may subsequently agree in writing that any such proceeding may be brought and maintained in any other court sitting in the United States that has jurisdiction.

(c)    The Parties further agree that should any dispute arise between the parties pursuant to this Agreement, the losing party in any action shall be responsible for paying the winning party's reasonable attorney fees.

Section 9.5    <u>Counterparts.</u>  This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. Execution and delivery of this Agreement by delivery of a facsimile or electronically recorded copy in .pdf file or similar format bearing a copy of the signature of a Party shall constitute a valid and binding execution and delivery of this Agreement by such Party. Such copies shall constitute enforceable original documents.

{00863216.DOCX;2 }

AWNK003162

Section 9.6    Headings.  The section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 9.7    Entire Agreement.  This Agreement, including the Exhibits and Schedules hereto and the documents referred to herein, embodies the entire agreement and understanding of the Parties in respect of the subject matter contained herein other than the Confidentiality Agreement. This Agreement supersedes all prior agreements and understandings between the Parties with respect to the subject matter hereof other than the Confidentiality Agreement.

Section 9.8    Amendment and Modification.  This Agreement may be amended or modified only by written agreement of the Selling Member Representative and Buyer.

Section 9.9    Binding Effect; Benefits.  This Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns; nothing in this Agreement, express or implied, is intended to confer on any Person other than the Parties and their respective successors and permitted assigns (and, to the extent provided in **Section 7.1**, the other Buyer Indemnified Parties and Seller Indemnified Parties) any rights, remedies, obligations or liabilities under or by reason of this Agreement.

Section 9.10    Joint Drafting.    The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

Section 9.11    Severability.  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable Law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement so long as the economic or legal substance of the transactions described in in this Agreement is not affected in any manner materially adverse to any Party.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible to the fullest extent permitted by applicable Law in an acceptable manner to the end that the transactions described in this Agreement are fulfilled to the extent possible.

Section 9.12    Interpretation.  When a reference is made in this Agreement to an Article, Section, Schedule, or Exhibit, such reference will be to an Article or Section of, or a Schedule or Exhibit to, this Agreement unless otherwise indicated. Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation." The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement will refer to this Agreement as a whole and not to any particular provision of this Agreement. All terms used herein with initial capital letters have the meanings ascribed to them herein and all terms defined in this Agreement will have such

279

defined meanings when used in any certificate or other document made or delivered pursuant hereto unless otherwise defined therein. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such term. Unless otherwise indicated, any agreement, instrument or statute defined or referred to herein, or in any agreement or instrument that is referred to herein, means such agreement, instrument or statute as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes and references to all attachments thereto and instruments incorporated therein. References to a Person are also to its successors and permitted assigns.

Section 9.13  <u>Assignability</u>.  This Agreement shall not be assignable by any Party hereto without the prior written consent of the other Parties; provided that Buyer (a) may grant a security interest in its rights under this Agreement to its lenders as security for Buyer's obligations to such lenders (and such lenders may exercise their rights and remedies with respect to such security interest), (b) may assign its rights under the Agreement to any Affiliate of Buyer and (c) may assign its rights to indemnity, in whole or in part, to any Person that acquires an interest in Buyer or a material portion of its assets or the Business. Notwithstanding any assignment by Buyer described in clauses (b) and (c) of the proviso in the previous sentence of this Section, Buyer shall remain liable under this Agreement jointly and severally with the assignee. No such assignment shall be a novation of Buyer's obligations under this Agreement.

Section 9.14  <u>Attorneys' Fees</u>.  If any Party hereto defaults in the performance of any of its obligations under this Agreement or if any dispute arises between Parties hereto concerning the meaning or interpretation of any provision of this Agreement, then the defaulting Party or the Party not prevailing in such dispute, as the case may be, shall pay any and all costs and expenses incurred by the other Party or Parties on account of such default and/or in enforcing or establishing its rights hereunder, including, without limitation, court costs (including costs of any trial or appeal therefrom), and reasonable attorneys' fees and disbursements.

Section 9.15  <u>Specific Performance.</u>  The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that each Party shall be entitled to an injunction or injunctions to prevent breaches of this Agreement (without any obligation of such Party to post any bond or other surety in connection therewith) and to enforce specifically the terms and provisions of this Agreement in addition to any other remedy to which such Party may be entitled at law or in equity.

Section 9.16  <u>Continuing Counsel.</u>  The Buyer hereby acknowledges that [___] has acted as counsel to the Company with respect to this Agreement and the transactions contemplated hereby. The following provisions apply to the attorney-client relationship between [___] and the Company following the Closing. The Buyer hereby agrees that (a) it will not seek to disqualify [___] from acting and continuing to act as counsel to the Selling Members or the Selling Member Representative either in the event of a dispute hereunder or in the course of the defense or prosecution of any claim relating to this Agreement or the transactions contemplated hereby, and (b) the Company has a reasonable expectation of privacy with respect to their communications (including any communications using the Company's computer and email

AWNK003164

systems and servers) with [___] prior to the Closing to the extent that such communications relate to this Agreement or the transactions contemplated hereby. The Buyer agrees that it will respect the confidentiality and privileged nature of all such communications between [___] and the Company, and the Buyer agrees that it will not seek discovery of any such communications or otherwise claim any right of access or use to any such communications to the extent so privileged. The Selling Parties hereby acknowledge that Robinson Brog Leinwand Greene Genovese & Gluck PC has acted as counsel to the Buyer with respect to this Agreement and the transactions contemplated hereby. The Selling Parties hereby agree that they will not seek to disqualify Robinson Brog Leinwand Greene Genovese & Gluck PC from acting and continuing to act as counsel to the Buyer or the Company either in the event of a dispute hereunder or in the course of the defense or prosecution of any claim relating to this Agreement or the transactions contemplated hereby.

*[Remainder of Page Intentionally Left Blank; Signature pages Follow]*

{00863216.DOCX;2 }

281

AWNK003165

IN WITNESS WHEREOF, the parties hereto have duly executed this Membership Interests Purchase Agreement as of the date first above written.

PHYSICIANS HEALTHCARE NETWORK MANAGEMENT SOLUTIONS, LLC

By: _____
      Name:
      Title:

OBJECTTECH HOLDINGS, LLC

By: _____
      Name: Arvind Walia
      Title:  Member

_____
[____] _____

_____
[____] _____

_____
[____] _____

AWNK003166

## ASSIGNMENT OF MEMBERSHIP INTEREST

FOR VALUE RECEIVED, the undersigned ("Assignor") hereby sells, assigns, transfers, grants and conveys unto PHYSICIANS HEALTHCARE NETWORK MANAGEMENT SOLUTIONS, LLC, a Delaware limited liability company, all of Assignor's right, title and interest in OBJECTTECH HOLDINGS, LLC., a New York limited liability company (the "Company"), standing in her name on the books said Company, together with all of her rights, powers and obligations arising thereunder and does hereby irrevocably constitute and appoint the Secretary of the Company as attorney-in-fact to transfer said interest on the books of the Company with full power and substitution in the premises.

IN WITNESS WHEREOF, the undersigned has executed this instrument as of the ___, day of June, 2017.

_____

_____

[___]

AWNK003167

## ASSIGNMENT OF MEMBERSHIP INTEREST

FOR VALUE RECEIVED, the undersigned ("Assignor") hereby sells, assigns, transfers, grants and conveys unto PHYSICIANS HEALTHCARE NETWORK MANAGEMENT SOLUTIONS, LLC, a Delaware limited liability company, all of Assignor's right, title and interest in OBJECTTECH HOLDINGS, LLC., a New York limited liability company (the "Company"), standing in her name on the books said Company, together with all of her rights, powers and obligations arising thereunder and does hereby irrevocably constitute and appoint the Secretary of the Company as attorney-in-fact to transfer said interest on the books of the Company with full power and substitution in the premises.

IN WITNESS WHEREOF, the undersigned has executed this instrument as of the __, day of June, 2017.

[___]

{00863216.DOCX;2 }{00863216.DOCX;2 }{00863216.DOCX;2 }{00863216.DOCX;2 }{00863216.DOCX;2 }

3

AWNK003168

## ASSIGNMENT OF MEMBERSHIP INTEREST

FOR VALUE RECEIVED, the undersigned ("Assignor") hereby sells, assigns, transfers, grants and conveys unto PHYSICIANS HEALTHCARE NETWORK MANAGEMENT SOLUTIONS, LLC, a Delaware limited liability company, all of Assignor's right, title and interest in OBJECTTECH HOLDINGS, LLC., a New York limited liability company (the "Company"), standing in her name on the books said Company, together with all of her rights, powers and obligations arising thereunder and does hereby irrevocably constitute and appoint the Secretary of the Company as attorney-in-fact to transfer said interest on the books of the Company with full power and substitution in the premises.

IN WITNESS WHEREOF, the undersigned has executed this instrument as of the __, day of June, 2017.

_____

[_____]

# EXHIBIT 6

**JPMorganChase** ⬡

**RCO Centralized Mail**
**Mail Code LA4-7300**
**700 Kansas Lane**
**Monroe, LA 71203-4774**

9/14/2021

JEFFREY P NOLAN
PACHULSKI STANG ZIEHL & JONES LLP
10100 SANTA MONICA BLVD 13TH FLOOR
LOS ANGELES CA 90067

**NOTICE OF ADDRESS CHANGE:** Please note that as of August 2, 2021, all mail previously managed in our Indianapolis, IN, or Fort Worth, TX, facility will be managed by our centralized mail processing team in Monroe, LA.

Please update your mailing address records to the following:
RCO Centralized Mail
Mail Code: LA4-7300
700 Kansas Lane
Monroe, LA 71203-4774

Should you have questions regarding this Notice of Change, please contact us at 1-844-751-7728. We accept operator relay calls.

