exercise such right to setoff will constitute an election of remedies or limit Buyer in any manner in the enforcement of any other remedies that may be available to it).

(vii)    The Buyer Indemnified Persons and the Seller Indemnified Persons shall in good faith use commercially reasonable efforts to mitigate Losses in connection with any claim under **Section 7.1(a)** and **Section 7.1(b)**, respectively.

(viii)    Any Losses for which any Indemnified Party is entitled to indemnification under this **Article 7** shall be determined without duplication of recovery to the extent such Indemnified Party  has been indemnified or reimbursed for such Loss under any other provision of this Agreement; and

(d)    Survival.

(i)    The representations, warranties and covenants of the Parties contained in this Agreement, any other Seller Document or Buyer Document, as the case may be, or in any instrument delivered pursuant hereto or thereto will survive the Closing and will remain in full force and effect thereafter, except that the representations and warranties of the Parties shall expire twelve (12) months following the Closing; provided, that: (i) such representations and warranties shall survive beyond such period with respect to any breach thereof if written notice thereof shall have been duly given within such period, (ii) the representations and warranties set forth in **Sections 3.10 (Tax Matters) and 3.12 (Employee Benefits)** shall survive the Closing until one (1) month following the lapse of the applicable statute of limitations, and (iii) the representations and warranties set forth in **Sections 3.1 (Organization; Authority; Due Execution), 3.5 (Capitalization), 4.1 (Ownership of Interest), 4.2 (Authority) and 5.1(b) (Authority)** shall survive indefinitely. None of the foregoing limitations on survival shall apply in the case of fraud, intentional misconduct or intentional misrepresentation.

(ii)    Subject to **Section 7.1(d)(i)** above, all other claims for indemnification with respect to Losses incurred by the Buyer Indemnified Parties pursuant to **Section 7.1(a)** shall be asserted within a period of three (3) years following the Closing (and if not asserted within such period shall lapse); provided, however, (1) any claims for indemnification with respect to Losses incurred by the Buyer Indemnified Parties pursuant to **Sections 7.1(a)(vii) or (viii)** may be asserted indefinitely and (2) any claims for indemnification with respect to Losses incurred by the Buyer Indemnified Parties pursuant to **Section 7.1(a)(v)** shall be asserted within a period of four (4) years following the Closing (and if not asserted within such period shall lapse).

(e)    Notice and Opportunity to Defend. The following shall apply:

(i)    If there occurs an event (a "**Covered Proceeding**") which a Party asserts is an indemnifiable event pursuant to **Section 7.1(a) or 7.1(b)**, the Party or Parties seeking indemnification (the "**Indemnified Party**") shall notify the other Party or Parties obligated to provide indemnification (the "**Indemnifying Party**") promptly. If such event involves any claim or the commencement of any action or proceeding by a third person, the Indemnified Party shall give such Indemnifying Party prompt written notice of such claim or the commencement of such action or proceeding; provided, however, that the failure to provide prompt notice as provided herein will relieve the Indemnifying Party of its obligations hereunder only to the extent that such failure prejudices the Indemnifying Party hereunder. In case any such action shall be brought

{00863216.DOCX;2 }

42

against any Indemnified Party and after such Indemnified Party has notified the Indemnifying Party of the commencement thereof, the Indemnifying Party shall be entitled to assume the defense thereof, with counsel reasonably selected by the Indemnifying Party and reasonably approved by the Indemnified Party after notice from the Indemnifying Party to the Indemnified Party. The Indemnifying Party and the Indemnified Party agree to cooperate fully with each other and their respective counsel in connection with the defense, negotiation or settlement of any such action or asserted liability.

(ii)    If the Indemnifying Party agrees to assume the defense of a Covered Proceeding, the Indemnified Party shall have the right to participate at its own expense in the defense of such action or asserted liability. If the Indemnifying Party is otherwise entitled to control the settlement of a Covered Proceeding (subject to the requirements and limitations of this **Section 7.1**), the Indemnifying Party will be entitled to control such settlement only if (A) the terms of such settlement require no more than the payment of money (for example, such settlement does not require the Indemnified Party to admit any wrongdoing or take or refrain from taking any action), (B) the full amount of such monetary settlement is fully paid by the Indemnifying Party, and (C) the Indemnified Party receives as part of such settlement a legally binding and enforceable unconditional satisfaction and release of all claimed liabilities or obligations in form and substance reasonably satisfactory to the Indemnified Party.

Section 7.2    Exclusive Remedy. From and after the Closing, Buyer Indemnified Persons and Seller Indemnified Persons' sole and exclusive remedy, whether in any individual, corporate or any other capacity, with respect to any and all Losses arising under this Agreement or the transactions contemplated hereby, regardless of the legal theory under which such liability or obligation may be sought to be imposed, whether sounding in contract or tort, or whether at law or in equity, or otherwise, shall be pursuant to the provisions of this **Article 7**.

Section 7.3    Payments.  Any amounts owed to the Buyer by the Selling Members (or any one or more of the Selling Members) pursuant to the terms of this Agreement, including but not limited to, **Section 1.2, Section 1.5, Section 1.6, Article 7**, shall be paid to the Buyer as a payment by the Selling Members in cash or available funds to an account designated by the Buyer within five (5) Business Days of the final determination of such payment.


ARTICLE 8

DEFINITIONS

Section 8.1    Definitions.  For purposes of this Agreement, the following terms used in this Agreement shall have the meanings ascribed to them below:

"**409A Plan**" has the meaning ascribed to such term in **Section 3.10(a)(xv)**.

"**Additional Interim Financial Statement**" has the meaning ascribed to such term in **Section 3.14(a)**.

"**Affiliate**" of any Person means another Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such first Person.

"**Agreement**" has the meaning ascribed to such term in the Preamble.

"**Annual Financial Statements**" has the meaning ascribed to such term in **Section 3.14(a).**

"**Basket**" has the meaning ascribed to such term in **7.1(c)(i).**

"**Books and Records**" means all operating data and records of the Company which are necessary to and used in the operation of the Business or that are located at the Company's primary offices, in each case including all books of account, ledgers, general, financial, accounting, tax, warranty, shipping records, invoices, management letters from accountants, purchase and sales records and information, customers' records, records pertaining to customer requirements, equipment maintenance and warranty information, customer and prospect lists, correspondence, catalogues, promotion materials, customer contacts, customer invoices, customer returns and vendor product information, credit and collection records, and all other files, records, literature and other documents of the Company, whether in written, electronic or other form.

"**Breaching Party**" has the meaning ascribed to such term in **Section 6.4(c).**

"**Business**" means the business activities, operations and affairs of the Company currently conducted.

"**Business Day**" means any day other than a Saturday, a Sunday or a day on which commercial banking institutions in New York, New York are authorized or obligated by law or executive order to be closed.

"**Buyer**" has the meaning ascribed to such term in the Preamble.

"**Buyer Documents**" has the meaning ascribed to such term in **Section 5.1(b)**.

"**Buyer Indemnified Persons**" has the meaning ascribed to such term in **Section 7.1(a).**

"**Buyer Prepared Return**" has the meaning ascribed to such term in **Section 6.3(d)**.

"**Cap**" means fifty percent of an amount equal to (i) all amounts paid by Buyer pursuant to **Article 1** less (ii) all amounts paid to Buyer by the Selling Members pursuant to **Article 1.**

"**Closing**" has the meaning ascribed to such term in **Section 2.1.**

"**Closing Accounts Receivable**" has the meaning ascribed to such term in **Section 1.5(f)**.

"**Closing Balance Sheet**" has the meaning ascribed to such term in **Section 1.5(a).**

"**Closing Date**" has the meaning ascribed to such term in **Section 2.1.**

"**Closing Date Calculation**" has the meaning ascribed to such term in **Section 1.5(a).**

"**Closing Payment**" has the meaning ascribed to such term in **Section 1.2(a)**

"**Closing Working Capital**" has the meaning ascribed to such term in **Section 1.5(a).**

"**Code**" means the Internal Revenue Code of 1986, as amended. All citations to the Code or to the regulations promulgated thereunder shall include any amendments or any substitute or successor provisions thereto.

"**Company**" has the meaning ascribed to such term in the Preamble.

"**Company Leased Property**" has the meaning ascribed to such term in **Section 3.8**.

"**Company Leases**" has the meaning ascribed to such term in **Section 3.8.**

"**Company Privacy Policies**" has the meaning ascribed to such term in **Section 3.29**.

"**Compensation and Benefits Plans**" has the meaning ascribed to such term in **Section 3.12(a).**

"**Confidential Information**" has the meaning ascribed to such term in **Section 6.4(b).**

"**Consent**" means any consent, approval, authorization, waiver, permit, grant, franchise, concession, agreement, license, exemption or order of, registration, certificate, declaration or filing with, or report or notice to, any Person, including but not limited to any Governmental Entity.

"**Contracts**" or "**Contract**" means all contracts, agreements, leases, licenses, franchises, purchase orders, sale, license or service orders, instruments, commitments, arrangements and understandings (in each case, whether written or oral and including all amendments thereto) to which the Company is a party or by which the Company is bound or under which the Company or the Business has any rights or is entitled to any benefits but excluding therefrom any licenses for "shrink-wrapped-off-the-shelf software".

"**Covered Proceeding**" has the meaning ascribed to such term in **Section 7.1(e).**

"**Disputed Item**" and "**Disputed Items**" has the meaning ascribed to such term in **Section 1.5(d)**.

{00863216.DOCX;2 }

"**Earn-Out Payment(s)**" means either or both of the Period 1 Earn-Out Payment and the Period 2 Earn-Out Payment, as applicable and to the extent earned hereunder**.**

"**EBITDA**" means earnings before interest, taxes, depreciation and amortization; provided, however that the calculation of EBITDA shall not include any corporate or administrative overhead costs of Buyer or its affiliates that is allocated to the Company.

"**Effective Date**" has the meaning ascribed to such term in the Preamble.

"**Employees**" mean current and former employees and consultants of the Company, including leased and temporary employees, involved in whole or in part in the Business.

"**Employment Agreements**" has the meaning ascribed to such term in **Section 6.8**.

"**Environmental Law**" means any Law, permit, authorization, policy, opinion, common law or agency requirement applicable to the Company relating to: (i) the protection, investigation or restoration of the environment, health and safety, or natural resources or exposure to any harmful or hazardous material, (ii) the handling, use, presence, disposal, release or threatened release of any chemical substance or waste water, or (iii) noise, odor, wetlands, pollution, contamination or any injury or threat of injury to persons or property, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, the Resource Conservation and Recovery Act, the Occupational and Safety and Health Act (solely to the extent related to Hazardous Substances), Clean Water Act and the Oil Pollution Act.

"**ERISA**" has the meaning ascribed to such term in **Section 3.12(b)**.

"**Excluded Earnings**" has the meaning ascribed to such term in **Section 1.6(a)**.

"**Excluded Liabilities**" means any and all of the debts, liabilities, claims and obligations of one or more members of the Company, whether fixed, contingent or otherwise, in each case to the extent existing or accrued or required to be accrued at or as of the Closing, or made, asserted or arising after the Closing but based upon or arising from any act, transaction, circumstance, sale or providing of goods or services, state of facts or other condition which occurred or existed on or prior to the Closing, whether or not then known, due or payable, including, without limitation, the following (but excluding the Qualified Accounts Payable):

(i)     any claims, liabilities or obligations against or of the Company under or arising out of any actual or claimed equity option, equity purchase, equity-based incentive, profit-sharing or similar plan(s), program(s), agreement(s) or arrangement(s) and/or under any and all qualified or non-qualified equity options, grants or awards and/or any other agreement, arrangement or understanding to make a payment to any manager, officer or employee in connection with the sale of the Interests or any transaction described in this Agreement;

(ii)    any and all claims, liabilities and obligations against or of the Company by, of or to any of its present or former direct or indirect shareholders, including any

arising out of any action by the Company in connection with any of the transactions described in this Agreement;

(iii)    any and all claims, liabilities and obligations in respect of brokerage or finder's fees payable by the Company and all investment banking, legal, accounting and other consulting or similar costs and expenses incurred by the Company in connection with the negotiation, execution and/or consummation of this Agreement and/or any of the transactions described in this Agreement;

(iv)    any and all Transaction Expenses, Indebtedness of the Company and Payables (other than Qualified Accounts Payable) and any and all other liabilities and obligations of the Company to the Selling Member or any Affiliate(s) of the Selling Member (whether current or long-term);

(v)    any and all claims, liabilities and obligations against or of the Company as a guarantor, co-obligor or surety of or with any other Person, or arising by reason of the Company being an Affiliate of a Selling Member or against or of any Affiliate of a Selling Member;

(vi)    any and all claims, liabilities and obligations for or in respect of any and all foreign, federal, state and local Taxes of or imposed on the Company for any Pre-Closing Tax Period);

(vii)    any and all claims, liabilities and obligations against or of the Company on account of Proceedings;

(viii)    any and all claims, liabilities and obligations against or of the Company with respect to any Compensation and Benefits Plans arising out of any events occurring, or circumstances or state of facts existing, prior to the Closing Date, it being agreed and understood that the Company or the Buyer, and not the Selling Member, shall be responsible for all Compensation and Benefits Plans arising out of any events occurring, or circumstances or state of facts existing, after the Closing Date so long as such event is not triggered by the Closing; or

(ix)    any and all claims, liabilities and obligations against or of the Company based on or arising from the presence of any Hazardous Substance on any of the Company Leased Property in violation of applicable Environmental Law, or any Hazardous Discharge on or prior to the Closing Date in violation of applicable Environmental Law, and/or the failure to obtain any license or permit required in connection with any Hazardous Substance or Hazardous Discharge in order to comply with applicable Environmental Law or the retention, disposal, treatment or use thereof, and/or arising out of any, in each case, based on or arising from any act, transaction, state of facts or other condition which occurred or existed before the Closing Date in violation of applicable Environmental Law, on, from, involving or by any of the Company Leased Property, or the Company, or any of its Affiliates, and/or any demand of any government agency or authority or other Person prior to, on or after the Closing Date which is based upon or in any way related to any discharge of any Hazardous Substance, the presence, use, disposal or treatment of a Hazardous Substance in violation of applicable Environmental Law prior to the Closing Date, on, from, involving or by any of the Company Leased Property, the Company or any of its Affiliates.

"**Financial Statements**" has the meaning ascribed to such term in **Section 3.14(a).**

"**First Earn-Out Period**" has the meaning ascribed to such term in **Section 1.3(a)**.

"**GAAP**" means U.S. generally accepted accounting principles, consistently applied.

"**Government Bid**" has the meaning ascribed to such term in **Section 3.19(a)(iv)**.

"**Government Contract**" has the meaning ascribed to such term in **Section 3.19(a)(iv)**.

"**Governmental Entity**" means (a) any supranational, federal, state, local, municipal, foreign or other government; (b) any governmental or quasi-governmental entity of any nature (including any governmental agency, branch, department, official or entity and any court or other tribunal); or (c) any body, authority or agency exercising or entitled to exercise any administrative, executive, judicial, legislative, police, regulatory or taxing authority, including any arbitral tribunal.

"**Hazardous Discharge**" means the use, management, handling, transport, treatment, generation, storage, spill, escape, seepage, leakage, spillage, emission, release, discharge, remediation or clean-up of any Hazardous Substance on or about any of the Company Leased Property or caused by the Company.

"**Hazardous Substance**" means any substance that is: (a) listed, classified or regulated in any concentration pursuant to any Environmental Law, (b) any petroleum product or by-product, asbestos-containing material, lead-containing paint or plumbing, polychlorinated biphenyls, radioactive materials or radon, or (c) any other substance which may be the subject of regulatory action by any Governmental Entity pursuant to any Environmental Law.

"**HIPAA**" has the meaning ascribed to such term in **Section 3.12(b)**.

"**Indebtedness**" means, without duplication, and in each case whether fixed, contingent or otherwise, and to the extent existing or accrued or required to be accrued at or as of the Closing, (a) any indebtedness for borrowed money or issued in substitution for or exchange of indebtedness for borrowed money, (b) any indebtedness evidenced by any note, bond, debenture or other debt security, including "overdraft", (c) all indebtedness for the deferred purchase price of property or a business represented by a note, or earn-out or contingent purchase payment obligation, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all indebtedness secured by a purchase money mortgage or other Lien to secure all or part of the purchase price of the property subject to such mortgage or Lien, (f) all obligations under leases which shall have been or must be, in accordance with GAAP, recorded as capital leases, (g) any credit extended in the nature of banker's acceptances or letters of credit, (h) any obligations (including, but not limited to, interest, fees, penalties and other expenses) under any interest rate swap agreements or instruments, (i) all interest, fees and other expenses owed with respect to the indebtedness referred to above, and (j) all indebtedness and liabilities referred to

{00863216.DOCX;2 }

48

above which is directly or indirectly guaranteed, and, with respect to (a) to (j) above, all premiums, penalties, charges, fees, expenses and other amounts that are or would be due (including with respect to early termination) in connection with the payment and satisfaction in full of such obligations.

"**Indemnifiable Loss**" has the meaning ascribed to such term in **Section 7.1(c)(vi)**

"**Indemnified Party**" has the meaning ascribed to such term in **Section 7.1(e)(i)**.

"**Indemnifying Party**" has the meaning ascribed to such term in **Section 7.1(e)(i)**.

"**Indemnity Payment**" has the meaning ascribed to such term in **Section 7.1(c)(v)**.

"**Independent Auditor**" means a mutually agreeable independent nationally recognized accounting firm who has not then provided services to any Party in the previous two (2) years (a "**Neutral Firm**") that will agree to act as Independent Auditor. If: (i) Buyer and the Selling Member Representative are unable to agree on the selection of an Independent Auditor within fifteen (15) days of the conclusion of the period described above, then each of Buyer, on the one hand, and the Selling Member Representative, on the other hand, shall select one Neutral Firm and those two Neutral Firms together shall appoint a Neutral Firm as Independent Auditor hereunder, and such appointment shall be conclusive and binding on all of the Parties; or (ii) if any Party does not select a Neutral Firm within ten (10) days of written demand therefor by the other Party, then the Neutral Firm selected by the other Party shall act as the Independent Auditor.

"**Intellectual Property**" means any know-how, proprietary rights or other intellectual property, including without limitation, trade secrets, inventions, formulae, processes, patents (including all reissues, divisions, continuations and extensions thereof), patent applications, Trademarks, Trademark registrations, Trademark applications, service marks, service mark registrations, service mark applications, copyrights, copyright registrations, copyright applications, web sites and home pages, uniform resource locators, domain names, all rights to, and all intellectual property used or necessary to, create, publish, modify or maintain, any website or home page, customer and vendor information, lists and data bases, customer files, customer lists, mailing and subscription lists, supplier lists, information not known to the general public, literary works, whether or not copyrightable, ideas, concepts, designs, drawings, discoveries, product and service developments, inventions, improvements, processes, logos, software, source codes and materials, object codes and materials, algorithms, techniques, technology, technical information, research material, prototypes and models.

"**Interests**" has the meaning ascribed to such term in the Preamble.

"**Interim Financial Statement**" has the meaning ascribed to such term in **Section 3.14(a)**.

"**IRS**" has the meaning ascribed to such term in **Section 3.10(a)(vi)**.

"**Law**" or "**Laws**" has the meaning ascribed to such term in **Section 3.17(a)**.

"**License Agreements**" has the meaning ascribed to such term in **Section 3.13(b)(i)**.

"**Liens**" means, with respect to any property or asset, all liens, mortgages, pledges, security interests, conditional sales agreements, purchase options, rights of first refusal or other encumbrance of like nature in respect of such property or asset.

"**Losses**" means any and all losses, damages, costs, deficiencies and reasonable expenses (including reasonable fees and expenses of counsel incident to any of the foregoing, or incurred in investigating or attempting to avoid the same or to oppose the imposition thereof, or in enforcing any of the obligations of any Indemnifying Party), excluding punitive damages.

"**MAC**" has the meaning ascribed to such term in the definition of "**Government Healthcare Program Contractor**".

"**Material Adverse Effect**" means any change or effect (or any development that is reasonably likely to result in any change or effect) that (a) is materially adverse to the assets, Business, financial condition, or results of operations of the Company, or (b) would materially and adversely impair the ability of the Selling Members to consummate the transactions described in this Agreement; provided however, that "Material Adverse Effect" does not include material adverse changes or effects on the assets, Business, financial condition or results of operations of the Company caused by events, conditions or circumstances that generally affect the economy or the industry in which the Company operate and do not affect the Company disproportionately.

"**Material Contracts**" has the meaning ascribed to such term in **Section 3.19(a)**.

"**Medicaid**" means the need-based health care program established under Title XIX of the Social Security Act.

"**Medical Waste**" means any solid or liquid waste that is generated in the diagnosis, treatment, or immunization of human beings or animals, in research pertaining thereto, or in the production or testing of biologicals, including, without limitation, blood soaked bandages; culture dishes and other glassware; discarded surgical gloves; discarded surgical instruments; discarded syringes and needles used to give shots or draw blood; blood and blood products; cultures, stocks, swabs used to inoculate cultures; removed body organs or other body tissue; human body waste; and discarded lancets.

"**Medicare**" means the health care program for individuals sixty five (65) years of age and over, certain disabled individuals, and certain individuals with end-stage renal disease established under Title XVIII of the Social Security Act.

"**Medicare Advantage**" means the health insurance program for certain individuals sixty five (65) years of age and over established under Part C of Title XVIII of the Social Security Act usually in the form of a coordinated care program and generally administered by non-governmental entities.

"**Minimum Working Capital**" has the meaning ascribed to such term in **Section 1.4(c)**.

{00863216.DOCX;2 }

"**Net Revenue**" means, for any particular period, the sum of (i) the gross revenues generated by the Company and its Subsidiaries for services rendered or products sold less (ii) amounts paid by the Company and its Subsidiaries to physicians and other medical professionals and practices in connection with services that resulted in payments to the Company and its Subsidiaries less (iii) amounts that the Company and its Subsidiaries paid to any Person for payments of commissions and sharing of administrative fees in connection with services that resulted in payments to the Company (iv) less the costs incurred by the Buyer in connection with the acquisition of the Interests.

"**Neutral Firm**" has the meaning ascribed to such term in the definition of "**Independent Auditor**".

"**Objection Notice**" has the meaning ascribed to such term in **Section 1.5(c)**.

"**OCR**" means the Office for Civil Rights of the United States Department of Health and Human Services.

"**OIG**" means the Office of the Inspector General of the United States Department of Health and Human Services.

"**Ordinary Course of Business**" means the ordinary course of business of the Company consistent with past custom and practice (including with respect to frequency and amount).

"**Owned Intellectual Property**" has the meaning ascribed to such term in **Section 3.13(a)**.

