bate-stamped AWNK003104-3168. The MIPA is a document produced by Defendant in this litigation and maintained in the files of this firm.

       7.     Attached hereto as **Exhibit 6** are true and correct copies of documents received by Plaintiff in response to a duly issued subpoena to JPMorgan Chase, bate-stamped EHREN-NIKNIM CHASE 000001-2 and 000171-197.

       8.     Attached hereto as **Exhibit 7** is the Proposed Order Granting Plaintiff's Motion For Summary Judgment, Or In The Alternative Summary Adjudication, Against Defendants John Petrozza and Abruzzi Investments, LLC.

      I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

      Executed this 18th day of January, 2023, at Los Angeles, California.

                              Jeffrey P. Nolan

SWORN TO AND SUBSCRIBED before me this
18th day of January, 2023.



SEAL OF
SOPHIA LOUISA LEE
Notary Public · California
Los Angeles County
Commission # 2337676
My Comm. Expires Dec 16, 2024

# EXHIBIT 1

Page 326

1
2    UNITED STATES BANKRUPTCY COURT
3    EASTERN DISTRICT OF NEW YORK
     ----------------------------------------X
4    In re:                      Chapter 11
     ORION HEALTHCORP, INC.,   No. 18-71748(AST)
5                    Debtors.
     ----------------------------------------
6    HOWARD M. EHRENBERG IN
     HIS CAPACITY AS LIQUIDATING
7    TRUSTEE OF ORION HEALTHCORP
     INC., ET AL.,                 Adv. Pro. No.
8                    Plaintiff,  8-20-08049(AST)
     ARVIND WALIA, NIKNIM
9    MANAGEMENT, INC.,
                     Defendant(s).
10   ----------------------------------------X
11
12                    October 28, 2021
13                    12:11 p.m.
14
15        Continued deposition of ARVIND WALIA,
16   held via Zoom at 27 Kettlepond Road,
17   Jericho, New York, pursuant to Notice,
18   before Theresa Tramondo, AOS, CLR, a
19   Notary Public of the State of New York.
20
21
22
23
     Reported by:
24
     THERESA TRAMONDO, AOS, CLR
25

Page 327

1

2   APPEARANCE OF COUNSEL:

3

4   FOR PLAINTIFF HOWARD M. EHRENBERG IN HIS

5   CAPACITY AS LIQUIDATING TRUSTEE OF ORION

6   HEALTHCORP INC., ET AL.:

7       PACHULSKI STANG ZIEHL & JONES LLP

8       10100 Santa Monica Boulevard, Floor 13

9       Los Angeles, California 90067-4003

10      BY:   JEFFREY NOLAN, ESQ.

11      jnolan@pszjlaw.com

12      (310)277-6910

13

14   FOR DEFENDANTS ARVIND WALIA and

15   NIKNIM MANAGEMENT, INC.:

16      ROSEN AND ASSOCIATES

17      747 Third Avenue

18      New York, New York 10017

19      BY:   SANFORD P. ROSEN, ESQ.

20      srosen@rosenpc.com

21      (212)223-1100

22

23   ALSO PRESENT:

24      PAUL RAFFERTY, Concierge, Veritext

25   Legal Solutions

Page 328

1

2              MR. NOLAN:  All parties agree

3         that the court reporter can

4         swear/affirm the witness in virtually

5         via Zoom as if the witness was in the

6         same room as the court reporter.

7         Unless there are any objections by any

8         party, say it's so stipulated.

9              MR. ROSEN:  So stipulated.

10             MR. NOLAN:  So stipulated.

11   A R V I N D   W A L I A, called as a

12   witness, having been duly sworn via Zoom

13   by a Notary Public, was examined and

14   testified as follows:

15   EXAMINATION BY (CONT'D)

16   MR. NOLAN:

17        Q.    Good morning, Mr. Walia.

18        A.    Good morning.

19        Q.    Can you speak up a little bit.

20   I lost you.  You were great --

21        A.    Good morning.

22        Q.    Mr. Walia, this is the third

23   session of your deposition.  Do you recall

24   the admonitions or discussions I had about

25   what we're doing here today?

Page 352

1                        Walia

2        A.      Yes, it was.

3        Q.      And it was doing that in the

4    sphere of with only -- with respect to

5    radiologists?

6        A.      That is correct, yes.

7        Q.      Did you -- since we last had

8    your deposition you were going to go back

9    and check and tell me whether or not

10   Objecttech filed tax returns.  Did they?

11       A.      Again, I believe I did.  I have

12   not been able -- I mean, the CPA firms have

13   changed, so I have to follow up with it.

14               So I -- right now, as of this

15   date, I don't have the answer whether --

16   definitively whether the taxes were filed or

17   not.

18       Q.      How about AllRad Direct, LLC,

19   what was the last year AllRad Direct filed

20   federal or state tax returns?

21       A.      I don't have the answer to that.

22       Q.      I believe your prior testimony

23   was that AllRad Direct went out of business

24   in 2013 or 2012; is that correct?

25       A.      It stopped doing business in

Page 353

                            Walia

1

2    that time frame.

3         Q.    Okay.  And if it stopped doing

4    business, there would be no -- would there

5    be any rationale for it to file tax returns

6    for those subsequent years?

7                MR. ROSEN:  Objection.

8                You can answer that, Arvid.

9         A.    I'm not an accountant, so that

10   would be a question for my accountants at

11   that time who were managing AllRad.

12        Q.    Well, you were the president or

13   owner or CEO of AllRad Direct LLC, correct?

14        A.    That is correct.

15        Q.    And you would be the person who

16   would have to sign the tax returns, correct?

17        A.    That is correct.

18        Q.    Do you recall ever signing any

19   tax returns for AllRad Direct after 2012?

20        A.    I don't remember.  My answer is:

21   I'll have to get back to you on this

22   question.

23        Q.    And you were --

24        A.    I remember doing something, but

25   I don't exactly remember.  It's been quite

Page 354

                              Walia

1

2    some time.  It's been about eight, nine

3    years.

4          Q.    You are the president and were

5    the owner of Objecttech LLC, correct?

6          A.    That is correct.

7          Q.    And as you sit here today, do

8    you recall if you ever filed a federal or

9    state tax return on behalf of Objecttech

10   LLC?

11         A.    Once again, I don't recall.  I

12   will have to get back to that question.  I

13   assume I did, but I don't recall it fully.

14         Q.    Is it a fair statement it would

15   only be you who would be filing those tax

16   returns for AllRad Direct or Objecttech LLC?

17         A.    That is correct.

18               MR. ROSEN:  Objection.

19               You can answer that, Arvind.

20         A.    Yes, that is correct.

21               MR. NOLAN:  Paul, can you keep

22         going down to -- let's go down to

23         detailed assessment.

24         Q.    Mr. Walia, did you provide any

25   of this information on 3973?  It's the lower

# EXHIBIT 2

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------ :
In re:                                                    :    Chapter 11
                                                          :
ORION HEALTHCORP, INC[1].                                 :    Case No. 8-18-71748 (AST)
                                                          :
                    Debtors.                              :    (Jointly Administered)
------------------------------------ :
HOWARD M. EHRENBERG IN HIS CAPACITY                       :
AS LIQUIDATING TRUSTEE OF ORION                           :    Adv. Pro. No. 8-20-08049 (AST)
HEALTHCORP, INC., ET AL.,                                 :
                                                          :
                    Plaintiff,                            :
                                                          :
v.                                                        :
                                                          :
ARVIND WALIA, NIKNIM MANAGEMENT,                          :
INC.,                                                     :
                                                          :
                    Defendant(s)                          :
------------------------------------ :

### PLAINTIFF'S AMENDED REQUEST FOR PRODUCTION OF DOCUMENTS PROPOUNDED TO DEFENDANT, ARVIND WALIA, SET ONE

TO:          Defendant, Arvind Walia

FROM:        Plaintiff, Howard M. Ehrenberg, Liquidating Trustee

**PLEASE TAKE NOTICE** that pursuant to Bankruptcy Rule 7034 and Rule 34 of the

Federal Rules of Civil Procedure Plaintiff requests that Defendant respond to Plaintiff's Request

for Production of Documents, Set Two ("Document Production Requests") within thirty (30)

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Orion Healthcorp, Inc. (7246); Constellation Healthcare Technologies, Inc. (0135); NEMS Acquisition, LLC (7378); Northeast Medical Solutions, LLC (2703); NEMS West Virginia, LLC (unknown); Physicians Practice Plus Holdings, LLC (6100); Physicians Practice Plus, LLC (4122); Medical Billing Services, Inc. (2971); Rand Medical Billing, Inc. (7887); RMI Physician Services Corporation (7239); Western Skies Practice Management, Inc. (1904); Integrated Physician Solutions, Inc. (0543); NYNM Acquisition, LLC (unknown) Northstar FHA, LLC (unknown); Northstar First Health, LLC (unknown); Vachette Business Services, Ltd. (4672); Phoenix Health, LLC (0856); MDRX Medical Billing, LLC (5410); VEGA Medical Professionals, LLC (1055); Allegiance Consulting Associates, LLC (7291); Allegiance Billing & Consulting, LLC (7141); New York Network Management, LLC (7168). The corporate headquarters and the mailing address for the Debtors listed above is 1715 Route 35 North, Suite 303, Middletown, NJ 07748.

days of the time of their service and produce all responsive documents at the offices of Pachulski Stang Ziehl & Jones LLP, attn.: Jeffrey P. Nolan, 10100 Santa Monica Boulevard, Suite 1300, Los Angeles, California 90067.

## DEFINITIONS AND INSTRUCTIONS

A.    The term "DOCUMENT(S)" means and includes, without limitation, the following: any and all writings of whatever kind, including the originals and all non-identical copies, whether different from the originals by reason of any notation made on such copies or otherwise (including without limitation correspondence, memoranda, notes, diaries, statistics, letters, telegrams, minutes, contracts, reports, studies, checks, statements, receipts, returns, summaries, pamphlets, books, prospectuses, interoffice and intra-office communications, offers, notations of any sort of conversations, telephone calls, meetings or other communications, bulletins, printed matter, computer printouts, teletypes, telefax, invoices, work sheets, and all drafts, alterations, modifications, changes and amendments of any of the foregoing), graphic or aural records or representations of any kind (including without limitation, photographs, charts, graphs, microfiche, microfilm, videotape, recordings, motion pictures), and electronic, mechanical or electric records or representations of any kind (including without limitation tapes, cassettes, discs, recordings).

B.    "BANKRUPTCY CASES" means case no. 8-18-71748 (AST) and all related chapter 11 cases filed in the United States Bankruptcy Court, Eastern District of New York.

C.    "CONCERN" or "CONCERNING" means relate to, refer to, describe, evidence or constitute.

D.    "DEBTOR" shall mean Orion Healthcorp, Inc., Constellation Healthcare Technologies, Inc. et al., and their affiliates in these chapter 11 cases.

E.    "PLAINTIFF" means the Howard M. Ehrenberg, Liquidating Trustee.

F.    "YOU" or "YOUR" means Arvind Walia, the named defendant in this adversary proceeding, and shall include any other names or alias, his successors, agents, representatives, attorneys, accountants, and all other persons acting on its behalf or under its control.

G.    DEFENDANTS means NIKNIM Management, Inc. and/or Arvind Walia the named defendants in the adversary proceeding 8-20-08049 (AST).

H.    "COMPLAINT" means the First Amended Complaint For Avoidance and Recovery of (1) Fraudulent Transfers; (2) Preferential Transfers; (3) Recovery of Avoided Transfers; (4) Objection To Claim No. 10067; Pursuant to 11 USC §§ 502, 544, 547, 548 and 550 [Dkt. No. 21], filed in this adversary; # 20-08049-ast on approximately May 26, 2021.

I.    "PERSON" means and includes natural persons, firms, associations, corporations, institutions, partnerships, government agencies, or other organizations cognizable at law, and their agents and employees.

J.    "COMMUNICATION" means every manner or means of disclosure, transfer, or exchange of information, words, thoughts or ideas, whether orally or by document, whether face-to-face, by telephone, mail, personal delivery, electronic communication or otherwise.

K.    "ACTION" means the legal proceeding commenced with the Complaint filed by DEBTOR against NIKNIM Management, Inc., in the United States Bankruptcy Court for the Eastern District of New York, Adv. No. 20-08049.

L.    "PREFERENCE PERIOD" means one year prior to March 16, 2018, the date on which DEBTOR filed its bankruptcy petition.

M.    "TRANSFERS" means any and all payments identified on Exhibit A to the First Amended Complaint For Avoidance and Recovery of (1) Fraudulent Transfers; (2) Preferential

Transfers; (3) Recovery of Avoided Transfers; (4) Objection To Claim No. 10067; Pursuant to

11 USC §§ 502, 544, 547, 548 and 550.

N.      "ANSWER" means DEFENDANT's Answer to First Amended Complaint and

Affirmative Defenses [Dkt. No. 23] filed in this adversary on or about June 9, 2021.

O.      PETITION DATE means March 16, 2018, the date the Debtors filed voluntary

petitions in bankruptcy.

P.      OBJECTTECH means Objecttech Holdings, LLC or any other related subsidiary

or business entity which it holds or owns a controlling share.

Q.      In responding to these Document Production Requests, YOU shall provide

DOCUMENTS that are known or available to YOU, YOUR attorneys, YOUR accountants, to

any of YOUR investigators, employees, agents, or other persons serving YOU or YOUR

attorneys.  Reasonable investigation is required of YOU to provide a complete response.  If, after

making such an investigation or having one made, YOU are still unable to fully respond, YOU

are required to respond to the extent possible, and, further, to explain what investigative steps

were undertaken, and how and why YOU are unable to provide a complete response.

R.      Throughout these Document Production Requests, the use of the masculine,

feminine or neuter is to be understood to include each of the others, where that is necessary to a

reasonable understanding of the Document Production Request.  Similarly, the use of the plural

is to be understood to include the singular, and vice versa.

S.      If YOU contend that any DOCUMENT called for by any of these Document

Production Requests is privileged, in whole or in part, or if YOU otherwise object to any part of

any Document Production Request, state the reasons for each objection, claim of privilege and/or

ground for refusal to produce, and identify each person having knowledge of the factual basis, if

any, on which each objection, claim of privilege and/or other ground(s) for refusal to produce is asserted.

   T.  If any DOCUMENTS requested herein have been lost or destroyed, the DOCUMENTS so lost or destroyed shall be identified by author, date, and subject matter.  In addition, the date of disposal, the manner of disposal, the reason for disposal, the PERSON authorizing disposal, and the PERSON disposing of the DOCUMENTS shall be identified.

   U.  All DOCUMENTS produced shall be produced as they are kept in the usual course of business or shall be organized and labeled to correspond to the paragraph of this request to which they are primarily responsive.

   V.  These Document Production Requests are of a continuing nature.  If YOU acquire additional DOCUMENTS responsive to these Document Production Requests after the service of YOUR responses thereto, YOU shall promptly furnish such DOCUMENTS to the undersigned attorneys.

## DOCUMENT PRODUCTION REQUESTS

**DOCUMENT REQUEST NO. 1:**

   If YOU contend that the DEBTOR'S assets had a value higher than the amount listed on the DEBTOR'S schedules, please produce all DOCUMENTS to support such claim.

**DOCUMENT REQUEST NO. 2:**

   If YOU contend that the DEBTOR'S liabilities were less than those listed on the DEBTOR'S schedules, please produce all DOCUMENTS to support such claim.

**DOCUMENT REQUEST NO. 3:**

   All DOCUMENTS which support, form the basis of or document any service or product

owed by YOU as evidenced in proof of claim number 10067 filed in Case Number 18-71753.

**DOCUMENT REQUEST NO. 4:**

All DOCUMENTS YOU contend evidence that the DEBTOR was solvent at any time

from January 1, 2016 to the PETITION DATE.

**DOCUMENT REQUEST NO. 5:**

Any and all DOCUMENTS that memorialize or record any COMMUNICATIONS

between DEFENDANTS and DEBTOR, or any executive or employee, from January 2016 to the

PETITION DATE CONCERNING debts owed to the DEFENDANTS.

**DOCUMENT REQUEST NO. 6:**

Any and all DOCUMENTS that constitute, relate, or refer in any way to the product or

services rendered by DEFENDANTS for which the payments identified on Exhibit "A" attached

to the COMPLAINT in this ACTION were received.

**DOCUMENT REQUEST NO. 7:**

Any and all DOCUMENTS memorializing the receipt of any payments between

DEFENDANTS and DEBTOR from July 1, 2015 to the PETITION DATE.

**DOCUMENT REQUEST NO. 8:**

Any and all account DOCUMENTS which reflect account reconciliations generated by

YOU for TRANSFERS with DEBTOR from July 1, 2016 to the PETITION DATE.

**DOCUMENT REQUEST NO. 9:**

Any and all DOCUMENTS, which YOU forwarded to DEBTOR regarding payment to

collect any debt or sum from January 1, 2015 to the PETITION DATE.

**DOCUMENT REQUEST NO. 10:**

All DOCUMENTS reflecting or memorializing any communication(s) between

DEFENDANTS in 2016, 2017, or 2018 memorializing or referencing the status of any debt or payment from the DEBTOR.

**DOCUMENT REQUEST NO. 11:**

Any and all DOCUMENTS, which memorialize, identify or otherwise support YOUR contentions within the First Affirmative Defense asserted within the ANSWER.

**DOCUMENT REQUEST NO. 12:**

Any and all DOCUMENTS, which memorialize, identify or otherwise support YOUR contentions within the Second Affirmative Defense asserted within the ANSWER.

**DOCUMENT REQUEST NO. 13:**

Any and all DOCUMENTS, which memorialize, identify or otherwise support YOUR contentions within the Third Affirmative Defense asserted within the ANSWER.

**DOCUMENT REQUEST NO. 14:**

Any and all DOCUMENTS, which memorialize, identify or otherwise support YOUR contentions within the Fourth Affirmative Defense asserted within the ANSWER.

**DOCUMENT REQUEST NO. 15:**

Any and all DOCUMENTS, which memorialize, identify or otherwise support YOUR contentions within the Fifth Affirmative Defense asserted within the ANSWER.

**DOCUMENT REQUEST NO. 16:**

Any and all DOCUMENTS, which memorialize, identify or otherwise support YOUR contentions within the Sixth Affirmative Defense asserted within the ANSWER.

**DOCUMENT REQUEST NO. 17:**

Any and all DOCUMENTS, which memorialize, identify or otherwise support YOUR contentions within the Seventh Affirmative Defense asserted within the ANSWER.

**DOCUMENT REQUEST NO. 18:**

Any and all DOCUMENTS, which memorialize, identify or otherwise support YOUR contentions within the Eighth Affirmative Defense asserted within the ANSWER.

**DOCUMENT REQUEST NO. 19:**

Any and all DOCUMENTS, which memorialize, identify or otherwise support YOUR contentions within the Ninth Affirmative Defense asserted within the ANSWER.

**DOCUMENT REQUEST NO. 20:**

Any and all DOCUMENTS, which memorialize, identify or otherwise support YOUR contentions within the Tenth Affirmative Defense asserted within the ANSWER.

**DOCUMENT REQUEST NO. 21:**

Any and all DOCUMENTS, which memorialize, identify or otherwise support YOUR contentions within the Eleventh Affirmative Defense asserted within the ANSWER.