**Case Name: HOWARD M EHRENBERG IN HIS CAPACITY AS LIQUIDATING TRUSTEE OF ORION HEALTHCORP INC ET AL V. ARVIN WALIA NIKNIM MANAGEMENT INC**
**Case No.: 20-08049 (AST)**
**JPMorgan Chase File No.: SB1259488-F1**

Dear Sir/Madam:

Here is the information that fulfills your request on the matter referenced above.

If you have questions, please call us at 1-844-751-7728. We're here to help Monday through Friday from 8:30 a.m. to 7:00 p.m. Eastern Time. Please know that we are only able to provide a status of this request. We can't verbally disclose further information related to the records and/or information provided.

Please notify our office immediately of any email address changes to avoid electronic delivery delays for future productions.

Sincerely,

Leah Lucas
Operations Manager, VP
Chase Customer Service

JPMorgan Chase Bank, N.A. Member FDIC
SUBP17

EHREN-NIKNIM CHASE 000001



## DECLARATION

### Case No. : 20-08049 (AST)

Desiree Kelley, certifies and declares as follows:

1. I am over the age of 18 years and not a party to this action.

2. My business address is 14800 Frye Road, Fort Worth, Texas 76155.

3. I am a Transactions Specialist III and Custodian of Records for JPMorgan Chase Bank, N.A. (hereinafter referred to as the "Bank") in the National Subpoena Processing Department located in Fort Worth, Texas.

4. Based on my knowledge of the Bank's business records practices and procedures, the enclosed records are a true and correct copy of the original documents kept by the Bank in the ordinary course of business.

5. Based on my knowledge of the Bank's business records practices and procedures, the records were made at or near the time of the occurrence of the matters set forth in the records by, or from information transmitted by a person with knowledge of those matters.

6. It is the regular practice of the Bank to make such a record of transactions in the ordinary course of business.

I declare under penalty of perjury, under the laws of the State of Texas, that the foregoing is true and correct.

Dated: 9/14/2021

By: Desiree Kelley
Desiree Kelley
Transactions Specialist III
JPMORGAN CHASE BANK, N.A.

SB1259488-F1

SUBP52a



EHREN-NIKNIM CHASE 000002

**NIKNIM MANAGEMENT INC.**
27 KETTLEPOND RD
JERICHO, NY 11753-1157

4214

1-2/210

DATE 06/29/11

PAY TO THE
ORDER OF    Cash.                    $ 500/-

Five Hundred —— 00/100    DOLLARS

**CHASE** ⬡
JPMorgan Chase Bank, N.A.
www.Chase.com

MEMO                                    MP

⑆O 210000 21⑆    76035    ⑆4214

ENDORSE HERE

DO NOT WRITE, STAMP OR SIGN BELOW THIS LINE
RESERVED FOR FINANCIAL INSTITUTION USE

EHREN-NIKNIM CHASE 000172



NIKNIM MANAGEMENT INC.
27 KETTLEPOND RD
JERICHO, NY 11753-1157

9783

1-2/210

DATE July 6/17

PAY TO THE
ORDER OF    Cash —    $ 750/—

Seven hundred and fifty Dollars    DOLLARS

CHASE
JPMorgan Chase Bank, N.A.
www.Chase.com

MEMO    Elizabeth for 2 weeks

⑈:0 2 10000 2 1⑈    7 6 0 3 5    ⑈9 7 8 3

ENDORSE HERE

DO NOT WRITE, STAMP OR SIGN BELOW THIS LINE
RESERVED FOR FINANCIAL INSTITUTION USE

EHREN-NIKNIM CHASE 000173

291

**NIKNIM MANAGEMENT INC.**
27 KETTLEPOND RD
JERICHO, NY 11753-1157

4691

1-2/210

DATE 6 / 19 / 17

PAY TO THE
ORDER OF  _Catherine Brickell Music_  | $ 390 | —

_three hundred and ninety dollars_  DOLLARS

**CHASE** 🅾
JPMorgan Chase Bank, N.A.
www.Chase.com

MEMO Vocal lesson

⑈021000021⑈    76035    ⑈4691

For Deposit Only - JPMC

EHREN-NIKNIM CHASE 000174



EHREN-NIKNIM CHASE 000175



EHREN-NIKNIM CHASE 000179



ENDORSE HERE
FOR LOCKBOX DEPOSIT
ONLY: NAI LI

THE FIRST NATIONAL BANK
OF LI
07/07/2017
GLEN HEAD  NY

NIKNIM MANAGEMENT INC.
27 KETTLEPOND RD
JERICHO, NY 11753-1157
4211
1-2/210

DATE  June 21.17

PAY TO THE
ORDER OF  Hamlet estates/Senders                  $ 1510

One thousand five hundred and ten

CHASE
JPMorgan Chase Bank, N.A.
www.Chase.com

MEMO  Dues for the Mail

⑆ 0000120⑆  75035  1124

DEPOSIT TICKET

**NIKNIM MANAGEMENT INC.**
27 KETTLEPOND RD
JERICHO, NY 11753-1157

DATE 02/3/12
DEPOSITS MAY NOT BE AVAILABLE FOR IMMEDIATE WITHDRAWAL

SIGN HERE FOR CASH RECEIVED (IF REQUIRED) ★

**CHASE** ⬤
JPMorgan Chase Bank, N.A.
www.Chase.com

☑ ☐ CASH ►

1-2/210

► 2465.04
  368.81

TOTAL FROM
OTHER SIDE ►

SUB TOTAL ►

LESS CASH
RECEIVED ►

$ 2833.85

⑈580 20 10 28⑈     76035

EHREN-NIKNIM CHASE 000180



**NIKNIM MANAGEMENT INC.**
27 KETTLEPOND RD
JERICHO, NY 11753-1157

4688

3-2/210

DATE June 19 17

PAY TO THE
ORDER OF ___ Cash ___                    $ 1000

One thousand Dollars ___    DOLLARS

**CHASE**
JPMorgan Chase Bank, N.A.
www.Chase.com

MEMO Kelly 600 (Ranju)

⑆021000021⑆      76035      ⑈4688

EHREN-NIKNIM CHASE 000183

**NIKNIM MANAGEMENT INC.**
27 KETTLEPOND RD
JERICHO, NY 11753-1157

5089

DATE July 18 17

PAY TO THE
ORDER OF _Cash_ $ 1160

One thousand one hundred and Sixty DOLLARS

**CHASE**
JPMorgan Chase Bank, N.A.
www.Chase.com

MEMO

⑆021000021⑆    76035    ⑈5089

549447310336 152052    20170717 000000000076035
TRN_DEBIT    NREYESL    1160
Jackson Heights 0494    94004 5494 12 0195

EHREN-NIKNIM CHASE 000184



**NIKNIM MANAGEMENT INC.**
27 KETTLEPOND RD
JERICHO, NY 11753-1157

5090

2/210

DATE July/12/17

PAY TO THE
ORDER OF  Dr Parisi                    $ 151.50

One hundred one Dollars one dollar and 50 cents DOLLARS

**CHASE**
JPMorgan Chase Bank, N.A.
www.Chase.com

MEMO  Doctor

⑆021000021⑈    76035    5090

582228554160 172529    20170717 00000000760035
TRN_DEBIT    IRESTRE    15150
Old Brookville 0822    94004 5822 4   0118

Mary S. Parisi, MD

TD Ba

> The Order Of
Old Brookville, NY

EHREN-NIKNIM CHASE 000185

**NIKNIM MANAGEMENT INC.**
27 KETTLEPOND RD
JERICHO, NY 11753-1157

5086

1-2/210

DATE _July/12/17_

PAY TO THE
ORDER OF _____Cash—_____ $ _235/ _

_Two hundred and thirty five_ DOLLARS 🔒

**CHASE** ⬡
JPMorgan Chase Bank, N.A.
www.Chase.com

MEMO _Sabn_

⑆021000021⑆        76035        5086

TD Mobile Deposit
7/18/2017 7:24:03 AM

EHREN-NIKNIM CHASE 000186



**NIKNIM MANAGEMENT INC.**
27 KETTLEPOND RD
JERICHO, NY 11753-1157

5087

1-7/210

DATE July 17 17

PAY TO THE
ORDER OF     TemPco                    $ 1466/44

One thousand and Four Hundred Sixty-Six 44/Cents     DOLLARS

**CHASE**
JPMorgan Chase Bank, N.A.
www.Chase.com

MEMO  Air Conditioner

⑆021000021⑆     76035     ⑈5087

FOR DEPOSIT ONLY
TEMPCO, INC.
819482277

**NIKNIM MANAGEMENT INC.**
27 KETTLEPOND RD
JERICHO, NY 11753-1157

5088
1-2/210

DATE 07/21/17

PAY TO THE
ORDER OF    Cash

$ 3000/—

DOLLARS

**CHASE**
JPMorgan Chase Bank, N.A.
www.Chase.com

MEMO

⑈0210000 2⑈    76035    ⑈ 5088

EHREN-NIKNIM CHASE 000188

302



**NIKNIM MANAGEMENT INC.**
27 KETTLEPOND RD
JERICHO, NY 11753-1157

5085

1-2/210

DATE 7/10/17

PAY TO THE
ORDER OF  Kathryn Brickell Music      | $ 520/—

Five hundred and twenty dollars  DOLLARS

**CHASE** ⬤
JPMorgan Chase Bank, N.A.
www.Chase.com

MEMO  Music Lesson

⑆021000021⑆      76035      ⑈5085

MP

For Deposit Only - JPMC

EHREN-NIKNIM CHASE 000189



NIKNIM MANAGEMENT INC.
27 KETTLEPOND RD.
CHO, NY 11753-1157

⑈580 20 10 28⑈    7603!