"**Party**" or "**Parties**" has the meaning ascribed to such term in the Preamble.

"**Payables**" means all accounts payable, accrued expenses and other amounts payable of the Company, in each case whether fixed, contingent or otherwise, whether invoiced or not, and to the extent existing or accrued or required to be accrued at or as of the Closing Date, determined in accordance with GAAP or consistent with the Company's existing method of accounting and income tax reporting.

"**Pension Plan**" has the meaning ascribed to such term in **Section 3.12(b)**.

"**Period 1 Earn-Out Payment**" has the meaning ascribed to such term in **Section 1.3(a)**.

"**Period 1 Earn-Out Calculation**" has the meaning ascribed to such term in **Section 1.3(c)**.

"**Period 2 Earn-Out Calculation**" has the meaning ascribed to such term in **Section 1.3(c)**.

"**Period 2 Earn-Out Payment**" has the meaning ascribed to such term in **Section 1.3(b)**.

"**Permits**" has the meaning ascribed to such term in **Section 3.17(b)**.

"**Permitted Liens**" means: (a) inchoate Liens for current taxes not yet due and payable and (b) minor Liens that have arisen in the Ordinary Course of Business (including mechanics', workers', landlords', warehousemen's, bailees', licensor's and other statutory liens (or other liens arising by operation of law) incurred in the Ordinary Course of Business for amounts not in default or being contested in good faith, and deposits or pledges to secure obligations under workmen's compensation or similar laws), which in each case and in the aggregate, are not substantial in amount, do not materially detract from the value of the assets subject thereto or materially impair the operations of the Business.

"**Person**" means an individual, corporation, partnership, limited liability company, trust or unincorporated organization or a Governmental Entity, or any other entity.

"**Personal Data**" means Protected Health Information, as defined in HIPAA.

"**Personal Property**" has the meaning ascribed to such term in **Section 3.7(a)**.

"**Pre-Closing Tax Period**" means any taxable period or portion thereof ending on or prior to the Closing Date.

"**Privacy and Security Laws** " shall mean Laws regarding collecting, accessing, using, disclosing, electronically transmitting, securing, sharing, transferring and storing Personal Data including federal, state or foreign laws or regulations regarding (a) data privacy and information security, (b) data breach notification (as applicable), (c) unfair or deceptive practices relating to data privacy and security and (d) trespass, computer crime and other Laws governing unauthorized access to or use of electronic data.

"**Privacy and Security Regulations**" means HIPAA, Title XIII HITECH, and the related regulations contained in 45 C.F.R. Parts 160 and 164.

"**Proceedings**" has the meaning ascribed to such term in **Section 3.6**.

"**Protected Health Information**" has the meaning set forth in 45 C.F.R. § 160.103.

"**Purchase Price**" has the meaning ascribed to such term in **Section 1.1**.

"**Purchase Price Allocation**" has the meaning ascribed to such term in **Section 6.3(i)**.

"**Qualified Accounts Payable**" has the meaning ascribed to such term in **Section 1.4(a)**.

"**Refundable Payment by a Client**" has the meaning ascribed to such term in **Section 1.6(a)**.

"**Reimbursable Expenses**" mean any and all expenses, including those related to automobiles, telephones, memberships, travel and entertainment, of managers, directors, officers,

employees and consultants of the Company that the Company is obligated to reimburse or are of the type that the Company has generally reimbursed.

"**Required Payment**" has the meaning ascribed to such term in **Section 1.6(a)**.

"**Resolution Period**" has the meaning ascribed to such term in **Section 1.5(d)**.

"**Restricted Period**" has the meaning ascribed to such term in **Section 6.4(a)**.

"**Second Earn-Out Period**" has the meaning ascribed to such term in **Section 1.3(a)**.

"**Seller Documents**" means this Agreement and each other agreement, document or instrument to be executed or delivered by the Company, any Selling Member, or the Selling Member Representative pursuant to this Agreement, including the Kelly Employment Agreement.

"**Seller Indemnified Persons**" has the meaning ascribed to such term in **Section 7.1(b)**.

"**Selling Member**" or "**Selling Members**" has the meaning ascribed to such term in the Preamble.

"**Selling Member Representative**" has the meaning assigned to it in the Preamble.

"**Selling Party**" or "**Selling Parties**" has the meaning ascribed to such term in the Preamble.

"**Selling Parties' Knowledge**" means the actual knowledge of the Selling Members, after due inquiry with the appropriate Company personnel.

"**Software**" means any and all (i) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, (ii) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (iii) descriptions, testing scripts, schematics, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, and (iv) all documentation, including user manuals, training materials and functional specifications or similar documentation included as part of any License Agreement, relating to any of the foregoing.

"**Specified Representations**" has the meaning ascribed to such term in **Section 7.1(c)(i)**.

"**Straddle Period**" has the meaning ascribed to such term in **Section 6.3(a)**.

"**Subsidiary**" or "**Subsidiaries**" of any Person means another Person, an amount of the voting securities, other voting rights or voting membership or partnership interests of which is sufficient to elect at least a majority of its board of directors or other governing body (or, if there are no such voting interests, fifty percent (50%) or more of any class or series of capital stock or

{00863216.DOCX;2 }

other partnership, joint venture, membership or other equity interest of which) is owned directly or indirectly by such first Person.

"**Tax**" or "**Taxes**" means all taxes, including (i) all federal, state, local, provincial or foreign income or franchise taxes; (ii) all gross receipts, ad valorem, value-added, goods and services, excise, real property, personal property, sales, use, transfer, withholding, employment, unemployment, insurance, social security, business license, business organization, environmental (including Taxes under Code section 59A), workers compensation, profits, license, lease, service, service use, severance, stamp, occupation, windfall profits, customs, duties, franchise, net worth, commercial profits and other taxes imposed by any Governmental Entity; (iii) any interest, penalties, assessments or additions to tax resulting from, attributable to or incurred in connection with any items listed in clauses (i) or (ii) of this paragraph; and (iv) any liability in respect of any items described in clauses (i), (ii) and/or (iii) payable by reason of contract, assumption, transferee liability, operation of law or Treasury Regulations section 1.1502-6(a) (or any predecessor or successor thereof or any similar provision under law or otherwise).

"**Tax Benefit**" means any actual reduction in Taxes payable for any year (or period) or increase in Tax refunds received for any year (or other period).

"**Tax Contest**" has the meaning ascribed to such term in **Section 6.3(f)**.

"**Tax Return**" means any return, declaration, report, statement or information return required to be filed with any Governmental Entity with respect to Taxes, including all required Schedules and other attachments thereto, and any amendments thereof.

"**Trademarks**" means all trademarks and service marks (whether registered or unregistered), trade names and designs, together with all goodwill related to the foregoing owned by or licensed to the Company.

"**Transaction Expenses**" means the sum of the fees and expenses of third parties (such as accountants, lawyers, consultants or other outside advisors) incurred by the Company arising or resulting from the transactions described in this Agreement, which remain outstanding as of the Closing Date.

"**Transaction Regulations**" means 45 C.F.R. Parts 160 and 162.

"**Transaction Tax Items**" means any payments relating to (i) the repayment of Indebtedness, (ii) any Transaction Expenses, (iii) any Payables and (iv) any indemnification payments made by the Selling Members under this Agreement.

"**UCC**" has the meaning ascribed to such term in **Section 1.4(b)**.

"**Websites**" has the meaning ascribed to such term in **Section 3.13(g)**.

## ARTICLE 9

## MISCELLANEOUS

Section 9.1    Waiver.  Any failure of any of the Selling Parties to comply with any of their obligations or agreements herein contained may be waived only in writing by Buyer. Any failure of Buyer to comply with any of its obligations or agreements herein contained may be waived only in writing by the Selling Member Representative. No waiver granted hereunder shall be deemed a waiver of any subsequent breach or default of the same or similar nature.

Section 9.2    Notices.  All notices, requests, demands and other communications provided for hereunder shall be in writing and directed to each applicable party at the address set forth hereafter or at such other address as to which such party may inform the other parties in writing in compliance with the terms of this Section:

If to Selling Parties, then to:                          [____]

with a copy (which shall not constitute notice) to:      [____]


      (a)      If to Buyer, then to:           Physicians Healthcare Network Management, LLC
c/o Robinson Brog Leinwand et al.
875 Third Avenue
9th Floor
New York, New York 10022

with a copy (which shall not constitute notice) to:      Robinson Brog Leinwand et al.
875 Third Avenue
9th Floor
New York, New York 10022
Attention: A. Mitchell Greene, Esq.

Notices shall be deemed properly delivered and received (i) if personally delivered, upon receipt thereof, (ii) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid; or (iii) if sent by a commercial overnight courier for delivery on the next Business Day, on the first Business Day after deposit with such courier for delivery. In this Section, "notice" includes any demand or request permitted or required under this Agreement.

Section 9.3    <u>Appointment of Selling Member Representative.</u>

[___] is hereby appointed, authorized and empowered to act as a representative, for the benefit of the Selling Members (the "**Selling Member Representative**"), as the exclusive agent and attorney-in-fact to act on behalf of each Selling Member, in connection with and to facilitate the consummation of the transactions contemplated hereby, which shall include the power and authority:

(a)    to interpret the terms and provisions of this Agreement;

(b)    to execute and deliver such waivers and consents in connection with this Agreement and the consummation of the transactions contemplated hereby as the Selling Member Representative, in her sole discretion, may deem necessary or desirable;

(c)    to enforce and protect the rights and interests of the Selling Members arising out of or under or in any manner relating to this Agreement, and each other agreement, document, instrument or certificate referred to herein or therein or the transactions provided for herein or therein (including, payments following the Closing, if any, pursuant to **Sections 1.3, 1.4 and 1.**5, and in connection with any and all claims for indemnification brought under **Article 7** hereof) and to take any and all actions which the Selling Member Representative believes are necessary or appropriate under this Agreement for and on behalf of the Selling Members;

(d)    to negotiate and compromise any dispute that may arise under this Agreement or the related agreements, and to sign any releases or other documents with respect to any such dispute; and

(e)    to make, execute, acknowledge, deliver and receive all such other agreements, guarantees, orders, receipts, endorsements, notices, requests, instructions, certificates, stock powers, letters and other writings, and, in general, to do any and all things and to take any and all action that the Selling Member Representative, in its sole and absolute discretion, may consider necessary or proper or convenient in connection with or to carry out the transactions contemplated by this Agreement and all other agreements, documents or instruments referred to herein or therein or executed in connection herewith and therewith.

Buyer shall have the right to rely upon all actions taken or omitted to be taken by the Selling Member Representative pursuant to this Agreement, all of which actions or omissions shall be legally binding upon the Selling Members.  The grant of authority provided for herein (i) is coupled with an interest and shall be irrevocable and survive the bankruptcy or liquidation of any Selling Member; and (ii) shall survive the consummation of the transactions contemplated by this Agreement.  All decisions and actions by the Selling Member Representative, including without limitation any agreement between the Selling Member Representative and the Buyer relating to indemnification obligations of the parties under this Agreement, including the defense or settlement of any claims and the making of payments with respect hereto, shall be binding upon all of the Selling Members, and no Selling Member shall have the right to object, dissent, protest or otherwise contest the same.  The Selling Members shall indemnify the Selling Member Representative with respect to any action taken or suffered by the Selling Member Representative in reliance upon any notice, direction, instruction, consent, statement or other documents believed by it to be genuinely and duly authorized, nor for any other action or inaction with respect to the

{00863216.DOCX;2 }

indemnification obligations of the parties under this Agreement, including the defense or settlement of any claims and the making of payments with respect thereto, except to the extent resulting from the Selling Member Representative's own willful misconduct or gross negligence. The Selling Member Representative may, in all questions arising under this Agreement and the Exhibits, rely on the advice of counsel, and for anything done, omitted or suffered in good faith by the Selling Member Representative, the Selling Member Representative shall not be liable to the Selling Members.

Section 9.4    Governing Law; Consent to Jurisdiction and Waiver of Jury Trial.

(a)    This Agreement shall be governed by and construed in accordance with the internal substantive laws, and not the choice of law rules, of the State of New York.

(b)    Each of the Parties irrevocably submits to the exclusive jurisdiction of the United States District Court for the Southern District of New York located in New York County, State of New York, or if such court does not have jurisdiction, the state courts of the State of New York located in New York County for the purposes of any suit, action or other proceeding arising out of this Agreement or any transaction contemplated hereby. Each of the Parties hereto irrevocably and fully waives the defense of an inconvenient forum to the maintenance of such suit, action or proceeding. Each of the Parties further agrees that service of any process, summons, notice or document to such Party's respective address listed above in one of the manners set forth in **Section 9.2** hereof shall be deemed in every respect effective service of process in any such suit, action or proceeding; provided that with respect to this **Section 9.4(b)** only, any such notice solely sent in accordance with **Section 9.2** shall be deemed given only if and when actually received by the other Party. Nothing herein shall affect the right of any Person to serve process in any other manner permitted by Law. Each of the Parties hereto irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement or the transactions contemplated hereby in either of the courts named in this subsection and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum. The Parties hereto hereby irrevocably and unconditionally waive trial by jury in any legal action or proceeding relating to this Agreement or any other agreement entered into in connection therewith and for any counterclaim with respect thereto. Notwithstanding the preceding, the Parties may subsequently agree in writing that any such proceeding may be brought and maintained in any other court sitting in the United States that has jurisdiction.

(c)    The Parties further agree that should any dispute arise between the parties pursuant to this Agreement, the losing party in any action shall be responsible for paying the winning party's reasonable attorney fees.

Section 9.5    Counterparts.  This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. Execution and delivery of this Agreement by delivery of a facsimile or electronically recorded copy in .pdf file or similar format bearing a copy of the signature of a Party shall constitute a valid and binding execution and delivery of this Agreement by such Party. Such copies shall constitute enforceable original documents.

{00863216.DOCX;2 }

Section 9.6    Headings.  The section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 9.7    Entire Agreement.  This Agreement, including the Exhibits and Schedules hereto and the documents referred to herein, embodies the entire agreement and understanding of the Parties in respect of the subject matter contained herein other than the Confidentiality Agreement. This Agreement supersedes all prior agreements and understandings between the Parties with respect to the subject matter hereof other than the Confidentiality Agreement.

Section 9.8    Amendment and Modification.  This Agreement may be amended or modified only by written agreement of the Selling Member Representative and Buyer.

Section 9.9    Binding Effect; Benefits.  This Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns; nothing in this Agreement, express or implied, is intended to confer on any Person other than the Parties and their respective successors and permitted assigns (and, to the extent provided in **Section 7.1**, the other Buyer Indemnified Parties and Seller Indemnified Parties) any rights, remedies, obligations or liabilities under or by reason of this Agreement.

Section 9.10    Joint Drafting.   The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

Section 9.11    Severability.  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable Law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement so long as the economic or legal substance of the transactions described in in this Agreement is not affected in any manner materially adverse to any Party.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible to the fullest extent permitted by applicable Law in an acceptable manner to the end that the transactions described in this Agreement are fulfilled to the extent possible.

Section 9.12    Interpretation.  When a reference is made in this Agreement to an Article, Section, Schedule, or Exhibit, such reference will be to an Article or Section of, or a Schedule or Exhibit to, this Agreement unless otherwise indicated. Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation." The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement will refer to this Agreement as a whole and not to any particular provision of this Agreement. All terms used herein with initial capital letters have the meanings ascribed to them herein and all terms defined in this Agreement will have such

defined meanings when used in any certificate or other document made or delivered pursuant hereto unless otherwise defined therein. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such term. Unless otherwise indicated, any agreement, instrument or statute defined or referred to herein, or in any agreement or instrument that is referred to herein, means such agreement, instrument or statute as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes and references to all attachments thereto and instruments incorporated therein. References to a Person are also to its successors and permitted assigns.

Section 9.13  <u>Assignability</u>.  This Agreement shall not be assignable by any Party hereto without the prior written consent of the other Parties; provided that Buyer (a) may grant a security interest in its rights under this Agreement to its lenders as security for Buyer's obligations to such lenders (and such lenders may exercise their rights and remedies with respect to such security interest), (b) may assign its rights under the Agreement to any Affiliate of Buyer and (c) may assign its rights to indemnity, in whole or in part, to any Person that acquires an interest in Buyer or a material portion of its assets or the Business. Notwithstanding any assignment by Buyer described in clauses (b) and (c) of the proviso in the previous sentence of this Section, Buyer shall remain liable under this Agreement jointly and severally with the assignee.  No such assignment shall be a novation of Buyer's obligations under this Agreement.

Section 9.14  <u>Attorneys' Fees</u>.  If any Party hereto defaults in the performance of any of its obligations under this Agreement or if any dispute arises between Parties hereto concerning the meaning or interpretation of any provision of this Agreement, then the defaulting Party or the Party not prevailing in such dispute, as the case may be, shall pay any and all costs and expenses incurred by the other Party or Parties on account of such default and/or in enforcing or establishing its rights hereunder, including, without limitation, court costs (including costs of any trial or appeal therefrom), and reasonable attorneys' fees and disbursements.

Section 9.15  <u>Specific Performance.</u>  The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that each Party shall be entitled to an injunction or injunctions to prevent breaches of this Agreement (without any obligation of such Party to post any bond or other surety in connection therewith) and to enforce specifically the terms and provisions of this Agreement in addition to any other remedy to which such Party may be entitled at law or in equity.

Section 9.16  <u>Continuing Counsel.</u>  The Buyer hereby acknowledges that [___] has acted as counsel to the Company with respect to this Agreement and the transactions contemplated hereby.  The following provisions apply to the attorney-client relationship between [___] and the Company following the Closing.  The Buyer hereby agrees that (a) it will not seek to disqualify [___] from acting and continuing to act as counsel to the Selling Members or the Selling Member Representative either in the event of a dispute hereunder or in the course of the defense or prosecution of any claim relating to this Agreement or the transactions contemplated hereby, and (b) the Company has a reasonable expectation of privacy with respect to their communications (including any communications using the Company's computer and email

systems and servers) with [___] prior to the Closing to the extent that such communications relate to this Agreement or the transactions contemplated hereby.  The Buyer agrees that it will respect the confidentiality and privileged nature of all such communications between [___]  and the Company, and the Buyer agrees that it will not seek discovery of any such communications or otherwise claim any right of access or use to any such communications to the extent so privileged. The Selling Parties hereby acknowledge that Robinson Brog Leinwand Greene Genovese & Gluck PC has acted as counsel to the Buyer with respect to this Agreement and the transactions contemplated hereby.  The Selling Parties hereby agree that they will not seek to disqualify Robinson Brog Leinwand Greene Genovese & Gluck PC from acting and continuing to act as counsel to the Buyer or the Company either in the event of a dispute hereunder or in the course of the defense or prosecution of any claim relating to this Agreement or the transactions contemplated hereby.

*[Remainder of Page Intentionally Left Blank; Signature pages Follow]*

IN WITNESS WHEREOF, the parties hereto have duly executed this Membership Interests Purchase Agreement as of the date first above written.

PHYSICIANS HEALTHCARE NETWORK
MANAGEMENT SOLUTIONS, LLC

By: _____
    Name:
    Title:

OBJECTTECH HOLDINGS, LLC

By: _____
    Name: Arvind Walia
    Title:  Member

_____
[____]

_____
[____]

_____
[____]

## ASSIGNMENT OF MEMBERSHIP INTEREST

FOR VALUE RECEIVED, the undersigned ("Assignor") hereby sells, assigns, transfers, grants and conveys unto PHYSICIANS HEALTHCARE NETWORK MANAGEMENT SOLUTIONS, LLC, a Delaware limited liability company, all of Assignor's right, title and interest in OBJECTTECH HOLDINGS, LLC., a New York limited liability company (the "Company"), standing in her name on the books said Company, together with all of her rights, powers and obligations arising thereunder and does hereby irrevocably constitute and appoint the Secretary of the Company as attorney-in-fact to transfer said interest on the books of the Company with full power and substitution in the premises.

IN WITNESS WHEREOF, the undersigned has executed this instrument as of the __, day of June, 2017.

_____

_____

[___]

## ASSIGNMENT OF MEMBERSHIP INTEREST

FOR VALUE RECEIVED, the undersigned ("Assignor") hereby sells, assigns, transfers, grants and conveys unto PHYSICIANS HEALTHCARE NETWORK MANAGEMENT SOLUTIONS, LLC, a Delaware limited liability company, all of Assignor's right, title and interest in OBJECTTECH HOLDINGS, LLC., a New York limited liability company (the "Company"), standing in her name on the books said Company, together with all of her rights, powers and obligations arising thereunder and does hereby irrevocably constitute and appoint the Secretary of the Company as attorney-in-fact to transfer said interest on the books of the Company with full power and substitution in the premises.

IN WITNESS WHEREOF, the undersigned has executed this instrument as of the __, day of June, 2017.

_____

_____

[___]

# ASSIGNMENT OF MEMBERSHIP INTEREST

FOR VALUE RECEIVED, the undersigned ("Assignor") hereby sells, assigns, transfers, grants and conveys unto PHYSICIANS HEALTHCARE NETWORK MANAGEMENT SOLUTIONS, LLC, a Delaware limited liability company, all of Assignor's right, title and interest in OBJECTTECH HOLDINGS, LLC., a New York limited liability company (the "Company"), standing in her name on the books said Company, together with all of her rights, powers and obligations arising thereunder and does hereby irrevocably constitute and appoint the Secretary of the Company as attorney-in-fact to transfer said interest on the books of the Company with full power and substitution in the premises.

IN WITNESS WHEREOF, the undersigned has executed this instrument as of the __, day of June, 2017.

_____

[___]

1742

# EXHIBIT C

# HEALTH NETWORK MANAGEMENT SOLUTION

*Product Description*

**This document provides a detailed description of the AllRad Direct's Health Network Management Solution including usage examples and screen shots of actual product functionality.**

# Health Network Management Solution

## Table of Contents

Introduction ........................................................................................................................................ 2

Product Overview .............................................................................................................................. 2

Functionality ...................................................................................................................................... 3

    Scheduling Referrals ....................................................................................................................... 3

    Information Management and Reporting.......................................................................................... 4

    Product Management Functionality ................................................................................................ 5

Technology and Architecture .............................................................................................................. 5

    Compliance and Security ................................................................................................................ 6

    Application ...................................................................................................................................... 7

    Network ......................................................................................................................................... 7

    Database ......................................................................................................................................... 7

Benefits ............................................................................................................................................. 8

    Providers ........................................................................................................................................ 8

    Patients .......................................................................................................................................... 8

    Payers............................................................................................................................................. 8

Usage Example .................................................................................................................................. 10

    PCP One Healthcare Network ........................................................................................................ 10

Summary ........................................................................................................................................... 11

1745

# Health Network Management Solution

## Introduction

The Healthcare Industry is changing at an astounding rate.  The days of fee for service appear to be rapidly becoming a thing of the past and value based reimbursement models are rapidly evolving as the future of revenue generation.  The new focus on capitation based revenue models demands creative new technology solutions that are able to track, monitor, and integrate all patient encounters and clinical outcomes in the totality of the healthcare environment.  Performing a diagnosis and prescribing a treatment plan are no longer sufficient for providers to receive full remuneration.  Providers are now being required to follow-up and proactively intervene throughout the entire treatment program, until the patient issue has been fully remediated.