**DOCUMENT REQUEST NO. 22:**

Any and all DOCUMENTS, which memorialize, identify or otherwise support YOUR contentions within the Twelfth Affirmative Defense asserted within the ANSWER.

**DOCUMENT REQUEST NO. 23:**

Any and all DOCUMENTS, which memorialize, identify or otherwise support YOUR contentions within the Thirteenth Affirmative Defense asserted within the ANSWER.

**DOCUMENT REQUEST NO. 24:**

Any and all DOCUMENTS, which memorialize any COMMUNICATION between Defendants and Paul Parmar from January 1, 2016 to the PETITION DATE.

**DOCUMENT REQUEST NO. 25:**

Any and all DOCUMENTS, which YOU forwarded to DEBTOR evidencing the

operations of OBJECTTECH from January 1, 2015 to the PETITION DATE.

**DOCUMENT REQUEST NO. 26:**

Any and all DOCUMENTS, which YOU forwarded to DEBTOR evidencing the

valuation of OBJECTTECH.

**DOCUMENT REQUEST NO. 27:**

Any and all DOCUMENTS, which memorialize, identify or otherwise constitute the

corporate documents governing the formation and/or governance of OBJECTTECH.

**DOCUMENT REQUEST NO. 28:**

ALL invoices issued by YOU to the DEBTOR from January 1, 2016 to the PETITION

DATE.

**DOCUMENT REQUEST NO. 29:**

Any and all COMMUNICATIONS between YOU and Paul Parmar from January 1,

2015, to the PETITION DATE.

**DOCUMENT REQUEST NO. 30:**

For any new value YOU contend was provided to the DEBTOR in the PREFERENCE

PERIOD, please produce any and all supporting DOCUMENTS for the services or product upon

which the services were rendered, including all bills, invoices, work sheets, correspondence and

memorialization of when product shipped or services rendered.

**DOCUMENT REQUEST NO. 31:**

Any and all DOCUMENTS that constitute the Federal and/or State tax records of

OBJECTTECH from January 1, 2015 to the January 1, 2019.

**DOCUMENT REQUEST NO. 32**:

Any and all COMMUNICATIONS between YOU and Sotirios Zaharis, a/k/a Sam Zaharis, from January 1, 2015, to the PETITION DATE.

**DOCUMENT REQUEST NO. 33**:

Any and all DOCUMENTS which support any services rendered by YOU for non-debtor Orion Health Corp. from January 1, 2015 to the PETITION DATE.

**DOCUMENT REQUEST NO. 34**:

Any and all DOCUMENTS, which memorialize any COMMUNICATION between YOU and Sage Group from January 1, 2015 to the PETITION DATE.

**DOCUMENT REQUEST NO. 35**:

Any and all DOCUMENTS that constitute the Federal and/or State tax records, including schedules, of AllRad Direct from January 1, 2015 to the January 1, 2019.

**DOCUMENT REQUEST NO. 36**:

Any and all DOCUMENTS, which memorialize any COMMUNICATION between YOU and Ravi Chivukula from January 1, 2015, to the PETITION DATE.

**DOCUMENT REQUEST NO. 37**:

Any and all DOCUMENTS, which reflect the ownership and formation of Orion Health Corp.

**DOCUMENT REQUEST NO. 38:**

Any and all DOCUMENTS that constitute the Federal and/or State tax records of Orion

Health Corp. from January 1, 2015 to the January 1, 2019.

Dated: August 4, 2020

Ilan D. Scharf, Esquire
Jeffrey P. Nolan, Esquire (admitted *pro hac vice*)
PACHULSKI STANG ZIEHL & JONES LLP
780 Third Avenue, 34th Floor
New York, New York 10017
Telephone:    (212) 561-7700
Facsimile:    (212) 561-7777

*Counsel for the Plaintiff,*
*Howard M. Ehrenberg in his capacity*
*as Liquidating Trustee of Orion Healthcorp, Inc., et al.*

**PROOF OF SERVICE**

STATE OF CALIFORNIA        )
                           )
COUNTY OF LOS ANGELES      )

I, Rolanda Mori, am employed in the city and county of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 10100 Santa Monica Blvd., 13th Floor, Los Angeles, California 90067-4100.

On August 4, 2021, I caused to be served the **PLAINTIFF'S AMENDED REQUEST FOR PRODUCTION OF DOCUMENTS PROPOUNDED TO DEFENDANT, ARVIND WALIA, SET ONE** in this action by placing a true and correct copy of said document(s) in sealed envelopes addressed as follows:

Sanford P. Rosen
Paris Gyparakis
**ROSEN & ASSOCIATES, P.C.**
747 Third Avenue
New York, NY 10017-2803

☑ (BY MAIL) I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Los Angeles, California, in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☐ (BY EMAIL) I caused to be served the above-described document by email to the parties indicated on the attached service list at the indicated email address.

☐ (BY NOTICE OF ELECTRONIC FILING) I caused to be served the above-described document by means of electronic transmission of the Notice of Electronic Filing through the Court's transmission facilities, for parties and/or counsel who are registered ECF Users.

☐ (BY OVERNIGHT DELIVERY) By sending by                    to the addressee(s) as indicated on the attached list.

I declare that I am employed in the office of a member of the bar of this Court at whose direction was made.

Executed on August 4, 2021, at Los Angeles, California.

_____
Rolanda Mori

DOCS_LA:339145.1 65004/003

201

# EXHIBIT 3

*CONFIDENTIAL*
*ATTORNEY-CLIENT PRIVILEGE*
*ATTORNEY WORK PRODUCT*

**ROSEN & ASSOCIATES, P.C.**
*Counsel to Arvind Walia and*
  *Niknim Management Inc.*
747 Third Avenue
New York, NY 10017-2803
(212) 223-1100
Sanford P. Rosen
Paris Gyparakis

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | |
| | Chapter 11 |
| ORION HEALTHCORP, INC. *et al.*, | |
| Debtors. | Case No. 18-71748 (AST) |
| HOWARD M. EHRENBERG, IN HIS CAPACITY AS LIQUIDATING TRUSTEE OF ORION HEALTHCORP, INC., ET AL., | |
| Plaintiff, | Adv. Proc. No. 20-08049 (AST) |
| v. | |
| ARVIND WALIA, NIKNIM MANAGEMENT INC., | |
| Defendants. | |

**DEFENDANTS' FIRST SET OF RESPONSES AND OBJECTIONS TO**
**PLAINTIFF'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS**

Defendant   Arvind   Walia   ("**Defendant**"),   through   his   counsel,   Rosen   &
Associates, P.C., as and for his first set of responses and objections (the "**Responses**") to
*Plaintiff's Request for Production of Documents Propounded to Defendant, Arvind Walia, Set*
*One* (the "**Document Request**"), propounded by Howard M. Ehrenberg, in his capacity as
liquidating trustee of the estates of Orion HealthCorp, Inc., et al. ("**Plaintiff**"), respectfully
represents as follows:

**Exhibit**
**0030**

203

## RESERVATION OF RIGHTS

A.      Defendant expressly reserves all rights to supplement, amend, or correct any of the responses and objections herein, as well as all rights to object to the admissibility of any part of any document produced in response to any request or information contained in any such document into this proceeding on the grounds of competency, relevancy, materiality, privilege, hearsay or any other proper ground, to the use of any such information for any purpose, in whole or in part, in any subsequent stage or proceeding in this action or any other action and/or proceeding.

B.      Any document subject to any privilege that is inadvertently produced shall not constitute or be deemed to constitute a waiver of such privilege and Defendant reserves all rights to demand the return of any inadvertently produced documents.

C.      In the following objections and responses, a statement that Defendant "will produce," means that, subject to any applicable General Objections (defined herein), Defendant will conduct a reasonable search for reasonably accessible documents in his possession, custody and control, if any, and will produce such non-privileged documents as may be found. Such statement shall not be deemed or construed as a representation that any such documents exist or do not exist, are or are not reasonably accessible or in Defendant's possession, custody and control, that Defendant performed any of the acts described in the request, or that Defendant acquiesces in the characterization of the conduct or activities contained in the request, or definitions and/or instructions applicable to such request.

## GENERAL OBJECTIONS

The following general objections (the "**General Objections**") apply to the Document Request and should be understood and read as applicable to each enumerated

2

request for production of documents contained therein (collectively, the "**Requests**," and individually, a "**Request**"):

D.    Defendant objects to each Request insofar as it seeks discovery of information or documents that are not in Defendant's possession, custody or control, or are already in Plaintiff's possession, custody or control or which is equally or more available to Plaintiff through public sources or records or sources other than Defendant.

E.    Defendant objects to each Request insofar as it seeks disclosure of information or documents which are protected by any applicable privilege, including, without limitation, the attorney-client privilege and/or are otherwise protected from disclosure.

F.    Defendant objects to each Request insofar as it seeks disclosure of information or documents that contain attorney work-product.

G.    Defendant objects to each Request insofar as it seeks disclosure of information or documents prepared in anticipation of litigation or that contain the mental impressions, conclusions, opinions or legal theories of an attorney or other representative of a party concerning the litigation.

H.    Defendant objects to each Request insofar as it seeks documents related to experts.

I.    Defendant objects to each Request insofar as it seeks documents or information that may be protected from disclosure by a confidentiality agreement, protective order or similar document.

J.    Defendant objects to each Request to the extent such request is overly broad, unduly burdensome and disproportionate to the needs of the case.

K.    Defendant objects to each Request insofar as it seeks to impose obligations beyond those permitted by the Federal Rules of Civil Procedure, will cause Defendant to incur unnecessary and unreasonable expense and/or do not set forth individual items or categories with reasonable particularity.

L.    Defendant objects to each Request insofar as it seeks disclosure of information or documents that are irrelevant, immaterial or not reasonably calculated to lead to discovery of admissible evidence.

M.    Defendant objects to each Request insofar as it seeks documents from non-parties.

N.    Defendant objects to each Request insofar as it contains no limitation on the time period for which responsive information or documents are sought and/or contains a time period that is inordinately long as unduly burdensome, vague and/or ambiguous or not material and necessary in the prosecution or defense of this action.

## OBJECTIONS AND RESPONSES TO REQUESTS FOR DOCUMENTS

**REQUEST FOR PRODUCTION NO. 1:** *If YOU contend that the DEBTOR'S assets had a value higher than the amount listed on the DEBTOR'S schedules, please produce all DOCUMENTS to support such claim.*

RESPONSE: *See* annexed document production bearing bates-numbers AWNK000001—AWNK003017.

**REQUEST FOR PRODUCTION NO. 2:** *If YOU contend that the DEBTOR'S liabilities were less than those listed on the DEBTOR'S schedules, please produce all DOCUMENTS to support such claim.*

4

> RESPONSE: *See* annexed document production bearing bates-numbers AWNK000001—AWNK003017 and AWNK003317—AWNK003392.

**REQUEST FOR PRODUCTION NO. 3:** *All DOCUMENTS which support, form the basis of or document any service or product owed by YOU as evidenced in proof of claim number 10067 filed in Case Number 18-71753.*

> RESPONSE: Subject to and without waiving any of the General Objections set forth herein, Defendant will produce any non-privileged documents responsive to this Request that is in its possession, custody or control.

**REQUEST FOR PRODUCTION NO. 4:** *All DOCUMENTS YOU contend evidence that the DEBTOR was solvent at any time from January 1, 2017 to the PETITION DATE.*

> RESPONSE: Subject to and without waiving any of the General Objections set forth herein, Defendant will produce any non-privileged documents responsive to this Request that is in its possession, custody or control.

**REQUEST FOR PRODUCTION NO. 5:** *Any and all DOCUMENTS that memorialize or record any COMMUNICATIONS between DEFENDANTS and DEBTOR, or any executive or employee, from January 2016 to the PETITION DATE CONCERNING debts owed to the DEFENDANTS.*

> RESPONSE: *See* annexed document production bearing bates-numbers AWNK003036 and ARNK003316.

**REQUEST FOR PRODUCTION NO. 6:** *Any and all DOCUMENTS that constitute, relate, or refer in any way to the product or services rendered by DEFENDANT for which the payments identified on Exhibit "A" attached to the COMPLAINT in this ACTION were received.*

5

> RESPONSE: Defendant objects to this Request to the extent it implies a legal conclusion that the payments identified on Exhibit "A" of the Complaint were received.
>
> *See* annexed document production bearing bates-numbers AWNK003019—AWNK003036, AWNK003210—AWNK003225, ARNK003316 and AWNK003317—AWNK003392.

**REQUEST FOR PRODUCTION NO. 7:** *Any and all DOCUMENTS memorializing the receipt of any TRANSFERS between DEFENDANT and DEBTOR from July 1, 2015 to the PETITION DATE.*

> RESPONSE: Defendant objects to this Request to the extent it implies a legal conclusion that the payments identified on Exhibit "A" of the Complaint were received.
>
> *See* annexed document production bearing bates-numbers AWNK003036 and ARNK003316.

**REQUEST FOR PRODUCTION NO. 8:** *Any and all account DOCUMENTS which reflect account reconciliations generated by DEFENDANT for TRANSFERS with DEBTOR from July 1, 2016 to the PETITION DATE.*

> RESPONSE: Defendant objects to this Request to the extent it implies a legal conclusion that the payments identified on Exhibit "A" of the Complaint were received.
>
> *See* annexed document production bearing bates-numbers AWNK003010—AWNK003017, AWNK003036 and ARNK003316.

6

**REQUEST FOR PRODUCTION NO. 9:** *Any and all DOCUMENTS, which YOU forwarded to DEBTOR regarding payment to collect any debt or sum from January 1, 2016 to the PETITION DATE.*

> RESPONSE: *See* annexed document production bearing bates-numbers AWNK003010—AWNK003017, AWNK003036 and ARNK003316.

**REQUEST FOR PRODUCTION NO. 10:** *All DOCUMENTS reflecting or memorializing any communication(s) between DEFENDANTS in 2017 or 2018 memorializing or referencing the status of the DEBTOR'S payments.*

> RESPONSE: *See* annexed document production bearing bates-numbers AWNK003010—AWNK003017, AWNK003036 and ARNK003316.

**REQUEST FOR PRODUCTION NO. 11:** *Any and all DOCUMENTS, which memorialize, identify or otherwise support YOUR contentions within the First Affirmative Defense asserted within the ANSWER.*

> RESPONSE: Subject to and without waiving any of the General Objections set forth herein, Defendant will produce any non-privileged documents responsive to this Request that is in its possession, custody or control.

**REQUEST FOR PRODUCTION NO. 12:** *Any and all DOCUMENTS, which memorialize, identify or otherwise support YOUR contentions within the Second Affirmative Defense asserted within the ANSWER.*

> RESPONSE: Subject to and without waiving any of the General Objections set forth herein, Defendant will produce any non-privileged documents responsive to this Request that is in its possession, custody or control.

**REQUEST FOR PRODUCTION NO. 13:** *Any and all DOCUMENTS, which memorialize, identify or otherwise support YOUR contentions within the Third Affirmative Defense asserted within the ANSWER.*

> RESPONSE: Subject to and without waiving any of the General Objections set forth herein, Defendant will produce any non-privileged documents responsive to this Request that is in its possession, custody or control.

**REQUEST FOR PRODUCTION NO. 14:** *Any and all DOCUMENTS, which memorialize, identify or otherwise support YOUR contentions within the Fourth Affirmative Defense asserted within the ANSWER.*

> RESPONSE: *See* annexed document production bearing bates-numbers AWNK003019—AWNK003036, AWNK003210—AWNK003225 and ARNK003316.

**REQUEST FOR PRODUCTION NO. 15:** *Any and all DOCUMENTS, which memorialize, identify or otherwise support YOUR contentions within the Fifth Affirmative Defense asserted within the ANSWER.*

> RESPONSE: *See* annexed document production bearing bates-numbers AWNK003019—AWNK003036, AWNK003210—AWNK003225 and ARNK003316.

**REQUEST FOR PRODUCTION NO. 16:** *Any and all DOCUMENTS, which memorialize, identify or otherwise support YOUR contentions within the Sixth Affirmative Defense asserted within the ANSWER.*

> RESPONSE: Defendant does not have possession, custody or control of any responsive documents.

8

**REQUEST FOR PRODUCTION NO. 17:** *Any and all DOCUMENTS, which memorialize, identify or otherwise support YOUR contentions within the Seventh Affirmative Defense asserted within the ANSWER.*

> RESPONSE: Defendant does not have possession, custody or control of any responsive documents.

**REQUEST FOR PRODUCTION NO. 18:** *Any and all DOCUMENTS, which memorialize, identify or otherwise support YOUR contentions within the Eighth Affirmative Defense asserted within the ANSWER.*

> RESPONSE: Defendant does not have possession, custody or control of any responsive documents.

**REQUEST FOR PRODUCTION NO. 19:** *Any and all DOCUMENTS, which memorialize, identify or otherwise support YOUR contentions within the Ninth Affirmative Defense asserted within the ANSWER.*

> RESPONSE: Defendant does not have possession, custody or control of any responsive documents.

**REQUEST FOR PRODUCTION NO. 20:** *Any and all DOCUMENTS, which memorialize, identify or otherwise support YOUR contentions within the Tenth Affirmative Defense asserted within the ANSWER.*

> RESPONSE: *See* annexed document production bearing bates-numbers AWNK003019—AWNK003036, AWNK003210—AWNK003225 and ARNK003316. Subject to and without waiving any of the General Objections set forth herein, Defendant will produce any additional non-privileged documents responsive to this Request that is in its possession, custody or control.

9

**REQUEST FOR PRODUCTION NO. 21:** *Any and all DOCUMENTS, which memorialize, identify or otherwise support YOUR contentions within the Eleventh Affirmative Defense asserted within the ANSWER.*

> RESPONSE: Defendant does not have possession, custody or control of any responsive documents.

**REQUEST FOR PRODUCTION NO. 22:** *Any and all DOCUMENTS, which memorialize, identify or otherwise support YOUR contentions within the Twelfth Affirmative Defense asserted within the ANSWER.*

> RESPONSE: Defendant does not have possession, custody or control of any responsive documents.

**REQUEST FOR PRODUCTION NO. 23:** *Any and all DOCUMENTS, which memorialize, identify or otherwise support YOUR contentions within the Thirteenth Affirmative Defense asserted within the ANSWER.*

> RESPONSE: Defendant does not have possession, custody or control of any responsive documents.

**REQUEST FOR PRODUCTION NO. 24:** *Any and all DOCUMENTS, which memorialize any COMMUNICATION between YOU and Paul Parmar from January 1, 2016 to the PETITION DATE.*

> RESPONSE: Defendant does not have possession, custody or control of any responsive documents.

**REQUEST FOR PRODUCTION NO. 25:** *Any and all DOCUMENTS, which YOU forwarded to DEBTOR evidencing the operations of OBJECTTECH from January 1, 2015 to the PETITION DATE.*

10

> RESPONSE: *See* annexed document production bearing bates-numbers AWNK002789—ARNK003316.

**REQUEST FOR PRODUCTION NO. 26:** *Any and all DOCUMENTS, which YOU forwarded to DEBTOR evidencing the valuation of OBJECTTECH.*

> RESPONSE: Defendant objects to this Request in its entirety as overly broad and unduly burdensome and to the extent that it seeks information that is not relevant and not reasonably calculated to lead to discovery of admissible evidence.
>
> the discovery of relevant, admissible evidence.