EHREN-NIKNIM CHASE 000190

*charles* SCHWAB
211 Main Street, San Francisco, CA 94105

Bank of America
Commercial Disbursement Account
Northbrook, IL

No **6916671**

70-2328
0719

Pay:
***THREE DOLLARS THIRTY CENTS***

Date: 07/19/2017

To The Order Of:
A WALIA & Y VIRK TTEE
JANAMINDER VIRK IRREVOCABLE TR

**PAY**

$3.30

Present For Payment Within 180 Days

⑆6916671⑆ ⑈071923⑉ 87651⑈011041⑆

DST 00000275 CHK59774-00

EHREN-NIKNIM CHASE 000195

1002

**NIKNIM MANAGEMENT INC.**
27 KETTLEPOND RD.
JERICHO, NY 11753-1157

1-2/210

DATE 07/30/12

PAY
TO THE
ORDER OF_____ Cash. _____ $ 1360

One Thousand Three Hundred Sixty ——00/100 DOLLARS

**CHASE**
JPMorgan Chase Bank, N.A.
www.Chase.com

FOR_____

⑆00100 2⑆ ⑈02 100002 1⑈    76035

ENDORSE HERE

K. Shapes

CHECK HERE AFTER MOBILE OR REMOTE DEPOSIT

DATE ____
DO NOT WRITE, STAMP OR SIGN BELOW THIS LINE
RESERVED FOR FINANCIAL INSTITUTION USE

EHREN-NIKNIM CHASE 000196





EHREN-NIKNIM CHASE 000197

# EXHIBIT 7

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| ORION HEALTHCORP, INC[1]. | : Case No. 18-71748 (AST) |
| | : |
| _____ Debtors. _____ | : (Jointly Administered) |
| | : |
| HOWARD M. EHRENBERG IN HIS | : |
| CAPACITY AS LIQUIDATING TRUSTEE OF | : Adv. Pro. No. 20-08049 (AST) |
| ORION HEALTHCORP, INC., ET AL., | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| ARVIND WALIA; NIKNIM MANAGEMENT | : |
| INC., | : |
| | : |
| | : |
| _____ Defendant. _____ | : |

------------------------------------

## ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
## AGAINST DEFENDANTS ARVIND WALIA AND NIKNIM MANAGEMENT INC.

The Court, having considered the *Motion for Summary Judgment, or in the Alternative*

*Summary Adjudication as Against Defendants Arvind Walia and Niknim Management Inc.*, ("the

---

1 The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Orion Healthcorp, Inc. (7246); Constellation Healthcare Technologies, Inc. (0135); NEMS Acquisition, LLC (7378); Northeast Medical Solutions, LLC (2703); NEMS West Virginia, LLC (unknown); Physicians Practice Plus Holdings, LLC (6100); Physicians Practice Plus, LLC (4122); Medical Billing Services, Inc. (2971); Rand Medical Billing, Inc. (7887); RMI Physician Services Corporation (7239); Western Skies Practice Management, Inc. (1904); Integrated Physician Solutions, Inc. (0543); NYNM Acquisition, LLC (unknown) Northstar FHA, LLC (unknown); Northstar First Health, LLC (unknown); Vachette Business Services, Ltd. (4672); Phoenix Health, LLC (0856); MDRX Medical Billing, LLC (5410); VEGA Medical Professionals, LLC (1055); Allegiance Consulting Associates, LLC (7291); Allegiance Billing & Consulting, LLC (7141); New York Network Management, LLC (7168). The corporate headquarters and the mailing address for the Debtors listed above is 1715 Route 35 North, Suite 203, Middletown, NJ 07748.

**Motion**") [Docket No. __] dated January __, 2023 of Plaintiff, Howard M. Ehrenberg in his capacity as Liquidating Trustee of Orion Healthcorp, Inc., *et al*., (the "**Plaintiff**" or the "**Liquidating Trustee**") seeking entry of judgment against Defendants Arvind Walia and Niknim Management Inc. (the "**Defendant**"); the accompanying *Joint Statement Of Uncontroverted Facts; Plaintiff's Statement Of Additional Uncontroverted Facts In Support Of Motion For Summary Judgment* [Docket No. __]*; Affidavit Of Jeff Nolan In Support Of Plaintiff's Motion For Summary Judgment* [Docket  No. __]*; Affidavit Of Edith Wong In Support Of Plaintiff's Motion For Summary Judgment* [Docket No. __]*; Request For Judicial Notice In Support Of Plaintiff's Motion For Summary* [Docket No. __]; and the Court having duly considered the argument of counsel at the Hearing; and the Court having determined that the legal and factual bases set forth in the Motion and all pleadings filed by the Trustee in support of the Motion establish sufficient cause for the relief requested in the Motion; and after due deliberation thereon; and good and sufficient cause appearing therefor as stated on the record at the Hearing to Issue Ruling on Plaintiff's Motion [Docket No. __] (the "**Ruling Hearing**"); and upon sufficient cause appearing therefore;

      IT IS HEREBY ORDERED, ADJUDGED AND DECREED that:

      1.    The Motion is granted with respect to the Plaintiff's First Cause of Action to Avoid an Intentionally Fraudulent Transfer under 11 U.S.C. §§544 and 548(a)(1)(A) and N.Y. Debtor and Creditor Law §276 as stated in particular on the record at the Ruling Hearing.  The evidence indicates the $4,020,000.00 Transfer ("Transfer") was an interest of the Debtors in property made by the Debtors to Defendants with actual fraudulent intent to misstate the transactions and thereby place those funds beyond the reach of legitimate creditors of the Debtors.

2.      The Motion is granted with respect to the Plaintiff's Second Cause of Action to Avoid a Constructively Fraudulent Transfer under 11 U.S.C. §544 and N.Y. Debtor and Creditor Law §§272-275, and §273-a, as against Defendants, as the Transfers of $4,020,000.00 to Defendants was not made in good faith or for fair consideration to the Debtors as stated in particular on the record of the Ruling Hearing.

3.      Judgment is issued in favor of Plaintiff against Defendants *Arvind Walia and Niknim Management Inc*. jointly and individually, in the total amount of $4,020,000.00, plus post judgment interest in accordance with the federal rate.

4.      The Bankruptcy Court retains jurisdiction to enforce and implement the respective terms and provisions of this judgment and any request for fees or costs.

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| ORION HEALTHCORP, INC.[1] | : Case No. 18-71748 (AST) |
| | : |
| Debtors. | : (Jointly Administered) |

---------------------------------------------

| | |
|---|---|
| HOWARD M. EHRENBERG IN HIS CAPACITY | : |
| AS LIQUIDATING TRUSTEE OF ORION | : Adv. Pro. No. 20-08049 (AST) |
| HEALTHCORP, INC., ET AL., | : |
| | : [Joint Statement of Uncontroverted |
| Plaintiff, | : Facts and Additional Separate |
| | : Statement of Facts, Affidavits Jeffrey |
| | : P. Nolan, Frank Lazzara and Request |
| v. | : For Judicial Notice Filed |
| | : Concurrently Herewith] |
| ARVIND WALIA AND NIKNIM MANAGEMENT, | : |
| INC. | : |
| | : |
| Defendants. | : |
| | : |

---------------------------------------------

## AFFIDAVIT OF EDITH WONG IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, SUMMARY ADJUDICATION AS AGAINST DEFENDANTS ARVIND WALIA AND NIKNIM MANAGEMENT, INC.

| | |
|---|---|
| STATE OF NEW JERSEY | ) |
| | ) |
| COUNTY OF BERGEN | ) |

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Orion Healthcorp, Inc. (7246); Constellation Healthcare Technologies, Inc. (0135); NEMS Acquisition, LLC (7378); Northeast Medical Solutions, LLC (2703); NEMS West Virginia, LLC (unknown); Physicians Practice Plus Holdings, LLC (6100); Physicians Practice Plus, LLC (4122); Medical Billing Services, Inc. (2971); Rand Medical Billing, Inc. (7887); RMI Physician Services Corporation (7239); Western Skies Practice Management, Inc. (1904); Integrated Physician Solutions, Inc. (0543); NYNM Acquisition, LLC (unknown) Northstar FHA, LLC (unknown); Northstar First Health, LLC (unknown); Vachette Business Services, Ltd. (4672); Phoenix Health, LLC (0856); MDRX Medical Billing, LLC (5410); VEGA Medical Professionals, LLC (1055); Allegiance Consulting Associates, LLC (7291); Allegiance Billing & Consulting, LLC (7141); New York Network Management, LLC (7168). The corporate headquarters and the mailing address for the Debtors listed above is 1715 Route 35 North, Suite 303, Middletown, NJ 07748.

Edith Wong, being duly sworn, deposes and says:

1.      I am a Managing Director within the Forensic and Litigation Consulting group at FTI Consulting ("FTI") and a Certified Public Accountant ("CPA") in the state of New York. I have more than 16 years of experience in forensic accounting investigations. The facts stated herein are of my own personal knowledge. If called upon as a witness to any facts set forth herein, I could and would competently testify thereto.

2.      I make this Affidavit in support of the accompanying *Motion For Summary Judgment, or in the Alternative Summary Adjudication, Against Defendants Arvind Walia and Niknim Management, Inc.* (the "Motion").[2]

3.      In September 2017, FTI was retained in connection with investigative and advisory services regarding Constellation Healthcare Technologies, Inc. ("CHT"). I was part of a team of FTI professionals (the "FTI Investigative Team") who, in conjunction with Debtors' counsel, conducted an investigation of the financial condition and business operations of CHT. In connection with the investigation, the FTI Investigative team was granted access to the records of the Debtors including, bank statements, accounts payable, accounts receivables, vendor files, customer files, financial systems and email communications of the Debtors' employees. I am familiar with the server which houses or maintains records within the Debtor's files in an electronic format having utilized it as part of my duties. As such, I am personally familiar with the Debtors' book and records.