CMS is mandating these changes to how providers are reimbursed, however it is clear that private carriers are well on the way to initiating similar value based population wellness models.  Existing billing, PM, and EMR systems alone are not adequate to provide the necessary metrics and connectivity required to deliver the quality of healthcare envisioned by these new revenue models.  A new and more open and connected solution is required.

## Product Overview

AllRad Direct, AllRad, understands the changing needs of the healthcare community and we have developed a technology solution that delivers a connected clinical network which meets the emerging needs for patient tracking, monitoring, and scheduling.  Our solution enables you to manage the welfare of your patients by connecting you to a network of providers (hospitals, labs, pharmacies, physical therapists, specialists, long term care facilities, etc.) allowing you to view and manage the continuity and coordination of care for your patients.  Our solution can be seamlessly integrated with payer systems and provider's PM and EMR systems through easy to configure application programming interfaces API's.  We have also included API's for extending functionality as new requirements are identified.

The AllRad solution provides state of the art technology to ensure that patients, providers, and payers have complete access and insight into every aspect of the diagnosis, treatment, and follow-up for each patient.  The data base has been designed to facilitate population wellness management solutions of the future by consolidating and storing clinical assessments, diagnostic laboratory and imaging results, prescribed treatment regimens and care plans and their clinical outcomes for each patient.

Provider profitability will be based on their success in delivering high-quality and effective care to their patients. Providers already realize that it is a financial necessity to be able to improve patient outcomes and healthcare experiences.  Fortunately, AllRad Health Network Management Solution has been designed with this objective in mind.

In addition to our comprehensive connectivity with a wide range of ancillary healthcare providers and payers our solution provides secure online portals for patients, providers, and payers along with

1746

## Health Network Management Solution

management dashboards for providers and patients. Our portals facilitate patient payments, status and historical reporting, and every type of scheduling and referral transaction.

Figure 1. Product Overview:



## Functionality

AllRad's Health Network Management Solution delivers the tools that are required to help providers transition to the emerging population wellness revenue models which are being mandated by HCFA/CMS and an increasing number of private payers. While Accountable Care Organizations (ACO) and Revenue Cycle Management (RCM) Companies are the primary target markets for this product medical groups and primary care physicians (PCP) can also greatly benefit from owning AllRad's Solution.

## Scheduling Referrals

Our solution has comprehensive scheduling functionality. The entire scheduling process is automated and facilitated with elaborate workflow management tools and user portals and dashboards.

Referrals can be entered manually by the referring physician's administrative team through the provider portal or via Fax or e-mail. If the referring provider has the capability, our system can accept automated requests from their PM or EHR systems via EDI, secure FTP, or HL7 interface.

The system automatically calls the patient and notifies them of the need to schedule an appointment. Patients may elect to accept the first available appointment, or request to be included in the scheduling call with the referred facility/service. Where acceptable, the system will schedule an appointment;

notify the patient and the referring provider, and mark the request as scheduled.  The patient is also able to indicate their location and equipment preference.

The system has a scheduler portal and dashboard with work queues and alert mechanisms to ensure that all referral requests are scheduled in a timely manner, patients are notified, and any required pre-authorizations, demographics, or clinical documentation is complete and provided to the referred facility/service.

The system also manages the tracking, monitoring, and billing for each scheduled patient encounter.  In addition to the request work queue the system provides follow-up queues for identifying patient no-shows that require re-schedule, completed appointments that require follow-up for results, and billing and billing follow-up queues.  These queues are all equipped with customizable alerts to ensure that patients keep their appointments, referring providers receive all the requested clinical documentation requested from the referred facility/service, and that billing is done quickly, efficiently, and accurately. The automated workflow along with the built-in automation ensures that ACO's, Billers, and Private Practices are able to manage the entire referral process in the most cost effective manner, while also collecting the data necessary to meet value based reporting needs for utilization management and review to ensure that they are profitable and that their patients receive the highest quality care at the lowest possible cost.

The built in workflow includes an automated quality assurance and audit process that ensures data integrity, accuracy, and completeness, user efficiency, and system and process compliance.  The system provides enhanced transparency to the entire process by providing the capability for schedulers, providers, and payers to add annotations to each patient record.  In the event that a patient is called and does not answer the phone; the scheduler is able to quickly note that a call was made and a message left on the answering machine simply by selecting the appropriate annotation message on the patient status screen.

## Information Management and Reporting

Information management and reporting are crucial components to any health network management solution.  AllRad delivers industry leading capabilities for information management and case reporting required for value based revenue models.  Our solution provides complete data for all of the following areas:

- ❑ Referring Provider data,
- ❑ Patient demographic, insurance, and clinical data,
- ❑ Referred Facility/Service Provider data,
- ❑ Billing and Payment Data,
- ❑ Clinical Data from Referred Facility/Service,
- ❑ Patient Employer data, and
- ❑ Agreements between referring and referred facilities.

**Health Network Management Solution**

These extensive data resources are utilized by our reporting engine to deliver a rich variety of customizable reports and the capability to generate ad-hoc and analytical reports.  In addition to the reporting provided by the system payers, providers, and patients can access the real-time information on any patient, request, or billing based on our strict security and access requirements.

Our system produces utilization reports to support value based revenue systems.  Providers use our reporting capability to ensure that they have received the maximum revenue for their services and the quality of the care they are providing.

## Product Management Functionality

In addition to the robust scheduling, reporting, billing, and quality control functionality the AllRad system provides tools to the technical and administrative teams to ensure that the system is finely tuned and delivers world class performance.  The technical tool kit that is delivered with the system enables your technical team to optimize the network and data bases, manage security and access control, and balance the application over multiple servers.  The administrative tool kit allows you to quickly modify the wording of alerts and annotation messages.  Portals, dashboards, and portions of user screens are able to be modified to meet changing business conditions.

## Technology and Architecture

The AllRad Health Network Management Solution uses state of the art technology to deliver industry leading innovation for ACO's and Healthcare Practices.  The Microsoft based technology enables easy integration with most PM, RCM, and EHR solutions being used today.  Figure 2 below provides an overview of the basic architecture of our solution.

# Health Network Management Solution

Figure 2.



## Compliance and Security

The Health Network Management solution is a fully compliant healthcare application that protects patient, provider, and payer information using a sophisticated and proprietary security system. Providers and Payers are able to access only the data that they are authorized to view.  Strict system controls prevent individual users from updating or viewing data without the proper advance clearance from the system.  The access control and system security manual outlines best practices for keeping the security current and fully compliant.  Audits are performed annually on the latest releases of our software by independent third parties to ensure that the product remains fully compliant and addresses any changes in compliance regulations from the federal or state governments or commercial providers.

Encryption of messages containing clinical or patient data is an important feature of our product.  The automated encryption of all communication with data requiring encryption ensures that organizations using our solution will always remain compliant with data encryption requirements.

Our team of professional technicians will work with users of our Health Network Management Solution to install intrusion detection safe guards on all application components to ensure that potential attacks on the system are thwarted before they can even access the system or data.

1750

# Health Network Management Solution

## Application

All of the applications in this system are written in C# in the .NET 4.5 environment.  The applications have been designed to support customization and add-ons by providing Application Programming Interfaces (API) in areas where our clients have expressed interest in attaching third party products or proprietary solutions.  For example there is an API to validate addresses, if you wish to add another layer of quality assurance by utilizing a commercial solution to ensure that the patient demographic data is correct.

## Network

Our solution has been designed to operate seamlessly with many products in use today in the Healthcare industry.  PM, EHR, and RCM systems can all be interfaced with our health network management solution through the use of HL7 interfaces.  We also communicate with these systems using a secure File Transfer Protocol (FTP) in case the 3rd party systems do not support HL7 interfaces.  Electronic Data Interchange (EDI) is also an available option for system owners who wish to enhance the automation of their overall systems and processes.

## Database

The AllRad system utilizes the SQL Server database for all data storage.  The SQL Server database solution is the industry leader for healthcare applications.  There are many tools available to make owning and maintaining these types of databases cost effective.  There are many data recovery and disaster recovery options available for this database system.

1751

**Health Network Management Solution**

## Benefits

The major benefit of using this system is the ease of managing, and billing referral requests; however AllRad believes that with the advent of value based revenue models, this system will be a critical success factor for all PCPs and ACOs as they try to provide their utilization reporting and measure the quality of their services.  This system will also be the basis for measuring the overall health of patient populations.

The following benefits are delivered to the various groups using the system; providers, patients, and payers.

### Providers

Providers using the system will be able to meet CMS requirements for Utilization Management and Utilization Review.  They will also receive productivity improvements in their offices.

- ❑ Automate, streamline, and dramatically reduce the cost of managing scheduling and referrals for the following
  - o Specialists,
  - o Lab and Imaging orders,
  - o SNF, Long Term Care, and Hospitals,
  - o Prescriptions, and
  - o Physical Therapy
- ❑ Support reporting for population health management
- ❑ Enhance the quality and effectiveness of patient care and deliver documented improvements for treatment outcomes through coordination of references and results at the point of care.

### Patients

This system also provides benefits to the patients of providers who utilize this system.  While the biggest benefit is the convenience this system delivers, the list below provides details on the specific benefits.

- ❑ Simplifies and Automates scheduling of referred services for patients
- ❑ Ensures that patients do not neglect to follow prescribed treatment or diagnosis procedures in a timely manner
- ❑ Reduces risk of complications or failure of treatment or diagnosis
- ❑ Simplifies and expedites the payment process, eliminating the laborious and redundant paperwork submission process.

### Payers

Although this system is not designed to meet specific payer needs, it does provide benefits to payers because of the improved operational performance on the part of the provider's billing staff or BPO.  The improved accuracy and completeness of clinical documentation is the largest benefit; however the following benefits often accrue to payers also.

- ❑ Reduced re-work due to missing or inaccurate demographic data or clinical documentation
- ❑ Reduced cost of operations

**Health Network Management Solution**

- ❑ Expedited claims processing
- ❑ Enables value based wellness data audits
- ❑ Improved cost management for the population care through network utilization

**Health Network Management Solution**

## Usage Example

The example of system usage described below is a hypothetical scenario based on the experience of current system users.

### PCP One Healthcare Network

Patient P came to Dr. D, a primary care physician, working in the PCP One Healthcare Network (PCP-1). PCP-1 is a medical practice which belongs to an ACO that uses the AllRad Health Network Management Solution.

Patient P has several symptoms that lead Dr. D to suspect that P may have a cardio pulmonary condition.  Dr. D orders that P go to a hospital and have a stress test and several blood tests.  He also asks P to return for further diagnosis when the results of the tests are complete.

Dr. D enters the test requests into his EHR system and at the end of the day they are automatically input into the AllRad solution at the ACO office.  The ACO call center staff uses the AllRad solution next morning to automatically notify P that they need to schedule an appointment with the hospital for the blood work and the stress test.  When P is contacted, the call center makes the appointments with the hospital that P requests at a time that is convenient to P.  The system notifies Dr. D and P of the appointment times and confirms with the hospital that P has accepted the appointments.  The system then automatically checks to see if P needs to have these tests pre-authorized based on the data that was provided by Dr. D's EHR system.

P forgets to go to his appointment so the system issues an alert that P did not show up for his appointments at the hospital, which the system knew because it did not receive confirmation from the hospital that P kept the appointment.  The alert goes to both P and Dr. D along with the ACO scheduling staff.  The staff contacts P and reschedules the appointments for the tests.

This time P makes his appointments and the hospital sends the test results to the system, again as an automated feed from their EHR system.  The test results are stored with P's patient data and also automatically forwarded to Dr. D.

The ACO billing staff sends out bills to P's insurance carrier for the tests and when they receive payments they pay the Hospital.  Any residual is automatically billed to P.

The data from all of these interactions is used for financial reporting and also to support the requirements for value based payments or penalties.

**Health Network Management Solution**

## Summary

 The AllRad Health Network Management Solution is poised to be the industry standard platform for the new network based value based wellness management healthcare business model.  With state of the art technology, and functionality that meets the current and known future needs of Health Network Management defined by HCFA/CMS, AllRad's solution delivers a secure, compliant, versatile, and dynamic platform to ensure providers maximize revenues, minimize costs, and deliver the highest quality patient care in the new population wellness management environment.  By providing customized portals and dashboards for providers, patients, and payers in a cloud based environment the AllRad solution simplifies, automates, and reduces the cost of scheduling, monitoring, tracking, and reporting on the complex network of ancillary services involved in the diagnosis and treatment of patient healthcare issues.

Most importantly, the AllRad solution has been designed to meet both known and unknown future requirements driven by a population wellness management business model.  The solution is easily scalable to meet the needs of rapidly growing IPA's and ACO's.  It is fully compliant and secure with intrusion detection, access control, and encryption as integral design features of the solution. Innovative API's are available to ensure seamless integration with current PM and EMR systems and Business Intelligence Systems that will deliver the reporting and metrics necessary to meet the requirements from HCFA/CMS and private payers going forward.

1755

# EXHIBIT D



# Health Network Management Solution

Innovation in Healthcare Networking

**AllRad Direct**
*a radiology network*

# Presentation Contents

- Introduction
- Solution Overview
- Solution Capabilities and Benefits
  - Healthcare Provider
  - Payer
  - Patient
- Technical Overview
- Summary

# Introduction

- The Healthcare Industry is changing at an astounding rate.  The days of fee for service appear to be rapidly becoming a thing of the past and value based reimbursement models are rapidly evolving as the future of revenue generation.  The new focus on capitation based revenue models demands creative new technology solutions that are able to track, monitor, and integrate all patient encounters and clinical outcomes in the totality of the healthcare environment.  Performing a diagnosis and prescribing a treatment plan are no longer sufficient for providers to receive full remuneration.  Providers are now being required to follow-up and proactively intervene throughout the entire treatment program, until the patient issue has been fully remediated.

- CMS is mandating these changes to how providers are reimbursed, however it is clear that private carriers are well on the way to initiating similar value based population wellness models.  Existing billing, PM, and EMR systems alone are not adequate to provide the necessary metrics and connectivity required to deliver the quality of healthcare envisioned by these new revenue models.  A new and more open and connected solution is required.

# Solution Overview

- AllRad Direct (AllRad) understands the changing needs of the healthcare community and we have developed a technology solution that delivers a connected clinical network which meets the emerging needs for patient tracking, monitoring, and scheduling.  Our solution enables you to manage the welfare of your patients by connecting you to a network of providers (hospitals, labs, pharmacies, physical therapists, specialists, long term care facilities, etc.) allowing you to view and manage the continuity and coordination of care for your patients.  Our solution can be seamlessly integrated with payer systems and provider's PM and EMR systems through easy to configure application programming interfaces API's.  We have also included API's for extending functionality as new requirements are identified.

- The AllRad solution provides state of the art technology to ensure that patients, providers, and payers have complete access and insight into every aspect of the diagnosis, treatment, and follow-up for each patient.  The data base has been designed to facilitate population wellness management solutions of the future by consolidating and storing clinical assessments, diagnostic laboratory and imaging results, prescribed treatment regimens and care plans and their clinical outcomes for each patient.

- Provider profitability will be based on their success in delivering high-quality and effective care to their patients. Providers already realize that it is a financial necessity to be able to improve patient outcomes and healthcare experiences.  Fortunately, AllRad Health Network Management Solution has been designed with this objective in mind.

- In addition to our comprehensive connectivity with a wide range of ancillary healthcare providers and payers our solution provides secure online portals for patients, providers, and payers along with management dashboards for providers and patients.  Our portals facilitate patient payments, status and historical reporting, and every type of scheduling and referral transaction.

# Solution Overview - Continued

AllRad's Health Network Management Solution delivers the following critical capabilities to network participants.

- Referrals
  - Specialists
  - Imaging and Labs
  - Hospitals, Surgery Centers, and Long Term Care Facilities
  - Physical Therapy
  - Pharmacies
- Patient Scheduling and Pre-Authorization
- Billing and Follow-up
  - Insurance both primary and secondary
  - HCFA and EOB features
- Payer Management
  - Contracts and Fee Schedules
  - Claim Submission
  - PPO management
- Alerts and Notifications
  - Patients
  - Providers
- Robust Reporting Capabilities

# Solution Overview - Continued



**Security**
- ❑ Intrusion Detection
- ❑ Access Control
- ❑ Encryption

**Connectivity**
- ❑ Practice Management
- ❑ EMR
- ❑ Payer Systems
- ❑ Other

**Functionality**

Patient Alerts and Notifications

Patient Referral Scheduling

Clinical Documentation Management and Reporting

Billing

Patient Payments

Patient Demographics Maintenance

Payer Portal

Result Tracking and Reporting

Provider Portal and Dashboard

Patient Portal

Physical Therapy

Diagnostic Imaging Services

Primary Care Physicians

Labs

IPA's and ACO's

Specialty Practices

HCFA/CMS And Other Payers

Pharmacies

Hospitals and Medical Centers

**Architecture**
- ❑ .NET 4.5
- ❑ SQL Server
- ❑ HL7
- ❑ Secure FTP
- ❑ EDI
- ❑ Cloud
- ❑ API's

**User Access**
- ❑ Web Portals
- ❑ Customized Dashboards
- ❑ Electronic Communications
- ❑ Consolidated Reporting
- ❑ HCFA/CMS Metrics

1762

# Capabilities and Benefits - Provider

**<u>Capabilities</u>**

❑ Automatically Schedule Referred Patients

❑ Pre-authorize patients prior to scheduling

❑ Provider Portal

- o Management and Status Reporting
- o Schedule Change Management
- o Payment Tracking and Reporting

❑ Data Collection and Storage

- o Patient Demographics
- o Patient Procedure and Clinical Documentation
- o Billing and Payment Processing and Reporting

# Capabilities and Benefits - Provider

**Benefits**

- Automate, streamline, and dramatically reduce the cost of managing scheduling and referrals for the following
  - Specialists,
  - Lab and Imaging orders,
  - Prescriptions, and
  - Physical Therapy
- Support reporting for population health management
- Enhance the quality and effectiveness of patient care and deliver documented improvements for treatment outcomes through coordination of references and results at the point of care.

# Capabilities and Benefits - Patient

## Capabilities

- Automatically Schedules Patient Procedures
  - Contacts patients via fax, e-mail, mail, and phone
  - Enables patient call in and real time scheduling with provider
- Patient Portal
  - Medical History Request and Reporting
  - Payments and Payment Reporting
  - Appointment Request and Scheduling/Re-scheduling
  - Demographic Data and Insurance Coverage Maintenance
- Automated notifications and reminders of appointments
- Automated Alerts when schedules are changed

# Capabilities and Benefits - Payer

**Capabilities**

- Gathers and Maintains Demographic Data
- Gathers and Consolidates Clinical Documentation
- Provides easy access to data for claims or value based wellness metrics
- Maintain PPO fee schedules and networks

**Benefits**

- Reduces re-work due to missing or inaccurate demographic data or clinical documentation
- Reduces cost and expedites claims and value based wellness penalties audits
- Manage cost for the care by utilizing the network

# Technology Overview

The AllRad Health Network Management Solution is built on a Microsoft technology platform which delivers a highly versatile and dynamic architecture to ensure the highest levels of security, compliance, reliability, and performance.  The architecture is designed to be a cloud based SaaS solution to support any scalability, performance, and availability requirements.  The following are the key components of the architecture:

**<u>Components</u>**
- SQL Server
- .NET 4.5
- HL7 interfaces
- EDI and Secure FTP file transfer and communications
- Fully HIPAA compliant

# Technology Overview



# Summary

The AllRad Health Network Management Solution is poised to be the industry standard platform for the new network based value based wellness management healthcare business model.  With state of the art technology, and functionality that meets the current and known future needs of Health Network Management defined by HCFA/CMS, AllRad's solution delivers a secure, compliant, versatile, and dynamic platform to ensure providers maximize revenues, minimize costs, and deliver the highest quality patient care in the new population wellness management environment.  By providing customized portals and dashboards for providers, patients, and payers in a cloud based environment the AllRad solution simplifies, automates, and reduces the cost of scheduling, monitoring, tracking, and reporting on the complex network of ancillary services involved in the diagnosis and treatment of patient healthcare issues.

Most importantly, the AllRad solution has been designed to meet both known and unknown future requirements driven by a population wellness management business model.  The solution is easily scalable to meet the needs of rapidly growing IPA's and ACO's.  It is fully compliant and secure with intrusion detection, access control, and encryption as integral design features of the solution.  Innovative API's are available to ensure seamless integration with current PM and EMR systems and Business Intelligence Systems that will deliver the reporting and metrics necessary to meet the requirements from HCFA/CMS and private payers going forward.

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>ORION HEALTHCORP, INC. *et al.*,[1]<br><br>               Debtors. | Chapter 11<br><br>Case No. 18-71748 (AST) |
| HOWARD M. EHRENBERG, IN HIS CAPACITY<br>AS LIQUIDATING TRUSTEE OF ORION<br>HEALTHCORP, INC., ET AL.,<br><br>               Plaintiff,<br>v.<br><br>ARVIND WALIA; NIKNIM MANAGEMENT INC.,<br><br>               Defendants. | Adv. Proc. No. 20-08049 (AST) |

**AFFIRMATION OF SANFORD P. ROSEN IN SUPPPORT OF DEFENDANTS'**
**OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Sanford P. Rosen, Esq., under penalty of perjury hereby affirms as follows:

1.      I am the principal shareholder of Rosen & Associates, P.C. ("**Rosen &**
**Associates**"), which firm maintains offices for the practice of law at 747 Third Avenue, New York,
NY 10017-2803.

2.      I am admitted to practice before the courts of the state of New York, the
United States District Courts for the Southern and Eastern Districts of New York, the United States
Court of Appeals for the Second Circuit, and the Supreme Court of the United States.

3.      I submit this affirmation in support of Defendants' Opposition to Plaintiff's
Motion for Summary Judgment.

---

[1] The debtors in these chapter 11 cases are: Orion Healthcorp, Inc.; Constellation Healthcare Technologies, Inc.;
NEMS Acquisition, LLC; Northeast Medical Solutions, LLC; NEMS West Virginia, LLC; Physicians Practice Plus
Holdings, LLC; Physicians Practice Plus, LLC; Medical Billing Services, Inc.; Rand Medical Billing, Inc.; RMI
Physician Services Corporation; Western Skies Practice Management, Inc.; Integrated Physician Solutions, Inc.;
NYNM Acquisition, LLC; Northstar FHA, LLC; Northstar First Health, LLC; Vachette Business Services, Ltd.;
Phoenix Health, LLC; MDRX Medical Billing, LLC; VEGA Medical Professionals, LLC; Allegiance Consulting
Associates, LLC; Allegiance Billing & Consulting, LLC; and New York Network Management, LLC.