**REQUEST FOR PRODUCTION NO. 27:** *Any and all DOCUMENTS, which memorialize, identify or otherwise constitute the corporate documents governing the formation and/or governance of OBJECTTECH.*

> RESPONSE: *See* annexed document production bearing bates-numbers AWNK003019—AWNK003036, AWNK003210—AWNK003225 and ARNK003316.

**REQUEST FOR PRODUCTION NO. 28:** *ALL invoices issued by YOU to the DEBTOR from January 1, 2016 to the PETITION DATE.*

> RESPONSE: *See* annexed document production bearing bates-numbers AWNK003036 & ARNK003316.

**REQUEST FOR PRODUCTION NO. 29:** *Any and all DOCUMENTS which YOU contend memorialize the terms for payment of product or services rendered by YOU to the DEBTOR in 2016 and/or 2017, including any contract or master agreement.*

11

> RESPONSE: *See* annexed document production bearing bates-numbers AWNK003019—AWNK003036, AWNK003210—AWNK003225 and ARNK003316.

**REQUEST FOR PRODUCTION NO. 30:** *For any new value YOU contend was provided to the DEBTOR in the PREFERENCE PERIOD, please produce any and all supporting DOCUMENTS for the services or product upon which the services were rendered, including all bills, invoices, work sheets, correspondence and memorialization of when product shipped or services rendered.*

> RESPONSE: Defendant does not have possession, custody or control of any responsive documents.

**REQUEST FOR PRODUCTION NO. 31:** *Any and all DOCUMENTS that constitute the Federal and/or State tax records of OBJECTTECH from January 1, 2015 to the January 1, 2019.*

> RESPONSE: Defendant objects to this Request in its entirety as overly broad and unduly burdensome and to the extent that it seeks information that is not relevant and not reasonably calculated to lead to discovery of admissible evidence.
>
> the discovery of relevant, admissible evidence.

**REQUEST FOR PRODUCTION NO. 32:** *For any of the TRANSFERS that you contend are not avoidable by the Debtor by virtue of the ordinary course defense of 11 U.S.C. section 547(c)(2), please produce all DOCUMENTS that YOU contend supports the defense.*

> RESPONSE: *See* annexed document production bearing bates-numbers AWNK003019—AWNK003036, AWNK003210—AWNK003225 and ARNK003316.

**REQUEST FOR PRODUCTION NO. 33:** *Any and all DOCUMENTS which support any services rendered by YOU for non-debtor Orion Health Corp.*

> RESPONSE: Defendant does not have possession, custody or control of any responsive documents.

**REQUEST FOR PRODUCTION NO. 34:** *Any and all DOCUMENTS, which memorialize any COMMUNICATION between YOU and Sage Group regarding AllRad Direct.*

> RESPONSE: Defendant does not have possession, custody or control of any responsive documents.

**REQUEST FOR PRODUCTION NO. 35:** *Any and all DOCUMENTS that constitute the Federal and/or State tax records of AllRad Direct from January 1, 2015 to the January 1, 2019.*

**REQUEST FOR PRODUCTION NO. 36:** *Any and all DOCUMENTS, which memorialize any COMMUNICATION between YOU and Ted Brindamour from January 1, 2016 to the PETITION DATE.*

> RESPONSE: *See* annexed document production bearing bates-numbers AWNK002789—ARNK003316.

Dated: New York, New York
        September 11, 2021


                    **ROSEN & ASSOCIATES, P.C.**
                    *Counsel to Arvind Wallia*

                    By: */s/ Sanford P. Rosen*
                            Sanford P. Rosen
                            Paris Gyparakis

                    747 Third Avenue
                    New York, NY 10017-2803
                    (212) 223-11001

13

# EXHIBIT 4

AWNK003013

Thanks

Arvind

---------------------------------------
Arvind Walia
CEO, Orion Health Corporation
300 Jericho Quadrangle West Suite 320
Jericho, NY 11753
http://www.orionhealthcorp.com/
516-874-8101 (phone)
646-536-2515 (fax)
516-770-6222 (Mobile)
---------------------------------------

**From:** Paul Parmar [mailto:paul@pegasusbluestarfund.com]
**Sent:** Friday, April 15, 2016 12:37 PM
**To:** Arvind Walia
**Subject:** RE: Wire Instructions and plan

Arvind,

I am on the conf. call still but I think what I sent you is what I can get approved and fit into my box, it still makes Porteck look like a bad purchase but this is life, you have to look at the total package I have put is in line with what we discussed, infact more than what we discussed.

First , I cannot do 300K salary + 675K equity that is a million a year in salary. So that is completely out of the window.

Second, I cannot wire more than 2.5m if you remember I told you yesterday also I do not want to look at the what is due and what is not as I see you as a partner and do not want to nickle and dime you infact I said if Ravi and your analysis is around 3m ( which is without taking any out for lost revenue from 13.2m to 9.5m I will let you have 3.5m which is almost 1.5m more than what I really think if we calculate the numbers per contract will come to around 2m but I am willing to give you 3.5 in return for you to allow me to structure it properly internally which requires I close the file with 2m payment.

AWNK003014

So please take a hard look at

1.  Wire today 2m

2.  1m for India within next 6 months

3.  1m paid in four payments twice a year on following dates Jan 1st 2017 and July 1st 2017, Jan 1st 2018 and July 1st 2018 each payment being 250K

4.  Starting June 1st 2016 a 5 year CEO contract at 300K equity per year with an additional bonus up to 125% ( 375K ) additional equity per year for performance of the firm ( meeting budgeted targets on revenue and EBITDA on RCM business )

And tell me what you can live with and what we should adjust. I really think I am above board and given you more , you should be happy with this, to minimize your taxes let me know what paperwork we need to show and I am willing to make this very tax efficient.

Paul

**From:** Arvind Walia [mailto:awalia@porteck.com]
**Sent:** Friday, April 15, 2016 12:28 PM
**To:** Paul Parmar <paul@pegasusbluestarfund.com>
**Subject:** RE: Wire Instructions and plan

Paul

This is what we talked about yesterday and based on your suggestions today.

1.  Wire today 2.5m

2.  1m for India within next 6 months (this is 1m for the management for India transition in the agreement)

3.  2m(300k salary for 3 years = 900k + 1.1M of AR payment) paid monthly over 3 years. (I need money for my monthly expense)

# EXHIBIT 5

AWNK003104

MEMBERSHIP INTERESTS PURCHASE AGREEMENT

made and entered into as of

June [_], 2017

by and among

PHYSICIANS HEALTHCARE NETWORK MANAGEMENT SOLUTIONS, LLC

OBJECTTECH HOLDINGS, LLC

[_____Arvind Walia_],

{00863216.DOCX;2 }

AWNK003103

| | |
|---|---|
| **From:** | Arvind Walia |
| **To:** | Arvind Walia |
| **Subject:** | Fwd: MIPA for Objecttech Holdings LLC |
| **Date:** | Sunday, August 22, 2021 2:39:05 PM |
| **Attachments:** | MIPA - Objecttech Holdings LLC 6 20 2017 UPDATED (3).pdf |

---------- Forwarded message ---------
From: <arvindwalia@gmail.com>
Date: Mon, Sep 28, 2020 at 4:23 PM
Subject: MIPA for Objecttech Holdings LLC
To: Gyparakis, Paris <pgyparakis@rosenpc.com>

--
-------------------------------------
Arvind Walia
CEO, Porteck Corporation
300 Jericho Quad West ste 320
Jericho NY 11753
http://www.porteck.com/
212-561-5560 ext 101(phone)
646-536-2515 (fax)
516-770-6222 (Mobile)
-------------------------------------------

MEMBERSHIP INTERESTS PURCHASE AGREEMENT, dated as of June [__], 2017 (the "**Effective Date**") (herein, together with the Schedules and Exhibits attached hereto, referred to as this "**Agreement**"), is by and among [_Arvind Walia_____], an individual residing at [__27 Kettlepond rd Jericho NY 11753_____] ("**Member 1**"), Member 1is sometimes referred to individually as a "**Selling Member**" and collectively as the "**Selling Members**"), Objecttech Holdings, LLC., a New York limited liability company ("**Company**") (each of the Selling Members and the Company are sometimes referred to individually as a "**Selling Party**" and collectively as the "**Selling Parties**"), Member 1, as the representative for the Selling Members (the "**Selling Member Representative**"), and Physicians Healthcare Network Management Solutions LLC ("**Buyer;**" each of Buyer, the Company, the Selling Members, and the Selling Member Representative is sometimes referred to individually as a "**Party**" and collective as the "**Parties**"). Capitalized terms used in this Agreement without definition shall have the meanings ascribed to such terms in **Section 8.1**.

WITNESSETH:

WHEREAS, the Selling Members own all of the issued and outstanding membership interest of the Company (the "**Interests**"); and

WHEREAS, the Selling Members wish to sell, and Buyer wishes to purchase, the Interests upon the terms of this Agreement;

NOW, THEREFORE, in consideration of the mutual covenants, agreements, representations and warranties herein contained, and upon the terms and subject to the conditions hereinafter set forth, the Parties hereto hereby agree as follows:

ARTICLE 1

SALE AND PURCHASE OF INTERESTS

Section 1.1    Sale of Interests; Purchase Price.  On the Closing Date and subject to the terms and conditions set forth in this Agreement, the Selling Members will sell, assign, and transfer to Buyer, and Buyer will purchase and acquire, all of the Interests, free and clear of all Liens, for and in consideration of (A) (1) the sum of those amounts actually paid to one or more of the Selling Parties and Selling Member Representative (i) as Closing Payment, (ii) any Earn-Out payments, and (iii) in respect of the adjustment of the Company's working capital in accordance with **Section 1.5**, less (B) any Required Repayments paid in accordance with **Section 1.6** (collectively, the "**Purchase Price**").

Section 1.2    Closing Payment.  The Closing Payment shall be paid as follows:

(a)    Initial Determination of Closing Payment.  The Closing Payment shall be $1,520,000, (the "**Closing Payment**").

{00863216.DOCX;2 }

1

AWNK003106

(b)    Payment of Closing Payment.  The Closing Payment will be paid to the Selling Members in immediately available funds by wire transfer to accounts designated by the Selling Member Representative in writing to Buyer at or prior to the Closing.

Section 1.3    Earn-Out Payments.

(a)    Period 1 Earn-Out.  In addition to the Closing Payment, the Selling Members shall receive an additional payment (a "**Period 1 Earn-Out Payment**") equal to (i) $325,000, if during the period of time between the Closing Date and the end of the sixth full calendar month after the Closing Date (the "**First Earn-Out Period**"), the Company's Net Profits were greater than or equal to twelve percent (12%) of the Company's Net Revenue during the same period, or (ii) otherwise, $0. By way of example, if during the First Earn-Out Period the Company's Net Revenues are $100 and during the same period the Company's Net Profits are at least $12, then the Selling Members shall receive the Period 1 Earn-Out Payment, as set forth herein. If however the Company's Net Profits during the First Earn-Out Period were less than $12, the Selling Members will receive no Period 1 Earn-Out Payment.

(b)    Period 2 Earn-Out.  In addition to the Closing payment and the Period 1 Earn-Out Payment (if any), the Selling Members shall receive an additional payment (a "**Period 2 Earn-Out Payment**," and together with the Period 1 Earn-Out Payment, the "**Earn-Out Payments**," and each individually, an "**Earn-Out Payment**") equal to (i) $325,000, if between the period of time between the date of the closing payment and  twelve full calendar months after the Closing Date (the "**Second Earn-Out Period**"), the Company's Net Profits are greater or equal to fifteen percent (15%) of the Company's Net Revenue during the same period, or (ii) otherwise, $0. By way of example, if during the Second Earn-Out Period the Company's Net Revenues are $100 and during the same period the Company's Net Profits are at least $15, then the Selling Members shall receive the Period 2 Earn-Out Payment, as set forth herein. If however the Company's Net Profits during the Second Earn-Out Period were less than $15, the Selling Members will receive no Period 2 Earn-Out Payment.

(c)    No later than seventy five (75) days following the end of the First Earn-Out Period, the Buyer will prepare and deliver to the Selling Member Representative a copy of the Company's consolidated income statement for First Earn-Out Period, together with a calculation of the Company's Net Revenue and Net Profit for the First Earn-Out Period, and the Period 1 Earn-Out Payment (the "**Period 1 Earn-Out Calculation**"). No later than seventy five (75) days following the end of the Second Earn-Out Period, the Buyer will prepare and deliver to the Selling Member Representative a copy of the Company's consolidated income statement for Second Earn-Out Period, together with a calculation of the Company's Net Revenue and Net Profit for the Second Earn-Out Period, and the Period 2 Earn-Out Payment (the "**Period 2 Earn-Out Calculation**").  In each case, the Buyer will make available to the Selling Member Representative at the Buyer's offices, or via electronic means, if possible, and upon reasonable notice, all of the relevant books and records maintained by the Company relating to the Company's business in order for the Selling Member Representative to review and confirm the Period 1 Earn-Out Calculation and the Period 2 Earn-Out Calculation.

(d)    Possible reduction to Period 2 Earn-Out.  As at the date of this Agreement, the amount of $200,000 is owing to Orion Healthcorp, Inc by Elite Imaging. Orion

{00863216.DOCX;2 }

AWNK003107

undertakes a best endeavors approach to try and collect this amount including filing a legal claim. To the extent that some or all this amount is not recovered from Elite Imaging, the Selling Members agree that the uncollected amount will be deducted from the Period 2 Earn-Out payment. Any third-party costs and expenses including but not limited to legal costs and fees will be taken into account to determining what, if any, deduction needs to be made from the Period 2 Earn-Out. For example, if legal costs and expenses total $10,000 and the amount of $150,000 is collected from Elite Imaging, then the sum of $60,000 will be held back from any Period 2 Earn-Out.

(e)    Dispute Resolution.    In the event that the Selling Member Representative does not agree with the Period 1 Earn-Out Calculation or the Period 2 Earn-Out Calculation, the Selling Member Representative and the Buyer shall resolve their disputes in accordance with the procedures set forth in **Section 1.5(c)-(e)**, including the applicable time frames for notices, with appropriate adjustments to reflect the fact that the subject of the dispute is the subject of **Section 1.3(a)-(c)** and not **Section 1.5(a)-(b)**.

(f)    Payment of Earn-Out Payments.    No later than three (3) Business Days following the determination of the final Period 1 Earn-Out Payment or Period 2 Earn-Out Payment, as applicable (whether because Selling Member Representative does not provide a timely Objection Notice or because of the final determination by the Independent Auditor), the Buyer shall deliver to the Selling Member Representative, or designee or assignee thereof, in immediately available funds by wire transfer to an account designated by the Selling Member Representative, or designee or assignee thereof, in writing to Buyer at or prior to the date of such payment, the applicable Earn-Out Payment pursuant to the terms of this Agreement, and the Selling Member Representative shall distribute such payment amounts to the Selling Members in amounts as determined by the Selling Members; provided.

(g)    The Selling Members and the Selling Member Representative acknowledge and agree that after the Closing the Buyer shall be entitled to operate the Company in any manner that it determines, in its sole discretion, to be appropriate, subject only to its obligation of good faith. Notwithstanding the foregoing, the Buyer acknowledges that the ability of the Selling Members to earn the Earn-Out Payments is a material inducement to enter into this Agreement and consummate the transactions contemplated hereby and the Buyer and its Affiliates, as applicable, hereby agree to use commercially reasonable efforts to try to achieve results that would result in the making of the Earn-Out Payments. In furtherance of the foregoing, the Buyer agrees that at any time prior to the expiration of all deadlines to earn the related Earn-Out Payments (i) it will not knowingly take any action or fail to take any action with the intent to frustrate the achievement of an Earn-Out Payment, (ii) it will carry on the Company and the Business as a going concern and with a view to profit and shall not cause or permit the Company to (a) carry out any act or make any omission where the primary purpose is or would be to reduce or defer income or profits of the Company; or (b) enter into any agreement or arrangement other than on arms' length terms, (iii) it will not present a petition for or pass any resolution for the winding-up of the Company, or (iv) appoint a receiver, administrative receiver or administrator over the whole or any part of the assets of the Company. If the Buyer is in breach of any of these provisions and the Selling Member Representative has not consented in writing to such breach, then the Net Profits for the relevant Earn-Out Year shall be adjusted as if the breach had not occurred for the purposes of ascertaining the Earn-Out Payments.

{00863216.DOCX;2 }

224

Case 8-20-08049-ast    Doc 55-5    Filed 01/18/23    Entered 01/18/23 20:31:58
Case 2:25-cv-02032-RPK    Document 5-1    Filed 05/12/25    Page 45 of 79 PageID #: 327

AWNK003108

Section 1.4    <u>Discharge of Debt and Liabilities; Maintenance of Working Capital</u>.

      (a)    <u>Discharge of Debt and Liabilities</u>.    At or before the Closing, the Company shall pay and discharge all debts, liabilities and obligations of the Company (including, without limitation, any liabilities in respect of any Indebtedness, Payables (except any Qualified Accounts Payable included in the calculation of Closing Working Capital) and Transaction Expenses then due and payable. "**Qualified Accounts Payable**" means accounts payable and accrued expenses that have been incurred in the Ordinary Course of Business; provided, however, that no account payable shall be a Qualified Accounts Payable if such account payable is due on or before the Closing, or if on the Closing Date such account payable is more than twenty nine (29) days old, or if such account payable if paid in the Ordinary Course of Business would have been paid prior to Closing, or if such account payable is for professional fees or for charges of vendors, or if the terms of such account payable provides that payment shall be made within less than thirty (30) days from the date of its issuance or if the terms of such account payable provides that payment shall be made within less than thirty (30) days from the date of its receipt.    For the avoidance of doubt, all accounts payable including payroll and liabilities incurred prior to Effective Date shall be the Selling Parties' responsibility; provided that the Selling Parties shall (i) cause all accounts receivable for services rendered prior to Effective Date to be utilized prior to the Effective Date to satisfy such payables and (ii) cause any surplus to be distributed prior to the Effective Date to the Selling Members.

      (b)    <u>Release of All Liens</u>.    At or before the Closing, the Company shall cause all security interests, encumbrances and other Liens (other than Permitted Liens) on or relating to any of the properties, assets and rights of the Company, at the Selling Members' sole cost and expense, to be released, extinguished and discharged in full, and shall deliver to Buyer instruments and Uniform Commercial Code ("**UCC**") termination statements, releasing, extinguishing and discharging all such security interests, encumbrances, mortgages and other Liens (other than Permitted Liens), all in form and substance satisfactory to Buyer. In the event Buyer elects to proceed with the Closing prior to its receipt of all such documentation, instruments and UCC termination statements, the Selling Members shall nevertheless obtain and deliver to Buyer all instruments and UCC termination statements, and obtain the release, extinguishment and discharge of all Liens contemplated to be released by this **Section 1.4(b)** promptly after the Closing.