4.      Paul Parmjit Parmar, aka Paul Parmar, was the Chief Executive Officer of the Debtor, Constellation Healthcare Technologies, Inc., a consolidated enterprise which

---

[2] Capitalized terms not otherwise defined herein have the same meaning ascribed to them in the Motion.

operated in the healthcare sector primarily in revenue and practice management for physician practices.

5.      The Debtor CHT maintained corporate bank accounts at M&T Bank. Attached to this Affidavit as **Exhibits A and B,** are true and correct copies of M&T Bank Statements for February 2016 and August 2016, respectively, of the Debtor CHT (Ex. A, Ehren-Walia 00138-140; 00147-148) as maintained and located within the business records of the Debtors. On February 19, 2016, $5,058,408.81, was transferred out of the Debtor CHT bank account (Ex. A, Ehren-Walia 00138) Again, On August 10, 2016, $12,740,000 was transferred out of the Debtor CHT bank account to the IOLA account. (Ex. B, Ehren-Walia 00147)

6.      The Debtor Orion Healthcorp Inc. maintained corporate bank accounts one of which was at JP Morgan Chase Bank, N.A.  Attached to this Affidavit as **Exhibit C,** is a true and correct copy of the March 2017, JP Morgan Chase Bank, N.A. bank statement of the Debtor Orion Healthcorp, Inc. with JP Morgan Chase Bank, N.A. as maintained and located within the business records of the Debtors.  (Ex. C, Ehren-Walia 00149-154) On March 10, 2017, $5,590,000 was transferred out of the Debtor Orion bank account to the IOLA Account. (Ex. C, Ehren-Walia 00152)

7.      Attached to this Affidavit as **Exhibit D** is a true and correct copy of an email chain from Paul Parmar dated December 1, 2014 (Ex. D, Ehren-Walia 005138-5140) as maintained and located within the business records of the Debtors.

8.      Attached to this Affidavit as **Exhibit E** are true and correct copies of correspondence dated February 20, 2015 (Ehren-Walia 005141) as maintained and located within the business records of the Debtors.

9.    Attached to this Affidavit as **Exhibit F** is are true and correct copy of the Asset Purchase Agreement made and entered as of March [ ], 2015 (Ehren-Abruzzi 000002-000076, as maintained and located within the business records of the Debtors and marked at the deposition of Walia as Ex. 1.

10.    Attached to this Affidavit as **Exhibit G** is a true and correct copy of Disbursement Authorization and Itemization Form Re: Sale Of Porteck Corporation (Ehren-Walia 000084-85 as maintained and located within the business records of the Debtors.

11.    Attached to this Affidavit as **Exhibit H,** is a true and correct copy of an email dated May 17, 2017 from Ted Brindamour to Arvind Walia and Paul Parmar with AllRad Direct Due Diligence Findings [Draft Report] dated May 18, 2017 (Ehren-Walia 003966-00402) as maintained and located within the business records of the Debtors.

12.    Attached to this Affidavit as **Exhibit I** is a true and correct copy of the multiple email exchange dated May 18, 2017 from Arvind Walia to Parmar and Zaharis (Ehren-Walia 003977-3988) as maintained and located within the business records of the Debtors.

13.    Attached to this Affidavit as **Exhibit J** is an email exchange between Parmar, Walia  and Zaharis dated May 31, 2017, (Ehren-Walia 004003-4006) as maintained and located within the business records of the Debtors.

14.    Attached to this Affidavit as **Exhibit K** is a true and correct copy of email from Arvind Walia dated May 31, 2017, to Paul Parmar attaching the AllRad Direct Due Diligence Findings [Draft Report] dated May 18, 2017 (Ehren-Walia 004019-4032) as maintained and located within the business records of the Debtors.

15.     Attached to this Affidavit as **Exhibit L** is a true and correct copy of email from Parmar to Robinson Brog dated May 31, 2017 (Ehren-Walia 004032) as maintained and located within the business records of the Debtors.

16.     Attached to this Affidavit as **Exhibit M** is a true and correct copy of email from Walia to Parmar dated June 15, 2017, (Ehren-Walia 004413) as maintained and located within the business records of the Debtors.

17.     Attached to this Affidavit as **Exhibit N** is a true and correct copy of email from Walia to Parmar dated June 19, 2017, (Ehren-Walia 004519) as maintained and located within the business records of the Debtors

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 18 day of January, 2023, at Tenafly, NJ .

JOEL GIL
Notary Public, State of New Jersey
My Commission Expires Feb 14, 2027

EDITH WONG

# EXHIBIT A

**M&T Bank**

| | |
|---|---|
| FOR INQUIRIES CALL: | NEW YORK CITY PRIVATE BANKING |
| | (212) 350-2535 |

00  0 07668M M2  077

000000                                    P

**CONSTELLATION HEALTHCARE TECHNOLOGIES IN**
**3200 WILCREST DR SUITE 600**
**HOUSTON TX 77042**

| ACCOUNT TYPE | |
|---|---|
| COMMERCIAL MONEY MARKET SAVINGS | |

| ACCOUNT NUMBER | STATEMENT PERIOD |
|---|---|
| 15004231868132 | FEB.01-FEB.29,2016 |

| | |
|---|---|
| BEGINNING BALANCE | $21,075,669.55 |
| DEPOSITS & CREDITS | 0.00 |
| LESS CHECKS & DEBITS | 6,359,681.01 |
| INTEREST | 1,455.66 |
| LESS SERVICE CHARGES | 450.00 |
| ENDING BALANCE | $14,716,994.20 |

INTEREST PAID YEAR TO DATE        $3,414.51

## ACCOUNT ACTIVITY

| POSTING DATE | TRANSACTION DESCRIPTION | DEPOSITS & OTHER CREDITS (+) | WITHDRAWALS & OTHER DEBITS (-) | DAILY BALANCE |
|---|---|---|---|---|
| 02/01/2016 | BEGINNING BALANCE | | | $21,075,669.55 |
| 02/01/2016 | TELLER MISCELLANEOUS DEBIT | | $100,000.00 | 20,975,669.55 |
| 02/05/2016 | In Branch Transfer/Withdrawal | | 300,000.00 | 20,675,669.55 |
| 02/08/2016 | BOOK TRANSFER DEBIT | | 138,394.41 | |
| 02/08/2016 | SERVICE CHARGE FOR ACCOUNT 015004231868132 | | 450.00 | 20,536,825.14 |
| 02/09/2016 | BOOK TRANSFER DEBIT | | 440,512.54 | 20,096,312.60 |
| 02/19/2016 | OUTGOING FEDWIRE FUNDS TRANSFER ROBINSON BROG LEINWAND GREENE | | 5,058,408.81 | 15,037,903.79 |
| 02/25/2016 | BOOK TRANSFER DEBIT | | 307,365.25 | 14,730,538.54 |
| 02/29/2016 | INTEREST PAYMENT | $1,455.66 | | |
| 02/29/2016 | BOOK TRANSFER DEBIT | | 10,000.00 | |
| 02/29/2016 | BOOK TRANSFER DEBIT | | 5,000.00 | 14,716,994.20 |
| | ENDING BALANCE | | | $14,716,994.20 |

## INTEREST RATE HISTORY

| INTEREST RATE | BEGINNING DATE | ENDING DATE |
|---|---|---|
| 0.10% | 01/31/2016 | 02/29/2016 |

TENTH AND MARKET STREET
1007 NORTH MARKET STREET SUITE 12 WILMINGTON, DE 19801

EHREN-WALIA 00138

318

# HOW TO BALANCE YOUR M&T BANK ACCOUNT

**TO BALANCE YOUR CHECKBOOK WITH YOUR ACCOUNT STATEMENT COMPLETE STEPS 1, 2, & 3.**

**STEP 1** **Place a checkmark ( ✔ )** beside each item listed on this statement which has a corresponding entry in your check register.
Also place a checkmark next to the item in your check register.

**STEP 2** **ADD** to your check register:
(a) Any deposits and other credits shown on this statement which you have not already entered.
(b) Any interest this statement shows credited to your account.

**STEP 3** **SUBTRACT** from your check register:
(a) Any checks or other withdrawals shown on this statement which you did not enter into your register.
(b) Any automatic loan payments or ATM or other electronic debits shown on this statement which you have not already subtracted.
(c) Any service charges shown on this statement which you have not already subtracted.

### TO DETERMINE THE CURRENT BALANCE IN YOUR ACCOUNT:

**STEP 4** List any outstanding checks or debits written in your register, but not yet appearing on your statement.

| OUTSTANDING CHECKS AND OTHER DEBITS | |
|---|---|
| NUMBER | AMOUNT |
| 1 | $ |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| SUBTOTAL OF COLUMN 1 | $ |

| OUTSTANDING CHECKS AND OTHER DEBITS | |
|---|---|
| NUMBER | AMOUNT |
| 13 | $ |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| SUBTOTAL OF COLUMN 2 | |
| SUBTOTAL OF COLUMN 1 + | |
| TOTAL OUTSTANDING CHECKS AND DEBITS | $ |

**STEP 5** **Enter on this line the Ending Balance** shown in the summary on the front of this statement.
$

**STEP 6** **Enter the total of any deposits or other credits** shown on your check register which are not shown on this statement.
$

**STEP 7** **Enter the total of STEPS 5 & 6.**
$

**STEP 8** **Enter TOTAL OUTSTANDING CHECKS & DEBITS** (from **STEP 4**).
$

**STEP 9** **Subtract STEP 8 from STEP 7** and enter the difference here.
$

This amount should be your current account balance.