4.      The Defendants have filed Defendants' Corrected Affidavit in Opposition to Plaintiff's Motion for Summary Judgment. It is identical to Arvind Walia's original affidavit except that the fourth paragraph is new.

5.      The fourth paragraph of the Corrected Affidavit provides:

> "I make this affidavit under penalty of purjury under the laws of the United States of America."

6.      The fourth paragraph has been added because it was inadvertantly excluded from Mr. Walia's original affidavit. I note that Mr. Walia stated in his original affidavit that he would testify as a witness in a court proceeding to the same facts stated in his affidavit.

Dated: Shelter Island, New York
         January 5, 2024

                                        /s/ Sanford P. Rosen
                                        Sanford P. Rosen



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES
LIMITED LIABILITY PARTNERSHIP

LOS ANGELES, CA
SAN FRANCISCO, CA
WILMINGTON, DE
NEW YORK, NY

10100 SANTA MONICA BLVD.
13th FLOOR
LOS ANGELES
CALIFORNIA 90067

**TELEPHONE: 310/277 6910**

FACSIMILE: 310/201 0760

**SAN FRANCISCO**

150 CALIFORNIA STREET
15th FLOOR
SAN FRANCISCO
CALIFORNIA 94111-4500

**TELEPHONE: 415/263 7000**

FACSIMILE: 415/263 7010

**DELAWARE**

919 NORTH MARKET STREET
17th FLOOR
P.O. BOX 8705
WILMINGTON
DELAWARE 19899-8705

**TELEPHONE: 302/652 4100**

FACSIMILE: 302/652 4400

**NEW YORK**

780 THIRD AVENUE
34th FLOOR
NEW YORK
NEW YORK 10017-2024

**TELEPHONE: 212/561 7700**

FACSIMILE: 212/561 7777

**TEXAS**

440 LOUISIANA STREET
SUITE 900
HOUSTON
TEXAS 77002

**TELEPHONE: 713/691 9385**

FACSIMILE: 713/691 9407

WEB: www.pszjlaw.com

Jeffrey P. Nolan

January 25, 2024

310.772.2313
jnolan@pszjlaw.com

The Honorable Alan S. Trust
Chief Judge
United States Bankruptcy Court
Eastern District of New York
Alfonse M. D'Amato Federal Courthouse
290 Federal Plaza
Central Islip, New York 11722

> **Re:** **In re Orion HealthCorp, Inc., et al.**
> **Howard M. Ehrenberg v. Arvind Walia;**
> **Niknim Management Inc.**
> **USBC EDNY Adv. Proc. No. 20-08049-ast**

Dear Judge Trust:

We are counsel for Howard M. Ehrenberg in his capacity as Liquidating Trustee of Orion Healthcorp, Inc., *et al.* (the "Liquidating Trustee") in the above referenced adversary proceeding.

Per the Court's instruction, I write to confirm that the Court has continued the Pretrial Conference from January 23, 2024 at 2:00 p.m. (prevailing Eastern Time) to **February 27, 2024 at 2:00 p.m.** (prevailing Eastern Time), before the Honorable Alan S. Trust, United States Bankruptcy Judge, Courtroom 960 of the United States Bankruptcy Court for the Eastern District of New York, 290 Federal Plaza, Central Islip, NY 11722.

I also write to confirm that the Court will take oral argument on the submitted motions for summary judgment. If counsel for the Defendants cannot participate in the continued hearing date, he is instructed to notify the Court and parties not later than **February 20, 2024, at 5:00 pm** at which time the Court may continue the hearing and decide the motions as submitted without oral argument.

Very truly yours,

*/s/ Jeffrey P. Nolan*

Jeffrey P. Nolan

LA:4870-5773-7632.1 65004.003



ROSEN & ASSOCIATES, P.C.
747 THIRD AVENUE
NEW YORK, NY 10017-2803
(212) 223-1100 TELEPHONE
(212) 223-1102 FACSIMILE

www.rosenpc.com

February 16, 2024

**BY EMAIL**

The Honorable Alan S. Trust
Chief Judge
United States Bankruptcy Court
Eastern District of New York
Alfonse M. D'Amato Federal Courthouse
290 Federal Plaza
Central Islip, New York 11722

      Re:    **In re Orion HealthCorp, Inc., et al.**

              **Howard M. Ehrenberg in his capacity as Liquidating Trustee of Orion Healthcorp, Inc., et al. v. Arvind Walia, et al.**
              <u>**Adv. Proc. No. 20-08049 (AST)**</u>

Dear Judge Trust:

      A hearing on the parties' respective summary judgment motions was last convened on January 23, 2024, at 2:00 p.m. The Court adjourned the hearings to February 27, 2024, at 2:00 p.m. because the defendants' special litigation counsel had been admitted to the hospital.

      At the hearing of January 23, the Court directed that the defendants file a letter, no later than February 20, 2024, stating whether the defendants would be able to proceed on February 27.

      We write to inform the Court that the defendants' special litigation counsel has been released from the hospital and the defendants intend to proceed on February 27.

      Thank you.

              Respectfully,

              /s/ Sanford P. Rosen

              Sanford P. Rosen

SPR/clm
cc: Jeffrey P. Nolan, Esq.



## PACHULSKI STANG ZIEHL & JONES

### LAW OFFICES
LIMITED LIABILITY PARTNERSHIP

LOS ANGELES, CA
SAN FRANCISCO, CA
WILMINGTON, DE
NEW YORK, NY

10100 SANTA MONICA BLVD.
13th FLOOR
LOS ANGELES
CALIFORNIA 90067

**TELEPHONE: 310/277 6910**

FACSIMILE: 310/201 0760

**SAN FRANCISCO**

150 CALIFORNIA STREET
15th FLOOR
SAN FRANCISCO
CALIFORNIA 94111-4500

**TELEPHONE: 415/263 7000**

FACSIMILE: 415/263 7010

**DELAWARE**

919 NORTH MARKET STREET
17th FLOOR
P.O. BOX 8705
WILMINGTON
DELAWARE 19899-8705

**TELEPHONE: 302/652 4100**

FACSIMILE: 302/652 4400

**NEW YORK**

780 THIRD AVENUE
34th FLOOR
NEW YORK
NEW YORK 10017-2024

**TELEPHONE: 212/561 7700**

FACSIMILE: 212/561 7777

**TEXAS**

440 LOUISIANA STREET
SUITE 900
HOUSTON
TEXAS 77002

**TELEPHONE: 713/691 9385**

FACSIMILE: 713/691 9407

WEB: www.pszjlaw.com

Jeffrey P. Nolan

February 21, 2024

310.772.2313
jnolan@pszjlaw.com

The Honorable Alan S. Trust
Chief Judge
United States Bankruptcy Court
Eastern District of New York
Alfonse M. D'Amato Federal Courthouse
290 Federal Plaza
Central Islip, New York 11722

> **Re:    In re Orion HealthCorp, Inc., et al.**
> **Howard M. Ehrenberg v. Arvind Walia;**
> **Niknim Management Inc.**
> **USBC EDNY Adv. Proc. No. 20-08049-ast**

Dear Judge Trust:

We are counsel for Howard M. Ehrenberg in his capacity as Liquidating Trustee of Orion Healthcorp, Inc., *et al.* (the "Liquidating Trustee") in the above referenced adversary proceeding.

Per the Court's instruction, I write to confirm that the Court has continued the Pretrial Conference from February 27, 2024 to **March 6, 2024,** at 1:30 pm EST, before the Honorable Alan S. Trust, United States Bankruptcy Judge, Brooklyn courthouse, 271-C Cadman Plaza, E Brooklyn, NY 11201. Appearances can be made in person or via the Zoom platform.

I also write to confirm that the Court will take oral argument on the submitted motions for summary judgment.

Very truly yours,

*/s/ Jeffrey P. Nolan*

Jeffrey P. Nolan

cc:  Sanford P. Rosen, Esq. (Via ECF and electronic mail)
     (Counsel for Defendants)

LA:4870-5773-7632.3 65004.003

1774



Jeffrey P. Nolan

March 5, 2024

310.772.2313
jnolan@pszjlaw.com

**PACHULSKI**
**STANG**
**ZIEHL**
**JONES**

L A W   O F F I C E S
LIMITED LIABILITY PARTNERSHIP

L O S   A N G E L E S , C A
S A N   F R A N C I S C O , C A
W I L M I N G T O N , D E
N E W   Y O R K , N Y

10100 SANTA MONICA BLVD.
13th FLOOR
LOS ANGELES
CALIFORNIA 90067

**TELEPHONE: 310/277 6910**

FACSIMILE: 310/201 0760

**SAN FRANCISCO**

150 CALIFORNIA STREET
15th FLOOR
SAN FRANCISCO
CALIFORNIA 94111-4500

**TELEPHONE: 415/263 7000**

FACSIMILE: 415/263 7010

**DELAWARE**

919 NORTH MARKET STREET
17th FLOOR
P.O. BOX 8705
WILMINGTON
DELAWARE 19899-8705

**TELEPHONE: 302/652 4100**

FACSIMILE: 302/652 4400

**NEW YORK**

780 THIRD AVENUE
34th FLOOR
NEW YORK
NEW YORK 10017-2024

**TELEPHONE: 212/561 7700**

FACSIMILE: 212/561 7777

**TEXAS**

440 LOUISIANA STREET
SUITE 900
HOUSTON
TEXAS 77002

**TELEPHONE: 713/691 9385**

FACSIMILE: 713/691 9407

WEB: www.pszjlaw.com

The Honorable Alan S. Trust
Chief Judge
United States Bankruptcy Court
Eastern District of New York
Alfonse M. D'Amato Federal Courthouse
290 Federal Plaza
Central Islip, New York 11722

**Re:    In re Orion HealthCorp, Inc., et al.**
**Howard M. Ehrenberg v. Arvind Walia;**
**Niknim Management Inc.**
**USBC EDNY Adv. Proc. No. 20-08049-ast**

Dear Judge Trust:

We are counsel for Howard M. Ehrenberg in his capacity as Liquidating Trustee of Orion Healthcorp, Inc., *et al.* (the "Liquidating Trustee") in the above referenced adversary proceeding.

Per the Court's instruction, I write to confirm that the Court has continued the Pretrial Conference from March 6, 2024 to **March 14, 2024,** at 2:00 pm EST, before the Honorable Alan S. Trust, United States Bankruptcy Judge, Brooklyn courthouse, 271-C Cadman Plaza, E Brooklyn, NY 11201. Appearances can be made in person or via the Zoom platform.

I also write to confirm that the Court will take oral argument on the submitted motions for summary judgment.

Very truly yours,

*/s/ Jeffrey P. Nolan*

Jeffrey P. Nolan

cc:  Sanford P. Rosen, Esq. (Via ECF and electronic mail)
      (Counsel for Defendants)

LA:4870-5773-7632.4 65004.003

1775



PACHULSKI
STANG
ZIEHL
JONES

L A W   O F F I C E S
LIMITED LIABILITY PARTNERSHIP

L O S   A N G E L E S ,   C A
S A N   F R A N C I S C O ,   C A
W I L M I N G T O N ,   D E
N E W   Y O R K ,   N Y

10100 SANTA MONICA BLVD.
13th FLOOR
LOS ANGELES
CALIFORNIA 90067

TELEPHONE: 310/277 6910

FACSIMILE: 310/201 0760

SAN FRANCISCO
150 CALIFORNIA STREET
15th FLOOR
SAN FRANCISCO
CALIFORNIA 94111-4500

TELEPHONE: 415/263 7000

FACSIMILE: 415/263 7010

DELAWARE
919 NORTH MARKET STREET
17th FLOOR
P.O. BOX 8705
WILMINGTON
DELAWARE 19899-8705

TELEPHONE: 302/652 4100

FACSIMILE: 302/652 4400

NEW YORK
780 THIRD AVENUE
34th FLOOR
NEW YORK
NEW YORK 10017-2024

TELEPHONE: 212/561 7700

FACSIMILE: 212/561 7777

TEXAS
440 LOUISIANA STREET
SUITE 900
HOUSTON
TEXAS 77002

TELEPHONE: 713/691 9385

FACSIMILE: 713/691 9407

Jeffrey P. Nolan

April 5, 2024

310.772.2313
jnolan@pszjlaw.com

The Honorable Alan S. Trust
Chief Judge
United States Bankruptcy Court
Eastern District of New York
Alfonse M. D'Amato Federal Courthouse
290 Federal Plaza
Central Islip, New York 11722

> **Re:    In re Orion HealthCorp, Inc., et al.**
> **Howard M. Ehrenberg v. Arvind Walia;**
> **Niknim Management Inc.**
> **USBC EDNY Adv. Proc. No. 20-08049-ast**

Dear Judge Trust:

We are counsel for Howard M. Ehrenberg in his capacity as Liquidating Trustee of Orion Healthcorp, Inc., *et al.* (the "Liquidating Trustee") in the above referenced adversary proceeding.

Per the Court's instruction, I write to confirm that the Court has continued the Pretrial Conference and the pending summary judgment motions from March 14, 2024 to **April 10, 2024 at 11:00 am** EST, before the Honorable Alan S. Trust, United States Bankruptcy Judge, Brooklyn courthouse, 271-C Cadman Plaza, E Brooklyn, NY 11201, which date will be treated as a Ruling Conference. Appearances can be made in person or via the Zoom platform.

Very truly yours,

*/s/ Jeffrey P. Nolan*

Jeffrey P. Nolan

cc:    (Counsel for Defendants)
Sanford P. Rosen, Esq; (Via ECF and electronic mail)
Eugene Scheiman, Esq. (Via ECF and electronic mail)

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------
In re:

ORION HEALTHCORP, INC., *et al.*,                     Case No.: 18-71748-AST

                                                      Chapter 11


                    Debtors.
-----------------------------------------------------------------
HOWARD M. EHRENBERG, IN HIS
CAPACITY AS LI  UIDATING TRUSTEE OF
ORION HEALTHCORP, INC., *et al*,

                    Plaintiff,

        -against-                                     Adv Pro No. 20-08049-AST

ARVIND WALIA  NIKNIM MANAGEMENT
INC.,

                    Defendants.
 -----------------------------------------------------------------

## ADVERSARY PRETRIAL SCHEDULING ORDER

        The Court enters this Order in accordance with Rule 16 of the Federal Rule of Civil
Procedure ("Federal Rules"), as incorporated by Rule 7016 of the Federal Rule of Bankruptcy
Procedure ("Bankruptcy Rules"). It is hereby **ORDERED**,

**Trial Date and Time Limits:**

1.      Trial in the above matter is scheduled for **July 24, 2024 at 9:30 a.m.**  Plaintiff will be given
        **2 Hours**, and the Defendants will be given **2 Hours** to present all arguments and evidence.
        The Plaintiff may reserve a portion of this time for rebuttal.

**Discovery:**

2.      Discovery is closed.

**Direct Testimony by Affidavit:**

3.      The parties shall submit any direct testimony from themselves and any witness under their
        control (including e  perts) by Affidavit signed by the witness(es).  Affidavits shall be filed
        with the Court no later than **July 10, 2024**  copies of the filed Affidavits shall be served

upon the opposing party (or parties) by facsimile, electronic mail, or first class mail simultaneously with the filing of same with the Court. Any witness for whom an Affidavit of direct testimony has been filed must appear at the trial for cross-e amination.

Any objection to any portion of a witness affidavit, including evidentiary objections, shall be filed no later than **July 12, 2024**.

Nothing contained herein, however, shall limit the applicability of Bankruptcy Rule 7032.

**Joint Pretrial Memorandum and Pretrial Submissions:**

4.    The parties are ordered to file, on or before **July 10, 2024**, a Joint Pretrial Memorandum approved by all counsel and unrepresented parties, which shall set forth the following:

(A)    The name, address and telephone number of each witness, separately identifying those whom the party e pects to present and those whom the party may call if the need arises, and identifying those witnesses for whom an affidavit of direct testimony has been filed

(B)    A list of witnesses whose testimony is e pected to be presented by means of a deposition and, if taken stenographically, a transcript of the pertinent portions of the deposition testimony

(C)    A list of witnesses intended to be called as e perts along with a summary of their qualifications, together with any statement(s) as to an objection to their qualification, and identifying those e pert witnesses for whom an affidavit of direct testimony has been filed    (D)    An appropriate identification (prenumeration) of each document or other e hibit, including witness affidavits, other than those to be used for impeachment or rebuttal, in the sequence in which they will be offered, including summaries of other evidence, separately identifying those e hibits which the party e pects to offer and those which the party may offer if the need arises

(E)    A statement of any objection, together with the grounds therefor, reserved as to the admissibility of a deposition designated by another party and/or to the admissibility of documents or e hibits.  Objections not so disclosed, other than objections under Rules 402 and 403 of the Federal Rules of Evidence, shall be deemed waived unless e cused by the Court for good cause shown

(F)    A statement confirming that the parties have e changed copies of the e hibits, other than those to be used for impeachment or rebuttal, no less than **seven (7) days** prior to filing the Joint Pretrial Memorandum  and

(G)    Facts which are admitted and require no proof.

(H)     uestions of fact to be determined by the Court at trial.

(I)     Issues of law to be decided by the Court at trial.

5.     The parties may each file briefs and submit proposed findings of fact and conclusions of law contemporaneous with the filing of the Joint Pretrial Memorandum.

6.     Parties shall bring sufficient copies of all e hibits to Court for trial so that a copy is available for the Courtroom Deputy, the witness and each counsel.  The parties shall provide one (1) additional set of e hibits in hard copy, and two (2) additional sets on a CD rom, flash drive or other media to Chambers no less than **three (3) business days** prior to trial.  E hibits shall be assembled in notebooks tabbed with appropriate e hibit numbers (Plaintiff shall designate its e hibits using numbers and Defendants shall designate their e hibits using letters).

**Amendments to Pleadings:**

7.     Any motions seeking leave to file amended or supplemental pleadings must be filed and served pursuant to Federal Rule 15, as incorporated by Bankruptcy Rule 7015, and Judge Trust's published procedures for motions in adversary proceedings, *http://www.nyeb.uscourts.gov/judge-trusts-procedures*, on or before **May 24, 2024**.

**Final Pretrial Conferences:**

8.     A *final* pretrial conference is scheduled for **July 17, 2024 at 1:30 p.m.** in Courtroom 960, United States Bankruptcy Court, 290 Federal Plaza, Central Islip, New York.

**Compliance with Rule 9037**:

9.     All papers submitted to the Court, including e hibits, must comply with Bankruptcy Rule 9037.

**Sanctions for Non-Compliance:**

10.    Failure to strictly comply with any of the provisions of this Order may result in the automatic entry of a dismissal, sanctions, a default, or other relief as the circumstances warrant, in accordance with Federal Rule 16, as incorporated by Bankruptcy Rules 7016 and 9014.

**Settlement/Mediation**:

11.    The parties are directed to return to mediation.  The mediation shall conclude on or before **May 10, 2024**.  The mediator shall file a report of mediation on or before **May 24, 2024**.  If a settlement is reached, the parties shall submit to the Court a stipulation approved by all parties and a motion for approval of same no less than **ten (10) business days** prior to the date of the Trial, along with an email to ast_hearings_nyeb.uscourts.gov, notifying the Court of the proposed settlement.  **If a stipulation and motion are not timely submitted to the Court, all parties shall be prepared to proceed with the Trial**.  If this adversary proceeding is removed from the trial calendar based upon the announcement of a settlement,

the case will not be reset for Trial if the parties fail to consummate the settlement. In such event, the Court will consider only a motion to enforce the settlement, unless the sole reason the settlement is not consummated is that the Court did not approve the settlement, in which case the matter will be reset for Trial at a later date.

Dated: April 16, 2024
        Central Islip, New York



_____
Alan S. Trust
Chief United States Bankruptcy Judge

# Notice Recipients

| | | |
|---|---|---|
| District/Off: 0207–8 | User: admin | Date Created: 4/17/2024 |
| Case: 8–20–08049–ast | Form ID: pdf000 | Total: 11 |

**Recipients of Notice of Electronic Filing:**
| | | |
|---|---|---|
| aty | Eugene Ronald Scheiman | eugene.scheiman@scheimanlaw.com |
| aty | Ilan D Scharf | ischarf@pszyjw.com |
| aty | Jeffrey P Nolan | jnolan@pszjlaw.com |
| aty | Paris Gyparakis | pgyparakis@pbnlaw.com |
| aty | Sanford P Rosen | srosen@rosenpc.com |

TOTAL: 5

**Recipients submitted to the BNC (Bankruptcy Noticing Center):**
| | | | | | |
|---|---|---|---|---|---|
| aty | Jeffrey Norlan | Pachulski Stang Ziehl & Jones LLP | 780 Third Avenue | 34th Floor | New York, NY 10017 |
| ust | United States Trustee | Long Island Federal Courthouse | 560 Federal Plaza – Room 560 | Central Islip, NY 11722–4437 USA | |
| 10129404 | Arvind Walia | C/O The Law Office of Eugene R. Scheiman | 570 Lexington Avenue, Suite 1600 | New York, New York 10022 | |
| 10129400 | Eugene R. Scheiman | The Law Office of Eugene R. Scheiman | 570 Lexington Avenue Suite 1600 | New York, N.Y. 10022 | eugene.scheiman@scheimanlaw.com | 646–280–9000 |
| 10128481 | Eugene R. Scheiman | The Law Office of Eugene R. Scheiman | 570 Lexington Avenue, Suite 1600 | 646–280–9000 | Eugene.scheiman@scheimanlaw.com |
| 10129405 | Niknim Management Inc. | C/O The Law Office of Eugene R. Scheiman | 570 Lexington Avenue, Suite 1600 | New York, New York 10022 | |

TOTAL: 6

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>ORION HEALTHCORP, INC. *et al.*,<br><br>          Debtors. | Chapter 11<br><br>Case No. 18-71748 (AST) |
| HOWARD M. EHRENBERG, IN HIS CAPACITY AS LIQUIDATING TRUSTEE OF ORION HEALTHCORP, INC., ET AL.,<br><br>          Plaintiff,<br>v.<br><br>ARVIND WALIA  NIKNIM MANAGEMENT INC.,<br><br>          Defendants. | Adv. Proc. No. 20-08049 (AST) |

**ORDER  RANTIN  AND DENYIN  IN PART PLAINTIFF S MOTION FOR SUMMARY JUD  MENT/SUMMARY ADJUDICATION AND DENYIN  DEFENDANTS AR  IND WALIA AND NIKNIM MANA  EMENT, INC. CROSS-MOTION FOR SUMMARY JUD  MENT; RULIN  ON E  IDENTIARY OBJECTIONS; AND ESTABLISHIN  FACTS AS ADMITTED IN THE CASE PURSUANT TO FRCP 56(g)**

       The Court, having considered the *Motion for Summary Judgment, or in the Alternative Summary Adjudication as Against Defendants Arvind Walia; Niknim Management Inc.,* Docket No. 53   as filed by  Plaintiff, Howard M. Ehrenberg in his capacity as Liquidating Trustee of Orion Healthcorp, Inc., *et al.* (the "**Plainti** ") and the accompanying *Joint Statement of Uncontroverted Facts; Plaintiff's Statement of Additional Uncontroverted Facts in Support of Motion for Summary Judgment or in the Alternative Summary Adjudication*  Docket No. 54 *; Affidavit of Jeff Nolan in Support of Plaintiff's Motion for Summary Judgment*  Docket No. 55 *; Affidavit of Edith Wong in Support of Plaintiff's Motion for Summary Judgment*  Docket No. 56 *; Affidavit of Frank Lazzara in Support of Plaintiff's Motion for Summary Judgment*  Docket No. 57 *;Request for Judicial Notice in Support of Plaintiff's Motion for Summary Judgment*  Docket

No. 58   and accompanying papers (collectively "the **Motion**")   Docket No. 53 [1] seeking entry

of judgment against Defendants Arvind Walia and Niknim Management, Inc.    (the

"**De endants**")   and all replies, objections and other pleadings relating thereto   Docket Nos. 60,

64-69, 71, 72, 73   and the Court, having considered the Defendants *Motion for Partial Summary*

*Judgment Dismissing Asserted in the Complaint Under 11 USC §544* and the pleadings related

thereto   Docket No. 51   and all replies, objections and other pleadings thereto   Docket Nos. 52,

61-62, 70   (collectively "the **Cross-Motion**")*;* and the Court after due deliberation thereon   and

as set forth in the record at the April 10, 2024   Ruling Conference (the "**Ruling Hearing**")   and

sufficient cause appearing therefor   and the Court having made certain legal and factual findings

as set forth in the record of the Ruling Hearing,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that:

1.    The portion of the Motion to avoid the First Transfer made on April 15, 2016 in the

amount of   2,500,000 is denied with respect to Plaintiff's First Cause of Action to Avoid

an Intentionally Fraudulent Transfer under 11 U.S.C.    544 and 548(a)(1)(A) and N.Y.