      (c)    <u>Maintenance of Minimum Working Capital</u>.    The Selling Members shall cause the Company        to take all necessary action to ensure that at the time of the Closing, and after the discharge of all debts, liabilities and obligations of the Company pursuant to **Section 1.4(a)** and the payment of any and all distributions to the Selling Members, the Company shall have Closing Working Capital in an amount of not less than One Dollar ($1.00) (the "**Minimum Working Capital**").

Section 1.5    <u>Post-Closing Working Capital Adjustment; Accounts Receivable</u>.

      (a)    <u>Post-Closing Working Capital Adjustment</u>.    If the Closing Working Capital is less than the Minimum Working Capital, the Selling Members shall make, in accordance with **Section 7.3**, a payment equal to the amount by which the Closing Working Capital is less than the Minimum Working Capital within three (3) Business Days of the final determination of

AWNK003109

the Closing Working Capital by wire transfer of immediately available funds of the Selling Members to an account designated by Buyer.  If the Minimum Working Capital is less than the Closing Working Capital, then Buyer shall pay to the Selling Members an additional amount equal to the amount by which the Minimum Working Capital is less than the Closing Working Capital, which shall be paid to the Selling Member Representative by Buyer within three (3) Business Days of the final determination thereof by wire transfer of immediately available funds of the Company to an account designated by the Selling Member Representative, or designee or assignee thereof; provided, however, if the Company is unable to make such payments in full, Buyer shall fund the Company for such purpose, or shall make any shortfall payments directly to the Selling Member Representative, all of which shall be done within the aforesaid three (3) Business Days. "**Closing Working Capital**" shall mean, as of the Closing Date, and on a consolidated basis, the sum of cash and cash equivalents (including marketable securities and short term investments, but excluding accounts receivables of the Company set forth on **Schedule 1.5(f)**), expenses pre-paid by the Company (including, but not limited to insurance premiums and rents), amounts the Company deposited with suppliers, vendors and landlords, and unbilled fees for work completed (i) which is not set forth on **Schedule 1.5(f)** and (ii) that can be reasonably expected to be converted into cash within one year, less the sum of Payables, checks issued by the Company that have not been debited from the Company's bank account, amounts pre-paid to the Company, and amounts deposited with the Company, each as of the Closing, Payables received after the Closing for the period prior to the Closing and all outstanding Reimbursable Expenses that were incurred prior to the Closing regardless of whether they were submitted to the Company prior to the Closing.

(b)    Delivery of Closing Balance Sheet and Closing Date Calculation. No later than the sixtieth (60th) day following the Closing, Buyer shall prepare and deliver to the Selling Member Representative, (i) a consolidated balance sheet of the Company as of the Effective Date, prepared in a manner consistent with the Financial Statements (the "**Closing Balance Sheet**"), and (ii) a written calculation of the Closing Working Capital (the "**Closing Date Calculation**"), as determined by reference to the relevant provisions of this Agreement and, as applicable, the Closing Balance Sheet.

(c)    Objection Notices.  On or prior to the 60th day after the Selling Member Representative's receipt of the Closing Date Calculation and the Closing Balance Sheet, the Selling Member Representative may give Buyer a written notice stating in reasonable detail the Selling Member Representative's objections (an "**Objection Notice**") to the Closing Date Calculation and/or the Closing Balance Sheet.   Buyer shall permit the Selling Member Representative and its representatives to have reasonable access to the books, records and other documents (including work papers) pertaining to or used in connection with preparation of the Closing Date Calculation and the Closing Balance Sheet.  Any determination expressly set forth in the Closing Date Calculation or on the Closing Balance Sheet which is not objected to in an Objection Notice shall be deemed final and binding upon the Selling Member Representative upon delivery of such Objection Notice, unless same is affected by a disputed portion of such determination.  Except to the extent the Selling Member Representative makes an objection to a determination set forth in the Closing Date Calculation or on the Closing Balance Sheet pursuant to an Objection Notice delivered to Buyer within such 60-day period, the Closing Date Calculation and Closing Balance Sheet will be deemed conclusive and binding upon the Parties.

{00863216.DOCX;2 }

AWNK003110

(d)       Disputed Items.  If the Selling Member Representative gives a timely Objection Notice as described in **Section 1.5(c)** above, then Buyer and the Selling Member Representative will negotiate in good faith to resolve their disputes regarding the Closing Date Calculation and the Closing Balance Sheet on or prior to the 30th day after the delivery of the Objection Notice (or such longer period as Buyer and the Selling Member Representative shall agree) (such period of time being hereinafter referred to as the "**Resolution Period**"). If, at or before the end of the Resolution Period, the Selling Member Representative and Buyer resolve such disputes and objections, then the calculations so agreed to by the Selling Member Representative and Buyer shall be deemed to be utilized in any Closing Date Calculation and the Closing Balance Sheet, as applicable.  If, at the end of the Resolution Period, the Selling Member Representative and Buyer have not resolved their disputes regarding the calculations set forth in a Closing Date Calculation or the Closing Balance Sheet, then such disputes (each a "**Disputed Item**", and collectively, the "**Disputed Items**") shall, within five (5) Business Days after the expiration of the Resolution Period, be submitted to the Independent Auditor for final determination. The Independent Auditor shall only have the authority to resolve matters expressly submitted to it for resolution.  In resolving any Disputed Item, the Independent Auditor may not assign a value to any Disputed Item greater than the greatest value for such Disputed Item claimed by either party or less than the smallest value for such Disputed Item claimed by either party.  The Independent Auditor's resolution of any disputes hereunder shall be made within sixty (60) calendar days of the submission of such disputes thereto, or as soon as reasonably practicable thereafter, and shall be set forth in a written statement delivered to the Selling Member Representative and Buyer.  The Closing Date Calculation and the Closing Balance Sheet as determined by the Independent Auditor will be conclusive and binding upon the Parties and will constitute the Closing Date Calculation and the Closing Balance Sheet for all purposes of this **Section 1.5**.

(e)       Responsibility for costs and expenses.  If all disputes regarding the disputed calculations are resolved in favor of the Selling Members, then Buyer shall pay the costs and expenses of the Independent Auditor.  If all disputes regarding the disputed calculations are resolved in favor of Buyer, then Selling Members jointly and severally shall pay the costs and expenses of the Independent Auditor.  If the disputes regarding the disputed calculations are resolved in part in favor of the Selling Members and in part in favor of Buyer, then the costs and expenses of the Independent Auditor shall be shared by the Selling Member Representative and Buyer equally.

(f)       Closing Accounts Receivable.  **Schedule 1.5(f)** sets forth outstanding accounts receivable, as of a date specified thereon, arising from the Selling Members' ownership and operation of the Company prior to the Effective Date or otherwise resulting from services rendered or goods sold by the Company prior to the Effective Date, which schedule the Selling Member Representative may update from time to time during the period ending nine months after the date hereof (as amended, the "**Closing Accounts Receivable**").  Monies received by the Company subsequent to the Closing Date arising from the Closing Accounts Receivable shall be held by the Company for the benefit of the Selling Members.  The Buyer shall cause the Company to use good faith bona fide efforts to collect such Closing Accounts Receivable, including, upon request by the Selling Member Representative, litigation; provided, however, that the Selling Members shall be responsible for the fees and expenses of such litigation; and provided, further however that that the Selling Member Representative and Buyer shall mutually agree on

{00863216.DOCX;2 }

AWNK003111

how to handle the Closing Accounts Receivables of current clients and no litigation shall be commenced with respect to such Closing Accounts Receivables without such mutual agreement. On or before the fifteenth 15th day following each of the first three quarterly anniversaries of the Closing Date (or the first Business Day thereafter), the Buyer shall cause the Company to submit a report to the Selling Member Representative outlining all of the monies received by the Company related to the Closing Accounts Receivable in such immediately preceding quarterly period, together with all statements and supporting documentation related thereto. Selling Member Representative shall promptly review such report and notify the Buyer if it is in agreement and if Selling Member Representative is in agreement, Buyer shall pay, in immediately available funds by wire transfer to an account designated by the Selling Member Representative such monies set forth in the report. In the event the Selling Member Representative or the Buyer, as applicable, disputes the amounts and calculations set forth in the Company's report(s), the Selling Member Representative and the Buyer shall resolve their disputes in good faith promptly and in any case within thirty (30) days from the Buyer's receipt or the Selling Member Representative's receipt, as applicable, of the report in accordance with the procedures set forth in **Section 1.5(c)-(e)** (with appropriate adjustments to reflect the fact that the subject of the dispute is the subject of **Section 1.5(f)** and not **Section 1.5(a)-(b)**) and jointly determine the amount of the monies that were received in such quarterly period related to the Closing Accounts Receivable and thereafter Buyer shall pay such amount in immediately available funds by wire transfer to such account.

(i)    Buyer shall cause the Company to, and the Company shall, use commercially reasonable good faith efforts to collect the Closing Accounts Receivable.

## ARTICLE 2

## CLOSING

Section 2.1    Closing.    The closing of the transactions provided for herein (the "**Closing**") will take place on the date hereof at the offices of the Buyer's counsel at the address set forth in **Section 9.2** hereof (the "**Closing Date**") and be effective as of the Effective Date. Except as otherwise provided herein, all proceedings to be taken and all documents to be executed and delivered by the Parties at the Closing shall be deemed to have been taken, executed and delivered simultaneously and no proceedings shall be deemed taken nor any documents executed or delivered until all have been taken, executed and delivered. Notwithstanding the foregoing (i) the Selling Parties may deliver any or all of the Seller Documents required hereunder to Buyer's counsel on or before the Closing Date (to hold and deliver in escrow according to the Selling Member Representative's written instructions), and (ii) Buyer may deliver any or all of the Buyer Documents required hereunder to the Company's counsel on or before the Closing Date (to hold and deliver in escrow according to the Buyer's written instructions).

Section 2.2    Closing Deliverables.

(a)    At the Closing, the Selling Parties will deliver to Buyer:

(i)    a certificate of good standing of the Company certified as of a then recent date by the New York Secretary of State and each other jurisdiction where the

228

AWNK003112

operation of the Business requires the Company to be qualified to do business the failure of which would have a Material Adverse Effect;

(ii)    pay-off letter(s) in form and substance reasonably satisfactory to Buyer evidencing the amount required to discharge at Closing all Indebtedness and accomplish the release of all Liens related thereto;

(iii)    a general release releasing the Company executed by the Selling Members in form and substance as **Exhibit 2.2.(a)(iv)**;

(iv)    the limited liability company or corporate records of the Company regarding member, manager, shareholder or director meetings, if any;

(v)    a list of all checks issued by the Company that have not been debited from the Company's bank accounts prior to the Closing;

(vi)    accountant compiled consolidated financial statements of the Company for the years ended December 31, 2015, and December 31, 2016, for and for the periods ended March 31, 2017 and May 31, 2017, provided, however that the financial statements for the period ended May 31, 2017 shall be provided to Buyer no later than June 30, 2017;

(vii)    copies of the resolutions duly adopted by the manager of the Company authorizing the execution, delivery and performance of this Agreement and each of the other Seller Documents executed by the Company and the consummation of all transactions described in this Agreement and thereby;

(viii)    a certificate of the secretary or other appropriate officer of the Company certifying as to the incumbency of the officer(s) of the Company executing this Agreement and the other Seller Documents, including specimen signatures, the Company's operating agreement and charter document;

(ix)    copies of UCC-3 termination statements extinguishing all Liens, other than permitted liens;

(x)    resignations of all managers or managing members or directors of members of the Company; and

(xi)    such other instruments and documents of any Selling Party, in form and substance reasonably acceptable to Buyer, as Buyer and its counsel may reasonably request.

(b)    At the Closing, Buyer will:

(i)    deliver to each Selling Member in accordance with **Section 1.2** the amount of the Closing Payment payable to such Selling Member as provided in **Section 1.2**;

{00863216.DOCX;2 }

8

(ii)    deliver to the Selling Member Representative such other instruments and documents, in form and substance reasonably acceptable to the Selling Member Representative, as the Selling Member Representative and its counsel may reasonably request;

(iii)    deliver to the Selling Member Representative a certificate of good standing of Buyer certified as of a then recent date by the Secretary of State of the jurisdiction of such entity's formation;

(iv)    deliver to the Selling Member Representative copies of the resolutions duly adopted by the manager of the Buyer authorizing the execution, delivery and performance of this Agreement and each of the other Buyer Documents executed by the Buyer and the consummation of all transactions described in this Agreement and thereby; and

(v)    deliver to the Selling Member Representative a certificate of the secretary or other appropriate officer of the Buyer certifying as to the incumbency of the officer(s) of the Buyer executing this Agreement and the other Buyer Documents, including specimen signatures.

## ARTICLE 3

## REPRESENTATIONS AND WARRANTIES REGARDING THE COMPANY

Each Selling Member hereby represents and warrants to the Buyer as follows.

Section 3.1    Organization; Authority; Due Execution.

(a)    The Company is a limited liability company duly organized, subsisting and in good standing under the laws of the State of New York and has all requisite limited liability company power and authority to own, lease and operate its properties and assets, and to carry on the Business as presently conducted as and in the places such properties are now owned, leased or operated and is qualified to do business and is in good standing as a foreign limited liability company in each jurisdiction where the ownership or operation of its properties or conduct of its business requires such qualification except where the failure to be so qualified or in good standing would not have a Material Adverse Effect. Selling Member Representative has provided, or caused to be provided, to Buyer a true and correct copy of its articles of organization and operating agreement as amended to date. Such articles of organization and operating agreement so delivered are in full force and effect. **Schedule 3.1(a)** hereto contains a true and correct list of each jurisdiction where the Company is qualified or licensed to do business. Selling Member Representative has provided, or caused to be provided, to Buyer true and correct copies of the minutes, if any, of all meetings of the members of the Company, the manager(s) of the Company and the committees thereof. The Books and Records contain true and correct, in all material respects, summaries of all actions taken at any member meetings, manager meetings, and include all written consents executed in lieu of the holding of any such meeting. **Schedule 3.1(a)** hereto lists all the officers and managers of the Company.

Section 3.2    Subsidiaries and Equity Investments. **Schedule 3.2** hereto lists the Company's Subsidiaries. Except as set forth on **Schedule 3.2** hereto, the Company does not have any interest, direct or indirect, or any commitment to purchase any interest, direct or indirect, in,

{00863216.DOCX;2 }

9

AWNK003114

or the power to vote the equity interest of, any other corporation, limited liability company, partnership, joint venture or other business enterprise or entity (other than with respect to any marketable securities included in current assets). Except as set forth on **Schedule 3.2** hereto, none of the Business has been conducted through any direct or indirect Subsidiary or any direct or indirect Affiliate of the Company or the Selling Parties. Each Subsidiary of the Company is an entity duly formed, organized, or incorporated and subsisting and in good standing under the laws of the state of its formation, organization or incorporation, as applicable, and has all requisite limited liability company or corporate, as applicable, power and authority to own, lease and operate its properties and assets, and to carry on the Business as presently conducted as and in the places such properties are now owned, leased or operated and is qualified to do business and is in good standing as a foreign limited liability company or corporation, as applicable, in each jurisdiction where the ownership or operation of its properties or conduct of its business requires such qualification except where the failure to be so qualified or in good standing would not have a Material Adverse Effect. Selling Member Representative has provided, or caused to be provided, to Buyer a true and correct copy of each such Subsidiary's articles of organization and operating agreement or certificate of incorporation and bylaws, as the case may be, as amended to date. Such articles of organization and operating agreement or certificate of incorporation and bylaws, as the case may be, so delivered are in full force and effect. **Schedule 3.2** hereto contains a true and correct list of each jurisdiction where any Subsidiary of the Company is qualified or licensed to do business. Selling Member Representative has provided, or caused to be provided, to Buyer true and correct copies of the minutes, if any, of all meetings of the members or shareholders of each Subsidiary of the Company, the manager(s) or director(s) of each Subsidiary of the Company and the committees thereof. The Books and Records contain true and correct, in all material respects, summaries of all actions taken at any member meetings, manager meetings, shareholder meetings or directors and include all written consents executed in lieu of the holding of any such meeting. **Schedule 3.2** hereto lists all the officers and managers or directors of the Subsidiaries of the Company.

Section 3.3    Consents; No Violation.

(a)    Except as set forth on **Schedule 3.3(a)** hereto, no notices, reports or other filings are required to be made with, nor are any consents, registrations, approvals, permits or authorizations required to be obtained by the Company from any Governmental Entity or Person (i) in connection with the execution and delivery of this Agreement or any of the other Seller Documents by any Selling Party and the consummation by the Selling Parties of the transactions described in this Agreement and thereby, or (ii) the absence of which would prevent, delay or impair of the ability of the Selling Members to consummate the transactions described in this Agreement or any other Seller Document, or impair in any material respect the ability of Buyer following consummation of the transactions described in this Agreement to conduct the Business in the Ordinary Course of the Business.

(b)    Assuming all Consents listed on **Schedule 3.3(a)** are obtained, except as set forth on **Schedule 3.3(b)** hereto, the execution, delivery and performance of this Agreement and the other Seller Documents by any Selling Party does not, and the consummation of the transactions described in this Agreement and thereby will not, constitute or result in (i) with or without the giving of notice or the passage of time, or both, a breach or violation of, or a default under, the certificate of incorporation, bylaws, articles of organization or operating agreement or

231

Case 8-20-08049-ast    Doc 55-5    Filed 01/18/23    Entered 01/18/23 20:31:58
Case 2:25-cv-02032-RPK    Document 5-1    Filed 05/12/25    Page 52 of 79 PageID #: 334

AWNK003115

other governing documents of the Company, (ii) with or without the giving of notice or the passage of time, or both, a breach of, or violation of or a conflict with, or a default under, or the termination of, or the acceleration under, any Material Contract, debt, obligation, governmental or non-governmental permit or license to which the Company is a party or to or by which the Company or any of the Interests is subject or bound, the result of which will have a Material Adverse Effect, (iii) the creation or imposition of any Lien upon the Business, the Company or any of the Interests that will not be discharged at the Closing, or (iv) the violation of any Law, order, judgment, decree or award of any court, Governmental Entity or arbitrator to or by which a Selling Party or the Business is subject or bound the result of which will have a Material Adverse Effect.

Section 3.4    <u>Indebtedness</u>.  Except as set forth on **Schedule 3.4**, the Company does not have any outstanding Indebtedness and is not a party to any Material Contract providing for the creation, incurrence or assumption thereof.

Section 3.5    <u>Capitalization</u>.

(a)    As of the date hereof, except as set forth on **Schedule 3.5**, all of the membership interests in the Company are owned by Member 1 and Member 2, which interests are set forth on **Schedule 3.5**.  As of the date hereof all of the equity interests in the Company's Subsidiaries, if any, are owned by the Company.

(b)    The Company has not any (i) issued or outstanding subscription, warrant, option, convertible security or other right (contingent or otherwise) to purchase or acquire any interest, (ii) obligation (contingent or otherwise) to issue any subscription, warrant, option, convertible security or other such right, or to issue or distribute to holders of any equity interest of the Company any evidences of indebtedness or assets of the Company, or (iii) obligation (contingent or otherwise) to purchase, redeem or otherwise acquire any equity interest or to pay any distribution or to make any other distribution in respect thereof.

(c)    There is no agreement, written or oral, between or among the Company and any holder(s) of securities of the Company, relating to the sale or transfer (including agreements relating to rights of first refusal, co-sale rights or "drag along" rights), registration under the Securities Act of 1933, as amended, or voting of the interests of the Company.