---

**Is your business growing too big or is it taking too much time for your deposit accounts to be balanced on the back of the statement like this?**
M&T Bank offers an account reconciliation service as one of its many cash management products.
For more information, contact your branch manager or relationship manager
or call M&T Bank Cash Management Services at 1-800-724-2240.

 **M&T Bank**

EHREN-WALIA 00139

# EXHIBIT B

## M&T Bank

| | |
|---|---|
| OR INQUIRIES CALL: | NEW YORK CITY PRIVATE BANKING<br>(212) 350-2535 |

00   0 07668M NM  017

000000                                    P

**CONSTELLATION HEALTHCARE TECHNOLOGIES IN**
**3400 RT 35 SOUTH**
**SUITE 9**
**HAZLET NJ 07730**

| ACCOUNT TYPE | |
|---|---|
| M&T ADVANCED BUSINESS CHECKING | |

| ACCOUNT NUMBER | STATEMENT PERIOD |
|---|---|
| 9862225647 | 08/01/16 - 08/31/16 |

| | |
|---|---|
| BEGINNING BALANCE | $29,047.16 |
| DEPOSITS & CREDITS | 12,790,719.89 |
| LESS CHECKS & DEBITS | 12,740,000.00 |
| LESS SERVICE CHARGES | 0.00 |
| ENDING BALANCE | $79,767.05 |

### ACCOUNT ACTIVITY

| POSTING DATE | TRANSACTION DESCRIPTION | DEPOSITS & OTHER CREDITS (+) | WITHDRAWALS & OTHER DEBITS (-) | DAILY BALANCE |
|---|---|---|---|---|
| 08/01/2016 | BEGINNING BALANCE | | | $29,047.16 |
| 08/09/2016 | In Branch Transfer/Deposit | $12,220,000.00 | | |
| 08/09/2016 | In Branch Transfer/Deposit | 500,000.00 | | 12,749,047.16 |
| 08/10/2016 | OUTGOING FEDWIRE TRANSFER AUTO NON REP Robinson Brog | | $12,740,000.00 | 9,047.16 |
| 08/12/2016 | DEPOSIT | 20,719.89 | | 29,767.05 |
| 08/17/2016 | INCOMING FEDWIRE FUNDS TRANSFER AMERICAN EXPRESS TRAVEL RELATED | 50,000.00 | | 79,767.05 |
| | NUMBER OF DEPOSITS/CHECKS PAID | 4 | 0 | |

TENTH AND MARKET STREET
1007 NORTH MARKET STREET SUITE 12 WILMINGTON, DE 19801

EHREN-WALIA 00147

# HOW TO BALANCE YOUR M&T BANK ACCOUNT

**TO BALANCE YOUR CHECKBOOK WITH YOUR ACCOUNT STATEMENT COMPLETE STEPS 1, 2, & 3.**

**STEP 1**  **Place a checkmark ( ✔ )** beside each item listed on this statement which has a corresponding entry in your check register.
Also place a checkmark next to the item in your check register.

**STEP 2**  **ADD** to your check register:
(a) Any deposits and other credits shown on this statement which you have not already entered.
(b) Any interest this statement shows credited to your account.

**STEP 3**  **SUBTRACT** from your check register:
(a) Any checks or other withdrawals shown on this statement which you did not enter into your register.
(b) Any automatic loan payments or ATM or other electronic debits shown on this statement which you have not already subtracted.
(c) Any service charges shown on this statement which you have not already subtracted.

### TO DETERMINE THE CURRENT BALANCE IN YOUR ACCOUNT:

**STEP 4**  **List** any outstanding checks or debits written in your register, but not yet appearing on your statement.

| OUTSTANDING CHECKS AND OTHER DEBITS | |
|---|---|
| **NUMBER** | **AMOUNT** |
| 1 | $ |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| **SUBTOTAL OF COLUMN 1** | $ |

| OUTSTANDING CHECKS AND OTHER DEBITS | |
|---|---|
| **NUMBER** | **AMOUNT** |
| 13 | $ |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| **SUBTOTAL OF COLUMN 2** | |
| **SUBTOTAL OF COLUMN 1 +** | |
| **TOTAL OUTSTANDING CHECKS AND DEBITS** | $ |

**STEP 5**  **Enter** on this line **the Ending Balance** shown in the summary on the front of this statement.    $

**STEP 6**  **Enter the total of any deposits or other credits** shown on your check register which are not shown on this statement.    $

**STEP 7**  **Enter the total of STEPS 5 & 6.**    $

**STEP 8**  **Enter TOTAL OUTSTANDING CHECKS & DEBITS** (from **STEP 4**).    $

**STEP 9**  **Subtract STEP 8 from STEP 7** and enter the difference here.    $

This amount should be your current account balance.

---

Is your business growing too big or is it taking too much time for your deposit accounts to be balanced on the back of the statement like this?
M&T Bank offers an account reconciliation service as one of its many cash management products.
For more information, contact your branch manager or relationship manager
or call M&T Bank Cash Management Services at 1-800-724-2240.

 **M&T Bank**

EHREN-WALIA 00148

# EXHIBIT C



**CHASE** 

JPMorgan Chase Bank, N.A.
Texas Market
P O Box 659754
San Antonio, TX 78265 - 9754

March 01, 2017 through March 31, 2017
Account Number: **000000684966450**

### CUSTOMER SERVICE INFORMATION

**If you have any questions about your
statement, please contact your
Customer Service Professional.**

00003210 DDA 201 211 09117 NNNNNNNNNN 1 000000000 63 0000

ORION HEALTHCORP INC
OPERATING ACCT
ATTN FINANCE
368 W PIKE ST STE 102
LAWRENCEVILLE GA 30046-3240

## CHECKING SUMMARY   Commercial Checking

|  | INSTANCES | AMOUNT |
|---|---|---|
| **Beginning Balance** | | **$343,294.90** |
| Deposits and Additions | 49 | 33,078,889.99 |
| Electronic Withdrawals | 48 | - 27,522,676.12 |
| Other Withdrawals, Fees & Charges | 5 | - 23,710.04 |
| **Ending Balance** | **102** | **$5,875,798.73** |

## DEPOSITS AND ADDITIONS

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 03/01 | Remote Online Deposit          1001 | $245,212.06 |
| 03/02 | Fedwire Credit Via: Grandpoint Bank/122244566 B/O: Rand Medical Billing Inc Simi Valley CA 93065-0000 Ref: Chase Nyc/Ctr/Bnf=Orion Healthcorp Inc Lawrenceville GA 30046-3240/Ac- 000000006849 Rfb=O/B Grandpoint B O Bi=Transfer To Orion Bbi=/Time/16:3 5 Imad: 0302Mmqfmp9E000159 Trn: 5879509061Ff | 80,000.00 |
| 03/02 | Fedwire Credit Via: Silicon Valley Bank/121140399 B/O: Collabnet Inc South San Francisco, CA 94080 Ref: Chase Nyc/Ctr/Bnf=Orion Healthcorp Inc Lawrenceville GA 30046-3240/Ac- 000000006849 Rfb=O/B Sil Vly Bk S O Bi=Invoice No.Inv-07312 Bbi=/Time/0 5:00 Imad: 0302L1B77D1C000080 Trn: 0316909061Ff | 6,254.00 |
| 03/02 | JPMorgan Access Transfer From Account000000004063105 | 195,000.00 |
| 03/02 | JPMorgan Access Transfer From Account000000004064343 | 119,000.00 |
| 03/02 | JPMorgan Access Transfer From Account000000004063682 | 78,000.00 |
| 03/03 | Fedwire Credit Via: Cobiz Bank NA/102003206 B/O: Western Skies Practice Managem Littleton, CO 80128-0000 Ref: Chase Nyc/Ctr/Bnf=Orion Healthcorp Inc Lawrenceville GA 30046-3240/Ac- 000000006849 Rfb=O/B Cobiz Bank Bbi =/Time/16:04 Imad: 0303J2B74W1C000187 Trn: 5437009062Ff | 75,000.00 |
| 03/03 | Deposit | 5,640.76 |