Debtor and Creditor Law   276, and Second Cause of Action to Avoid a Constructively

Fraudulent Transfer under 11 U.S.C.   544 and N.Y. Debtor and Creditor Law    272-

275, and   273-a,   as a factual issue remains to be determined at trial   as stated in

particular on the record at the Ruling Hearing.

2.    The portion of the Motion to avoid the Second Transfer made on June 23, 2017, in the

amount of   1,520,000 is granted as against Defendant Niknim Management, Inc., as to

Plaintiff's First Cause of Action to Avoid an Intentionally Fraudulent Transfer under 11

U.S.C.    544 and 548(a)(1)(A) and N.Y. Debtor and Creditor Law   276, and Second

---

[1] Capitalized terms used but not defined herein shall have the meanings and definitions ascribed to them in the Motion.

2

Cause of Action to Avoid a Constructively Fraudulent Transfer under 11 U.S.C.  544 and N.Y. Debtor and Creditor Law   272-275, and   273-a, as Plaintiff has carried his burden and no further issue of fact or law remains.  As to Defendant Arvind Walia, the Motion <u>is denied</u> as to the Second Transfer, as a factual issue remains to be determined at trial as stated in particular on the record at the Ruling Hearing.

3.      For purposes of the Motion, Plaintiff has failed to establish that, as a matter of law, judgment awarded in favor of Plaintiff should be rendered against Defendants jointly and severally on the theory of alter ego liability.  In that regard, that portion of the Motion <u>is denied</u>.

4.      The Cross-Motion is denied for the reasons set forth on the record at the Ruling Hearing.

5.      Pursuant to Fed. R. Civ. Proc. 56(g) and as set forth on the record of the Ruling Hearing, certain facts are established for trial as undisputed facts established in the case.

6.      The Bankruptcy Court retains jurisdiction to enforce and implement the respective terms and provisions of this Order.

Dated: April 22, 2024
        Central Islip, New York

_____
                Alan S. Trust
        Chief United States Bankruptcy Judge

# Notice Recipients

District/Off: 0207–8                    User: admin                    Date Created: 4/23/2024

Case: 8–20–08049–ast                    Form ID: pdf000                Total: 7


**Recipients of Notice of Electronic Filing:**

| | | |
|---|---|---|
| aty | Eugene Ronald Scheiman | eugene.scheiman@scheimanlaw.com |
| aty | Ilan D Scharf | ischarf@pszyjw.com |
| aty | Jeffrey P Nolan | jnolan@pszjlaw.com |
| aty | Paris Gyparakis | pgyparakis@pbnlaw.com |
| aty | Sanford P Rosen | srosen@rosenpc.com |

TOTAL: 5


**Recipients submitted to the BNC (Bankruptcy Noticing Center):**

| | | | | | |
|---|---|---|---|---|---|
| aty | Jeffrey Norlan | Pachulski Stang Ziehl & Jones LLP | 780 Third Avenue | 34th Floor | New York, NY 10017 |
| ust | United States Trustee | Long Island Federal Courthouse | 560 Federal Plaza – Room 560 | | Central Islip, NY 11722–4437 USA |

TOTAL: 2

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| ORION HEALTHCORP, INC.,[1] | Case No. 18-71748-(AST) |
| Debtor. | |
| HOWARD M. EHRENBERG IN HIS CAPACITY AS LIQUIDATING TRUSTEE OF ORION HEALTHCORP, INC., ET AL., | |
| Plaintiff, | |
| - against - | Adversary Proc. No. 20-08049-(AST) |
| ARVIND WALIA; NIKNIM MANAGEMENT INC., | |
| Defendant. | |

**PARTIAL JUDGEMENT AGAINST NIKNIM MANAGEMENT INC.**

The Court called this adversary for the duly scheduled ruling conference on April 10, 2024,

(the "Ruling Conference") on plaintiff, Howard M. Ehrenberg, In His Capacity As Liquidating

Trustee Of Orion Healthcorp, Inc.'s ("Plaintiff") motion (the "Motion") for Summary Judgment,

or in the Alternative Summary Adjudication as Against Defendants Arvind Walia ("Walia") and

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Orion Healthcorp, Inc. (7246); Constellation Healthcare Technologies, Inc. (0135); NEMS Acquisition, LLC (7378); Northeast Medical Solutions, LLC (2703); NEMS West Virginia, LLC (unknown); Physicians Practice Plus Holdings, LLC (6100); Physicians Practice Plus, LLC (4122); Medical Billing Services, Inc. (2971); Rand Medical Billing, Inc. (7887); RMI Physician Services Corporation (7239); Western Skies Practice Management, Inc. (1904); Integrated Physician Solutions, Inc. (0543); NYNM Acquisition, LLC (unknown) Northstar FHA, LLC (unknown); Northstar First Health, LLC (unknown); Vachette Business Services, Ltd. (4672); Phoenix Health, LLC (0856); MDRX Medical Billing, LLC (5410); VEGA Medical Professionals, LLC (1055); Allegiance Consulting Associates, LLC (7291); Allegiance Billing & Consulting, LLC (7141); New York Network Management, LLC (7168). The corporate headquarters and the mailing address for the Debtors listed above is 1715 Route 35 North, Suite 303, Middletown, NJ 07748

Niknim Management Inc. ("Niknim"), and the Court granted the Motion in part, and denied the Motion in part.  Therefore, consistent with the Court's decision on the Motion, judgment is hereby entered against Niknim in favor of Plaintiff as follows.

**IT IS HEREBY ORDERED**:

1.    Judgment is entered against defendant, Niknim Management Inc. and in favor of Plaintiff, Howard M Ehrenberg, the duly appointed Liquidating Trustee for Orion Healthcorp., Inc., in the amount of $1,520,000 in principal plus costs of suit of $350.00 and prejudgment interest calculated from the from the date of the filing of the Complaint on March 13, 2020, to judgment, (1,524 days) as allowed by the applicable statutory interest rate.

2.    Post-judgment interest shall accrue and be payable by defendant, Niknim Management Inc., at the prevailing federal rate pursuant to 28 U.S.C. § 1961(a) from the date of entry of this Judgment to the date the amount is paid in full.

Dated: May 22, 2024
       Central Islip, New York

_____
            Alan S. Trust
Chief United States Bankruptcy Judge

# Notice Recipients

District/Off: 0207–8                   User: admin                        Date Created: 5/22/2024

Case: 8–20–08049–ast                   Form ID: pdf000                    Total: 9

---

**Recipients submitted to the BNC (Bankruptcy Noticing Center) without an address:**
pla          Howard M Ehrenberg

                                                                          TOTAL: 1

**Recipients of Notice of Electronic Filing:**
aty          Ilan D Scharf           ischarf@pszyjw.com
aty          Jeffrey P Nolan         jnolan@pszjlaw.com
aty          Paris Gyparakis         pgyparakis@pbnlaw.com
aty          Sanford P Rosen          srosen@rosenpc.com

                                                                          TOTAL: 4

**Recipients submitted to the BNC (Bankruptcy Noticing Center):**
aty          Jeffrey Norlan        Pachulski Stang Ziehl & Jones LLP      780 Third Avenue        34th Floor       New York,
             NY 10017
ust          United States Trustee        Long Island Federal Courthouse        560 Federal Plaza – Room 560        Central Islip,
             NY 11722–4437 USA
10129404     Arvind Walia        C/O The Law Office of Eugene R. Scheiman        570 Lexington Avenue, Suite 1600        New
             York, New York 10022
10129405     Niknim Management Inc.        C/O The Law Office of Eugene R. Scheiman        570 Lexington Avenue, Suite
             1600        New York, New York 10022

                                                                          TOTAL: 4

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------
|  |  |
In re: | : | Chapter 11
 | : |
ORION HEALTHCORP, INC.[1] | : | Case No. 18-71748 (AST)
 | : |
            Debtors. | : | (Jointly Administered)

-------------------------------------

HOWARD M. EHRENBERG IN HIS CAPACITY AS :   Adv. Pro. No. 20-08049 (AST)
LIQUIDATING TRUSTEE OF ORION
HEALTHCORP, INC., ET AL.,            :   Trial:   July 24, 2024
                                   :   Time:   9:30 a.m.
                Plaintiff,    :   Place:   Courtroom 960
                                     :           U.S. Bankruptcy Court
                  v.           :           290 Federal Plaza
                                     :           Islip, NY
ARVIND WALIA; NIKNIM MANAGEMENT, INC.,   :   PTC:   July 17, 2024
                                     :   Time:   1:30 p.m.
                Defendants.   :   
                                     :   Judge:   Hon. Alan S. Trust

-------------------------------------

**TRIAL BRIEF OF PLAINTIFF, HOWARD M. EHRENBERG IN HIS CAPACITY AS
LIQUIDATING TRUSTEE OF ORION HEALTHCORP, INC.**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Orion Healthcorp, Inc. (7246); Constellation Healthcare Technologies, Inc. (0135); NEMS Acquisition, LLC (7378); Northeast Medical Solutions, LLC (2703); NEMS West Virginia, LLC (unknown); Physicians Practice Plus Holdings, LLC (6100); Physicians Practice Plus, LLC (4122); Medical Billing Services, Inc. (2971); Rand Medical Billing, Inc. (7887); RMI Physician Services Corporation (7239); Western Skies Practice Management, Inc. (1904); Integrated Physician Solutions, Inc. (0543); NYNM Acquisition, LLC (unknown) Northstar FHA, LLC (unknown); Northstar First Health, LLC (unknown); Vachette Business Services, Ltd. (4672); Phoenix Health, LLC (0856); MDRX Medical Billing, LLC (5410); VEGA Medical Professionals, LLC (1055); Allegiance Consulting Associates, LLC (7291); Allegiance Billing & Consulting, LLC (7141); New York Network Management, LLC (7168). The corporate headquarters and the mailing address for the Debtors listed above is 1715 Route 35 North, Suite 303, Middletown, NJ 07748.

# **TABLE OF CONTENTS**

I.    PROCEDURAL POSTURE ................................................................................. 2

II.   PRELIMINARY STATEMENT ........................................................................ 2

III.  FACTS ............................................................................................................. 3

     (i)     The First Transfer (April 15, 2016):  $2,500,000 .................................... 3

     (ii)    The Second Transfer (June 28, 2017): $1,520,000 ............................... 7

     (iii)   Defendant NIKNIM Management, Inc. and Its Operations.................... 8

IV.   BY DEFENDANT'S OWN ADMISSION THE FIRST TRANSFER IS AN
     INTENTIONALLY FRAUDULENT TRANSFER UNDER STATE AND
     FEDERAL LAW ............................................................................................... 8

V.    THE DIRECT EVIDENCE CLEARLY ESTABLISHES THE DUO OF PARMAR
     AND WALIA FALSIFYING THE APA TO DEFRAUD CREDITORS ...................... 10

     (i)     The Lack Or Inadequacy Of Consideration: ....................................... 12

     (ii)    The Family, Friendship Or Close Associate Relationship Between
            The Parties: ......................................................................................... 14

     (iii)   The Retention Of Possession, Benefit, Or Use Of The Property In Question:..... 14

     (iv)   The Secrecy, Haste, Or Unusualness Of The Transaction;  A Questionable
            Transfer Not In The Usual Course Of Business: ................................. 15

     (v)    The Financial Condition Of The Party Sought To Be Charged Both Before
            And After The Transaction In Question: ............................................. 16

     (vi)   The Existence Or Cumulative Effect Of A Pattern Or Series Of Transactions Or
            Course Of Conduct After The Incurring Of Debt, Onset Of Financial Difficulties,
            Or Pendency Or Threat Of Suits By Creditors: ................................. 17

     (vii)   The General Chronology Of The Events And Transactions Under Inquiry: ........ 17

VI.   THE FIRST TRANSFER WAS CONSTRUCTIVELY FRAUDLENT TO CREDITORS
     AS THE DEBTOR WAS INSOLVENT AND THE TRANSFER WAS NOT MADE
     FOR FAIR CONSIDERATION ......................................................................... 18

VII.  DEFENDANT WALIA PARTICIPATED IN THE FRAUDULENT TRANSFER........ 21

VIII.   DEFENDANTS WALIA AND NIKNIM ARE THE ALTER EGO OF ONE
        ANOTHER AND EQUITY DEMANDS THEY BE HELD JOINTLY AND
        SEVERALLY RESPONSIBLE FOR ANY JUDGMENT ............................................ 22

        (i)     NIKNIM's Lack of Business Purpose ................................................. 23

        (ii)    Commingling of Funds ........................................................................ 23

        (iii)   NIKNIM's Deposits To Pay Walia's Personal Expenses: .................... 23

        (iv)    The Failure To Maintain Adequate Corporate Minutes Or Records ................... 24

        (v)     Domination Or Control Of The Corporation By The Stockholder ...................... 24

        (vi)    Capitalization ..................................................................................... 24

        (vii)   Use Of A Single Address .................................................................... 25

        (viii)  Inequitable Result .............................................................................. 25

Comes now Plaintiff, Howard M. Ehrenberg in his capacity as Liquidating Trustee of Orion Healthcorp, Inc., and submits his Trial Brief pursuant to the Adversary Pretrial Scheduling Order.

## I.
## PROCEDURAL POSTURE

1.     On April 10, 2024, the Court issued extensive findings of fact pursuant to Fed. R. Proc. 56(g) , incorporated by Rule 7056, which became the law of the case.  (See Notice of Ruling ("NOR"), p. 8, lns. 10-17, attached hereto as **Exhibit A**.)

2.     Two Transfers are at issue in the Complaint.  The First in the amount of $2,500,000 ("First Transfer" and the Second Transfer in the amount of $1,520,000 ("Second Transfer").  The Second Transfer has already been adjudicated as an intentional and constructively fraudulent transfer; the only remaining question being the liability of the Defendant Arvind Walia. It is an established fact at trial that the Transfers constituted the Debtors property and both Transfers were made within two years  before the date of the filing of the Petition.

## II.
## PRELIMINARY STATEMENT

3.     The undisputed facts leave no doubt.  The Transfers were an orchestrated fraud on creditors perpetrated by Paul Parmar and Arvind Walia.  Defendant, Arvind Walia was either his partner in crime or his enabler, as neither Transfer could have occurred but for Defendant Walia's involvement.  Both Transfers orchestrated a fraud on all creditors.  $4,020,000 exited the estate for no consideration.

4.     The Trustee will submit evidence that the Transfers between insiders were not arm's-length transactions made in the usual course of business, but hastily conceived, in secret where the two executives talked in riddles in order to cover their true intentions. The APA and the alleged escrow which Walia claims as the source of the "fair consideration" stems from a transaction which is admittedly fraudulent on its face.  If the agreement is viewed as being

conceived with the intent to deceive, it cannot be the source of a valid debt enforceable under New York law. But even more to the point, the only admissible evidence introduced at trial will satisfy the badges of fraud. Defendants' will introduce no credible evidence of value, a burden they shoulder. Instead, Defendants' will offer explanations that are not credible. Whether partner or participant, the admissible evidence submitted by the Trustee documents no consideration, let alone "reasonably equivalent value," received for the First Transfer. As the facts make clear, Defendant NIKNIM was purposely inserted by Walia only a day or two before the executives diverted the Debtor's monies. Walia then personally drained the NIKNIM bank account within 3 days which monies he used to pay he and his family's personal expenses. Walia followed no corporate formalities for NIKNIM abusing the corporate privilege. Creditors deserve the opportunity to purse both Defendants for the wrongs perpetrated.

### III.
### FACTS

5.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (F), (H) and (O)

6.      Venue of this adversary proceeding in this district is proper pursuant to 28 U.S.C. § 1409.

7.      The First Amended Complaint seeks the return of $4,020,000. It is undisputed that the transfers at issue involved an interest of the Debtor in property, that was made on or within two years before the date of the filing of the petition in bankruptcy.

8.      Parmar and Defendant Walia were both high level officers of the debtors Orion and CHT at the time of each transfer and Defendant Walia was an insider. (NOR, p. 39, lns. 3-6)

### (i)      The First Transfer (April 15, 2016):  $2,500,000

9.      The Debtors were an enterprise of several companies aggregated through a series of acquisitions which operated in the healthcare sector primarily in revenue and practice management for physician practices.  (NOR, p. 26, lns. 6-10)

10.    In 2015, Paul Parmar was the Chief Executive officer of CHT and looking to acquire a medical billing company. He became interested in purchasing Porteck Corporation. (NOR, p. 26, lns. 6-18)

11.    Porteck Corporation ("Porteck") was a technology services company in the healthcare industry incorporated, owned and controlled by Defendant Walia who acted as its CEO. (NOR, p. 26, lns. 2-23)

12.    At the time, Porteck consisted of two business lines: AHMS and PC Advantage ("PCA") which were both medical billing companies. (NOR, pp. 26-27, lns. 24-1)

13.    In March 2015, the debtor entity Physicians Practice Plus acquired the assets of Porteck pursuant to an Asset Purchase Agreement ("APA"). The Sellers were Walia, Porteck, and the Janaminder Trust. (NOR, p. 26, lns. 6-18)  Mr. Walia executed the APA on behalf of himself, Porteck and the Janaminder Trust. The Walia Trust never signed the APA. Mr. Parmar executed the APA on behalf of the Debtor, Physicians Practice. (NOR, p. 27, lns. 10-18)

14.    The APA, reflects a purchase price of $12.8 million for the sale of Porteck even though Mr. Walia had agreed in writing to sell the Porteck assets for $10.8 million. The purchase price was "juiced upwards" because Mr. Parmar told Walia he needed to add an additional $2M to the APA as "deal fees". (NOR, p. 27, lns. 18-24)

15.    Mr. Walia was unconcerned about the deal price being juiced up. Mr Walia testified that he paid no attention to what Mr. Parmar was doing when the APA purchase price was set at $2 million more than the agreed purchase price. Per his testimony, "as long as Walia's share did not change, it did not concern me." As established by the record, the actual deal fees paid to the broker, Abstract business advisors, was $192,500, or one-tenth or so of the nearly $2 million by which the purchase price was juiced up. (NOR, pp. 27-28, lns. 25-18)

16.    In terms of the value of the assets acquired by the debtor entity, the net asset value of AHMS in 2015 was $1.35 million. The assets were valued at $2,350,000 less a $1M liability, a promissory note paid off by the Debtor at acquisition. (NOR, p. 28, lns. 19-22)

17.    The assets of PCA were valued at $2,546,246 but there was 1.9 M in loans outstanding. The net asset value of PCA recorded at time of purchase by the Debtor was $474,000.  The actual value of the assets acquired from Porteck at the time they were acquired was $1.824 million, being the net asset value of AHMS and the net asset value of PCA.  (NOR, pp. 28-29, lns. 23-3)

18.    Despite the written record of the asset valuation, Mr. Parmar and Mr. Walia agreed to the value of the assets being $10.8 million and apparently was five times the 2014 [sic] EBITDA of $2.2 million.  And again, that five times multiple is before the $2 million was added into the transaction.  (NOR, p. 29, lns. 4-8)

19.    Bank records provided evidence memorializing a wire of $9.8 million from the debtor Constellation Healthcare Technologies to the IOLTA account at Robinson Brog, which was used to close the Porteck sale.  (NOR, p. 29, lns. 9-13)

20.    Of the $9.8 million, $6.8 million was wired on to Mr. Walia and $3 million went sideways in the vernacular to another non-debtor entity controlled by Mr. Parmar called First United Health.  (NOR, p. 29, lns. 14-17)

21.    Once the Porteck deal closed shortly thereafter in June of 2015, Mr. Walia was installed as the chief executive officer of the Debtor's main operating company, Orion Health Co., and became the chief technology officer of Constellation Healthcare Technologies.  He continued to serve in those capacities through the fall of 2018.  (NOR, pp. 29-30, lns. 25-5)

22.    While Mr. Walia was CEO of Orion and CTO of Constellation Healthcare Technologies, on or about April 15 of 2016, the debtor, Constellation Healthcare Technologies, transferred $2.5 million from its JP Morgan account to NIKNIM.  (NOR, p. 30, lns. 6-10)