Section 3.6    <u>Litigation</u>.  The Order in the form annexed hereto on Schedule 3.6 has not been amended or modified.  Except as set forth in **Schedule 3.6** hereto, there is no pending civil, criminal or administrative suit, action, proceeding, or to the Selling Parties' Knowledge, investigation, review or inquiry, and, to the Selling Parties' Knowledge, there is no civil, criminal or administrative suit, action, proceeding, investigation, review or inquiry threatened, against the Company or any of its properties or rights, nor is there any judgment, decree, injunction, rule or order of any Governmental Entity or arbitrator outstanding against the Company or any of its properties or rights (the foregoing collectively referred to as "**Proceedings**").  To Selling Parties' Knowledge, none of the Proceedings is reasonably likely, either individually or in the aggregate, to have a Material Adverse Effect or to prevent, impair or materially delay the ability of the Company to consummate the transactions contemplated by this Agreement and the other Seller Documents.  To Selling Parties' Knowledge, there is no meritorious basis for any such civil, criminal, or administrative suit, action or other Proceeding.

{00863216.DOCX;2 }

11

AWNK003116

Section 3.7    <u>Personal Property.</u>

(a)    Set forth on **Schedule 3.7(a)** hereto is a true and correct list of all tangible personal property owned or leased or licensed by the Company (the "**Personal Property**"), except for items having a value of less than $5,000, which do not, in the aggregate, have a total market value of more than $25,000, and sets forth with respect to all such listed items, all leases and licenses related thereto. The Company has good and marketable title to, or hold by valid and existing lease or license, all of the Personal Property, except with respect to assets disposed of in the Ordinary Course of Business, free and clear of all Liens.

(b)    The Personal Property together with any Company Leased Property has been used in the Ordinary Course of the Business. Except as set forth on **Schedule 3.7(b)** hereto, to the Selling Parties' Knowledge, each item of Personal Property is free from material defects and is in reasonably good operating condition and repair (subject to normal wear and tear and regular maintenance). To the Selling Parties' Knowledge, the Personal Property has been maintained by the Company in all material respects in accordance with normal industry practice and has been reasonably suitable for use in the Ordinary Course of the Business.

Section 3.8    <u>Real Property.</u>  The Company does not own, and has not at any time owned, any real property. **Schedule 3.8** hereto sets forth a complete and correct list, in all material respects of all real property leased, subleased, licensed, operated or occupied by the Company (collectively the "**Company Leased Property**"), the location thereof, and the leases, licenses or other agreements pursuant to which the Company leases, subleases, licenses, operates or occupies the Company Leased Property (collectively, the "**Company Leases**"). Except as set forth in **Schedule 3.8** hereto, neither the Company, nor, to the Selling Parties' Knowledge, any other party is in default under any of the Company Leases (nor, to the Selling Parties' Knowledge, does there exist any condition which, upon the passage of time or the giving of notice or both, would cause a default thereunder). Except as set forth in **Schedule 3.8** hereto, no Company Leased Property is occupied by a party other than the Company, and, to the Selling Parties' Knowledge, no party has a right to occupy such property other than the Company. The Company has not assigned, leased, subleased or granted to any Person any rights in any Company Lease. Other than the Company Leases, there are no other agreements or arrangements whatsoever relating to the use or occupancy by the Company of any of the Company Leased Property. The Company has not transferred, mortgaged or assigned any interest in any of the Company Leases. To the Selling Parties' Knowledge, (i) there is no pending or threatened condemnation or similar Proceeding affecting any Company Leased Property or any portion thereof, (ii) each Company Leased Property is supplied with utilities and other services sufficient to operate the Business conducted at such Company Leased Property, and (iii) the Company has not received written notice from any Governmental Entity that the operations of the Company or the Business on the Company Leased Property, or the Company Leased Property, violate in any material manner any applicable building code, zoning requirement, or classification or statute relating to the particular property or such operations. The Company Leased Property is, to the Selling Parties' Knowledge, in reasonably good operating condition and repair and has been used in the Ordinary Course of the Business at the Company Leased Property.

Section 3.9    <u>Customer List.</u>  Neither the Company nor any other Person, has sold, assigned, leased or licensed or transferred to any Person any list of past, present or prospective

233

AWNK003117

customers, suppliers or licensees of the Business. No Person (other than the Company) is entitled to use any such list.

Section 3.10  <u>Tax Matters.</u>

(a)    The Company has timely filed all Tax Returns required to be filed by the Company in the manner provided by Law.  All such Tax Returns are true, correct and complete in all material respects. The Company has timely paid all Taxes due, whether or not shown as being due on any Tax Returns. All Taxes that the Company is or was required by Law to collect or withhold have been duly withheld or collected, and, to the extent required by Law, paid to the proper Tax authority. Except as has been disclosed on **<u>Schedule 3.10(a)</u>** hereto:

(i)    No claim for unpaid Taxes has become a Lien of any kind against the property of the Company or is being asserted against the Company, except for Liens for Taxes not yet due.

(ii)    No audit, examination, investigation, deficiency or refund litigation or other Proceeding in respect of Taxes of the Company is pending (or to the Selling Parties' Knowledge, threatened or being conducted by a Tax authority), and neither the Company nor any Selling Member has received written notice of the commencement of any audit, examination, deficiency litigation or other Proceeding with respect to any such Taxes.

(iii)    No material issues have been raised in any written notice received by the Company or any Selling Member from any Tax authority in connection with the examination of any of the Tax Returns filed by the Company after January 1, 2011.

(iv)    No extension or waiver of the statute of limitations on the assessment of any Taxes has been granted to the Company and is currently in effect.

(v)    The Company (A) has not been a member of an affiliated group within the meaning of Code Section 1504(a) or any similar group under state, local or foreign law filing a consolidated federal income Tax Return; (B) has no liability for the Taxes of any Person under Treasury Regulation Section 1.1502-6 (or any similar provision of state, local, or foreign law), as a transferee or successor, by contract (other than contracts entered into in the ordinary course of business, the primary purposes of which were not the sharing of Taxes), or otherwise; and (C) is not a party to, bound by, or has any obligation under, or potential liability with regards to, any Tax sharing arrangement, Tax indemnification agreement or similar contract or arrangement.

(vi)    The Company has never entered into or been a party to (A) a transaction subject to registration pursuant to Code Section 6111 as a "reportable transaction" within the meaning of Code Section 6111(b)(2) or as a "tax shelter" as defined in former Code Sections 6111(c) or (d), (B) a transaction subject to the list requirements of Code Section 6112, (C) a tax shelter within the meaning of Code Section 6662(d), or (D) a "listed transaction" as set forth in written guidance or a written notice issued by the Internal Revenue Service (the "**<u>IRS</u>**"). No Tax Returns of the Company contain or was required to contain a disclosure statement under Sections 6011 or 6662 of the Code (or any predecessor statute) or any similar provision of state, local or foreign Law.

{00863216.DOCX;2 }

234

AWNK003118

(vii)    No power of attorney has been granted by or with respect to the Company which remains in effect with respect to any matter relating to Taxes.

(viii)    No member of the Company is a party to any agreement, plan, contract or arrangement that would result, separately or in the aggregate, in the payment of any "excess parachute payments" within the meaning of Section 280G of the Code.

(ix)    The Company has no deferred intercompany gain or loss arising as a result of a deferred intercompany transaction within the meaning of Treasury Regulation Section 1.1502-13 (or similar provision under state, local or foreign law) or any excess loss accounts within the meaning of Treasury Regulation Section 1.1502-19.

(x)    The Company is not and has never been a United States real property holding corporation (as that term is defined in Section 897(c)(2) of the Code) during the applicable period specified in Section 897(c)(1)(ii) of the Code.

(xi)    The Company is not and has never been subject to a Tax ruling that has continuing effect.

(xii)    The Company will not be required to include any item of income in, or exclude any item of deduction from, taxable income for any taxable period (or portion thereof) ending on or after the Effective Date as a result of any: (A) adjustment under either Section 481(a) or 482 of the Code (or an analogous provision of state, local or foreign law) by reason of a change in accounting method or otherwise for any period ending on or prior to the Effective Date; (B) "closing agreement" as described in Code section 7121 (or any corresponding or similar provision of state, local or foreign income Tax law) executed on or prior to the Effective Date; (C) intercompany transaction or excess loss account described in Treasury Regulations under Code Section 1502 (or any corresponding or similar provision of state, local or foreign income Tax law) existing on or prior to the Closing Date; (D) installment sale or open transaction disposition made on or prior to the Effective Date; or (E) prepaid amount received on or prior to the Effective Date.

(xiii)    Other than as a result of the transactions contemplated by this Agreement, the net operating losses, if any, of the Company are not limited under Section 382 of the Code and any excess credits, net capital losses, and foreign tax credits of the Company are not limited under Section 383 of the Code.

(xiv)    No claim has ever been made by an authority in a jurisdiction where the Company does not file Tax Returns that the Company is or may be subject to taxation by that jurisdiction.

(xv)    All "non-qualified deferred compensation plans" (as such term is defined under section 409A(d)(1) of the Code and the guidance issued thereunder) of the Company under which the Company makes, is obligated to make or promises to make any payments or other awards (each, a "**409A Plan**") (A) meet and have met the requirements of Code Sections 409A(a)(2), (3), and (4) of the Code, and (B) are, and at all times were, operated in accordance with such requirements, are operated in good faith compliance with the transitional relief and all guidance and regulations provided by the Internal Revenue Service under section

{00863216.DOCX;2 }

14

AWNK003119

409A of the Code, and (C) no 409A Plan has been funded by an off-shore arrangement described in Section 409A(b)(1) of the Code.

(xvi)    The Company does not own any interest in any entity that is treated as a "disregarded entity" for federal tax purposes.

(xvii)    The Company has not distributed stock of another entity, or had its equity distributed by another entity, in a transaction that was purported or intended to be governed, in whole or in part, by Section 355 or 361 of the Code.

(xviii)    The Selling Parties have delivered or made available to Buyer true and correct copies of all income and other material Tax Returns including the K-1 statements which the Company has distributed to its Members, examination reports, and statements of deficiencies filed by, assessed against, or agreed to by the Company since January 1, 2015.

(xix)    The Company is currently taxed as a "partnership" for federal income tax purposes.  The Company has never elected to be treated as an association taxable as a corporation pursuant to Treasury Regulation Section 301.7701-3(c) or otherwise.

(b)    The representations and warranties in this **Section 3.10** (other than those in **Sections 3.10(a)(ix), (xi), (xii) and (xvii)**) shall only be construed and interpreted as applying to Taxes and associated liabilities occurring in Pre-Closing Tax Periods.

Section 3.11  Employees.  **Schedule 3.11** hereto sets forth the name, current annual compensation rate (including bonus and commissions), title, current base salary rate, accrued but unpaid bonus and commissions, accrued sick leave, accrued vacation benefits and accrued severance pay of each Employee of the Company other than those who ceased to be employees or consultants prior to December 31, 2016. **Schedule 3.11** hereto further lists all such Employees, as well as agents and independent contractors, covered by an employment non-competition, non-solicitation, consulting or severance agreement with the Company, and the Company has provided to Buyer current and complete copies of each such agreement, as well as copies of any confidentiality or other agreement covering any proprietary Intellectual Property applicable to any such Person. **Schedule 3.11** hereto further lists the policies and practices of the Company concerning Reimbursable Expenses, and the amounts of Reimbursable Expenses that have been submitted to the Company but have not been reimbursed as of the Closing Date.  The Company is not a party to or otherwise bound by any collective bargaining agreement, contract or other agreement or understanding with a labor union or labor organization, nor is the Company the subject of any Proceeding asserting that it has committed an unfair labor practice or seeking to compel the Company to bargain with any labor union or labor organization, nor is there pending or, to the Selling Parties' Knowledge, threatened, any labor strike, dispute, walkout, work stoppage, slowdown or lockout involving the Company. To the Selling Parties' Knowledge, the Company is in compliance in all material respects with all applicable Laws respecting employment and employment practices, independent contractor arrangements, terms and conditions of employment and wages and hours and occupational safety and health. Except as disclosed in **Schedule 3.11** hereto, there is no action, suit or legal, administrative, arbitration, grievance or other Proceeding pending or, to the Selling Parties' Knowledge, threatened and, to

Selling Parties' Knowledge, there is no investigation pending or threatened against the Company relating to the employment practices of the Company or any of the applicable Laws described in this **Section 3.11**. Except as set forth on **Schedule 3.11,** the Selling Parties have not received any written notice, and, to the Selling Parties' Knowledge, no Employee of the Company (other than those who ceased to be employees or consultants prior to December 31, 2016) intends or is considering terminating his or her employment with the Company before the Closing or does not intend to accept employment with Buyer on the Closing Date or if he intends to accept employment with Buyer is considering terminating his/her employment with Buyer thereafter.

Section 3.12    Employee Benefits.

(a)    A copy of each bonus, deferred compensation, pension, retirement, profit-sharing, thrift, savings, employee membership ownership, membership bonus, membership purchase, membership option, employment, retention, deal-sharing, termination, severance, exit, change of control, compensation, medical, health or other welfare plan, agreement, policy or arrangement that covers or covered employees, directors, managers, former employees, former directors or former managers of the Company (the "**Compensation and Benefit Plans**") has been provided to Buyer prior to the Closing Date. For each Compensation and Benefit Plan, copies of the following documents (to the extent applicable) have also been provided to Buyer prior to the Closing Date: (i) any amendments since the last restatement of such plan; (ii) any trust agreement or other funding agreement; (iii) the most recent Form 5500 annual report, including all attachments; (iv) the most recent annual actuarial valuation report; and (v) the most recent IRS determination letter, and any outstanding request for such a letter. The Compensation and Benefit Plans existing as of the Effective Date are listed on **Schedule 3.12(a)** hereto.

(b)    All of the Compensation and Benefit Plans are in compliance in all material respects with all applicable Laws including but not limited to the Code, the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), the Health Insurance Portability and Accountability Act of 1996, as amended by P.L. 111-5 Division A ("**HIPAA**"), and the Family and Medical Leave Act. Each Compensation and Benefit Plan that is an "employee pension benefit plan" within the meaning of Section 3(2) of ERISA (a "**Pension Plan**"), that is intended to be qualified under Section 401(a) of the Code and is not a standardized prototype plan has received a favorable determination letter from the IRS, has applied for such letter in a timely fashion, or has a remaining period of time within which to apply for such a letter, and the Company is not aware of any circumstances likely to result in revocation of any such favorable determination letter, the refusal to issue such a favorable determination letter or any material costs under the IRS's Employee Plans Compliance Resolution System. There are no pending or, to the Selling Parties' Knowledge, threatened claims or litigation relating to any of the Compensation and Benefit Plans. The Company has not engaged in a transaction with respect to any Compensation and Benefit Plan that, assuming the taxable period of such transaction expired as of the Closing Date, would subject it to fiduciary liability payment of additional benefits or a material tax or penalty imposed pursuant to either Section 4975 of the Code or Section 502 of ERISA.

(c)    As of the Closing Date, except as set forth on **Schedule 3.12(c)** hereto, the Company does not maintain or contribute to an employee pension benefit plan subject to Title IV of ERISA or Section 412 of the Code.

{00863216.DOCX;2 }

AWNK003121

(d)      Except as set forth on **Schedule 3.12(d)** hereto, the Company does not have any obligations for retiree health and life benefits under any Compensation and Benefit Plan. The Company may amend or terminate any such plan under the terms of such plan at any time without incurring any material liability thereunder. Except as set forth on **Schedule 3.12(d)** hereto, the Company does not have any obligation to provide group continuation coverage to former employees or their dependents as required by Section 600 et seq. of ERISA and Section 4980B of the Code.

(e)      Except as set forth on **Schedule 3.12(e)** hereto, neither the execution of this Agreement by the Company or the Selling Members nor the consummation of the transactions contemplated by this Agreement will (i) entitle any employees of the Company to severance pay, (ii) accelerate the time of payment or vesting or trigger any payment of compensation or benefits or forgiveness of indebtedness under, increase the amount payable or trigger any other material obligation pursuant to, any of the Compensation and Benefit Plans, or (iii) result in any breach or violation of, or a default under, any of the Compensation and Benefit Plans.

(f)      Except as set forth on **Schedule 3.12(f)** hereto, all annual reports required to be filed under any Laws applicable to the Compensation and Benefits Plans have been timely filed with the respective Governmental Entity with which such reports are required to be filed, including, without limitation Form 5500 and Form 11-K.

(g)      To the Selling Parties' Knowledge, all Compensation and Benefit Plans covering current or former non-U.S. employees or former employees of the Company comply in all material respects with applicable Laws. The Company does not have any material unfunded liabilities with respect to any Compensation and Benefit Plan that covers such employees.

(h)      Except as set forth on **Schedule 3.12(h)**, the Company (x) does not participates, maintains or contributes to, or has any liability or obligation under or with respect to, any single or multi-employer Compensation and Benefit Plan governed by or subject to Title IV of ERISA (whether by reason of being a member of an affiliated group of companies, one of which maintains such a plan, or otherwise), and (y) has not participated, maintained, contributed or incurred any liability or obligation with respect to any such plan.

Section 3.13   Intellectual Property.

(a)      **Schedule 3.13(a)** hereto sets forth all of the Intellectual Property owned, in whole or in part, including jointly with others, by the Company (collectively, the "**Owned Intellectual Property**") including, without limitation a complete and accurate list of all United States and foreign (i) patents and patent applications; (ii) Trademark registrations and applications and material unregistered Trademarks; (iii) copyright registrations and applications, indicating for each, the applicable jurisdiction, registration number (or application number) and date issued (or date filed), and (iv) Software. **Schedule 3.13(a)** hereto lists all actions that must be taken by Buyer within one hundred eighty (180) days from the Effective Date, including the payment of any registration, maintenance, renewal fees, annuity fees and taxes or the filing of any documents, applications or certificates for the purposes of maintaining, perfecting or preserving or

Case 8-20-08049-ast    Doc 55-5    Filed 01/18/23    Entered 01/18/23 20:31:58
Case 2:25-cv-02032-RPK    Document 5-1    Filed 05/12/25    Page 59 of 79 PageID #: 341

AWNK003122

renewing any Intellectual Property of the Company. **Schedule 3.13(a)** separately lists all Owned Intellectual Property that is owned in part or jointly owned with any other Person.

> (b)    License Agreements.

> (i)    **Schedule 3.13(b)(i)** hereto sets forth a complete and accurate list of all license, service or similar agreements (written or oral) granting to the Company any material right to use or practice any rights under any Intellectual Property (other than off-the-shelf software that is subject to "shrink-wrap" or similar license and is commercially available and is not a material component of any product or service marketed, distributed or commercially exploited by the Company) (collectively, the "**License Agreements**").

> (ii)    The Company has not licensed Software or granted other rights in to use or practice any rights under any Owned Intellectual Property.

> (iii)    No Person has received from the Company, or has the right to use, any Owned Intellectual Property.

> (iv)    Except as set forth on **Schedule 3.13(b)(iv)** hereto, there is no outstanding or, to the Selling Parties' Knowledge, threatened dispute or disagreement with respect to any License Agreement. Except as set forth in **Schedule 3.13(b)(iv)** hereto, the Company is not in breach of, and has not failed to perform under, any of the License Agreements.