# CHASE ⬡

March 01, 2017 through March 31, 2017
Account Number: **000000684966450**

## DEPOSITS AND ADDITIONS *(continued)*

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 03/06 | Book Transfer Credit B/O: Vachette Business Services, Ltd. Blissfield MI 49228-1266 Trn: 4791100065Jo | 85,000.00 |
| 03/06 | Book Transfer Credit B/O: Northeast Medical Solutions, LLC Monroeville PA 15146-2156 Trn: 4805100065Jo | 65,000.00 |
| 03/06 | Fedwire Credit Via: Grandpoint Bank/122244566 B/O: Rand Medical Billing Inc Simi Valley CA 93065-0000 Ref: Chase Nyc/Ctr/Bnf=Orion Healthcorp Inc Lawrenceville GA 30046-3240/Ac- 000000006849 Rfb=O/B Grandpoint B O Bi=Transfer To Orion Bbi=/Time/15:4 9 Imad: 0306Mmqfmp9E000108 Trn: 4852409065Ff | 62,000.00 |
| 03/06 | Fedwire Credit Via: Zb, NA, (Formerly Amegy Bank N.A.)/113011258 B/O: Rmi Physician Services Corp Houston TX 77042-6000 77042 Ref: Chase Nyc/Ctr/Bnf=Orion Healthcorp Inc Lawrenceville GA 30046-3240/Ac- 000000006849 Rfb=21982281 Bbi=/Bnf/Dallas TX/Time/12:53 Imad: 0306L4B74B3C000856 Trn: 3150309065Ff | 31,000.00 |
| 03/06 | Remote Online Deposit       1001 | 1,249.00 |
| 03/06 | JPMorgan Access Transfer From Account000000004063105 | 97,000.00 |
| 03/06 | JPMorgan Access Transfer From Account000000004064343 | 65,000.00 |
| 03/06 | JPMorgan Access Transfer From Account000000004063682 | 33,000.00 |
| 03/07 | Remote Online Deposit       1001 | 250.00 |
| 03/08 | Fedwire Credit Via: Grandpoint Bank/122244566 B/O: Rand Medical Billing Inc Simi Valley CA 93065-0000 Ref: Chase Nyc/Ctr/Bnf=Orion Healthcorp Inc Lawrenceville GA 30046-3240/Ac- 000000006849 Rfb=O/B Grandpoint B O Bi=Transfer To Orion Bbi=/Time/16:3 3 Imad: 0308Mmqfmp9E000141 Trn: 5012809067Ff | 26,000.00 |
| 03/08 | Fedwire Credit Via: Cobiz Bank NA/102003206 B/O: Western Skies Practice Managem Littleton, CO 80128-0000 Ref: Chase Nyc/Ctr/Bnf=Orion Healthcorp Inc Lawrenceville GA 30046-3240/Ac- 000000006849 Rfb=O/B Cobiz Bank Bbi =/Time/16:41 Imad: 0308J2B74W1C000237 Trn: 5078509067Ff | 20,000.00 |
| 03/08 | Fedwire Credit Via: Zb, NA, (Formerly Amegy Bank N.A.)/113011258 B/O: Rmi Physician Services Corp Houston TX 77042-6000 77042 Ref: Chase Nyc/Ctr/Bnf=Orion Healthcorp Inc Lawrenceville GA 30046-3240/Ac- 000000006849 Rfb=22002378 Bbi=/Bnf/Dallas TX/Time/15:12 Imad: 0308L4B74B3C001899 Trn: 4242709067Ff | 8,000.00 |
| 03/08 | JPMorgan Access Transfer From Account000000004063105 | 119,000.00 |
| 03/08 | JPMorgan Access Transfer From Account000000004064343 | 51,000.00 |
| 03/08 | JPMorgan Access Transfer From Account000000004063682 | 38,000.00 |
| 03/09 | Book Transfer Credit B/O: Physicians Practice Plus LLC Jericho NY 11753- Trn: 3634700068Jo | 117,000.00 |
| 03/09 | Book Transfer Credit B/O: Vachette Business Services, Ltd. Blissfield MI 49228-1266 Trn: 3644700068Jo | 44,000.00 |
| 03/09 | Remote Online Deposit       1001 | 2,589.85 |
| 03/10 | Fedwire Credit Via: Bank of America N A/026009593 B/O: Orion Healthcorp Inc Roswell Gaus Ref: Chase Nyc/Ctr/Bnf=Orion Healthcorp Inc Lawrenceville GA 30046-3240/Ac- 000000006849 Rfb=01170310001627Nn O Bi=Ref Nynm,Ref Orion Healthcorp IN C Bbi=/Time/15:12 Imad: 0310B6B7Hu3R011563 Trn: 4714209069Ff | 29,562,500.00 |
| 03/10 | Fedwire Credit Via: Grandpoint Bank/122244566 B/O: Rand Medical Billing Inc Simi Valley CA 93065-0000 Ref: Chase Nyc/Ctr/Bnf=Orion Healthcorp Inc Lawrenceville GA 30046-3240/Ac- 000000006849 Rfb=O/B Grandpoint B O Bi=Transfer To Orion Bbi=/Time/15:1 0 Imad: 0310Mmqfmp9E000188 Trn: 4693809069Ff | 52,000.00 |
| 03/10 | Book Transfer Credit B/O: Northeast Medical Solutions, LLC Monroeville PA 15146-2156 Trn: 5271600069Jo | 47,000.00 |

# CHASE ◆

March 01, 2017 through March 31, 2017
Account Number: **000000684966450**

## DEPOSITS AND ADDITIONS | *(continued)*

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 03/10 | Orig CO Name:Paypal        Orig ID:Paypalsd11 Desc Date:170309 CO Entry Descr:Transfer Sec:PPD    Trace#:091000017451864 Eed:170310   Ind ID:53622A38Sp5We        Ind Name:Porteck Corporation Transfer Trn: 0687451864Tc | 9,000.00 |
| 03/16 | Remote Online Deposit        1001 | 599.95 |
| 03/16 | JPMorgan Access Transfer From Account000000004063105 | 219,000.00 |
| 03/16 | JPMorgan Access Transfer From Account000000004064343 | 84,000.00 |
| 03/16 | JPMorgan Access Transfer From Account000000004063682 | 42,000.00 |
| 03/17 | Remote Online Deposit        1001 | 125,555.41 |
| 03/17 | Deposit | 13,279.52 |
| 03/20 | Fedwire Credit Via: Grandpoint Bank/122244566 B/O: Rand Medical Billing Inc Simi Valley CA 93065-0000 Ref: Chase Nyc/Ctr/Bnf=Orion Healthcorp Inc Lawrenceville GA 30046-3240/Ac- 000000006849 Rfb=O/B Grandpoint B O Bi=Transfer To Orion Bbi=/Time/13:4 1 Imad: 0320Mmqfmp9E000063 Trn: 3594009079Ff | 92,000.00 |
| 03/20 | Fedwire Credit Via: Cobiz Bank NA/102003206 B/O: Western Skies Practice Managem Littleton, CO 80128-0000 Ref: Chase Nyc/Ctr/Bnf=Orion Healthcorp Inc Lawrenceville GA 30046-3240/Ac- 000000006849 Rfb=O/B Cobiz Bank Bbi =/Time/13:37 Imad: 0320J2B74W1C000073 Trn: 3549909079Ff | 72,000.00 |
| 03/22 | Remote Online Deposit        1001 | 4,776.53 |
| 03/28 | Remote Online Deposit        1001 | 10,822.59 |
| 03/29 | Remote Online Deposit        1001 | 67,285.87 |
| 03/29 | Deposit | 447.21 |
| 03/30 | Deposit        877321217 | 25.00 |
| 03/31 | Fedwire Credit Via: Grandpoint Bank/122244566 B/O: Rand Medical Billing Inc Simi Valley CA 93065-0000 Ref: Chase Nyc/Ctr/Bnf=Orion Healthcorp Inc Lawrenceville GA 30046-3240/Ac- 000000006849 Rfb=O/B Grandpoint B O Bi=Transfer To Orion Bbi=/Time/15:1 9 Imad: 0331Mmqfmp9E000214 Trn: 7410109090Ff | 60,000.00 |
| 03/31 | Fedwire Credit Via: Silicon Valley Bank/121140399 B/O: Collabnet Inc South San Francisco, CA 94080 Ref: Chase Nyc/Ctr/Bnf=Orion Healthcorp Inc Lawrenceville GA 30046-3240/Ac- 000000006849 Rfb=O/B Sil Vly Bk S O Bi=Invoice No.Inv-08731 Bbi=/Time/0 5:01 Imad: 0331L1B77D1C000245 Trn: 0458809090Ff | 6,254.00 |
| 03/31 | JPMorgan Access Transfer From Account000000004063105 | 475,000.00 |
| 03/31 | JPMorgan Access Transfer From Account000000004063682 | 176,000.00 |
| 03/31 | JPMorgan Access Transfer From Account000000004064343 | 174,000.00 |
| 03/31 | Orig CO Name:Merck 2187        Orig ID:1221109110 Desc Date:Mar 31 CO Entry Descr:EDI Paymntsec:CCD    Trace#:028000088438435 Eed:170331   Ind ID:160390617        Ind Name:Integrated Physician S Ref*TN*0160390617*Merck Sharp And D Ohme Corp.2100643530 00074265000000 02 116,14\ Trn: 0898438435Tc | 116,148.24 |