23.    Mr. Walia testifies that the stated purpose of the escrow arrangement was to protect the rights of Physicians Practice, the actual acquirer, as purchaser under the Porteck APA to receive $2.5 million to the extent such funds were required to indemnify Physicians Practice though as a practical matter, the arrangement was not necessary to protect the buyer because it simply withheld payment of the $2.5 million.  (NOR, p. 30, lns. 16-24)

4860-9842-2982.8 65004.003

5

1795

24.     The written agreement in Section 1.6 of the APA provides that for purposes of partially-securing the seller's obligations, the amount of $2,500,000 shall be delivered by the buyers at closing to the escrow agent by wire transfer of immediately available funds pursuant to an escrow agreement substantially in the form attached as Exhibit A to the APA. (NOR, pp. 30-31, lns. 25-6) [Emphasis added]

25.     Section 1.6 clearly required certain conditions of the escrow including that it be established and that it be funded upon occurrence of certain events.  However, no escrow agreement was ever executed and no escrow account was ever established.  Despite Walia's assertion that the $2.5 million was owed to him or his company, the books and records of the Debtor reflect no antecedent debt at the year ending December.  There is no antecedent debt reflected reflected on the books and records as being owed to Walia or NIKNIM.  (NOR, p. 31, lns. 9-19)

26.     The Debtor's books and records reflect no debt being owed as a result of the Porteck transaction as of the end of 2015.  (NOR, p. 31, 19-21)

27.     The Debtor's 2016 books and records did not evidence the satisfaction of any antecedent debt of $2.5 million or any increase in the net assets of the Debtors as a result of that $2.5 million transfer.  (NOR, p. 31, lns. 22-25)

28.     The Trustee asserts that the $2.5 million transfer was fraudulent based in part on an email that Mr. Parmar sent to Mr. Walia on the date of the transfer, stating, "I am willing to give you $3.5 million in return for you to allow me to structure it properly internally, which requires I close the file with the $2 million payment." (NOR, p. 32, lns. 1-6)

29.     On the same day as that email, the Debtor transferred $2.5 million from its M&T account, the M&T account of CHT to the JP Morgan account of NIKNIM. (NOR, p. 32, lns. 7-9)

**(ii)    The Second Transfer (June 28, 2017): $1,520,000**

30.    The second transfer at issue involves a 2017 transaction and agreement under which Mr. Walia agreed to sell to Mr. Parmar or a designated entity a software company that Mr. Walia indirectly owned called AllRad Direct LLC.  Object Tech Holding LLC was a shell company that Allrad owned. (NOR, p. 32, lns. 13-19)

31.    The sale was memorialized by a membership interest purchase agreement, or "MIPA", dated June 2017 between Object Tech as seller and Physicians Healthcare Network Management Solutions as buyer.  Physicians Network Solutions, is not and was not one of the Debtors, but was again a third party entity owned or controlled by Mr. Parmar.  (NOR, pp. 32-33, lns. 20-1)

32.    The MIPA required a due diligence report and the negotiations required the diligence report to be prepared in connection with the sale, but the due diligence report was never completed. (NOR, p. 33, lns. 2-5)

33.    The MIPA required various schedules to be provided.  Those schedules were never completed, such as 1.3, earnout payments; 1.4, discharge of debts and liabilities, maintenance of working capital. The MIPA also called for certain revenue projections, balance sheets or statements of assets and liabilities to be provided.  Those were never provided. State and federal tax returns that were called for under the MIPA from the sellers were never provided. And the Debtor's board of directors never approved the purchase.  (NOR, p. 33, lns. 2-16)

34.    Despite these deficiencies, the MIPA sale closed in June of 2017 and Debtor's funds, $1,520,000, was wired out of the Robinson Brog IOLTA account to the NIKNIM bank account at JP Morgan Chase. Correspondingly, all of the shares of AllRad were transferred, but transferred to the non-debtor entity, Physicians Network Solutions.  No assets were ever transferred in connection with the AllRad Object Tech transaction to any of the Debtors. (NOR, p. 33, lns. 17-24)

35.    At no point during 2017 did any of the debtors' books and records evidence an antecedent debt of $1,520,000 or any other debt owed to either of the defendants in connection with Object Tech or AllRad. In fact, the debtors' books and records do not evidence

4860-9842-2982.8 65004.003                         7

the satisfaction of any antecedent debt or increase in net assets of the debtors through the acquisition of the interest in Object Tech or AllRad. The second transfer occurred within eight months prior to the petition date, well within the two- year period.  (NOR, pp. 33-34, lns. 25-4)

### (iii)    Defendant NIKNIM Management, Inc. and Its Operations

36.    Defendant NIKNIM is a corporation formed under the laws of the State of New York with its principle place of business at Walia's residence at 27 Kettlepond Road, Jericho, New York.  (NOR, p. 27, lns. 2-5)

37.    NIKNIM was incorporated in 2015, and at all times Walia owned and managed NIKNIM as the sole employee, officer, and shareholder.  NIKNIM is an S corp. formed by Walia to manage his consulting work, personal investments, and that of his family trust.  NIKNIM followed and observed no corporate formalities and maintained no resolutions of shareholders or minutes.  (NOR, p. 27, lns. 5-9)

38.    NIKNIM was paid by the Debtor as a personal accommodation to Mr. Walia for tax purposes.  (NOR, p. 41, lns. 15-16).  NIKNIM was originally capitalized one or two thousand dollars. (NOR, p. 42, lns. 3-5)  Walia was receiving monies from Orion in 2017 which he would deposit at his convenience into either the NIKNIM or his personal checking account.  In 2016-2017, Walia would deposit monies from his other investments, family trust, and his wife's accounts into the NIKNIM bank account.  Walia used the NIKNIM account to pay personal expenses of his such as pool maintenance, purchasing suits, salon treatments, voice lessons, homeowner dues, and car payments. (NOR, p. 41,lns. 17-25)

39.    Walia personally directed that the Transfers identified in the Complaint be deposited into the NIKNIM bank account at JP Morgan Chase.  (NOR, p. 41, lns. 17-19)

## IV.
## BY DEFENDANT'S OWN ADMISSION THE FIRST TRANSFER IS AN INTENTIONALLY FRAUDULENT TRANSFER UNDER STATE AND FEDERAL LAW

40.    In its First Claim for Relief, the Plaintiff  seeks: to avoid the intentionally fraudulent transfer of the Debtors' funds pursuant to 11 U.S.C. §§ 544, 548 and 550 and NY

Debt & Cred L ("NYDCL") §276, *et seq.*, or recover the value thereof, and preserve the Transfer for the benefit of the Debtors' estate pursuant to 11 U.S.C. § 551.  The standard set forth in New York state law regarding actual fraudulent conveyances essentially overlaps with the Bankruptcy Code. *Barnard v Albert (In re Janitorial Close-Out City Corp.)*, 2013 Bankr LEXIS 523, at *14 (Bankr. E.D.N.Y. Feb. 8, 2013).  Unlike NYDCL Sections 273 and 275, under NYDCL Section 276, a transferor does not need to receive fair consideration for a conveyance to be fraudulent ("where actual intent to defraud is proven, the conveyance will be set aside regardless of the adequacy of the consideration given.")  *MFS/Sun Life Tr.-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 934 (S.D.N.Y. 1995) (citing *to HBE Leasing,* 48 F.3d. at 639); *Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 56 (2nd Cir. 2005). Actual fraudulent intent under NYDCL §278(2) has been construed such that it is satisfied if a "transferee participated or acquiesced in the transferor's fraudulent design. 13 Romualdo P. Eclavea, Carmody-Wait 2d New York Practice with Forms §§85-29 & 85-30 (2002) (emphasis added); *Berlenbach v. Bischoff*, 137 Misc. 719, 244 N.Y.S. 369, 371 (N.Y.Sup.Ct. Spec. Term 1930).  "When considering whether a debtor had an actual intent to hinder, delay, or defraud its creditors, courts focus on the intent of the transferor not on the intent of the transferee." *45 John Lofts, LLC v. Meridian Cap. Grp. LLC (In re 45 John Lofts, LLC)*, 650 B.R. 602, 611-612 (Bankr. S.D.N.Y. 2023) . A court will look at the intent of corporate actors and individuals in instances where a debtor is not an individual. *Id.* at *17 (citing *In re Roco Corp.,* 701 F.2d 978, 984-85 (1st. Cir. 1983))

41.    Circumstantial evidence may be used to demonstrate actual fraud. "Due to the difficulty of proving actual intent to hinder, delay, or defraud creditors, the pleader is allowed to rely on 'badges of fraud' to support his case, i.e., circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent." *Sharp Int'l Corp. v. State St. Bank & Tr. Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 56 (2d Cir. 2005) (citing *Wall St. Assocs. v. Brodsky*, 257 A.D.2d 526, 684 N.Y.S.2d 244, 247 (App. Div. 1st Dep't 1999)). Courts frequently look to "badges of fraud" to establish an inference of fraudulent intent in cases

brought under an actual intent theory. Such badges of fraud include: 1) the lack or inadequacy of consideration; 2) the family, friendship or close associate relationship between the parties; 3) the retention of possession, benefit, or use of the property in question; 4) the financial condition of the party sought to be charged both before and after the transaction in question; 5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; 6) the general chronology of the events and transactions under inquiry; 7) a questionable transfer not in the usual course of business; and 8) the secrecy, haste, or unusualness of the transaction. *Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Techs., Ltd.)*, 337 B.R. 791, 809 (Bankr. S.D.N.Y. 2005). The presence or absence of any single badge of fraud is not conclusive; rather, the inquiry focuses on what factors are present, as well as the context for the badges of fraud. *Halperin v. Morgan Stanley Inv. Mgmt., Inc. (In re Tops Holding II Corp.)*, 646 B.R. 617, 675 (Bankr. S.D.N.Y. 2022), leave to appeal denied, 2023 U.S. Dist. LEXIS 2749, 2023 WL 119445 (S.D.N.Y. Jan. 6, 2023).  Although "badges of fraud" are not conclusive and are more or less strong or weak according to their nature and the number occurring in the same case, "**'a concurrence of several badges will always make out a strong case'**". *Gafco, Inc. v. H. D. S. Mercantile Corp.*, 47 Misc. 2d 666, 665 (1965). (Emphasis Added)

## V.
## THE DIRECT EVIDENCE CLEARLY ESTABLISHES THE DUO OF PARMAR AND WALIA FALSIFYING THE APA TO DEFRAUD CREDITORS

42.     Parmar and Walia had both the motive and opportunity to defraud the Debtors' creditors.  *45 John Lofts, LLC v. Meridian Cap. Grp. LLC (In re 45 John Lofts, LLC)*, 650 B.R. 602, 613 (Bankr. S.D.N.Y. 2023) Motive "entail[s] concrete benefits that could be realized by one or more" of the actions alleged, and opportunity "entails the means and likely prospect of achieving concrete benefits by the means alleged." *Id.*

43.     There is direct evidence of fraud by the Transferor, Paul Parmar, even before examining the circumstantial evidence  surrounding the "badges of fraud".  Walia admits the APA was intentionally misstated by Parmar to add millions of dollars in "deal fees". (NOR, pp.

27-28, lns. 17-18) Walia knew the "deal fees" were bogus since he received the statement of the deal fees. (Pl **Trial Ex. 1**) The Trustee has proven the deal fees were yet another kickback scheme by Parmar taking $3 million off the top. (NOR, p. 29, lns. 14-17)  It is also an established fact, Walia knew about and participated in juicing up the purchase price. (NOR, 28, lns. 2-18)  Actual fraudulent intent under NYDCL §278(2) has been construed such that it is satisfied if a "transferee participated or acquiesced in the transferor's fraudulent design". 13 Romualdo P. Eclavea, Carmody-Wait 2d New York Practice with Forms §§85-29 & 85-30 (2002) (emphasis added); *Berlenbach v. Bischoff*, 137 Misc. 719, 244 N.Y.S. 369, 371 (N.Y.Sup.Ct. Spec. Term 1930).  False statements, misrepresentations and backdating documents is evidence of intent to defraud as an effort to make an illegitimate transaction appear legitimate. See *United States v. Maciejewski*, 70 F. Supp. 2d 129, 134 (Bankr. N.D.N.Y. 1999)

44.      Where there is such overwhelming evidence of fraud or deception in a contract, the Trustee submits the Court should not accept Walia's explanation that the contract could provide consideration as to do so is against public policy. See *Chia Huey Chou v. Remington Tai Che*, 2010 U.S. Dist. LEXIS 142766, *9 (E.D.N.Y. 2010), citing to *Contemporary Mission, Inc. v. Bonded Mailings, Inc.*, 671 F.2d 81, 86 (2d Cir. 1982) (A contract is void in New York and unenforceable as a matter of public policy when its performance would practice fraud or deception on a third party). *Id.* citing to *McConnell v. Commonwealth Pictures Corp.*, 7 N.Y.S.2d 465, 471, 166 N.E.2d 494, 199 N.Y.S.2d 483 (1960) (As a matter of public policy, fraud and deception practiced on a third party . . . will invalidate a New York contract, at least where there is a 'direct connection between the illegal transaction . . . and the obligation sued upon). A court may interfere and prevent the arrangement being further consummated in case of partial performance) *Di Tomasso*, 250 A.D. 206, 209, 293 N.Y.S. 912, 916 (App. Div. 2nd Dept. 1937).[2] See *AQ Asset Mgt. LLC v. Levine*, 2013 N.Y. Misc. LEXIS 2054, *28 (N.Y. Sup. Ct., Mar. 28, 2013) (If it was agreed that the funds would be deposited with Levine under false

---

[2] As set forth in *Chia Huey Chou, supra*, (the Second Circuit has instructed "courts [to] not be timid in voiding agreements which tend to injure the public good or contravene some established interest of society." *Chia Huey Chou v. Remington Tai Che*, 2010 U.S. Dist. LEXIS 142766, *10 (E.D.N.Y. 2010) citing to *Stamford Bd. of Educ. v. Stamford Educ. Ass'n.*, 697 F.2d 70, 73 (2d Cir. 1982).

pretenses, to not pay federal taxes, the agreement between sellers and Levine would be unenforceable. No cause of action can arise from an agreement which has been documented falsely for an illegal purpose regardless of degree of complicity in scheme).

45.     The APA was deceptive and fraudulent on its face and there is a direct connection between it and Defendants' attempt to use the APA as a shield. A contract against public policy cannot be the source of a defense especially where it simply seeks to perpetrate a further fraud. Addressing the circumstantial evidence, the Trustee submits all the badges of fraud are implicated.

### (i)     The Lack Or Inadequacy Of Consideration:

46.     The term "reasonably equivalent value" in 11 U.S.C. § 548(a)(1)(B) and the term "fair consideration" in New York's Debtor & Creditor Law have the same fundamental meaning and are interpreted similarly by the courts. *Pryor v. Tiffen (In re TC Liquidations LLC)*, 463 B.R. 257, 268 (E.D.N.Y. 2011) "Whether a debtor received a reasonably equivalent value is analyzed from the point of view of the debtor's creditors, because the function of this element is to allow avoidance of only those transfers that result in a diminution of a debtor's prepetition assets." *Mendelsohn v. Kovalchuk (In re APCO Merch. Servs.)*, 585 B.R. 306 (Bankr. E.D.N.Y. 2018); *Jordan v. Kroneberger (In re Jordan)*, 392 B.R. 428, 441 (Bankr. D. Idaho 2008); *see also Frontier Bank v. Brown (In re N. Merch., Inc.)*, 371 F.3d 1056, 1059 (9th Cir. 2004) ("the primary focus . . . is on the net effect of the transaction on the debtor's estate and the funds available to the unsecured creditors."). "The touchstone is whether the transaction conferred realizable commercial value on the debtor reasonably equivalent to the realizable commercial value of the assets transferred." *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 647 (3d Cir. 1991).

47.     The Debtor's books and records evidence no antecedent debt owed to the Defendants, Walia or NIKNIM related to the First Transfer. (NOR, 31, lns. 22-25). As such, no argument can be made for the satisfaction of an antecedent debt. Rather, Defendants claim that 2.5M was set aside in an escrow. Just like the "deal fees", the escrow was <u>more</u> fiction.

However, if the Court did entertain the argument, it is clear the Debtor received nothing in exchange for the $2.5M First Transfer.

48.    First, the Trustee established that what the Debtor purchased for 12.8M had an net asset value of $1.824 million. (NOR, p. 29, lns. 19-3) . In reality, what the Debtor received was <u>far less</u> than what the financial documents evidence on the face of the deal.  AHMS  had loss of revenue in 2015/16 of (-1,776,862). (Pl **Trial Ex 2**) (See **Trial Aff'd of F. Lazzara**, ¶11) What the Debtor purchased had a net asset value of $1.824 million and an agreed-upon formulaic reduction in value due to "AHMS Revenue loss adjustment to purchase Price" of (-1,776,862. (Pl Trial Ex 3). If you further remove the Bad AR of AHMS from the asset value per the APA, the net value of the assets sold to the Debtor was only $47,128. ($1,824,000- $1,776,872) versus the $12.8M the Debtor paid.  (See **Trial Aff'd of F. Lazzara**, ¶11)

49.    Second, the Trustee retained an expert in the area of working capital adjustment and related escrow provisions to examine the APA to determine if, <u>assuming arguendo,</u> there was an escrow, would any amounts be due Walia or the Debtor?  Mr. Mitchell works for Grant Thorton, and advises buyers and sellers on the accounting and financial aspects of purchase agreements and many of the metrics involved therein such as price adjustments, working capital adjustments, cash, indebtedness, escrows and earn-outs. (See **Trial Affidavit of Maxwell G. Mitchell**, ¶¶2, 3) He is a Chartered Accountant (Scotland) and serves as both as an accountant and business advisor in mergers and acquisitions. (See **Trial Affidavit Maxwell G. Mitchell**, ¶3) He examined Section 1.6(e) of the APA and noted it was incomplete and contains non-standard language.  However, if you applied standard industry norms,  the working capital adjustment in a purchase agreement is used to adjust the purchase price for any excess or deficit of working capital acquired, compared to a target (or 'normal') level of working capital, which is the amount required to operate the acquired business in the ordinary course. Such deficit, if any, is typically applied against any amount held in escrow.  (See **Trial Affidavit of Maxwell G. Mitchell**, ¶¶ 5, 6, 7) His conclusion, as part of any escrow true-up in the present case there was a working capital deficiency of ($1,924,837), which sum was owed to the Buyer, Debtor, as part of

any reconciliation. (See **Trial Affidavit of Maxwell G. Mitchell**, ¶8). Based on his M&A experience, the use of escrow is as a vehicle to true-up the purchase price, post-closing and simply taking the claimed full escrow monies is improper. (See **Trial Affidavit of Maxwell G. Mitchell**, ¶10).

50.     The admissible evidence establishes nothing of any value was exchanged for the First Transfer. This factor is a badge of fraud as the transaction went to personally benefit the two insiders. *See Est. of Tawil v. Sutton*, 2024 N.Y. Misc. LEXIS 839, Kings County Supreme Court (2024) (citing to *Axginc Corporation v. Plaza Automall Ltd.*, 2022 U.S. Dist. LEXIS 90477, 2022 WL 2135474 (E.D.N.Y, 2022)) (Inadequacy of the consideration is considered a "particularly important" badge establishing a fraudulent conveyance). The further payment of $2.5M to Walia conferred no realizable commercial value on the debtor reasonably equivalent to the realizable commercial value of the assets transferred." *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 647 (3d Cir. 1991). The first badge is established.

> **(ii)     The Family, Friendship Or Close Associate Relationship Between The Parties:**

51.     Walia was introduced to Parmar in 2009, and visited his home at the Colts Neck, NJ property. (Depo. Walia, p. 50, lns. 13-25, lns. 2-17) Parmar was the CEO of the Debtor, CHT, and Walia the CEO of the Debtor Orion and the Chief Technology Officer of CHT after February 2015, the year predating the Transfer. They were both insiders at the time of the Transfer. (NOR, p. 39, lns. 5-6) The evidence supports the establishment of the second badge.

> **(iii)     The Retention Of Possession, Benefit, Or Use Of The Property In Question:**

52.     The evidence at trial establishes that the First Transfer was sent by Parmar to Walia on April 15, 2016. The monies then were taken by Defendants NIKNIM and Walia. There is no evidence to indicate Parmar retained control or possession of the First Transfer, especially since the evidence indicated Parmar paid the CEO of Orion to "in return allow me to structure it properly", i.e. look the other way as he did with the deal fees. (Pl **Trial Ex 9,** April 15, 2016 email at 12:37 p.m.) Parmar did not retain possession of the money, but he did receive a benefit.

It is a different scenario than usual, but the intent is clear. "Fraudulent acts are as varied as the fish in the sea." *In re Kaiser*, 722 F.2d 1574, 1583(2nd Cir. 1983) The third badge is established by the parties own communications.

### (iv)    The Secrecy, Haste, Or Unusualness Of The Transaction;  A Questionable Transfer Not In The Usual Course Of Business:

53.    The facts and circumstances surrounding the First Transfer and the explanation provided by the Defendants clearly demonstrate  the First Transfer was made in haste, concealed, and not an ordinary or usual business transaction. Though the Porteck deal closed no later than March 3, 2015 (Pl **Trial Ex. 4**), the Defendant and the executives do not even mention the issue of a closing payment until 5:19 pm on April 7, 2016. (Pl **Trial Ex. 10**).  There was no discussion in 2015 of a legitimate escrow, executing an escrow agreement, or funding an escrow. As a matter of established fact, no escrow was funded or created. (NOR, p. 31, lns. 11-13)  The next afternoon on April 8, Walia responds:

> "Paul, I will (sic) like to meet this Monday to resolve the post-closing calculations.  Please let me know if you are available to meet this Monday".
> (Pl **Trial Ex. 10, email dated April 8, 2016**).

54.    One week later, on April 15, 2016, with Parmar using his pegasusbluestar email address, there is a flurry of  emails where Walia says at 11:21 am, here is my wire instructions, "wire this money today". (Pl **Trial Ex. 9**).  Parmar's response does not reference an escrow, but a wire of $2M and $1M for "India".  (Pl **Trial Ex. 9**).  45 minutes later, Walia responds, give me $2.5M and $1M for India.  The entire email chain is suspect , but what is clear is that 9 minutes later Parmar responds;

> "I cannot wire more than 2.5m if you remember I told you yesterday….I will let you have 3.5m which is almost 1.5m more than I really think if we calculate the numbers per contract will come around to 2m but I am willing to give you 3.5m **in return for you to allow me to structure it properly internally** which requires I close the file with 2m payment." (Pl **Trial Ex. 9**) (Emphasis Added)

Less than an hour later Parmar states:

> "I will give you 2.5m today but I want you to understand I am looking at the bigger picture and trying to make this work…" (Pl **Trial Ex. 9**).