> (c)    Ownership; Sufficiency of Intellectual Property Assets.    The Company owns or possesses adequate licenses or other rights to use and practice, free and clear of all Liens (other than Permitted Liens), rights, claims, conditions, restrictions, limitations and interests of any Governmental Entity, orders and arbitration awards, and without payment of any kind to any Person, all of the Owned Intellectual Property. The Company is not engaged in the wrongful use of any confidential information or trade secrets or patentable inventions of any current or former employee or consultant of the Company or any other person, firm or entity and to Selling Parties' Knowledge no such employee, consultant, person, firm or entity, has alleged that the Company is engaged in such wrongful use or that members of the Company do not own the Owned Intellectual Property. Except as set forth in **Schedule 3.13(c)** hereto, the Owned Intellectual Property identified in **Schedule 3.13(a)** hereto, together with the  unregistered copyrights of the Company, if any, and rights under the licenses granted to the Company under the License Agreements, if any, constitute all the material Intellectual Property rights used in the operation of the Business, other than "shrink wrap" software licenses and, to the Selling Parties' Knowledge, are all the Intellectual Property rights necessary to operate the Business after the Effective Date in the same manner as the Business has been operated by the Company.

> (d)    No Infringement. To Selling Parties' Knowledge, none of the products or services manufactured, distributed, marketed, sold, licensed or performed by the Company, nor any of the Owned Intellectual Property used in the conduct of the Business, infringe upon, violate or constitute the unauthorized use of any rights owned or controlled by any Person, including any Intellectual Property or proprietary rights (including, without limitation, patents, design patents, Trademarks, common law marks, domain names, trade dress, industrial property and copyrights) of any Person.

{00863216.DOCX;2 }

Case 8-20-08049-ast    Doc 55-5    Filed 01/18/23    Entered 01/18/23 20:31:58
Case 2:25-cv-02032-RPK    Document 5-1    Filed 05/12/25    Page 60 of 79 PageID #: 342

AWNK003123

(e)     <u>No Pending or Threatened Infringement Claims</u>. Except as set forth on **Schedule 3.13(e)** hereto, there is no pending litigation and no written notice or other claim has been received by the Company (i) alleging that the Company has engaged in any activity or conduct that infringes upon, violates or constitutes the unauthorized use of any of the Intellectual Property or proprietary rights of any Person, or (ii) challenging the ownership, use, validity or enforceability of any Owned Intellectual Property, or the Intellectual Property exclusively licensed by or to the Company. The Company has not received any writing requesting, inquiring or demanding the licensing of any other Person's Intellectual Property or proprietary rights.

(f)     <u>No Infringement by Third Parties</u>. To Selling Parties' Knowledge, no third party is misappropriating, infringing, diluting, or violating any Owned Intellectual Property or Intellectual Property exclusively licensed to the Company, and no such claims have been brought against any Person by the Company.

(g)     **Schedule 3.13(g)** hereto sets forth a list of all websites of the Business or of, or maintained by, the Company (the "**Websites**"). With respect to such Websites, except as set forth on **Schedule 3.13(g)** hereto, the Company (i) itself or through contractors, operates and manages each Website, (ii) has the right to modify each Website, and to make links and hyperlinks therefrom to other internet sites, and (iii) owns or possesses the perpetual, world-wide, royalty-free, fully assignable right to operate each Website as presently conducted, including, without limitation, the fully assignable right to operate such Website with its current host on its current server as presently operated and to use, enhance, and create derivative works of or from and maintain all source code and other Intellectual Property and proprietary rights necessary to operate, develop, modify, make derivative works of or from, support and maintain each Website. Without limiting the foregoing, except as set forth on **Schedule 3.13(g)** hereto, the Company owns or possesses the perpetual, world-wide royalty free, fully assignable right to use, display, perform, publish, disseminate, transmit and distribute the content and other information displayed, published, performed, disseminated, transmitted or distributed on or through each Website, and to disseminate, transmit, distribute, market, sell or license the information, products, and services disseminated, transmitted, marketed, sold or licensed on or through each Website.

Section 3.14   <u>Financial Statements ; Accounts Receivable</u>

(a)     Annexed hereto as **Schedule 3.14(a)** are the (i) compiled consolidated financial statements of the Company as at and for the twelve month periods ended December 31, 2016, 2015, and 2014, together with a report thereon by Company's accountants (collectively, the "**Annual Financial Statements**"), (ii) unaudited internal interim consolidated financial statements of the Company as at and for the three-month period ended March 31, 2017 (the "**Interim Financial Statement**"), and (iii) unaudited internal interim consolidated financial statements of the Company and its Subsidiaries as at and for the one-month periods ended April 30, 2017, and May 31, 2017 (the "**Additional Interim Financial Statement**"), provided, however that the Additional Interim Financial Statement shall be provided to Buyer no later than June 15, 2017, including in each of clauses (i), (ii) and (iii), balance sheets and a statement of income and retained earnings (the Annual Financial Statements, the Interim Financial Statement and the Additional Interim Financial Statement, collectively the "**Financial Statements**"). Except as set forth therein or in **Schedule 3.14(a)** hereto, the Annual Financial Statements have been prepared on an accrual basis using consistent accounting practices for periods and dates presented, in all

{00863216.DOCX;2 }

AWNK003124

material respects in accordance with the Statements on Standards for Accounting and Review Services issued by the American Institute of Certified Public Accountants throughout the periods indicated. The Financial Statements present fairly the consolidated financial position of the Company as of the dates indicated and present fairly, in all material respects, the consolidated financial condition of the Company for the periods then ended. The Interim Financial Statement and the Additional Interim Financial Statement have been prepared in all material respects on a basis consistent with the Annual Financial Statements, except that the Interim Financial Statement and the Additional Interim Financial Statement do not contain notes and other presentation items required by GAAP, may be subject to normal audit or year-end adjustments and have not been audited, reviewed, compiled, or otherwise tested by the Company's independent auditor. The balance sheet included in the Interim Financial Statement and the Additional Interim Financial Statement presents fairly, in all material respects, the financial condition of the Business as at the end of the three-month period ended March 31, 2017 and the one-month periods ended April 30, 2017 and May 31, 2017, respectively. The statement of income and retained earnings included in the Interim Financial Statement and the Additional Interim Financial Statement present fairly in all material respects the results of operations of the Business for the three-month period ended March 31, 2017 and the one-month periods ended April 30, 2017 and May 31, 2017

(b)      Accounts Receivable. Except as indicated on **Schedule 3.14(b)**, all accounts receivable of the Company are reflected properly on the Books and Records, represent bona fide, current and valid obligations arising from sales actually made or services actually performed in the Ordinary Course of Business. Such accounts receivable are not subject to any material setoffs or counterclaims, are current and collectible within nine (9) months from the invoice relating to the applicable account receivable, and will be collected within such period in accordance with their terms at their recorded amounts, subject only to the allowance for doubtful accounts set forth in the Balance Sheet included in the most recent Interim Financial Statement as adjusted for the passage of time through the Closing Date consistent with the past custom and practice of the Company. Except as set forth therein or in **Schedule 3.14(b)** hereto, the Company has not received written notice from any obligor of any material accounts receivable that such obligor is refusing to pay or contesting payment of which has not been resolved prior to the Closing Date, other than in the Ordinary Course of Business under any Contract with any obligor of any accounts receivable.

Section 3.15      Absence of Certain Changes.

(a)      Except as set forth on **Schedule 3.15(a)** hereto, since January 1, 2017, (x) the Company has conducted the Business only in, and has not engaged in any transaction other than according to, the Ordinary Course of Business, (y) the Company has not entered into any Contracts that are materially less favorable to the Company than Contracts entered into in the Ordinary Course of Business, and (z) there has not occurred:

(i)      any Material Adverse Effect;

(ii)      any damage, destruction or other casualty loss with respect to any material asset or property owned, leased or otherwise used by the Company, whether or not covered by insurance;



AWNK003125

(iii)    any declaration, setting aside or payment of any dividend, or other distribution (whether in cash, membership interest or property) in respect of the equity interest, or any repurchase, redemption or other reacquisition of any equity interest or other securities of the Company;

(iv)    any change in the accounting principles, practices or methods of the Company;

(v)    any change in any material Tax election or any settlement or compromise of any material Tax claim or liability; or

(vi)    any agreement or commitment to take any of the actions referred to in clauses (iii) through (v) above.

(b)    Without limiting the foregoing provisions of **Section 3.15(a)**, since the date of the most recent Annual Financial Statement, except as set forth in **Schedule 3.15(b)** hereto, the Company has not:

(i)    incurred any obligation or liability, absolute, accrued, contingent or otherwise, whether due or to become due, except current liabilities for trade or business obligations incurred in the Ordinary Course of Business, none of which are, individually or in the aggregate, material;

(ii)    mortgaged, pledged or subjected to any Lien (other than Permitted Liens), any of the rights, assets or property, tangible or intangible of the Company;

(iii)    sold, transferred, leased to others or otherwise disposed of any assets, properties or rights of the Company, except for inventory sold, supplies consumed, and minor amounts of obsolete equipment replaced, in each case in the Ordinary Course of Business;

(iv)    to Selling Parties' Knowledge, been subject to or encountered any labor union organizing activity, had any actual or, to Selling Parties' Knowledge, threatened employee strike, work stoppage, slow down or lockout, or, to Selling Parties' Knowledge, had any material adverse change in its relations with its employees, consultants, customers, distributors or suppliers or any governmental regulatory authority or self-regulatory authority;

(v)    transferred or granted any rights under, or entered into any settlement regarding the breach or infringement of, any license, copyright, Trademark, patent, or other Intellectual Property of the Company, or modified any existing rights with respect thereto;

(vi)    made any change in excess of 2% in the rate of compensation, commission, bonus or other direct or indirect remuneration payable, or paid or agreed or orally promised to pay, conditionally or otherwise, any bonus, extra compensation, pension or severance or vacation pay, to any employee, consultant, salesman, representative or agent of the Company;

AWNK003126

(vii)    instituted, settled or agreed to settle any litigation, action or Proceeding before any Governmental Entity;

(viii)    received any written notice or other information from any member, distributor, salesman, representative, vendor, supplier, customer or group of customers, that it (they) intend(s) to cease doing business with the Company, including, without limitation, any written notices of material change in revenues, costs or method of distribution;

(ix)    made any purchase commitments materially in excess of the normal, ordinary and usual requirements of the Business or at any price materially in excess of the current market price or upon terms and conditions more onerous than those that are usual and customary in the trade or made any change in its selling, pricing, advertising or personnel practices inconsistent with its prior or prudent business practices;

(x)    taken any action to accelerate any payment of or taken any action to adversely change the terms of, any accounts receivable of the Company, nor delayed the payment of, or taken any action to adversely change the terms of the accounts payable of the Company;

(xi)    entered into any transaction, contract or commitment other than in the Ordinary Course of Business, or paid or agreed to pay any brokerage, finder's fee, or other compensation in connection with, or incurred any severance pay obligation by reason of, this Agreement or the transactions contemplated hereby;

(xii)    amended any Compensation and Benefit Plans; or

(xiii)    entered into any agreement or made any commitment to take any of the types of actions described in any of clauses (i) through (xii) of this **Section 3.15(b)**.

Section 3.16    <u>Bank Accounts.</u>  **Schedule 3.16** hereto sets forth a list of all bank and savings accounts, securities accounts, certificates of deposit and safe deposit boxes of the Company and those persons authorized to sign thereon as of the date of this Agreement.

Section 3.17    <u>Compliance with Law.</u>

(a)    Except as set forth in **Schedule 3.17(a)** hereto, since January 1, 2013, the Business has not been, and is not being, conducted in violation of any law, ordinance, regulation, treaty, judgment, order (whether temporary, preliminary or permanent), decree, arbitration award, license or permit of any Governmental Entity (each a "**Law**" and collectively, "**Laws**"), except for violations or possible violations that, individually or in the aggregate, are not material or are not reasonably likely to prevent, materially delay, materially burden or materially impair the Selling Parties' ability to consummate the transactions described in this Agreement or materially impair the ability of Buyer, following the Closing, to conduct the Business in the manner in any jurisdiction in which it is now being conducted. No action or demand or, to the Selling Parties' Knowledge, review, by any Governmental Entity with respect to the Company or affecting any of its properties or assets is pending or, to the Selling Parties' Knowledge, threatened, nor has any Governmental Entity provided written notice to the Company of an intention to conduct the same or that an investigation of the Company is being conducted. To the Selling Parties'

{00863216.DOCX;2 }

AWNK003127

Knowledge, no material change is required in the processes, properties or procedures of the Company in connection with any such Laws, and the Company has not received any written notice of any material noncompliance with any such Laws that has not been cured as of the Closing Date.

(b)    Except as set forth on **Schedule 3.17(b)** hereto, the Company has in full force and effect all material approvals, authorizations, certificates, filings, franchises, licenses, and permits of or with all Governmental Entities (collectively, "**Permits**") necessary to own, lease or operate the properties and other assets of the Company and to carry on, the Business. All such Permits are set forth on **Schedule 3.17(b)** hereto. There is no continuing default under, or violation of, any such Permit, and each such Permit is in full force and effect. The execution, delivery, and performance of this Agreement, and the consummation of the transactions described in this Agreement will not result in a violation of or default under and will not cause the revocation or cancellation of any such Permit. The Company has not received any written notice that, and there are no facts which have, or reasonably should have, led it or the Selling Members to believe that any of the Permits are not currently in good standing.

(c)    The Company has kept in all material respects all required records and has filed in all material respects with Governmental Entities all required notices, supplemental applications and annual or other reports required for the operation of the Business and in all material respects in accordance with applicable Law. To the Selling Parties' Knowledge, neither the ownership nor use of the assets or properties of the Company, nor the conduct, production or operations of the Business, conflicts with the rights of any Person. Neither the ownership nor use of the assets or properties of the Company, nor the conduct, production or operations of the Business violates, or, with the giving of notice or the passage of time, or both, will violate, conflict with or result in a default, right to accelerate or loss of rights under, any terms or provisions of (a) the certificate of incorporation, bylaws, articles of organization or operating agreement or other governing documents of the Company, or (b) any Permit held by the Company, or any Material Contract or material commitment to the Company is a party, that is material to the Ordinary Course of the Business.

Section 3.18    Environmental Matters.    Except as disclosed in **Schedule 3.18** hereto: (i) the Company has complied in all material respects with all applicable Environmental Laws; (ii) the Company has no material liability under any Environmental Law for any Hazardous Substance disposal or contamination on the properties currently owned or operated by the Company; (iii) the Company has no material liability under any Environmental Law for any Hazardous Substance disposal or contamination on the properties formerly owned or operated by the Company; (iv) the Company has no liability under any Environmental Law for any Hazardous Substance disposal or contamination on any property owned or operated by any other Person; (v) the Company is not in violation of or has any liability under any Environmental Law for any release or threat of release of any Hazardous Substance; (vi) the Company has not received any written notice, demand, letter, claim or request for information alleging that it may be in violation of or liable under any Environmental Law; (vii) the Company is not subject to any orders, decrees, injunctions or other arrangements with any Governmental Entity or an indemnitor of any third party indemnitee for any liability under any Environmental Law or relating to Hazardous Substances; (viii) to the Selling Parties' Knowledge, there are no circumstances or conditions involving the Company that could reasonably be expected to result in any material claims, liability, investigations, costs or restrictions on the ownership, use, or transfer of any of its property pursuant

AWNK003128

to any Environmental Law; (ix) to the Selling Parties' Knowledge, none of the Company Leased Properties contains any underground storage tanks, asbestos-containing material, lead-based paint, or polychlorinated biphenyls in violation of any Environmental Law or that would reasonably be expected to result in liability to the Company under any Environmental Law; and (x) the Company has not engaged in any activities involving the generation, use, handling or disposal of any Hazardous Substances in violation of any Environmental Law or that would reasonably be expected to result in any material liability under any Environmental Law. Except as disclosed in **Schedule 3.18** hereto, there have been no environmental investigations, studies, audits, tests, reviews or other analyses conducted by or for the Company, or, to the Selling Parties' Knowledge, by someone other than the Company, relating to any property or facility now or previously owned or leased by the Company that have not been delivered to Buyer.

Section 3.19    Contracts and Commitments.

(a)    **Schedule 3.19(a)** hereto contains a true and correct list of all of the following current Contracts and documents to which the Company is bound or which pertain to any of the Business (together with all other Contracts required to be listed on a Schedule to this Agreement and/or delivered or made available to Buyer, the "**Material Contracts**"):

(i)    service, management, consulting or similar types of Contracts involving receipts by the Company in excess of $25,000 in any 12-month period during term of any such Contract;

(ii)    sale, maintenance, supply, purchase, distribution, dealer, and distributor Contracts involving receipts in excess of $25,000 in any 12-month period during term of any such Contract;

(iii)    sale, maintenance, supply, purchase, distribution, dealer, and distributor Contracts involving payments in excess of $25,000 in any 12-month period during term of any such Contract;

(iv)    Government Contracts and Government Bids (as used herein, "**Government Contract**" means any Contract that (x) is between the Company and a U.S. or other Governmental Entity or (y) is entered into by the Company as a subcontractor (at any tier) in connection with a Contract between another Person and a U.S. or other Governmental Entity, and, "**Government Bid**" means any offer by the Company to sell goods or to provide services prior to the Closing Date which, if accepted, would result in a Government Contract);

(v)    covenants not to compete or other covenants (x) limiting or restricting the development, manufacture, marketing, distribution or sale of any of the products or services of the Company or any future line extension of such products or services into other forms, or (y) limiting or restricting the ability of the Company to enter into any market or line of business or to compete with any other Person, or any other covenant restricting or prohibiting the Company from transacting business or dealing in any manner with any other Person;

(vi)    Contracts with any Affiliate of the Company or with any director, officer, shareholder, manager or employee of the Company or any Affiliate of the Company;

{00863216.DOCX;2 }

24

AWNK003129

(vii)    advertising Contracts requiring expenditures or fees in excess of $20,000 in any twelve-month period after the Closing Date;

(viii)    management, employment, service, consulting, retention, severance or other similar type of Contract whereby the Company is provided with services;

(ix)    Contracts relating in whole or in part to the Intellectual Property of the Company (including any Contract under which the Company is the licensee or licensor of any such Intellectual Property, but excluding any Contracts related to "shrink wrapped" Software) that are material to the Business;

(x)    internet or website related agreements relating to the Business (including, without limitation, all interactive service, portal, web site management, hosting, server, content licensing, advertising, branding, and link or hyperlink agreements) and development agreements, except for click through or similar type agreements;

(xi)    leases, subleases or licenses under which the Company holds any leasehold or other interest or right to the use of any real property, or pursuant to which the Company has assigned, leased, subleased or granted to any Person any rights therein;

(xii)    mortgage, pledge, security agreement, deed of trust, loan agreement, credit agreement, indenture, conditional sale or title retention agreement, equipment financing obligation or other instrument or agreement granting a Lien (other than a Permitted Lien) upon any of the properties or assets of the Company;

(xiii)    Contracts regarding the release, transportation or disposal of Hazardous Substances, or the clean-up, abatement or other action relating to Hazardous Substances or Environmental Laws;

(xiv)    Contracts establishing or creating any partnership, joint venture, limited liability company, limited liability partnership or similar entity;

(xv)    Contracts to make any capital expenditures or capital additions or improvements with commitments in excess of $10,000 in any twelve-month period after the Closing Date or in excess of $50,000 in the aggregate over the term of any such Contract;

(xvi)    Contracts relating to the storage or warehousing of any inventory or products of the Company, or relating to the charter or purchase of transportation or shipping services;

(xvii)    guarantees or other Contracts in respect of any Indebtedness of any Person other than with respect to the deposit of third party checks;

(xviii)    Contracts providing for the indemnification of the Company or of any current or former director, officer or employee of the Company (other than such provisions as are set forth in the Certificate of Incorporation, Articles of Organization, operating agreement or similar charter documents of the Company);

{00863216.DOCX;2 }

         (xix)   any agreements, arrangements or commitments by or relating to the Company under which the Company indemnifies any other Person or is required to carry insurance for the benefit of any other Person (other than credit agreements, leases, supply agreements and other Contracts otherwise scheduled as Material Contracts);

         (xx)   all other Contracts, commitments and purchase orders (other than short-term purchase orders for supplies and services and sales orders of inventory, for cash), in each case: other than those (A) made in the Ordinary Course of Business on customary terms and conditions and consistent with past practices, and (B) involving payments or receipts by the Company of less than $25,000 in any single case or series of related orders; and

         (xxi)   any other Contracts to which the Company is a party or by which it or any of the Business is bound that is material to the Business or the Company and the Subsidiaries.