| **Total Deposits and Additions** | | **$33,078,889.99** |
|---|---|---|







**CHASE ◯**

March 01, 2017 through March 31, 2017
Account Number: **000000684966450**

## ELECTRONIC WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 03/01 | Fedwire Debit Via: Mfrs Buf/022000046 A/C: Msmd LLC US Ref:/Time/13:57 Imad: 0301B1Qgc07C010235 Trn: 3997700060Jo | $20,000.00 |
| 03/01 | JPMorgan Access Transfer To Account000000699642872 | 11,051.22 |
| 03/01 | Orig CO Name:Orion Healthcorp     Orig ID:9966450001 Desc Date:Prfund CO Entry Descr:Cash Disb Sec:CCD   Trace#:021000023722829 Eed:170301  Ind ID:9966450001        Ind Name:EFT File Name: Rp06010     EFT/ACH Created Offset For Origin#: 9090209001  CO Eff Date: 17/03/ | 37,517.37 |
| 03/02 | JPMorgan Access Transfer To Account000000699642864 | 380,540.40 |
| 03/02 | Fedwire Debit Via: Cb&T Dv of Synovus/061100606 A/C: Data Media US Imad: 0302B1Qgc04C004841 Trn: 5686600061Jo | 38,688.00 |
| 03/02 | JPMorgan Access Transfer To Account000000699642864 | 37,969.18 |
| 03/02 | JPMorgan Access Transfer To Account000000699642864 | 19,328.47 |
| 03/02 | Orig CO Name:Orion Healthcorp     Orig ID:9966450001 Desc Date:Prfund CO Entry Descr:Cash Disb Sec:CCD   Trace#:021000022908220 Eed:170302  Ind ID:9966450001        Ind Name:EFT File Name: Rp06111     EFT/ACH Created Offset For Origin#: 9090209001  CO Eff Date: 17/03/ | 2,530.10 |
| 03/03 | Book Transfer Debit A/C: Physicians Practice Plus LLC Jericho NY 11753- Trn: 4622700062Jo | 110,000.00 |
| 03/03 | JPMorgan Access Transfer To Account000000699642872 | 300,000.00 |
| 03/03 | Book Transfer Debit A/C: Orion Healthcorp Inc Lawrenceville GA 30046-3240 Trn: 4862700062Jo | 76,742.86 |
| 03/06 | JPMorgan Access Transfer To Account000000699642872 | 219,021.39 |
| 03/08 | JPMorgan Access Transfer To Account000000699642872 | 315,000.00 |
| 03/08 | Fedwire Debit Via: Wells Fargo NA/121000248 A/C: Chlic US Ref:/Time/13:25 Imad: 0308B1Qgc03C010155 Trn: 3301200067Jo | 976.31 |
| 03/08 | JPMorgan Access Transfer To Account000000699642872 | 69,154.82 |
| 03/09 | JPMorgan Access Transfer To Account000000699642864 | 8,857.17 |
| 03/09 | JPMorgan Access Transfer To Account000000699642864 | 286,477.32 |
| 03/09 | Orig CO Name:Orion Healthcorp     Orig ID:9966450001 Desc Date:Prfund CO Entry Descr:Cash Disb Sec:CCD   Trace#:021000029939280 Eed:170309  Ind ID:9966450001        Ind Name:EFT File Name: Rp0680O     EFT/ACH Created Offset For Origin#: 9090209001  CO Eff Date: 17/03/ | 3,500.00 |
| 03/10 | Fedwire Debit Via: Citicorp FL/266086554 A/C: Holland & Knight Llp Trust Account US Ref: Kelly Litigation Escrow Imad: 0310B1Qgc01C004736 Trn: 5262200069Jo | 820,500.00 |
| 03/10 | Fedwire Debit Via: Wells Fargo NA/121000248 A/C: Robinson Brog Leinwand Greene Genovus Ref: Nynm Acqsn Reps & Warranties Escrow/Time/16:35 Imad: 0310B1Qgc07C023085 Trn: 5328500069Jo | 3,590,000.00 |
| 03/10 | Fedwire Debit Via: Wells Fargo NA/121000248 A/C: Robinson Brog Leinwand Greene Genovus Ref: Nynm Acqsn Share Escrow/Time/16:37 Imad: 0310B1Qgc03C005940 Trn: 5334300069Jo | 2,000,000.00 |
| 03/10 | JPMorgan Access Transfer To Account000000699642864 | 155,040.58 |
| 03/10 | Book Transfer Debit A/C: Elizabeth Kelly Staten Island NY 10304-1355 Ref: Nynm Acqsn Orion Healthcorp Trn: 5469400069Jo | 15,589,500.00 |
| 03/14 | JPMorgan Access Transfer To Account000000699642872 | 136,425.57 |
| 03/14 | Fedwire Debit Via: Bk Amer Nyc/026009593 A/C: Mcguire Woods Operating Account US Ref: Orion Healthcorp Inc Imad: 0314B1Qgc05C009052 Trn: 4158000073Jo | 42,850.00 |
| 03/14 | Fedwire Debit Via: Bk Amer Nyc/026009593 A/C: Moore And VAN Allen US Ref: 327000.027492, 758171 Imad: 0314B1Qgc05C009882 Trn: 4550800073Jo | 28,500.00 |
| 03/14 | Orig CO Name:Orion Healthcorp     Orig ID:9966450001 Desc Date:Prfund CO Entry Descr:Cash Disb Sec:CCD   Trace#:021000023320959 Eed:170314  Ind ID:9966450001        Ind Name:EFT File Name: Rp0730S     EFT/ACH Created Offset For Origin#: 9090209001  CO Eff Date: 17/03/ | 2,968.01 |

# CHASE ⬡

March 01, 2017 through March 31, 2017

Account Number: 000000684966450



## ELECTRONIC WITHDRAWALS *(continued)*

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 03/14 | Orig CO Name:Bmwfinancial Svs      Orig ID:1222568977 Desc Date:170312 CO Entry Descr:Bmwfs Pymtsec:PPD    Trace#:021000029641895 Eed:170314  Ind ID:210311393        Ind Name:Harmohan Par4002267244 Trn: 0729641895Tc | 1,714.24 |
| 03/15 | Fedwire Debit Via: Qd Cty B&T Bttndrf/073902232 A/C: Pediatric Group Associates SC US Imad: 0315B1Qgc03C006974 Trn: 4125400074Jo | 191,739.16 |
| 03/15 | Fedwire Debit Via: First Financial Bk/042200910 A/C: Children's Medical Center Payroll US Imad: 0315B1Qgc04C004420 Trn: 4129800074Jo | 119,579.98 |
| 03/15 | Fedwire Debit Via: Fifth Third Cinci/042000314 A/C: Pediatric Associates of Dayton US Ref:/Time/17:15 Imad: 0315B1Qgc08C008789 Trn: 5765100074Jo | 359,488.31 |
| 03/15 | Orig CO Name:Bankdirect Capit      Orig ID:9000022256 Desc Date:031517 CO Entry Descr:Web Pmts Sec:Web    Trace#:111924687880371 Eed:170315  Ind ID:Wrh7H6      Tnd Name:Orion Healthcorp, Inc 877-226-5456 Trn: 0747880371Tc | 8,714.42 |
| 03/16 | JPMorgan Access Transfer To Account000000699642864 | 19,455.10 |
| 03/16 | JPMorgan Access Transfer To Account000000699642864 | 375,410.68 |
| 03/16 | Orig CO Name:Orion Healthcorp      Orig ID:9966450001 Desc Date:Prfund CO Entry Descr:Cash Disb Sec:CCD    Trace#:021000026145699 Eed:170316  Ind ID:9966450001        Ind Name:EFT File Name: Rp07519    EFT/ACH Created Offset For Origin#: 9090209001  CO Eff Date: 17/03/ | 44,586.55 |
| 03/16 | Orig CO Name:Orion Healthcorp      Orig ID:9966450001 Desc Date:Prfund CO Entry Descr:Cash Disb Sec:CCD    Trace#:021000026145681 Eed:170316  Ind ID:9966450001        Ind Name:EFT File Name: Rp0751J    EFT/ACH Created Offset For Origin#: 9090209001  CO Eff Date: 17/03/ | 1,200.00 |
| 03/20 | Fedwire Debit Via: Cb&T Dv of Synovus/061100606 A/C: Data Media US Imad: 0320B1Qgc01C005540 Trn: 4933700079Jo | 94,712.65 |
| 03/20 | Book Transfer Debit A/C: Sher Tremonte Llp Attorney Trust New York, NY 100042209 Trn: 4933600079Jo | 9,444.44 |
| 03/20 | Book Transfer Debit A/C: Physicians Practice Plus LLC Jericho NY 11753- Trn: 4951800079Jo | 110,956.46 |
| 03/21 | Orig CO Name:Orion Healthcorp      Orig ID:9966450001 Desc Date:Prfund CO Entry Descr:Cash Disb Sec:CCD    Trace#:021000026514537 Eed:170321  Ind ID:9966450001        Ind Name:EFT File Name: Rp0800T    EFT/ACH Created Offset For Origin#: 9090209001  CO Eff Date: 17/03/ | 7,289.00 |
| 03/21 | Orig CO Name:NJ Naturalgas      Orig ID:4210621680 Desc Date:Mar 17 CO Entry Descr:Ebill    Sec:Web    Trace#:031000056092910 Eed:170321  Ind ID:10399608032017        Ind Name:Payer Name Trn: 0796092910Tc | 2,162.35 |
| 03/21 | Orig CO Name:NJ Naturalgas      Orig ID:4210621680 Desc Date:Mar 17 CO Entry Descr:Ebill    Sec:Web    Trace#:031000056092911 Eed:170321  Ind ID:10399619032017        Ind Name:Payer Name Trn: 0796092911Tc | 1,554.43 |
| 03/23 | JPMorgan Access Transfer To Account000000699642864 | 8,727.66 |
| 03/23 | JPMorgan Access Transfer To Account000000699642864 | 278,747.87 |
| 03/28 | JPMorgan Access Transfer To Account000000699642872 | 943,806.98 |
| 03/30 | JPMorgan Access Transfer To Account000000699642864 | 375,630.50 |
| 03/30 | JPMorgan Access Transfer To Account000000699642864 | 19,777.94 |
| 03/30 | JPMorgan Access Transfer To Account000000699642872 | 244,838.63 |
| **Total Electronic Withdrawals** | | **$27,522,676.12** |

328



March 01, 2017 through March 31, 2017
Account Number: **000000684966450**

## OTHER WITHDRAWALS, FEES & CHARGES

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 03/03 | Withdrawal | $5,000.00 |
| 03/15 | Account Analysis Settlement Charge | 6,210.04 |
| 03/16 | Withdrawal | 5,500.00 |
| 03/16 | Withdrawal | 500.00 |
| 03/27 | Withdrawal | 6,500.00 |
| **Total Other Withdrawals, Fees & Charges** | | **$23,710.04** |

Your service charges, fees and earnings credit have been calculated through account analysis.