55.    There was <u>nothing usual</u> about the emails.  Send me money "today", exchanged within "minutes", wildly divergent topics or the simple fact no one else is included in the discussions on Friday April 15, 2016, but for Parmar and Walia.  Minutes later, same day, 2.5M is transferred from one insider to the other. (NOR, p. 30, lns. 6-11)  The transaction and/or the First Transfer does not show up on the Debtor's books and records.  (NOR, p. 31, lns. 14-25). These two badges of fraud, haste/secrecy and unusual transaction are satisfied and extremely relevant as it clearly shows insiders at work diverting millions outside the prying eyes of creditors.

<center>(v)    <b>The Financial Condition Of The Party Sought To Be Charged Both Before And After The Transaction In Question:</b></center>

56.    The First Transfer occurred on April 15, 2016.  Prior to this time, the Debtor was insolvent.  (See <b>Trial Affidavit of Craig Jacobson</b>, ¶11).  Prior to this time, judgment creditors existed who had obtained judgments that went unsatisfied. (See Plaintiff's Req. for Judicial Notice, Claim No. 1000) On March 9, 2016, the debtors Physicians Practice Plus and CHT were sued by a plaintiff, Criterions. LLC. (See Plaintiff's Req. for Judicial Notice, Criterions, LLC) The executive team was not paying legitimate creditors.  Rather, the executive team which included Walia were devising schemes to divert millions of dollars to one another. Between 2015 and 2016, the net loss of the Debtor blossomed from net losses of (-$11,917,826) for 2015 to (-$46,742,748) for 2016. (See <b>Trial Affidavit of Craig Jacobson</b>, ¶11).  From 2016 to 2017, Walia and Parmar diverted not less than $4M to Walia alone.  On the Petition Date, the Debtors are liable on $158 million in secured debt to a lender consortium headed by BOFA who allege they were defrauded as part of the Go-Private transaction . (See <b>Trial Aff'd of Lazzara</b>, ¶12) <i>See Messer v. Wei Chu (In re Xiang Yong Gao)</i>, 560 B.R. 50, 64 (Bankr. E.D.N.Y. 2016) (the Debtor appears to have endeavored to render himself "judgment proof" by divesting himself of any assets and compiling liabilities).  Parmar accumulated massive liabilities while he diverted assets into the name of others.

57.    The Trustee has submitted credible evidence to satisfy this badge of fraud.

     **(vi)**    **The Existence Or Cumulative Effect Of A Pattern Or Series Of Transactions Or Course Of Conduct After The Incurring Of Debt, Onset Of Financial Difficulties, Or Pendency Or Threat Of Suits By Creditors:**

58.    Between 2016 to when the First Transfer was consummated to June 23, 2017, when the Second Transfer was consummated, the time frame was marked by crisis and a series of sham transactions orchestrated by Parmar with the assistance of his executive team and friends.

59.    Parmar's house was in foreclosure. Only weeks before the First Transfer, Parmar asked a fellow investor, John Petrozza to incorporate Aquila Alpha to purchase the first trust deed for his Colts Neck property. (See **Trial Aff'd of F. Lazzara**, ¶13) Parmar deposited $3.5M from the CHT bank account into the company Aquila Alpha, and pretending to be a third party disinterested buyer, purchased the $24M Note for $4M at a 75% discount from Deutche Bank. (See **Trial Aff'd of F. Lazzara**, ¶13). The transaction was a fraud.

60.    On January 30, 2017, the Go-Private transaction orchestrated by Parmar and company was effectuated. (See **Trial Aff'd of F. Lazzara**, ¶12) However, it did not go as planned as the FBI stepped in and seized $20M of the proceeds in the Robinson Brog IOLA account from the Go-Private transaction as it suspected the transaction was effectuated by fraud. (See **Trial Aff'd of F. Lazzara**, ¶¶12, 14) Various assets on the Debtor's balance sheet such as MDRX, Phoenix Health, LLC and Northstar, disappeared and the Debtors were forced to amend their tax returns. (See **Trial Affidavit of Craig Jacobson**, ¶9).

61.    The pattern of fraud is significant and credible.

     **(vii)**    **The General Chronology Of The Events And Transactions Under Inquiry:**

62.    The undisputed facts are that no legitimate business purpose exists for the First Transfer. (Pl **Trial Ex. 8**) Walia's attempt to justify why Parmar was going to divert $2.5M to him on April 8, 2016, is entertaining but more evidence of fraud. (Pl **Trial Ex. 5**) The deal fees siphoned off to Parmar were $3M, not $2M as Walia claimed. (Pl **Trial Ex. 5**; NOR, p. 29, lns. 14-17) There was no escrow, so the Court has evidence of Parmar and Walia covering their

tracks. Even if you ignore the fact no escrow was established or funded, an objective examination of the financial documents associated with the APA at the time of the deal in February 2015 clearly indicates there was a working capital deficiency of (-$1,924,837), which sum was owed to the Buyer. (See **Trial Affidavit of Maxwell G. Mitchell**, ¶8). Just because Walia issues an email 14 months after the closing asserting there is an escrow <u>and</u> he is entitled to all of it, does not make it so. The First Transfer was invisible to creditors. It was instead created only due to a series of emails between two men who were insiders. The Transfer was made in haste, concealed and clearly not in the ordinary course of the Debtor's business.

63.    Plaintiff submits that each and every badge of fraud is documented. Defendants will submit no admissible evidence to rebut the evidence other than unsupported claims of the participant in the fraud, Arvind Walia:

## VI.
## THE FIRST TRANSFER WAS CONTRUCTIVELY FRAUDULENT TO CREDITORS AS THE DEBTOR WAS INSOLVENT AND THE TRANSFER WAS NOT MADE FOR FAIR CONSIDERATION

64.    Plaintiff submits the expert report of Craig Jacobson, a Managing Director at GlassRatner Advisory Capital Group who's credentials have been accepted in other similar cases involving solvency or valuation within Federal and State Courts. (see **Trial Affidavit of Craig Jacobson**, ¶¶1,2,3, filed concurrently herewith) Mr. Jacobson reviewed financial documents, bankruptcy documents and interviewed individuals with back ground on the Debtors and its operations. He prepared a solvency/insolvency analysis based on the traditional methods of analyzing insolvency in a fraudulent conveyance case. (see **Trial Affidavit of Craig Jacobson,** ¶7) The Expert Report focused and analyzed the history of the business, a financial analysis of Orion including CHT, the industry and the economy as of the various measurement dates, the value of the business enterprise which was used to perform a balance sheet test, a forecast of the company's operations and debt obligations to perform a cash flow test, and an analysis of the company and other industry companies to perform a capital adequacy test, an analysis of the company's contingent liability, and examined other evidence of insolvency. (see **Trial Affidavit**

**of Craig Jacobson, ¶8)** Mr. Jacobson was aware of the alleged sham transactions perpetrated from the Orion and CHT accounts which he did not accept or dismiss but looked for objective evidence of it impacting the financial condition of the Debtors. (See **Trial Affidavit of Craig Jacobson, ¶9**) In summary, the entities Orion and CHT failed the Balance Sheet Test, the Cash Flow Test, and the Capital Adequacy Test as of the measure dates of April 15, 2016, June 23, 2017 and June 28, 2017, and were insolvent. (see **Trial Affidavit of Craig Jacobson, ¶11**)

65.    Defendant did not retain and designate their own expert to render an opinion on solvency. Rather, they waited until 6 months after the designation date and gave their expert Plaintiff and Defendants' mediation briefs. The analysis to rebut Mr. Jacobson's opinion of insolvency is flawed as it is based on an assumption that is improper and not the facts in the case. Plaintiff filed a Motion in Limine #1 to strike the report and Mr. Lunden's testimony.

66.    NYDCL §273 defines "fair consideration" for purposes of §273-a, and provides that Fair consideration is given for property, or obligation,

a.   When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or

b.   When such property, or obligation, is *received in good faith* to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained.

*Lyman Commerce Solutions, Inc. v. Lung,* 2015 U.S. Dist. LEXIS 51447, 21(S.D.N.Y, 2015)[3]; *See also Kittay v. Flutie N.Y. Corp. (In re Flutie N.Y. Corp.),* 310 B.R. 31, 53(Bankr. SDNY 2018).

67.    As set forth in the analysis of the "Intentional Fraud" Cause of action, at page 10 herein, Plaintiff has submitted admissible evidence to demonstrate the Debtor did not receive reasonably equivalent value, let alone any consideration. Defendant will submit no credible rebuttal evidence . *United States v. Alfano,* 34 F. Supp. 2d 82, 848 (E.D.N.Y. 1999). (Defendants who present no credible evidence to meet their burden of proving that the property

---

[3] Section 548(c) requires both value and good faith and in the absence of either, the defense fails. *Berman v. Pavano (In re Michael S. Goldberg, LLC),* 2020 Bankr. LEXIS 2314, 22 (Bankr. Conn. 2020).

was conveyed for "fair consideration" as defined under prevailing New York State law have not met their burden).

68.     Even if there is fair consideration, a transfer is still constructively fraudulent in the absence of good faith on the part "of both the transferor and the transferee." *Wimbledon Fin. Master Fund v. Wimbledon Fund, SPC*, 2016 N.Y. Misc. LEXIS 4805 (N.Y. Sup. Ct., Dec. 2016) (emphasis added), quoting *Berner Trucking, Inc. v. Brown*, 281 AD2d 924, 925, 722 N.Y.S.2d 656 (1st Dept. 2001); *see Sardis v. Frankel*, 113 A.D.3d 135, 142, 978 N.Y.S.2d 135 (1st Dept. 2014) ("'Fair consideration' ... is not only a matter of whether the amount given for the transferred property was a 'fair equivalent' or 'not disproportionately small,' but whether the transaction is made 'in good faith,' an obligation that is imposed on both the transferor and the transferee.").

69.     The evidence at Trial will demonstrate both (i) that the Transfer was not exchanged for a fair equivalent or made to secure an advance or antecedent debt; and (ii) that the First Transfer was not made in good faith. A transferee's good faith is lacking if the transferee acted with either actual or constructive knowledge of the fraudulent scheme." *See HBE Leasing Corp.*, 48 F.3d 623, 636 (2nd Cir. 1995); *see* NYDCL §278(1). *See also In re Skalski*, 257 B.R. at 711 ("fair value is not sufficient if bad faith taints the transaction"). *Geltzer v. Artists Mktg. Corp. (In re Cassandra Group)*, 338 B.R. 583, 594 (Bankr S.D.N.Y. 2006) The evidence overwhelmingly supports that Walia participated in the fraudulent scheme.

70.     As significant, "**[a]n insider** payment is not in good faith, regardless of whether or not it was paid on account of an antecedent debt." (Emphasis added) *Am. Media, Inc. v. Bainbridge & Knight Labs., LLC*, 135 A.D.3d 477, 478, 22 N.Y.S.3d 437 (1st Dept. 2016), citing *EAC of N.Y., Inc. v. Capri 400, Inc.*, 49 A.D.3d 1006, 1007, 853 N.Y.S.2d 419 (3d Dept. 2008) Here, it is an undisputed fact that Walia was an insider at the time of both Transfers. (NOR, p. 39, lns. 5-6) New York courts have recognized that where the transferee is an officer, director, or major shareholder of the transferor, good faith is lacking as a matter of law. See *Sharp Int'l Corp. v. State St. Bank & Trust Co.*, 403 F.3d 43, 54 (2d Cir. 2005); *Farm Stores, Inc. v. Sch.*

*Feeding Corp.,* 102 A.D.2d 249, 477 N.Y.S.2d 374 (2d Dept. 1984). When preferences are given

to a debtor corporation's shareholders, officers, or directors, such transfers are *per se* violations

of the good faith requirement. *Id.* (citing *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 634 (2d Cir.

1995)). The Transfers are a *per se* violation of the good faith requirement.

71.    The Trustee submits that simply because Walia instructed Parmar to pay

Defendant NIKNIM, does not change the fact the First Transfer was between "insiders". (Pl Trial

Ex. 9, April 15, 2016 email) *See Schnelling v. Crawford (In re James River Coal Co.)*, 360 B.R.

139, 161 (Bankr. D. Va. 2007) (A corporation, being an entity created by law, is incapable of

formulating or acting with intent and the intent of the officers and directors may be imputed to

the corporation). NIKNIM played no role in the transaction. NIMNIM appeared on the scene

less than one (1) hour before the First Transfer and was sent the funds only due to Walia's

request. (**Pl Trial Ex. 9**)

<div align="center">

**VII.**
**DEFENDANT WALIA PARTICIPATED IN THE FRAUDULENT TRANSFER**

</div>

72.    Under New York law, a creditor may recover money damages against a transferee

who received assets via a fraudulent transfer. *See Cadle Co. v. Newhouse*, 74 F. App'x 152, 153

(2d Cir. 2003) (summary order) ("A creditor may recover money damages against parties who

participate in the fraudulent transfer and are either transferees of the assets or beneficiaries of the

conveyance." (quoting *RTC Mort. Trust 1995-S/N1 v. Sopher*, 171 F. Supp. 2d 192, 201

(S.D.N.Y. 2001)). Under federal law, one "participates" in a fiduciary's breach if he or she

affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables it

to proceed. *Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43,

51(2nd Cir. 2005) (citing to *Diduck v. Kaszycki & Sons Contractors, Inc.*, 974 F.2d 270, 284 (2d

Cir. 1992) (2d Cir. 2003). Masterminding the fraudulent transfers, using some of the transferred

assets to pay personal expenses, and diverting funds to cheat creditors is sufficient to support a

finding of personal involvement in a fraudulent conveyance. *Stochastic Decisions, Inc. v.

DiDomenico*, 995 F.2d 1158, 1172 (2d Cir. 1993) An officer acting as a signatory on its

corporate bank accounts and who authorizes expenditures to benefit himself and his family members, benefits both directly and indirectly and is liable for the entire amount of the fraudulent transfers. *Fannie Mae v. Olympia Mortg. Corp.*, 2014 U.S. Dist. LEXIS 79479, *19 (E.D.N.Y. June 10, 2014)  The owner of the transferee corporation, the individual and the defendant was, "[b]y any meaning of the word" a "beneficiary" of the corporations' fraudulent transfers and thus liable for the fraudulent conveyance. *U.S. v. Lax,* 414 F. Supp. 3d 359, 366-367 (E.D.N.Y. 2019)

73.      The trial record will support that Walia masterminded the fraudulent APA and it could not have occurred but for his participation.  Walia assisted Parmar to breach his fiduciary duty which is "participation" under federal law.  Walia assisted Parmar to breach his fiduciary as to the First Transfer.  Parmar said it best, "I am willing to give you 3.5 in return for you to allow me to structure it properly".  (Pl **Trial Ex. 9**) The trial record will support that Walia was the only signatory to  the NIKNIM bank account and utilized the account to benefit himself and his family members.  Walia is the undisputed owner of the transferee NIKNIM and he personally benefitted and is liable.

## VIII.
## DEFENDANTS WALIA AND NIKNIM ARE THE ALTER EGO OF ONE ANOTHER AND EQUITY DEMANDS THEY BE HELD JOINTLY AND SEVERALLY RESPONSIBLE FOR ANY JUDGMENT

74.      Alter ego liability exists under New York law "when a parent or owner uses the corporate form to achieve fraud, or when the corporation has been so dominated by an individual or another corporation . . . that its separate identity so disregarded that it primarily transacted the dominator's business rather than its own." *City of Almaty v. Ablyazov*, 2019 U.S. Dist. LEXIS 55183, *14 (Bankr. S.D.N.Y. 2019); *Kiobel v. Royal Dutch Petroleum*, 621 F.3d 111, 195 (2d Cir. 2010) (internal quotation marks and citation omitted).  "Factors to be considered in determining whether the owner has 'abused the privilege of doing business in the corporate form' include whether there was a 'failure to adhere to corporate formalities, inadequate capitalization, commingling of assets, and use of corporate funds for personal use'." (*East Hampton Union Free*

*School Dist. v Sandpebble Bldrs., Inc.*, 66 AD3d 122, 127, 884 NYS2d 94 (2009),

quoting *Millennium Constr., LLC v Loupolover*, 44 AD3d 1016, 1016-1017, 845 NYS2d 110

(2007))[4]. The undisputed facts evidence the factors outlined above warrant that any finding of

liability for receipt of the Transfers by NIKNIM is similarly extended to Walia since he

personally executed the operative documents, made the representations and engineered the

Transfers with Parmar. The Second Transfer for the purchase of a shell company with no

earnings or financial documents is nothing short of ourtrageous.

### (i)    NIKNIM's Lack of Business Purpose

75.    NIKNIM was incorporated in 2015 and at all times had a single employee,

officer, and shareholder who was Walia. NIKNIM was formed to manage Walia's consulting

work, take care of his personal investments, and that of his family trust. (NOR, 27, lns. 6-9)

NIKNIM was paid by the Debtor as a personal accommodation to Walia for tax purposes. (NOR,

p. 41, lns. 15-16)

### (ii)    Commingling of Funds

76.    Walia was receiving monies from Orion in 2017 which he would deposit as a

personal accommodation into either his personal checking account or that of NIKNIM. (NOR,

41, lns. 17-19) In 2016-2017, Walia would deposit monies from his other investments, family

trust, and his wife's accounts into the NIKNIM bank account as well. (NOR, p. 40, lns. 20-22)

### (iii)    NIKNIM's Deposits To Pay Walia's Personal Expenses:

77.    Use of a corporation's bank account for personal use is evidence of a lack of

separation between the individual and the corporation. See *First Horizon Bank v. Moriarty-*

*Gentile*, 2015 U.S. Dist. LEXIS 165695, *20 (Bankr. E.D.N.Y. 2015) (The evidence shows that

defendant treated the HPLP bank account as her own, diverted funds to pay her personal bills,

---

[4] Because a decision to pierce the corporate veil in any given instance will necessarily depend on the attendant facts and equities, there are no definitive rules governing the varying circumstances when this power may be exercised. *Baby Phat Holding Co., LLC v. Kellwood Co.*, 123 AD3d 405, 407, 997 N.Y.S.2d 67, citing to (*Matter of Morris v New York State Dept. of Taxation & Fin.*, 82 NY2d 135, 141, 623 NE2d 1157, 603 NYS2d 807 [1993]).

1813

commingled and failed to segregate funds, used HPLP as a conduit for defendant's acting business, and failed to maintain arm's-length transactions with HPLP by making continuous and frequent transfers between the HPLP bank account and her personal account.) Here, it is not disputed that Walia used the NIKNIM account to pay his personal expenses such as pool maintenance, purchase of suits, salon treatments, voice lessons, homeowner's dues, automobile payments for he and his wife as well as large withdrawals of cash. (NOR, 41, lns. 20-25) The bank account of NIKNIM was utilized by Walia for his personal use.

### (iv)    The Failure To Maintain Adequate Corporate Minutes Or Records

78.    NIKNIM followed no corporate formalities and maintained no resolutions of shareholders or minutes. (NOR, pp. 41-42, lns. 25-2)

### (v)    Domination Or Control Of The Corporation By The Stockholder

79.    Domination, especially with respect to the transaction attacked, and such domination used to commit the fraud or wrong against a plaintiff is the essence of the inquiry. *Gardiners Bay Landscape v. Postiglione (In re Postiglione)* 2019 Bankr. LEXIS 1887, *10 (Bankr. E.D.N.Y 2019) citing to *Baby Phat Holding Co. LLC v. Kellwood Co.*, 123 AD3d 405, 407, 997 N.Y.S.2d 67 (App. Div.1st Dept.). A key factor in any decision to disregard the separate corporate entity is the element of control or influence exercised by the individual sought to be held liable over corporate affairs." *Angelo Tomasso, Inc. v. Armor Construction & Paving, Inc.,* 187 Conn. 544, 556-57, 447 A.2d 406 (1982) Both transactions and related Transfers were dominated by Walia who orchestrated and directed the flow of funds. Walia even filed a proof of claim listing himself as the creditor for alleged monies owed under the Porteck sale.

### (vi)    Capitalization

80.    NIKNIM was capitalized with a small sum of one or two thousand dollars. (NOR, p. 42, lns. 2-3) The sum in dispute is in excess of 4M, evidencing the amount of capitalization of NIKNIM was entirely inadequate. Further, as evidenced by Pl **Trial Exhibit 16**, anytime there were deposits in excess of one million dollars ($1,000,000) to NIKNIM, Walia drained the

money within days out of the NIKNIM account leaving an ending monthly balance of less than $50,000 in that same month.  (See **Trial Aff'd of F. Lazzara**, ¶8)

### (vii)    Use Of A Single Address

81.    Defendant NIKNIM is a corporation formed under the laws of the State of New York with its principle place of business <u>at Walia's house</u>. (NOR, 27, lns. 2-9)

### (viii)    Inequitable Result

82.    A plaintiff may be considered "injured" by the defendant's actions when "a company is rendered unable to pay the claims pending against it by third parties because of another company or individual's domination of the business." *See Balmer v. 1716 Realty LLC*, No. 05 CV 839 (NG)(MDG), 2008 U.S. Dist. LEXIS 38113, 2008 WL 2047888, at *6 (E.D.N.Y. May 9, 2008) (citing *Austin Powder Co. v. McCullough*, 216 A.D.2d 825, 827, 628 N.Y.S.2d 855 (App. Div. 3d Dept. 1995)). Actual or common law fraud need not be proven. See *DER Travel Servs. v. Dream Tours & Adventures*, No. 99 Civ. 2231 (HBP), 2005 U.S. Dist. LEXIS 25861, 2005 WL 2848939, at *9 (S.D.N.Y. Oct. 28, 2005).

83.    In the present case, the undisputed facts evidence Parmar, with Walia's active participation created fictitious acquisitions, Objecttech and Allrad, a fictitious due diligence report, a fictitious purchase price in the APA agreement for Porteck, and directed the diversion of Debtor funds, all the while acting as the CEO of Orion and an officer of CHT.  Legitimate creditors  did not stand a chance and had to sue, just like the Trustee had to step in and sue in the present adversary.  Under the circumstances, it would be inequitable for the Trustee and creditors to be forced to expend further legal fees to pursue only one Defendant.  Judgment is proper against both Defendants, and each of them, and Plaintiff reserves its right to seek fees and costs due to the significant expenditure of time and costs to creditors.