         (b)     Each Material Contract is a valid and binding obligation of the Company, in full force and effect and enforceable in accordance with its terms, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar Laws relating to or affecting creditors' rights generally and general principles of equity.

         (c)     Except as set forth on **Schedule 3.19(c),** neither the Company nor, to the Selling Parties' Knowledge, any other party to any Material Contract, is in violation of or in default under any Material Contract, nor, to the Selling Parties' Knowledge, has any event occurred, or circumstance or condition exist, that (with or without notice or lapse of time or both) would reasonably be expected to (i) result in a violation of, or default under, any Material Contract, (ii) give any party the right to cancel or terminate or modify any Material Contract, or (iii) give any party to any Material Contract the right to seek material damages or other remedies. Except as set forth in **Schedule 3.19(c)** hereto, there have been no oral or written modifications of, or amendments or waivers with respect to, any of the terms of any of the Material Contracts. To the Selling Parties' Knowledge, except for any consents required thereunder which are properly so indicated on **Schedule 3.19(a)** hereto, (x) each Material Contract will be unaffected by the sale of or other transfer of the Interests and the transactions described in this Agreement and the other Seller Documents, and (y) following the Closing, the Company will be entitled to the full benefits thereof, provided the Company continues to abide by the terms thereof.

         Section 3.20   Insurance.   **Schedule 3.20** hereto sets forth: (a) the policies of insurance presently in force covering the Company specifying with respect to each such policy, the name of the insurer, type of coverage, term of policy, limits of liability and annual premium; (b) the losses of the Company, by year, by type of coverage, since January 1, 2015 based on information received from the insurance carrier(s) of the Company; (c) all outstanding insurance claims by the Company for damage to or loss of property or income which have been referred to insurers or which the Company believes to be covered by commercial insurance and (d) general comprehensive liability policies carried by the Company since January 1, 2015, including excess liability policies, if any. The Company has heretofore delivered or made available to Buyer true and correct copies of the policies and agreements set forth on **Schedule 3.20** hereto. The Company has not received any written notice regarding termination of insurance policies set forth on **Schedule 3.20** and the invoiced premiums with respect thereto covering all periods up to and

{00863216.DOCX;2 }

including the date of the Closing have been or will be paid prior to Closing. Such policies have been maintained in the Ordinary Course of Business, such insurance policies are, to Selling Parties' Knowledge, valid, outstanding and enforceable policies, provide (in the Selling Parties' opinion) adequate insurance coverage for the assets and operations of the Business, will remain in full force and effect through the respective dates set forth on **Schedule 3.20** hereto without the payment of additional premiums, and will not in any way be affected by, or terminate or lapse by reason of, the transactions described in this Agreement.  Affiliate Transactions.

(a)    Except as set forth in **Schedule 3.21(a)** hereto, the Company has not purchased goods or services from, or sold goods or services to, or otherwise engaged in any transaction with, any Person (i) that is an Affiliate of the Company, or (ii) with respect to which any Affiliate of the Company, or any member of the immediate family of any such Affiliate, owns more than 10% of the voting equity of such Person. All such transactions were entered into in the Ordinary Course of Business and on terms and conditions that are no less favorable to the Company than would be obtained in a comparable arm's length transaction with a Person that is not an Affiliate of the Company.

(b)    Except as set forth in **Schedule 3.21(b)** hereto, no member, employee, officer, director or agent of the Company has any interest in any property, real or personal, tangible or intangible, used in or pertaining to the Business.

Section 3.22    Distributors, Suppliers and Customers.

(a)    Set forth in **Schedule 3.22(a)** hereto is a list of names and addresses of the ten (10) largest suppliers (measured by dollar volume of purchases) of the Company and the percentage of the business which each such supplier represented during the twelve (12) month periods ended December 31, 2015 and December 31, 2016.  Set forth in **Schedule 3.22(a)** hereto is a list of names and addresses of the ten (10) largest customers (measured by dollar volume of purchases) and all other customers that accounted for more than $50,000 in revenue of the Company and the percentage of the business which each such customer represented during the twelve (12) month periods ended December 31, 2015 and December 31, 2016.  Except as set forth on **Schedule 3.22 (a),** neither any Selling Party nor the Company has received any written notice, and to the Selling Parties' Knowledge, there is no reason to believe that (u) any customer has expressed any concern about the  performance by the Company of its services or the cost of such services, (v) any customer has ceased, or will cease (either before or after the Closing), to use the products or services of the Company, (w) any customer has materially reduced or will materially reduce (either before or after the Closing) the use of products or services of the Company, (x) any customer intends or is considering reevaluating the use of the products or services of the Company, either before or after the Closing, (y) the Company is at risk of any of its customers not renewing its agreement or arrangement with the Company, or reducing the services or products it obtains from the Company, on account of performance, prices or otherwise or (z) the Company is not performing all of its contractual obligations to each of its customers as required and in accordance with such the applicable Contract.  To the Selling Parties' Knowledge, no unfilled customer order or commitment obligating the Company to perform services will result in a loss to the Company upon completion of performance.

{00863216.DOCX;2 }

(b)     To Selling Parties' Knowledge, the relationships of the Company with its distributors, suppliers, customers, and licensors or sublicensors of rights with respect to Intellectual Property are reasonably good commercial working relationships.

Section 3.23    Products Liability and Warranty Liability.    Except as set forth in **Schedule 3.23** hereto, the Company does not provide any product warranties with respect to the products or services sold by the Company. Except as set forth in **Schedule 3.23** hereto, the Company has not received any written complaints of any damages to any Person relating to the products or services of the Company with respect to which the Company has any liability. The Selling Parties do not know of any facts that indicate the Company has any material liability for warranty claims or returns with respect to any of its products or services.  **Schedule 3.23** hereto sets forth a description of all product or service warranty claims in excess of $10,000 per such warranty claim, with respect to products and services of the Company since January 1, 2011.

Section 3.24    Absence of Certain Business Practices.    Neither the Company nor any officer, or employee of the Company, nor any other agent, person or entity acting on its behalf, has, directly or indirectly, given or agreed to give any gift or similar benefit to any client, customer, governmental employee or other person or entity who is or may be in a position to help or hinder the business of the Company (or assist the Company in connection with any actual or proposed transaction) which (a) subjects the Company to any damage or penalty in any civil, criminal or governmental litigation or Proceeding, (b) if not given in the past, would have had an adverse effect on the assets, properties, business or operations of the Company, or (c) if not continued in the future, adversely affects the  assets, or operations of the Company or which subjects the Company to suit or penalty in any private or governmental litigation or Proceeding. There are no situations with respect to the Company which involved or involves (i) the use of any corporate funds for unlawful contributions, gifts, or other unlawful expenses related to political activity, (ii) the making of any direct or indirect unlawful payments to government officials or others from corporate funds or the establishment or maintenance of any unlawful or unrecorded funds, (iii) the receipt of any illegal discounts or rebates or any other violation of antitrust laws or (iv) to the Selling Parties' Knowledge, any investigation by any Government Entity.

Section 3.25    Records.    The Books and Records are, and at all times were, prepared in the Ordinary Course of Business and appropriately reflect the operations and transactions of the Company in all material respects.

Section 3.26    Intentionally Omitted.

Section 3.27    Brokers and Finders.    Except for the fees set forth on **Schedule 3.27**, which are the sole responsibility of the Selling Parties, none of the Selling Parties nor any of their respective officers, directors, trustees or employees has employed any broker or finder or incurred any liability for any brokerage fees, commissions or finders' fees in connection with the transactions described in this Agreement.

Section 3.28    Inventory.    Except as listed on **Schedule 3.28** the Company maintains no inventory.

Section 3.29    Privacy.    The Company is not in breach of any contractual or regulatory obligation to secure or otherwise safeguard Personal Data it receives in connection with

{00863216.DOCX;2 }

AWNK003133

the operation of its business and the Websites.  The Company has at all times taken commercially reasonable measures to ensure that all Personal Data is protected against loss and unauthorized access, use, modification, disclosure or other misuse, and, except as set forth in **Schedule 3.29**, to Selling Parties' Knowledge, there has been no unauthorized access to or other misuse of such data.  The Company has made all notifications to customers or individuals required to be made by the Company by any Privacy and Security Laws arising out of or relating to any event of access to or acquisition of any Personal Data by an unauthorized Person, including third parties and employees of the Company acting outside of the scope of their authority or authorization in a manner which is otherwise unlawful.  True and correct copies of all applicable current internal and customer or user-facing privacy policies of the Company ("**Company Privacy Policies**") have been provided or made available to Buyer.  The Company has complied in all material respects with all Privacy and Security Laws in connection with the operation of the Business of the Company and the Websites.  No Personal Data disclosures, representations or covenants made to any customer, or contained in any Company Privacy Policy, have been inaccurate or in violation of any Privacy and Security Laws.  There is no complaint to, or audit of, or Proceeding, or written claim or, to the Selling Parties' Knowledge, investigation currently pending against the Company by (i) any Person, or (ii) any Governmental Entity, with respect to the collection, use or disclosure of Personal Data.  The negotiation, execution and consummation of the transactions described in this Agreement, and any disclosure and/or transfer of information in connection therewith, will not breach or otherwise cause any violation of any Privacy Policy or Privacy and Security Laws.  To the Selling Parties' Knowledge, the Company has not received any complaints or other notices from any source of any failures to meet the requirements of the Privacy and Security Regulations or Transaction Regulations.

Section 3.30   <u>Full Disclosure.</u>  No representation or warranty by the Company in this Agreement and no statement contained in the schedules hereto or any certificate or other document furnished or to be furnished to the Company pursuant to this Agreement contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading.  Except as set forth on **Schedule 3.30** the contents of the data room in which the Selling Parties were providing information to the Buyer and its representatives are true, complete and accurate; provided, however, that the Company and the Selling Members make no representations and warranties with respect to (i) information or documents containing any projections, forward looking statements, budgets, or pro forma information and (ii) documents in the data room that have been redacted or provided in limited form.

ARTICLE 4
REPRESENTATIONS AND WARRANTIES OF THE SELLING MEMBERS

Section 4.1   <u>Ownership of Interest</u>.  Such Selling Member is the legal and beneficial owner of the Interests set forth by its name on **Schedule 3.5**, and at the Closing such Interests shall be free and clear of all Liens. Upon the delivery of such Interests, Buyer will acquire the beneficial and legal, valid and marketable title to such Interests.

Section 4.2   <u>Authority</u>.  Such Selling Member has the legal power, right and authority to enter into and perform this Agreement and each other Seller Document to which it is a party, and to perform each of its obligations hereunder and thereunder. This Agreement and the

{00863216.DOCX;2 }

AWNK003134

other Seller Documents to which such Selling Member is a party have been duly executed and delivered by such Selling Member, and such Agreement and such Seller Documents constitute a valid and binding obligation of such Selling Member, enforceable in accordance with their terms subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar Laws relating to or affecting creditors' rights generally and general principles of equity. The execution, delivery and performance of this Agreement and such Seller Documents by such Selling Member (a) except as set forth on **Schedule 3.3(b)** hereof, require no action by or in respect of, or filing with, or consent of, any Governmental Entity or any other Person and (b) do not contravene, or constitute a default under, any provision of applicable Law or of any agreement, judgment, injunction, order, decree or any other instrument binding upon such Selling Member.

        Section 4.3    <u>Litigation</u>.    There is no Proceeding pending against such Selling Member, or, to its actual knowledge, threatened against or affecting such Selling Member or any of its properties or rights, nor is there any judgment, decree, injunction, rule or order of any Governmental Entity or arbitrator outstanding against or affecting either such Selling Member or any of its properties or rights, except such that are not, individually or in the aggregate, reasonably likely to prevent, materially delay or materially impair (a) its ability to consummate the transactions described in this Agreement, (b) Buyer's ability to acquire ownership of the Interests, free and clear of all Liens, or (c) the ability of Buyer, following the Closing, to conduct the Business.

        Section 4.4    <u>Brokers and Finders.</u>    Except for the fees set forth on **Schedule 3.27**, which are the sole responsibility of the Selling Parties, such Selling Member has not employed any broker or finder or incurred any liability for any brokerage fees, commissions or finders' fees in connection with the transactions described in this Agreement.

ARTICLE 5

REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to the Selling Members that:

        Section 5.1    <u>Organization; Authority; Due Execution</u>.

        (a)    Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of its jurisdiction of organization and has all requisite corporate power and authority to own and operate its properties and assets and to carry on its business as presently conducted and is qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of its properties or conduct of its business requires such qualification, except where the failure to be so qualified or in good standing, when taken together with all other such failures, will not prevent, materially delay or materially impair Buyer's ability to consummate the transactions described in this Agreement.

        (b)    Buyer has all requisite corporate power and authority to enter into this Agreement and each agreement, document and instrument to be executed or delivered by it in connection with this Agreement (collectively, the "**Buyer Documents**"), to perform its obligations hereunder and thereunder, and to consummate the transactions described in this Agreement and

{00863216.DOCX;2 }

30

AWNK003135

thereby. The execution, delivery and performance of this Agreement and the other Buyer Documents to be executed by Buyer as the case may be and the consummation by Buyer as the case may be of the transactions described in this Agreement and thereby have been duly and validly authorized and no other corporate proceedings on the part of Buyer or their respective members are necessary with respect to any such matter. This Agreement and the other Buyer Documents to be executed by Buyer as the case may be have been duly executed and delivered by Buyer as applicable and constitute the valid, binding and enforceable obligations of to be executed Buyer as the case may be, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar Laws relating to or affecting creditors' rights generally and general principles of equity.

Section 5.2    Consents; No Violation.

(a)    No notices, reports or other filings are required to be made with, nor are any consents, registrations, approvals, permits or authorizations required to be obtained by Buyer from any Governmental Entity or any other Person in connection with the execution and delivery of this Agreement or the other Buyer Documents to be executed by Buyer and the consummation by Buyer of the transactions described in this Agreement and thereby except those that the failure to make or obtain will not, individually or in the aggregate, prevent, materially delay or materially impair Buyer's ability to consummate the transactions described in this Agreement.

(b)    The execution, delivery and performance of this Agreement and the other Buyer Documents do not, and the consummation of the transactions described in this Agreement and thereby will not, constitute or result in: (i) (with or without notice, lapse of time or both) a breach or violation of, or a default under, Buyer's certificate of incorporation or bylaws or other governing documents, or (ii) (with or without notice, lapse of time or both) a breach or violation or a conflict with, or a default under, or the termination of, or the acceleration under, any Contract, debt, obligation, governmental or non-governmental permit or license to which Buyer is a party to or to by which it is subject or bound; except, in the case of clause (ii) of this **Section 5.1(b)**, for any violation, default or acceleration, that, individually or in the aggregate, will not prevent, materially delay or materially impair Buyer's ability to consummate the transactions described in this Agreement.

Section 5.3    Litigation.  There is no civil, criminal or administrative suit, action, proceeding, investigation, review or inquiry pending or, Buyer's knowledge, threatened against or affecting Buyer or any of its respective properties or rights, nor is there any judgment, decree, injunction, rule or order of any Governmental Entity or arbitrator outstanding against or affecting Buyer or any of its respective properties or rights such that will not, individually or in the aggregate, prevent, materially delay or materially impair Buyer's ability to consummate the transactions described in this Agreement.

Section 5.4    Compliance with Law.  Buyer is not in violation of any Law, except for violations or possible violations that, individually or in the aggregate, will not prevent, materially delay or materially impair Buyer's ability to consummate the transactions described in this Agreement.

{00863216.DOCX;2 }

AWNK003136

Section 5.5    Brokers and Finders.  Buyer and Seller and their respective officers, directors, trustees or employees can employ a broker or finder and incur a liability for any brokerage fees, commissions or finders' fees in connection with the transactions contemplated by this Agreement.

Section 5.6    Availability of Funds.  Buyer has sufficient cash and/or available credit facilities to pay the Purchase Price, all post-Closing payments that may reasonably be expected to be due and payable after the Closing pursuant to the terms of this Agreement, and any other amounts payable pursuant to this Agreement and to consummate the transactions contemplated by this Agreement.

Section 5.7    Independent Investigation.   The Buyer has conducted its own independent investigation, review and analysis of the Company and the Interests.  The Buyer acknowledges and agrees that: (a) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, it has relied solely upon its own investigation, the contents of the data room in which the Selling Parties were providing information to the Buyer and its representatives (except for (i) information or documents containing any projections, forward looking statements, budgets, or pro forma information and (ii) documents in the data room that have been redacted or provided in limited form) and the express representations and warranties (including the schedules associated therewith) of the Selling Members and the Company set forth in this Agreement, and in any documents, certificates or other items delivered by the Selling Members or the Company in connection with the Closing; and (b) neither the Company, the Selling Members nor any other Person has made any representation or warranty as to the Company or the Interests, except as expressly set forth in this Agreement, and in any documents, certificates or other items delivered by the Selling Members or the Company in connection with the Closing.


ARTICLE 6

CERTAIN COVENANTS AND AGREEMENTS OF THE, SELLING MEMBERS AND BUYER

Section 6.1    Expenses and Finder's Fees.  Except as provided in **Sections 3.27 and 5.5** concerning brokers and finders' fees and in **Article 7** and except for the Transaction Expenses, whether or not the Closing is consummated, all costs and expenses incurred in connection with this Agreement and the transactions contemplated by this Agreement shall be paid by the Party incurring such expense; provided, however, any legal or other professional fees incurred by the Company related to or arising from the transactions contemplated by this Agreement, including the negotiation and drafting of this Agreement, that remain outstanding as of the Closing Date shall be the responsibility of the Selling Members.