## DAILY ENDING BALANCE

| DATE | AMOUNT | DATE | AMOUNT |
|------|--------|------|--------|
| 03/01 | $519,938.37 | 03/17 | 6,725,188.20 |
| 03/02 | 519,136.22 | 03/20 | 6,674,074.65 |
| 03/03 | 108,034.12 | 03/21 | 6,663,068.87 |
| 03/06 | 13,261.73 | 03/22 | 6,667,845.40 |
| 03/07 | 13,511.73 | 03/23 | 6,380,369.87 |
| 03/08 | 205,380.60 | 03/27 | 6,373,869.87 |
| 03/09 | 70,135.96 | 03/28 | 5,440,885.48 |
| 03/10 | 7,585,595.38 | 03/29 | 5,508,618.56 |
| 03/14 | 7,373,137.56 | 03/30 | 4,868,396.49 |
| 03/15 | 6,687,405.65 | 03/31 | 5,875,798.73 |
| 03/16 | 6,586,353.27 | | |

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS:** Call or write us at the phone number or address on the front of this statement (non-personal accounts contact Customer Service) if you think your statement or receipt is incorrect or if you need more information about a transfer listed on the statement or receipt.    We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.  Be prepared to give us the following information:

 • Your name and account number
 • The dollar amount of the suspected error
 • A description of the error or transfer you are unsure of, why you believe it is an error, or why you need more information.

We will investigate your complaint and will correct any error promptly.  If we take more than 10 business days (or 20 business days for new accounts) to do this, we will credit your account for the amount you think is in error so that you will have use of the money during the time it takes us to complete our investigation .

**IN CASE OF ERRORS OR QUESTIONS ABOUT NON-ELECTRONIC TRANSACTIONS:** Contact the bank immediately if your statement is incorrect or if you need more information about any non-electronic transactions (checks or deposits) on this statement. If any such error appears, you must notify the bank in writing no later than 30 days after the statement was made available to you.  For more complete details, see the Account Rules and Regulations or other applicable account agreement that governs your account.

JPMorgan Chase Bank, N.A. Member FDIC



# EXHIBIT D

## RE: Combined Porteck and PCA by Client

**From:**
Paul Parmar <"/o=exchangelabs/ou=exchange administrative group
(fydibohf23spdlt)/cn=recipients/cn=807e953e3e604cdeb1e5c6668cf3199e-paul">
**To:**
Glenn Cunningham <glenc@g-r-consulting.com>
**Date:**
Mon, 01 Dec 2014 11:40:22 -0500

Hahahahaha this is a joke, please please find me a real billing company

**From:** Glenn Cunningham [mailto:glenc@g-r-consulting.com]
**Sent:** Monday, December 1, 2014 11:38 AM
**To:** Paul Parmar
**Subject:** RE: Combined Porteck and PCA by Client

Last month.

Glenn R. Cunningham,
President, G R Capital Management Inc.
451 Hungerford Dr., Suite 119 - 227
Rockville, MD 20850
Off: (240) 477-7320
Fax:(240) 454-8182
Cell:(240) 994-8876
E-Mail: glenc@g-r-consulting.com

This electronic mail may contain information that is privileged, proprietary and confidential and/or exempt from disclosure under applicable law. This transmission is intended solely for the individual or entity designated above. If you are not the intended recipient, you should understand that any distribution, copying, or use of the information contained in this transmission by anyone other than the intended recipient is unauthorized and strictly prohibited. If you have received this electronic mail in error, please immediately notify the sender and destroy all copies which you may have of this communication.

**From:** Paul Parmar [mailto:paul@pegasusbluestarfund.com]
**Sent:** Monday, December 01, 2014 11:24 AM
**To:** Glenn Cunningham
**Subject:** RE: Combined Porteck and PCA by Client

When was it acquired ?

**From:** Glenn Cunningham [mailto:glenc@g-r-consulting.com]
**Sent:** Monday, December 1, 2014 11:23 AM
**To:** Paul Parmar
**Subject:** RE: Combined Porteck and PCA by Client

PCA is a recent medical billing acquisition.

Glenn R. Cunningham,
President, G R Capital Management Inc.
451 Hungerford Dr., Suite 119 - 227
Rockville, MD 20850
Off: (240) 477-7320
Fax:(240) 454-8182
Cell:(240) 994-8876
E-Mail: glenc@g-r-consulting.com

EHREN-WALIA 005138

This electronic mail may contain information that is privileged, proprietary and confidential and/or exempt from disclosure under applicable law.  This transmission is intended solely for the individual or entity designated above.  If you are not the intended recipient, you should understand that any distribution, copying, or use of the information contained in this transmission by anyone other than the intended recipient is unauthorized and strictly prohibited.  If you have received this electronic mail in error, please immediately notify the sender and destroy all copies which you may have of this communication.

**From:** Paul Parmar [mailto:paul@pegasusbluestarfund.com]
**Sent:** Monday, December 01, 2014 11:18 AM
**To:** Glenn Cunningham
**Subject:** RE: Combined Porteck and PCA by Client

So PCA data set is prospective clients ?

**From:** Glenn Cunningham [mailto:glenc@g-r-consulting.com]
**Sent:** Monday, December 1, 2014 11:07 AM
**To:** Paul Parmar
**Subject:** RE: Combined Porteck and PCA by Client

Change the call to noon. Done

Also they have like I mentioned to you on the phone as I knew this from before, 17% of the revenue is Telecom and not medical billing ? correct, 16.2 % of the gross revenue is from the India call center, perhaps we use a different multiple for the valuation?

What is PCA Data Set ? with no names of clients under this category, PCA is a client list of a recent acquisition. I requested the client list be sorted by revenue. We should have the TTM list later today.

What are the two subtotals ? why are certain clients bucketed together in the two subtotals ? Not sure of either, I have requested an answer from the broker, he is working on it. I will ask during the call.

First set of clients in the subtotal is 11.1% and second set of clients in subtotal is 52.4%, telecom is 17% and Authorizations is 2.28%, PCA Data Set is 18% = 100% ?

What is the set of clients in first subtotal that is 11.1% I'm not sure why they broke out the client list this way. Have asked, will mention during the call at 12:00.
What are the set of clients in second subtotal that is 52.4%, Above.
What is PCA Data Set that is 18%, Acquisition client list.


Glenn R. Cunningham,
President, G R Capital Management Inc.
451 Hungerford Dr., Suite 119 - 227
Rockville, MD 20850
Off: (240) 477-7320
Fax:(240) 454-8182
Cell:(240) 994-8876
E-Mail: glenc@g-r-consulting.com


This electronic mail may contain information that is privileged, proprietary and confidential and/or exempt from disclosure under applicable law.  This transmission is intended solely for the individual or entity designated above.  If you are not the intended recipient, you should understand that any distribution, copying, or use of the information contained in this transmission by anyone other than the intended recipient is unauthorized and strictly prohibited.  If you have received this electronic mail in error, please immediately notify the sender and destroy all copies which you may have of this communication.

**From:** Paul Parmar [mailto:paul@pegasusbluestarfund.com]

EHREN-WALIA 005139

**Sent:** Monday, December 01, 2014 6:38 AM
**To:** Glenn Cunningham
**Subject:** RE: Combined Porteck and PCA by Client

Change the call to noon.

Also they have like I mentioned to you on the phone as I knew this from before, 17% of the revenue is Telecom and not medical billing ?

What is PCA Data Set ? with no names of clients under this category

What are the two subtotals ? why are certain clients bucketed together in the two subtotals ?

First set of clients in the subtotal is 11.1% and second set of clients in subtotal is 52.4%, telecom is 17% and Authorizations is 2.28%, PCA Data Set is 18%  = 100% ?

What is the set of clients in first subtotal that is 11.1%
What are the set of clients in second subtotal that is 52.4%
What is PCA Data Set that is 18%

**From:** Glenn Cunningham [mailto:glenc@g-r-consulting.com]
**Sent:** Monday, December 1, 2014 6:24 AM
**To:** Paul Parmar
**Subject:** FW: Combined Porteck and PCA by Client

Paul,

In preparation for today's call at 10 with the Porteck group, I have attached 2015 projected revenue by client. They are working on the TTM revenue by client which we hope to have shortly.

Let me know if you have questions.

Glenn R. Cunningham,
President, G R Capital Management Inc.
451 Hungerford Dr., Suite 119 - 227
Rockville, MD 20850
Off: (240) 477-7320
Fax:(240) 454-8182
Cell:(240).994-8876
E-Mail: glenc@g-r-consulting.com

This electronic mail may contain information that is privileged, proprietary and confidential and/or exempt from disclosure under applicable law.  This transmission is intended solely for the individual or entity designated above.  If you are not the intended recipient, you should understand that any distribution, copying, or use of the information contained in this transmission by anyone other than the intended recipient is unauthorized and strictly prohibited.  If you have received this electronic mail in error, please immediately notify the sender and destroy all copies which you may have of this communication.

EHREN-WALIA 005140

# EXHIBIT E



**Date:** 2/20/2015

**To:** Arvind Walia
CEO, Porteck Corporation
300 Jericho Quadrangle West Suite 320
Jericho, NY 11753

http://www.porteck.com/
516-874-8101 (phone)
646-536-2515 (fax)
516-770-6222 (Mobile)

**Re:** For the Sale of Porteck Corporation to:

Constellation Health Technologies, Inc.
875 3rd Avenue
9th Floor
New York, NY 10022
Paul Parmar, CEO

Purchase price:                          $7,800,000
Paid at Closing:                         $5,500,000
Earn-out paid in 12 months:  $2,300,000

**Due Now: $5,500,000 x 3.5%  =  $192,500**

Earn out paid in 12 months subject to a success fee of 3.5x the amount paid.

**Wire:**    Abstract Business Advisors, LLC
Wells Fargo, Anthem Village branch. Henderson, NV
RT# 121000248  /

For any additional questions, please call Dana Ferguson 504-220-4660

Exhibit
Wal 0009

*2712 Botticelli Drive*            *Henderson, NV 89052*            *Phone: 702-896-9286*

EHREN-WALIA 005141

# EXHIBIT F