84.     By separate cover, Plaintiff respectfully submits his Conclusions of Law.

Dated:  July 10, 2024                    Respectfully submitted,

                                         PACHULSKI STANG ZIEHL & JONES LLP


                                         /s/ *Jeffrey P. Nolan*
                                         Ilan D. Scharf, Esq.
                                         Jeffrey P. Nolan, Esq. *(admitted pro hac vice)*
                                         PACHULSKI STANG ZIEHL & JONES LLP
                                         780 Third Avenue, 34th Floor
                                         New York, New York 10017
                                         Telephone:     (212) 561-7700
                                         Facsimile:     (212) 561-7777

                                         *Counsel for Plaintiff, the Liquidating Trustee*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing document has been served via U.S. Mail and the Court's Electronic Filing System to:

# EXHIBIT A

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    EASTERN DISTRICT OF NEW YORK

3    Case No. 18-71748-ast

4    - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6    ORION HEALTHCORP, INC., et al.,

7             Debtor.

8    - - - - - - - - - - - - - - - - - - - - - - - - - x

9    Adv. Case No. 20-08049-ast

10   - - - - - - - - - - - - - - - - - - - - - - - - - x

11   HOWARD M. EHRENBERG, in his capacity as liquidating trustee

12   of Orion HealthCorp, Inc., et al.,

13                  Plaintiffs,

14           v.

15   ARVIND WALIA; NIKNIM MANAGEMENT, INC.,

16                  Defendants.

17   - - - - - - - - - - - - - - - - - - - - - - - - - x

18   Adv. Case No. 8-20-08052-ast

19   - - - - - - - - - - - - - - - - - - - - - - - - - x

20   HOWARD M. EHRENBERG in his capacity as LIQUIDATING TRUSTEE

21   OF ORION HEALTHCORP, INC., et al.,

22                  Plaintiffs,

23           v.

24   ABRUZZI INVESTMENTS, LLC,

25                  Defendants.



Page 2

1    - - - - - - - - - - - - - - - - - - - - - - - - - x

2                    United States Bankruptcy Court

3                    290 Federal Plaza

4                    Central Islip, New York 11722

5

6                    April 10, 2024

7                    11:29 AM

8

9

10

11

12

13

14

15

16

17

18

19

20

21    B E F O R E :

22    HON ALAN S. TRUST

23    U.S. BANKRUPTCY JUDGE

24

25    ECRO:   UNKNOWN

1    HEARING re Recovery Of Certain Transfers

2

3    HEARING re Summary Judgment

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Rita Weltsch

```
 1    A P P E A R A N C E S :

 2

 3    PACHULSKI STANG ZIEHL & JONES LLP

 4         Attorneys for Trustee Howard Ehrenberg

 5         780 Third Avenue, 34th Floor

 6         New York, NY 10017

 7

 8    BY:  JEFFREY P. NOLAN

 9

10    ROSEN & ASSOCIATES

11         Attorneys for Arvind Walia

12         747 Third Avenue

13         New York, NY 10017

14

15    BY:  SANFORD P. ROSEN

16

17    THE LAW OFFICE OF EUGENE R. SCHEIMAN, PLLC

18         Attorneys for Niknim Management Inc.

19         570 Lexington Ave, Suite 1600

20         New York, NY 10022

21

22    BY:  EUGENE R. SCHEIMAN

23

24

25
```

Page 5

1    GIULIANO LAW, P.C.

2         Attorney for the Counter-Claimant Abruzzi Investments

3         445 Broadhollow Road, Suite 25

4         Melville, NY 11754

5

6    BY:  ANTHONY F. GIULIANO

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2            MR. ROSEN:  Good morning, Judge.

3            THE COURT:  Good morning.

4            MR. ROSEN:  You're muted, Judge.

5            THE COURT:  That will make for a short ruling

6    conference.

7            MR. ROSEN:  Sorry.  That's better.  We can hear

8    you now.

9            THE COURT:  I've been ruling for the last hour-

10   and-a-half.  You guys didn't hear it?

11           MR. ROSEN:  I'm so sorry.  Can you do it again?

12           THE COURT:  Sorry, my throat is sore now.

13           CLERK:  Good morning.  I am Alexis -- excuse me.

14           THE COURT:  It's contagious.

15           CLERK:  Good morning.  I am Alexis Hennigan,

16   backup courtroom deputy for Chief Judge Alan S. Trust

17   presiding.  These hearings are being recorded.  Please speak

18   clearly.  Once you hear your case called, please give your

19   appearance.  And remember, before speaking please state your

20   name so we can get a clear record of who is appearing.  All

21   parties not speaking, please put your phone on mute.

22           Case Number 20-08049, Howard M. Ehrenberg v.

23   Arvind Walia, et al, and Case Number 20-08052, Howard M.

24   Ehrenberg v. Abruzzi Investments LLC, et al.

25           THE COURT:  Let's take appearances please.  First

in Walia.

MR. ROSEN: Good morning, Judge. Sanford Rosen, Rosen & Associates. And we are counsel for the Defendants.

MR. SCHEIMAN: Good morning, Your Honor. Eugene Sheiman with the Law Firm of Eugene Scheiman, co-counsel for the Defendants.

MR. NOLAN: Good morning, Your Honor. Jeff Nolan appearing on behalf of the Plaintiffs, Howard Ehrenberg, the Trustee of the Orion Liquidating Trust.

MR. EHRENBERG: Good morning, Your Honor. I'm Howard Ehrenberg, the liquidating trustee.

THE COURT: All right. Do we have counsel in Abruzzi also?

MR. GIULIANO: Yes, Your Honor. Good morning. Good morning, Your Honor. Anthony Giuliano for the defendants in the Abruzzi matter.

THE COURT: All right. And Mr. Nolan, you're still representing Mr. Ehrenberg in Abruzzi?

MR. NOLAN: Yes, Your Honor. Jeff Nolan appearing on behalf of the plaintiff in the 08052 Abruzzi adversary on behalf of the plaintiff.

THE COURT: All right. I'm going to start with the ruling conference in 20-08052, Ehrenberg v. Abruzzi Investments and John Petrozza.

This is the Court's ruling made in narrative form

1    under Rule 7052 and will include the Court's findings of

2    undisputed facts and conclusions of law.  This is a core

3    proceeding under Title 28, Section 157(b)(2)(H).  The venue

4    is proper in this court.  Due and proper notice of the

5    various motions have been provided to the parties.  The

6    Court has before it Plaintiff-Trustee's motion for summary

7    judgment, the Defendant's cross-motion for summary judgment,

8    and motion to strike, which raises various evidentiary

9    issues.

10           The Court has determined that the following facts

11   are not subject to a genuine dispute and are therefore

12   established in this case pursuant to Rule 56(g) of the

13   Federal Rules of Civil Procedure as incorporated by Rule

14   7056.  The Court will also address the myriad evidentiary

15   objections raised by the Defendants to the extent that they

16   relate to the determination that this Court has made as to

17   what facts are not in genuine dispute.

18           This adversary proceeding revolves around one

19   payment, a $250,000 transfer made to one or more of the

20   defendants.  That transfer came prepetition from funds that

21   belonged to one or more of the debtors.  Those funds of

22   $250,000 were ultimately repaid, but repaid to a non-debtor

23   entity.  However, for purposes of this summary judgment

24   motion, the only issue before the Court is the transfer that

25   was made of the $250,000.

1        The Court has determined for the reasons that

2    follow to deny both parties' cross-motions for summary

3    judgment and will issue a trial scheduling order on the

4    pending claims.

5        The Debtors are the various multiple entities that

6    are listed in the adversary proceeding.  I won't recite all

7    18 or so of them in the record, but they are apparent on the

8    face of the adversary.

9        Those entities prepetition operated a consolidated

10   enterprise of companies which were aggregated through a

11   series of acquisitions and operated in the healthcare sector

12   space, primarily in revenue and practice management.

13       At all times relevant, John Petrozza, who I will

14   refer to as Petrozza, has been a resident of the State of

15   Florida who did business in New York.  His entity, Abruzzi

16   Investments, is a Limited Liability Company that had no

17   employees, no officers, and no directors but was managed by

18   Mr. Petrozza.  I'll refer to them collectively as

19   Defendants.  The only activity undertaken by Abruzzi was to

20   invest money on Mr. Petrozza's behalf.

21       Between 2015 and 2016, Mr. Petrozza considered

22   Paul Parmar, who was the primary principal of the Debtors,

23   as a close friend.  Mr. Parmar was at all relevant times the

24   primary operating person, officer, and controlling

25   shareholder behind the Debtors.

1          In June of 2013, Mr. Petrozza commenced his

2     business relationship with the Debtors when he was

3     approached by Mr. Parmar and asked to invest $4 million in

4     Constellation Healthcare Investment, which I'll refer to as

5     CHI, which is a non-debtor entity.  CHI allegedly held an

6     ownership interest in the Debtor entity, Orion HealthCorp

7     Inc., which I will refer to as Orion.  According to the

8     Defendants, their purpose in investing $4 million in CHI was

9     to acquire 100 percent ownership interest in Orion.  Mr.

10    Petrozza subsequently made the $4 million investment in what

11    he believed was CHI.  Additionally, he paid approximately

12    $300,000 to Orion to cover IPO and expenses associated with

13    his investment.  The money paid by Mr. Petrozza was sent to

14    Parmar and subsequently deposited into an IOLTA account held

15    at Robinson Brog Leinwald Greene Genovese & Gluck, referred

16    to as Robinson Brog, in the name of the non-debtor entity,

17    Constellation Health LLC.

18         In December of 2015, the United States District

19    Court for the Southern District of Texas entered a judgment

20    against Orion in the amount of $194,185.  That Southern

21    District of Texas judgement ultimately resulted in a proof

22    of claim being filed in the bankruptcy case and assigned as

23    Claim Number 1000.  That judgment remained outstanding at

24    the time the Debtors filed for bankruptcy relief.

25         On March 9th of 2016, a lawsuit was filed against

1    the debtor entities Physician Practice Plus and CHT by a

2    plaintiff called Criterions LLC.  On November 30th of 2017,

3    an adverse judgement was entered against those debtors,

4    Physician Practice and CHT, for some $77,000.  That

5    judgement also remained outstanding at the petition date.

6            In November of 2016 as part of a large-scale

7    private transaction involving taking CHT private, Mr.

8    Petrozza met with Mr. Parmar and the board of directors who

9    approved to go-private transaction so they could all make "a

10   gazillion dollars".  Petrozza asserted he was an investor in

11   one or more of the debtors at the time of the go-private

12   transaction and wanted to receive a multiple on his $4

13   million investment.

14           Along the way, several fictitious entities have

15   been created to represent ownership of the equity of CHT.

16   One of those entities was Lexington Landmark Services, Inc.,

17   which as far as Mr. Parmar knew, did not exist as a

18   legitimate business.  While his name was signed on certain

19   documents, he claimed his signature was forged and that he

20   never gave Robinson Brog authority to receive monies on

21   behalf of Landmark Services.

22           Mr. Petrozza testified that on May 24th of 2017,

23   he asked Mr. Parmar for a personal loan of $200,000.  He

24   testified that he wanted the money in order to acquire a

25   lease to a certain property in Florida.  The Court has not

1  been provided with any specifics concerning what property or

2  what lease.

3        In any event, on that same day, on May 24th, 2017,

4  Mr. Parmar directed partner Mitchell Greene at Robinson Brog

5  to wire $250,000 from the Debtor's IOLTA account to Mr.

6  Abruzzi.  Later that same day at 8:39 p.m., Parmar emailed

7  Mr. Greene to wire the $250,000 and he did not care which

8  account the funds were taken out of.

9        The next day, May 25, Robinson Brog confirmed to

10 Mr. Parmar that the $250,000 wire was in fact sent from the

11 Debtor's IOLTA account to Abruzzi.  The funds were sent from

12 an account held in the name of Constellation Health/CHT

13 Closing.  That transaction is what the pleadings refer to

14 and what the Court will refer to as the Transfer.

15        The Debtor's books and records evidence no

16 antecedent debt owed to the Defendants at any time during

17 the calendar year 2017.  Mr. Petrozza could not explain why

18 he asked for $200,000 but received $250,000.

19        Mr. Petrozza further testified that shortly after

20 receiving the wire, the deal for the property that he was

21 working on in Florida fell through and he no longer needed

22 the money.  He then advised his assistant, Lisa Basich, to

23 return the money to Mr. Parmar.  Mr. Parmar then provided

24 wiring instructions to Ms. Basich, who then directed that

25 the funds be wired back as directed by Mr. Parmar.

1          On June 28th of 2017, $250,000 was liquidated from

2     an investment account of Abruzzi and forwarded to Mr.

3     Petrozza's checking account.  The next day, Mr. Abruzzi

4     wired $250,000 to an entity called Sunshine Star LLC.

5     Sunshine Star was a newly-created entity, not a debtor

6     entity, but was created by or for the benefit of Mr. Parmar

7     and his at that time girlfriend, Elena Sartison.  The

8     Debtor's books and records reflect no antecedent debt owed

9     to Sunshine Star during 2017.

10          In October of 2017, Sunshine Star closed the bank

11     account into which the $250,000 had been wired.  Defendants

12     admit that the transfer to Sunshine did not benefit any of

13     the Debtors and that the Defendants had provided no services

14     for the debtors.

15          The multiple entities which ended up filing for

16     bankruptcy on March 16, 2018 include the entities the Court

17     has described thus far.  The Debtor's cases had been jointly

18     administered.

19          In July of 2018, Defendant Abruzzi Investment,

20     filed Claim Number 10062, identifying itself as a

21     shareholder of CHT.  That day Defendant also filed Claim

22     10063, asserting it held a 49 percent member interest in

23     CHT.

24          This adversary proceeding was commenced in March

25     of 2020.  The only transaction at issue for summary judgment

1    purposes, as I said, is the $250,000 wire transfer sent to

2    Abruzzi on May 25, 2017.  That transfer was from the funds

3    that belonged to one or more of the Debtors.

4            The parties have filed various pleadings

5    throughout this case, including and answer and counterclaim,

6    a plaintiff's motion for summary judgment, defendant's

7    cross-motion for summary judgment, and motions to strike

8    various of the evidentiary affidavits submitted by the

9    trustee.  The various motions have been on submission with

10   the Court since May of 2022.

11           I will let the parties know it is not this Court's

12   practice to hold matters on submission for nearly that

13   length of time.  So the Court's apologies to the parties for

14   the length of time it's taken to get to today's rulings.

15           Standards for summary judgement are well known by

16   the parties.  The Court won't recite them.  The central

17   issue is whether or not there exists genuine issues of

18   material fact -- whether or not there are genuine issues of

19   material fact that are in dispute such that judgment as a

20   matter of law can or cannot be awarded to either party.

21           Where cross-motions for summary judgment are

22   pending, the Court must make an independent valuation of

23   each motion separately.

24           Even though the Court is denying both summary

25   judgement motions because the matter will ultimately be

1    tried, I'm going to go ahead and give you my evidentiary

2    rulings on the affidavits that were presented to the Court

3    because the Court anticipates those affidavits will appear

4    again at the time of trial and there is no reason to redo

5    these objections.

6         With respect to the affidavit of Edith Wong and

7    the declaration of Frank Lazzara, Defendants have objected

8    under Rule 901 of the Federal Rules of Evidence, which is an

9    authentication requirement.  The caselaw that addresses Rule

10   901 is fairly replete that the burden of authentication is

11   not particularly high.  The Defendant objects to the Wong

12   affidavit and Lazzar declarations, including emails and

13   other business records that are identified in those

14   declarations because Ms. Wong and Mr. Lazzar did not

15   constitute witnesses with knowledge of the items that are

16   par of what they are claimed to be.

17        However, in a related adversary proceeding arising

18   out of the same Orion case, the same evidentiary objections

19   were raised by the same counsel as here.  Anecdotally, the

20   district court in that action determined that personal

21   knowledge is not a requirement for the authentication of

22   written documents in the Second Circuit.  See Aquila Alpha

23   v. Ehrenberg, 2023 WL 2164268 *4 (E.D.N.Y. Feb. 22, 2023),

24   affirmed by the Second Circuit, 95 F.4th 98.

25        The evidentiary objections to the Wong affidavit

1    and Lazzar affidavit for 901 purposes are overruled.

2    There's an adequate basis for the Court to accept those

3    documents as part of the summary judgment record, which

4    means that they can then become part of the trial record.

5           As to Ms. Sartison, the Debtor also -- the

6    Defendants also objected to her declaration which contained

7    the opening and closing bank statement of M&T for Sunshine

8    Star, again, based on authentication.  Again, there is an

9    adequate basis that's set out in the Sartison affidavit to

10   authenticate those documents, including the Ms. Sartison's

11   declaration that "At the request and direction of Mr.

12   Parmar, I opened an account at M&T Bank for Sunshine Star

13   LLC."

14          As the creator of the bank account for Sunshine,

15   there is clearly enough circumstantial evidence to

16   authenticate the opening and closing statements of that very

17   same bank account.  Refer you all back again to Acquila

18   Alpha.  Both the District Court's opinion and the Second

19   Circuits affirmed this.

20          The Defendants also object to the Wong and Lazzar

21   declarations as inadmissible expert testimony.  However,

22   there is no specific statement contained in either

23   declaration which should be stricken because it is providing

24   an opinion.  Both of those declarations were offering fact

25   testimony and aren't proffered as expert testimony, so 703

1   is irrelevant.

2         As far as the Defendant's hearsay objection, that

3   too is overruled obviously under the well-known hearsay

4   exception for business records under 803(6).  The records

5   attached are business records and the objection is

6   overruled.  Hearsay objections and business records

7   exceptions have been routinely construed in favor of

8   admissibility due to the general trustworthiness of

9   regularly-kept records and the need for this type of

10   evidence in many cases, particularly cases which an

11   independent trustee is appointed to oversee the

12   administration of a case and/or litigation arising

13   therefrom.  I'll refer the party to Arista Records v. Lime

14   Group, 784 F.Supp.2d 398, 421 and Chevron Corp. v. Donziger,

15   974 F.Supp.2d 362, 691-692.

16         With respect to the question of whether or not the

17   $250,000 was property of the estate, the Court has

18   determined that as a matter of law, the funds transferred

19   were property of the bankruptcy estate -- would have been

20   property of the bankruptcy estate had the bankruptcy estate

21   had the bankruptcy case existed at the time that the

22   transfer occurred.  The record is undisputed that the

23   Debtors utilized the IOLTA account at Robinson Brog to hold

24   large amounts of funds and for multiple transactions.  Just

25   because the fund were held in an IOLTA account does not make

1    them not funds of the Debtors.  New York Fiduciary Law

2    Section 4971 is clear that monies that are held by an

3    attorney or held in a fiduciary capacity from a client for a

4    client and/or for a designated beneficial owner.  The

5    Debtors had control and custody over the funds while they

6    sat in the Robinson Brog account and had the power to direct

7    their disposition.

8            The  Court finds no genuine dispute as to whether

9    or not the funds transferred to the Defendants are

10   recoverable as property of the estate.

11           In terms then of the substantive legal theory,

12   trustee moves forward first on Bankruptcy Code Section

13   548(a)(a), which allows the recovery of any property that

14   was transferred with actual intent to hinder, delay, or

15   defraud any entity to which the Debtor was or became liable,

16   as well as New York DCL Section 276, which provides that

17   every conveyance made and every obligation incurred with

18   actual intent to hinder, delay, or defraud present or future

19   creditors is fraudulent.  The two statutes are adequately

20   identical for the Court to conduct one analysis of both.

21   See Janitorial Close-out City Corp., 2013 WL 492375 *5

22   (Bankr. E.D.N.Y. 2013).

23           Transfer may be avoided either under 548(a) of the

24   Bankruptcy Code or New York DCL 276.  If the Debtor had an

25   interest in the property transferred, which is undisputed

1   here -- as to which there is no genuine dispute here.  The

2   transfer occurred within two years of the petition date.

3   That is undisputed here.  And the transfer was made with

4   actual intent to hinder, delay, or defraud a creditor.

5   That's where the factual dispute arises.

6          The trustee has the burden of establishing the

7   actual intent of the transfer or debtor by clear and

8   convincing evidence.  See In re Jacobs, 394 B.R. 646, 658

9   (Bankr. E.D.N.Y. 2008).

10         Because it is difficult to find direct evidence of

11  actual fraudulent intent, courts in this circuit look to

12  certain badges of fraud which can constitute circumstantial

13  evidence of fraudulent intent.  See In re Kaiser, 722 F.2d

14  1574, 1582-1583 (2d. Cir. 1983).  The parties generally

15  agree on what those badges of fraud can include.  Lack of

16  consideration, close association between the parties, the

17  financial condition of the transferor, chronology of events

18  and transactions under inquiry.

19         The Court has determined that a genuine issue of

20  fact disputes as to whether or not there was adequate

21  consideration for the transfer of the $250,000.  In the

22  shortest way to state it, Plaintiff asserts that it was

23  simply a transfer for no consideration.  The Defendant

24  asserted it was a loan, and a loan supported by a promise to

25  repay.

1          The Defendants rely on certain text messages to or

2     from Mr. Petrozza where he requests the $200,000 in exchange

3     for a promise to repay it.  The record is clear though that

4     there is no signed promissory note.  There doesn't appear to

5     be any interest charged for the loan or any collateral

6     provided.

7          Based upon the entire record before the Court,

8     there is a genuine dispute of material fact as to whether or

9     not there was consideration for the transfer at the time the

10    transfer was made and whether or not that consideration is

11    adequate.

12         On the close relationship, there is a close

13    relationship in this record between Petrozza and Mr. Parmar

14    for the reasons that I've already outlined.  There doesn't

15    appear to be any retention of possession or benefit of the

16    property by the Debtor once transferred.  Funds went to

17    Petrozza.  Petrozza then paid the funds back in the

18    equivalent amount that he received, although he didn't pay

19    it into the right entity.

20         As far as the financial condition of the Debtor

21    before or at the time of the transfer, the undisputed

22    evidence before the Court based upon an expert opinion from

23    B. Reily is that the Debtors were insolvent on the measuring

24    date, the probative date, the date of the transfer.  So

25    insolvency condition here exists.

1          In addition, the record is clear that there was

2     the Southern District of Texas judgement outstanding at the

3     time -- prior to the time that the transfer was made and the

4     FBI had seized over $20 million from the IOLTA account prior

5     to the time of the transfer.

6          Questions certainly do exist concerning the

7     overall chronology of events and whether or not the

8     transaction should have been considered legitimate at the

9     time that it was made, but that is a fact issue for the

10    court to determine after trial.

11         With respect to the Trustee's cause of action for

12    a constructively fraudulent transfer and New York DCL 273-a,

13    New York law is clear that any conveyance made without fair

14    consideration when debtor is a defendant in action for money

15    judgement and a judgement has been docketed against him can

16    be set aside as a constructively fraudulent transfer.  To

17    prevail, the Plaintiff must establish that the conveyance

18    was made without fair consideration and for the same reasons

19    that I discussed in connection with the actual fraudulent

20    transfer claim.  The Court has found a question of fact as

21    to whether or not there was fair consideration for the

22    transfer at the time it was made.  The other elements under

23    273-a have been satisfied as a matter of law by the trustee.

24         Again, as I've noted, the expert insolvency report

25    of Craig Jacobson from B. Reily is unrebutted in the summary