Section 6.2    Public Announcements.  The Parties agree that no public release, announcement or any other disclosure to the public concerning any of the transactions contemplated hereby shall be made or issued by any Party without the prior written consent of Buyer and the Selling Member Representative (which consent of either party shall not be unreasonably withheld, conditioned or delayed), except to the extent such release, announcement

{00863216.DOCX;2 }

AWNK003137

or disclosure may be required by applicable law or regulation (including the regulations relating to exchanges upon which the shares of Buyer or its Affiliates are listed or traded), in which case the Party required to make the release, announcement or disclosure shall allow Buyer or the Selling Member Representative, as the case may be, reasonable time to comment on such release, announcement or disclosure in advance of such issuance or disclosure.

Section 6.3    Tax Matters.    The following provisions shall govern certain Tax matters:

(a)    Straddle Period. In the case of any Tax period that includes (but does not end on) the Closing Date (a "**Straddle Period**"), the amount of any Taxes based on or measured by income, receipts, sales or payroll of the Company which relate to the Pre-Closing Tax Period shall be determined based on an interim closing of the books as of the close of business on the Closing Date (and for such purpose, the taxable period of any partnership or other pass-through entity in which the Company holds a beneficial interest shall be deemed to terminate at such time); provided, however, that any Taxes attributable to transactions outside the ordinary course of business after the Closing Date shall relate to the portion of the Straddle Period beginning after the Closing Date and the amount of Taxes of the Company not based on or measured by income, receipts, sales or payroll of the Company for a Straddle Period which relate to the Pre-Closing Tax Period shall be deemed to be the amount of such Tax for the entire taxable period multiplied by a fraction, the numerator of which is the number of days in the taxable period ending on the Closing Date and the denominator of which is the number of days in such Straddle Period.

(b)    Certain Taxes and Fees. All transfer, documentary, sales, use, stamp, registration and other such Taxes, and all conveyance fees, recording charges and other fees and charges (including any penalties and interest) incurred in connection with consummation of the transactions contemplated by this Agreement shall be paid by the Selling Members when due, and each Selling Member will, at its own expense, file all necessary Tax Returns and other documentation with respect to all such Taxes, fees and charges, and, if required by applicable law, Buyer will, and will cause the Company and its Affiliates to join in the execution of any such Tax Returns or other documentation.

(c)    Cooperation on Tax Matters. Buyer, the Company, and the Selling Members shall cooperate fully, as and to the extent reasonably requested by any other Party, in connection with the filing of Tax Returns and any audit, litigation, refund claim or other Proceeding with respect to Taxes. Such cooperation shall include the retention and (upon any other Party's request) the provision of records and information which are reasonably relevant to any such filing, audit, litigation, refund claim or other Proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder. The Company and the Selling Members agree to retain all books and records with respect to Tax matters pertinent to the Company relating to any taxable period beginning before the Effective Date until the expiration of the statute of limitation (and, to the extent notified by Buyer or the Selling Members, any extensions thereof) of the respective taxable periods, and to abide by all record retention agreements entered into with any Tax authority.

(d)    Pre-Closing Tax Periods. The Selling Member Representative shall prepare or cause to be prepared and timely file or cause to be timely filed all Tax Returns for the

{00863216.DOCX;2 }

AWNK003138

Company for all periods ending on or prior to the Effective Date that are filed after the Closing Date. All such returns shall be correct and complete in all material respects and prepared in accordance with applicable Law. The Selling Member Representative shall permit Buyer to review and comment on each such Tax Return at least thirty (30) days prior to filing. The Selling Member Representative shall make such revisions to such Tax Returns as are reasonably requested by the Buyer.  To the extent permitted by applicable Law, each Selling Member shall include any income, gain, loss, deduction or other tax items for such period on its Tax Returns in a manner consistent with the Schedule K-ls prepared or caused to be prepared by the Selling Member Representative for such periods.  Buyer shall prepare (or cause to be prepared) and file (or cause to be filed) each other Tax Return required to be filed by the Company after the Closing Date for a taxable period beginning on or before the Closing Date (each a "**Buyer Prepared Return**").  Each Buyer Prepared Return (A) shall be prepared in a manner consistent with the prior practice of the Company unless otherwise required by applicable Law, (B)  shall be provided to the Selling Member Representative for review and comment at least thirty (30) days before the due date for filing such Buyer Prepared Return, and (C) the Selling Member Representative shall have the right to review and comment on each such Buyer Prepared Return before filing.  Buyer shall make such revisions to any Buyer Prepared Returns as are reasonably requested by the Selling Member Representative.

(e)    Accrual Basis. The Sellers shall use their reasonable best efforts to cause the Tax Returns for all taxable periods commencing on or after January 1, 2016 to be prepared on an accrual basis and not on a cash basis.

(f)    Tax Contests.  The Company shall promptly notify the Selling Member Representative in writing upon receipt by the Company or any of its Affiliates of a written notice of any pending or threatened action with respect to Taxes for which any of the Selling Members may have liability pursuant to this Agreement or otherwise, provided, however, that no failure or delay by the Company to provide such notice shall reduce or otherwise affect the obligation of the Selling Members hereunder, except to the extent that they are actually prejudiced thereby.  After the Closing Date, except as set forth in this **Section 6.3(f)**, the Company shall control the conduct, through counsel of its own choosing, of any audit, claim for refund, or administrative or judicial proceeding involving any asserted Tax liability or refund with respect to the Company (each a "**Tax Contest**").  In the case of a Tax Contest after the Closing Date that relates solely to Pre-Closing Tax Periods, the Selling Member Representative may elect to control the conduct of such Tax Contest, but the Company shall have the right to participate in such Tax Contest at its own expense and the Selling Member Representative shall not settle or otherwise resolve such Tax Contest without the prior written permission of the Buyer, which consent shall not be unreasonably withheld, delayed, or conditioned; provided that, if the Selling Member Representative fails to assume control of the conduct of any such Tax Contest within thirty (30) days following the receipt by the Selling Member Representative of notice of such Tax Contest from the Company, then the Company shall have the right to assume control of such Tax Contest. In the case of any Tax Contest relating to any Pre-Closing Tax Period that is not controlled by the Selling Member Representative pursuant to this **Section 6.3(f)**, (i) the Selling Member Representative shall have the right to participate in such Tax Contest at its own expense and (ii) the Company shall not settle or otherwise resolve such Tax Contest without the prior written permission of the Selling Member Representative, which consent shall not be unreasonably withheld, delayed, or conditioned.  The provisions of this **Section 6.3(f)**, rather than those of **Section 7.1(e)**, shall apply in the case of any Tax Contest.

{00863216.DOCX;2 }

34

(g)    <u>Buyer Tax Acts.</u>  Following the Closing Date, neither Buyer, nor the Company nor any Affiliate thereof may (i) file, amend or modify a Tax Return of the Company for any taxable period ending on or before the Closing Date, except in accordance with **Section 6.3(d)**, (ii) take any action that would extend the applicable statute of limitations for any Taxes or Tax Return of the Company for any taxable periods ending on or before the Closing Date, (iii) file, amend or revoke any Tax election on behalf of the Company for any taxable periods ending on or before the Closing Date, (iv) surrender any right to claim a refund of Taxes relating to the Company relating to any taxable periods ending on or before the Closing Date, or (v) make a voluntary disclosure to a Governmental Entity with respect to any Tax or Tax Returns of the Company for any taxable periods ending on or before the Closing Date, in each case, without the prior written consent of the Selling Member Representative.

(h)    <u>Tax Refunds</u>.  All refunds of Taxes of the Company for any Pre-Closing Tax Period (including any portion of a Straddle Period ending on the Closing Date as determined in accordance with the same principles provided for in **Section 6.3(a)**), whether in the form of cash received or a credit against Taxes otherwise payable, shall be the property of the Selling Members and all other refunds shall be the property of the Buyer.  To the extent that Buyer, the Company, or any of their Affiliates receives a refund after the Closing Date that is the property of the Selling Members, Buyer shall pay to the Selling Member Representative for distribution to the Selling Members the amount of such refund (and any interest received from the Governmental Entity with respect to such refund).  The amount due to the Selling Members shall be payable twenty (20) days after receipt of the refund from the applicable Governmental Entity (or, if the refund is in the form of direct credit, twenty (20) days after the filing of the Tax Return claiming the benefit of such credit).  Buyer shall, and shall cause its Affiliates, to take all actions necessary, or reasonably requested by the Selling Member Representative, to timely claim any refunds that will give rise to a payment under this **Section 6.3(h)**.

(i)    <u>Allocation of Purchase Price</u>.  The Parties agree to treat for U.S. federal, state and local income tax purposes the purchase and sale of the Interests pursuant to this Agreement in a manner consistent with Revenue Ruling 99-6, situation #2.  For purposes of determining (i) Buyer's initial Tax basis in the assets of the Company immediately following the Closing and (ii) the portion of the gain or loss recognized by the Selling Members upon the sale of the Interests pursuant to this Agreement that is attributable to the Company's "unrealized receivables" and "inventory items" (as such terms are defined in Section 751 of the Code), Buyer and each of the Selling Members agree to file all Tax Returns in accordance with the Purchase Price Allocation (as hereinafter defined).  Any adjustments to the Purchase Price pursuant to this Agreement shall result in an adjustment to the Purchase Price Allocation to reflect the proportionate change amongst those classes of assets (or assets that correspond to the liabilities), including goodwill, that caused the adjustment to the Purchase Price.  The Parties shall cooperate in the preparation of a schedule allocating the Purchase Price (along with any liabilities of the Company that are not corporations) to the assets of the Company that are not corporations (the **"Purchase Price Allocation"**).  Buyer shall file, in accordance with Section 1060 of the Code, a Form 8594 reflecting the Purchase Price Allocation.  The Parties shall report, act and file Tax Returns (including Internal Revenue Service Form 8594) in all respects and for all purposes consistent with the Purchase Price Allocation.  The Parties shall, as applicable, timely and properly prepare, execute, file and deliver all such documents, forms and other information as the other Parties may reasonably request to prepare in connection with the Purchase Price Allocation.  If,

{00863216.DOCX;2 }

35

AWNK003140

however, the Parties are unable to complete such Purchase Price Allocation within one hundred twenty (120) days following the Closing Date, or such later date as agreed to by the Parties, then Buyer shall file IRS Form(s) 8594 and the Parties shall each file any other federal, state and local income Tax Returns, allocating the Purchase Price (and any liabilities of the Company) in the manner each believes is appropriate. The Parties shall promptly advise one another of the existence of any Tax audit, controversy or litigation related to any allocation hereunder. None of the Parties shall take any position (whether on any Tax Returns, in any Tax Contest or Proceeding or otherwise) that is inconsistent with this **Section 6.3(i)** unless required to do so by Law. Notwithstanding the foregoing, the Parties agree that (i) the amount allocated to any assets of the Company that is not a corporation that were subject to depreciation or amortization by the Company for income Tax purposes shall be equal to such the Company's adjusted tax basis in such assets for federal income tax purposes as of the Closing Date, and (ii) the amount allocable to the Company's accounts receivable shall equal the amount paid to the Selling Member Representative with respect thereto pursuant to **Section 1.5(f)**.

(j)     <u>Transaction Tax Items.</u>  The Parties agree that, to the fullest extent allowable by applicable Laws, all Transaction Tax Items shall be treated (but solely for Tax purposes) as liabilities of the Selling Members that are being assumed by Buyer and, accordingly, any federal, state or local income Tax deductions arising from any payment of such Transaction Tax Items, including any deductions relating to unamortized deferred financing fees relating to any Indebtedness, shall be claimed by the Selling Members, rather than by Buyer. Neither Buyer, nor the Company (for any period following the Closing Date) nor any Affiliates thereof shall claim any income Tax deduction for any payments made in connection with any Transaction Tax Items on any Tax Return or take any position on any Tax Return or otherwise that is inconsistent with the Selling Members claiming all available income Tax deductions with respect to the payment of any Transaction Tax Items in computing their federal, state and local income Tax liabilities.

Section 6.4     <u>Non-Competition, Non-Solicitation and Non-Disclosure.</u>

(a)     <u>Non-Competition, Non-Solicitation.</u>  Subject to the last paragraph of Section 5 of any applicable Employment Agreements, each Selling Member agrees that it shall not, and it shall take all commercially reasonable efforts to cause its Affiliates to not, whether or not for compensation, directly or indirectly, individually or as an officer, director, shareholder, member, manager, trustee, employee, consultant, advisor, partner, proprietor or otherwise, for a period commencing on the Effective Date and ending thirty-six (36) months after the Effective Date (the "**Restricted Period**"): (i) other than with respect to employment or other similar arrangement with the Company, participate or engage in or provide any services to, or have any direct or indirect interest in, any business whose operations, in whole or in part, are the same as, similar to or are in competition with any of the business operations carried on by the Company during their employment by the Company or that the Company contemplated (and which such Selling Member should have known that the Company was contemplating) carrying on at the time of the termination of her employment by the Company in New York, New Jersey, Pennsylvania, or Connecticut; <u>provided</u>, <u>however</u>, that nothing in this Agreement shall preclude such Selling Member from purchasing or owning up to five percent (5%) of the outstanding capital stock of any company which has a class of securities registered under Section 12 of the Securities Act of 1934, as amended, or trading on a national securities exchange or quoted in an over-the-counter market; (ii) encourage, solicit, or induce, or in any manner attempt to encourage, solicit, or induce,

AWNK003141

any person or entity employed by, or providing consulting services to, the Company, the Buyer and/or the Buyer's parent and subsidiaries' key employees or key consultants, to terminate such person's or entity's employment or services (or in the case of a consultant, materially reduce such services) with the Company, the Buyer and/or the Buyer's parent and subsidiaries; (iii) hire any person or entity who was employed by the Company, the Buyer and/or the Buyer's parent and subsidiaries' key employees or key consultants within the six (6) month period prior to the date on which such Selling Member ceases to be an employee of the Company; or (iv) encourage, solicit or induce, or in any manner attempt to encourage, solicit or induce, any client, account, customer or licensee of the Company and/or the Buyer or any other Person with whom the Company and/or the Buyer has a business relationship to cease doing business with or reduce the amount of business conducted with the Company and/or the Buyer, or in any way interfere with the relationship between any such client, account, customer, licensee or business relation with the Company and/or the Buyer. For the avoidance of doubt a key employee or key consultant is any person or company who is compensated more than $100,000 a year or who has a title of Vice President or above or, if a consultant, is providing similar services to a person who has a title of Vice President or above. The Selling Members shall be entitled to rely on the representations of any person or entity with respect to their title and compensation and whether or not they worked for the Buyer's parent or subsidiaries.

(b)    Non-Disclosure. Each Selling Member agrees that it shall not, and it shall take all efforts to cause its Affiliates to not, use for itself or others, or publish, disclose or otherwise reveal or divulge, any Confidential Information (as such term is defined below); provided, that subsequent to the fifth anniversary of the Effective Date, such restriction shall apply only if such use or disclosure is materially adverse to the Company. Each Selling Member shall, and shall take all commercially reasonable efforts to cause its Affiliates to, (1) maintain all Confidential Information in the strictest confidence and keep the same secret using at least the same degree of care as it uses for its own confidential information, (2) retain all Confidential Information in trust in a fiduciary capacity for the sole and absolute benefit of the Company, and (3) refrain from using or allowing to be used any Confidential Information for its own benefit or for the benefit of any third party, provided, however, that in the event disclosure of Confidential Information is requested of a Selling Member (i) by a Governmental Authority under color of law or applicable regulation, (ii) pursuant to subpoena or other compulsory process, or (iii) otherwise as may be required by law, such Selling Member to the extent lawfully possible will give the Company prompt prior written notice, which, to the extent possible, shall be at least five (5) days, before its disclosure and will provide the Company with copies of any responsive materials. For purposes of this Agreement, "**Confidential Information**" shall mean non-public information concerning the financial data, strategic business plans, product development (or other proprietary product data), customer lists, customer information, costs, pricing, materials, supplies, vendors, products, services, information relating to governmental relations, discoveries, practices, processes, methods, marketing plans, Intellectual Property and other material non-public, proprietary and confidential information of the Company or relating to the Business, that, in any case, is not otherwise generally available to the public and has not been disclosed by the Company to others not subject to confidentiality agreements. Confidential information does not include information that (i) becomes known to a Selling Member from a source other than the Company or Affiliate thereof; provided, that, such source has not entered into a confidentiality agreement with the Company or Affiliate thereof with respect to such information or obtained the information from an entity or person who is a party to a confidentiality agreement with the Company with

{00863216.DOCX;2 }

Case 8-20-08049-ast    Doc 55-5    Filed 01/18/23    Entered 01/18/23 20:31:58
Case 2:25-cv-02032-RPK    Document 5-1    Filed 05/12/25    Page 79 of 79 PageID #: 361

AWNK003142

respect to such information, (ii) is proven by competent evidence by a Selling Member that it was independently conceived or discovered by such Selling Member without reference to or use of the Confidential Information, or (iii) has become publicly known and made generally available through no wrongful act of a Selling Member.

      (c)    Enforcement. If any Selling Member commits a breach, or threatens to commit a breach, of any of the provisions of **Section 6.4(a)-(b),** (such person committing or threatening to commit a breach, the "**Breaching Party**"), then the Company shall have the right and remedy to have such provisions of this Section specifically enforced by any court having equity jurisdiction, it being acknowledged and agreed that any such breach or threatened breach will cause irreparable injury to the Company and that money damages will not provide an adequate remedy at law; and in connection therewith the right to seek, without notice to such Breaching Party and without the need to post any bond, a temporary restraining order, an injunction and any other equitable relief. Such right of injunctive relief shall be cumulative only in addition to the right of the Company to recover from such Breaching Party the liquidated damages as set forth in **Section 6.4(d)** below.

      (d)    Severability. The provisions of this **Section** are severable, and if any provision or any part of any provision of this **Section** is found to be invalid or unenforceable, the balance of that provision and the other provisions hereof shall be given full force and effect and remain fully valid and enforceable.

      (e)    Blue-Penciling. If any one, or any part, of the covenants contained in this **Section 6.4** is held to be unenforceable because of the duration of such provision or the area covered thereby, the parties agree that the court making such determination shall have the power to reduce the duration and/or area of such provision and, in its reduced form, said provision shall then be enforceable.

      (f)    Venue. The parties hereto intend to and hereby confer jurisdiction to enforce the covenants contained in this **Section 6.4** upon the courts of any state or other jurisdiction within the geographical scope of such covenants. In the event that the courts of any one or more of such states or other jurisdictions shall hold such covenants wholly unenforceable by reason of the breadth of such scope or otherwise, it is the intention of the parties hereto that such determination not bar or in any way affect in the courts of any other states or other jurisdictions within the geographical scope of such covenants the right of the Company or the right of the Selling Members, as applicable, to the relief for breaches of such covenants in such other states, the above covenants as they relate.

      Section 6.5    Expense Accounts. Except as expressly consented to by Buyer in writing, the Company shall cause all of its managers, directors, officers, employees and consultants to submit all claims for Reimbursable Expenses incurred prior to the Closing to be submitted to the Company prior to the Closing and shall cause all travel, entertainment and other Reimbursable Expenses incurred by their managers, directors, officers, employees and consultants that the Company is obligated to reimburse or that the Company has in the past typically reimbursed to be reimbursed prior to the Closing.

{00863216.DOCX;2 }