Case 2:25-cv-02038-RPK    Document 5-13    Filed 05/12/25    Page 1 of 112 PageID #: 1548

# HEALTH NETWORK MANAGEMENT SOLUTION

*Product Description*

**This document provides a detailed description of the AllRad Direct's Health Network Management Solution including usage examples and screen shots of actual product functionality.**

# Health Network Management Solution

# Table of Contents

Introduction ........................................................................................................................ 2

Product Overview ............................................................................................................... 2

Functionality ...................................................................................................................... 3

    Scheduling Referrals ...................................................................................................... 3

    Information Management and Reporting........................................................................ 4

    Product Management Functionality ............................................................................... 5

Technology and Architecture .............................................................................................. 5

    Compliance and Security ............................................................................................... 6

    Application ..................................................................................................................... 7

    Network ........................................................................................................................ 7

    Database ....................................................................................................................... 7

Benefits .............................................................................................................................. 8

    Providers ....................................................................................................................... 8

    Patients ......................................................................................................................... 8

    Payers............................................................................................................................ 8

Usage Example .................................................................................................................... 10

    PCP One Healthcare Network ......................................................................................... 10

Summary ............................................................................................................................. 11

1447

# Health Network Management Solution

## Introduction

The Healthcare Industry is changing at an astounding rate.  The days of fee for service appear to be rapidly becoming a thing of the past and value based reimbursement models are rapidly evolving as the future of revenue generation.  The new focus on capitation based revenue models demands creative new technology solutions that are able to track, monitor, and integrate all patient encounters and clinical outcomes in the totality of the healthcare environment.  Performing a diagnosis and prescribing a treatment plan are no longer sufficient for providers to receive full remuneration.  Providers are now being required to follow-up and proactively intervene throughout the entire treatment program, until the patient issue has been fully remediated.

CMS is mandating these changes to how providers are reimbursed, however it is clear that private carriers are well on the way to initiating similar value based population wellness models.  Existing billing, PM, and EMR systems alone are not adequate to provide the necessary metrics and connectivity required to deliver the quality of healthcare envisioned by these new revenue models.  A new and more open and connected solution is required.

## Product Overview

AllRad Direct, AllRad, understands the changing needs of the healthcare community and we have developed a technology solution that delivers a connected clinical network which meets the emerging needs for patient tracking, monitoring, and scheduling.  Our solution enables you to manage the welfare of your patients by connecting you to a network of providers (hospitals, labs, pharmacies, physical therapists, specialists, long term care facilities, etc.) allowing you to view and manage the continuity and coordination of care for your patients.  Our solution can be seamlessly integrated with payer systems and provider's PM and EMR systems through easy to configure application programming interfaces API's.  We have also included API's for extending functionality as new requirements are identified.

The AllRad solution provides state of the art technology to ensure that patients, providers, and payers have complete access and insight into every aspect of the diagnosis, treatment, and follow-up for each patient.  The data base has been designed to facilitate population wellness management solutions of the future by consolidating and storing clinical assessments, diagnostic laboratory and imaging results, prescribed treatment regimens and care plans and their clinical outcomes for each patient.

Provider profitability will be based on their success in delivering high-quality and effective care to their patients. Providers already realize that it is a financial necessity to be able to improve patient outcomes and healthcare experiences.  Fortunately, AllRad Health Network Management Solution has been designed with this objective in mind.

In addition to our comprehensive connectivity with a wide range of ancillary healthcare providers and payers our solution provides secure online portals for patients, providers, and payers along with

### Health Network Management Solution

management dashboards for providers and patients.  Our portals facilitate patient payments, status and historical reporting, and every type of scheduling and referral transaction.

Figure 1. Product Overview:



## Functionality

AllRad's Health Network Management Solution delivers the tools that are required to help providers transition to the emerging population wellness revenue models which are being mandated by HCFA/CMS and an increasing number of private payers.  While Accountable Care Organizations (ACO) and Revenue Cycle Management (RCM) Companies are the primary target markets for this product medical groups and primary care physicians (PCP) can also greatly benefit from owning AllRad's Solution.

## Scheduling Referrals

Our solution has comprehensive scheduling functionality.  The entire scheduling process is automated and facilitated with elaborate workflow management tools and user portals and dashboards.

Referrals can be entered manually by the referring physician's administrative team through the provider portal or via Fax or e-mail.  If the referring provider has the capability, our system can accept automated requests from their PM or EHR systems via EDI, secure FTP, or HL7 interface.

The system automatically calls the patient and notifies them of the need to schedule an appointment. Patients may elect to accept the first available appointment, or request to be included in the scheduling call with the referred facility/service.  Where acceptable, the system will schedule an appointment;

1449

## Health Network Management Solution

notify the patient and the referring provider, and mark the request as scheduled.  The patient is also able to indicate their location and equipment preference.

The system has a scheduler portal and dashboard with work queues and alert mechanisms to ensure that all referral requests are scheduled in a timely manner, patients are notified, and any required pre-authorizations, demographics, or clinical documentation is complete and provided to the referred facility/service.

The system also manages the tracking, monitoring, and billing for each scheduled patient encounter.  In addition to the request work queue the system provides follow-up queues for identifying patient no-shows that require re-schedule, completed appointments that require follow-up for results, and billing and billing follow-up queues.  These queues are all equipped with customizable alerts to ensure that patients keep their appointments, referring providers receive all the requested clinical documentation requested from the referred facility/service, and that billing is done quickly, efficiently, and accurately. The automated workflow along with the built-in automation ensures that ACO's, Billers, and Private Practices are able to manage the entire referral process in the most cost effective manner, while also collecting the data necessary to meet value based reporting needs for utilization management and review to ensure that they are profitable and that their patients receive the highest quality care at the lowest possible cost.

The built in workflow includes an automated quality assurance and audit process that ensures data integrity, accuracy, and completeness, user efficiency, and system and process compliance.  The system provides enhanced transparency to the entire process by providing the capability for schedulers, providers, and payers to add annotations to each patient record.  In the event that a patient is called and does not answer the phone; the scheduler is able to quickly note that a call was made and a message left on the answering machine simply by selecting the appropriate annotation message on the patient status screen.

## Information Management and Reporting

Information management and reporting are crucial components to any health network management solution.  AllRad delivers industry leading capabilities for information management and case reporting required for value based revenue models.  Our solution provides complete data for all of the following areas:

- ❑ Referring Provider data,
- ❑ Patient demographic, insurance, and clinical data,
- ❑ Referred Facility/Service Provider data,
- ❑ Billing and Payment Data,
- ❑ Clinical Data from Referred Facility/Service,
- ❑ Patient Employer data, and
- ❑ Agreements between referring and referred facilities.

# Health Network Management Solution

These extensive data resources are utilized by our reporting engine to deliver a rich variety of customizable reports and the capability to generate ad-hoc and analytical reports.  In addition to the reporting provided by the system payers, providers, and patients can access the real-time information on any patient, request, or billing based on our strict security and access requirements.

Our system produces utilization reports to support value based revenue systems.  Providers use our reporting capability to ensure that they have received the maximum revenue for their services and the quality of the care they are providing.

## Product Management Functionality

In addition to the robust scheduling, reporting, billing, and quality control functionality the AllRad system provides tools to the technical and administrative teams to ensure that the system is finely tuned and delivers world class performance.  The technical tool kit that is delivered with the system enables your technical team to optimize the network and data bases, manage security and access control, and balance the application over multiple servers.  The administrative tool kit allows you to quickly modify the wording of alerts and annotation messages.  Portals, dashboards, and portions of user screens are able to be modified to meet changing business conditions.

## Technology and Architecture

The AllRad Health Network Management Solution uses state of the art technology to deliver industry leading innovation for ACO's and Healthcare Practices.  The Microsoft based technology enables easy integration with most PM, RCM, and EHR solutions being used today.  Figure 2 below provides an overview of the basic architecture of our solution.

1451

### Health Network Management Solution

Figure 2.



### Compliance and Security

The Health Network Management solution is a fully compliant healthcare application that protects patient, provider, and payer information using a sophisticated and proprietary security system. Providers and Payers are able to access only the data that they are authorized to view. Strict system controls prevent individual users from updating or viewing data without the proper advance clearance from the system. The access control and system security manual outlines best practices for keeping the security current and fully compliant. Audits are performed annually on the latest releases of our software by independent third parties to ensure that the product remains fully compliant and addresses any changes in compliance regulations from the federal or state governments or commercial providers.

Encryption of messages containing clinical or patient data is an important feature of our product. The automated encryption of all communication with data requiring encryption ensures that organizations using our solution will always remain compliant with data encryption requirements.

Our team of professional technicians will work with users of our Health Network Management Solution to install intrusion detection safe guards on all application components to ensure that potential attacks on the system are thwarted before they can even access the system or data.

# Health Network Management Solution

## Application

All of the applications in this system are written in C# in the .NET 4.5 environment.  The applications have been designed to support customization and add-ons by providing Application Programming Interfaces (API) in areas where our clients have expressed interest in attaching third party products or proprietary solutions.  For example there is an API to validate addresses, if you wish to add another layer of quality assurance by utilizing a commercial solution to ensure that the patient demographic data is correct.

## Network

Our solution has been designed to operate seamlessly with many products in use today in the Healthcare industry.  PM, EHR, and RCM systems can all be interfaced with our health network management solution through the use of HL7 interfaces.  We also communicate with these systems using a secure File Transfer Protocol (FTP) in case the 3rd party systems do not support HL7 interfaces.  Electronic Data Interchange (EDI) is also an available option for system owners who wish to enhance the automation of their overall systems and processes.

## Database

The AllRad system utilizes the SQL Server database for all data storage.  The SQL Server database solution is the industry leader for healthcare applications.  There are many tools available to make owning and maintaining these types of databases cost effective.  There are many data recovery and disaster recovery options available for this database system.

1453

**Health Network Management Solution**

## Benefits

The major benefit of using this system is the ease of managing, and billing referral requests; however AllRad believes that with the advent of value based revenue models, this system will be a critical success factor for all PCPs and ACOs as they try to provide their utilization reporting and measure the quality of their services.  This system will also be the basis for measuring the overall health of patient populations.

The following benefits are delivered to the various groups using the system; providers, patients, and payers.

### Providers

Providers using the system will be able to meet CMS requirements for Utilization Management and Utilization Review.  They will also receive productivity improvements in their offices.

- ❑ Automate, streamline, and dramatically reduce the cost of managing scheduling and referrals for the following
  - o Specialists,
  - o Lab and Imaging orders,
  - o SNF, Long Term Care, and Hospitals,
  - o Prescriptions, and
  - o Physical Therapy
- ❑ Support reporting for population health management
- ❑ Enhance the quality and effectiveness of patient care and deliver documented improvements for treatment outcomes through coordination of references and results at the point of care.

### Patients

This system also provides benefits to the patients of providers who utilize this system.  While the biggest benefit is the convenience this system delivers, the list below provides details on the specific benefits.

- ❑ Simplifies and Automates scheduling of referred services for patients
- ❑ Ensures that patients do not neglect to follow prescribed treatment or diagnosis procedures in a timely manner
- ❑ Reduces risk of complications or failure of treatment or diagnosis
- ❑ Simplifies and expedites the payment process, eliminating the laborious and redundant paperwork submission process.

### Payers

Although this system is not designed to meet specific payer needs, it does provide benefits to payers because of the improved operational performance on the part of the provider's billing staff or BPO.  The improved accuracy and completeness of clinical documentation is the largest benefit; however the following benefits often accrue to payers also.

- ❑ Reduced re-work due to missing or inaccurate demographic data or clinical documentation
- ❑ Reduced cost of operations

## Health Network Management Solution

❑ Expedited claims processing
❑ Enables value based wellness data audits
❑ Improved cost management for the population care through network utilization

**Health Network Management Solution**

## Usage Example

The example of system usage described below is a hypothetical scenario based on the experience of current system users.

## PCP One Healthcare Network

Patient P came to Dr. D, a primary care physician, working in the PCP One Healthcare Network (PCP-1). PCP-1 is a medical practice which belongs to an ACO that uses the AllRad Health Network Management Solution.

Patient P has several symptoms that lead Dr. D to suspect that P may have a cardio pulmonary condition. Dr. D orders that P go to a hospital and have a stress test and several blood tests. He also asks P to return for further diagnosis when the results of the tests are complete.

Dr. D enters the test requests into his EHR system and at the end of the day they are automatically input into the AllRad solution at the ACO office. The ACO call center staff uses the AllRad solution next morning to automatically notify P that they need to schedule an appointment with the hospital for the blood work and the stress test. When P is contacted, the call center makes the appointments with the hospital that P requests at a time that is convenient to P. The system notifies Dr. D and P of the appointment times and confirms with the hospital that P has accepted the appointments. The system then automatically checks to see if P needs to have these tests pre-authorized based on the data that was provided by Dr. D's EHR system.

P forgets to go to his appointment so the system issues an alert that P did not show up for his appointments at the hospital, which the system knew because it did not receive confirmation from the hospital that P kept the appointment. The alert goes to both P and Dr. D along with the ACO scheduling staff. The staff contacts P and reschedules the appointments for the tests.

This time P makes his appointments and the hospital sends the test results to the system, again as an automated feed from their EHR system. The test results are stored with P's patient data and also automatically forwarded to Dr. D.

The ACO billing staff sends out bills to P's insurance carrier for the tests and when they receive payments they pay the Hospital. Any residual is automatically billed to P.

The data from all of these interactions is used for financial reporting and also to support the requirements for value based payments or penalties.

**Health Network Management Solution**

## Summary

 The AllRad Health Network Management Solution is poised to be the industry standard platform for the new network based value based wellness management healthcare business model.  With state of the art technology, and functionality that meets the current and known future needs of Health Network Management defined by HCFA/CMS, AllRad's solution delivers a secure, compliant, versatile, and dynamic platform to ensure providers maximize revenues, minimize costs, and deliver the highest quality patient care in the new population wellness management environment.  By providing customized portals and dashboards for providers, patients, and payers in a cloud based environment the AllRad solution simplifies, automates, and reduces the cost of scheduling, monitoring, tracking, and reporting on the complex network of ancillary services involved in the diagnosis and treatment of patient healthcare issues.

Most importantly, the AllRad solution has been designed to meet both known and unknown future requirements driven by a population wellness management business model.  The solution is easily scalable to meet the needs of rapidly growing IPA's and ACO's.  It is fully compliant and secure with intrusion detection, access control, and encryption as integral design features of the solution. Innovative API's are available to ensure seamless integration with current PM and EMR systems and Business Intelligence Systems that will deliver the reporting and metrics necessary to meet the requirements from HCFA/CMS and private payers going forward.

# EXHIBIT D

**ALLRAD DIRECT**
*a radiology network*

# Health Network Management Solution

Innovation in Healthcare Networking

# Presentation Contents

- Introduction
- Solution Overview
- Solution Capabilities and Benefits
  - Healthcare Provider
  - Payer
  - Patient
- Technical Overview
- Summary

# Introduction

- The Healthcare Industry is changing at an astounding rate.  The days of fee for service appear to be rapidly becoming a thing of the past and value based reimbursement models are rapidly evolving as the future of revenue generation.  The new focus on capitation based revenue models demands creative new technology solutions that are able to track, monitor, and integrate all patient encounters and clinical outcomes in the totality of the healthcare environment.  Performing a diagnosis and prescribing a treatment plan are no longer sufficient for providers to receive full remuneration.  Providers are now being required to follow-up and proactively intervene throughout the entire treatment program, until the patient issue has been fully remediated.

- CMS is mandating these changes to how providers are reimbursed, however it is clear that private carriers are well on the way to initiating similar value based population wellness models.  Existing billing, PM, and EMR systems alone are not adequate to provide the necessary metrics and connectivity required to deliver the quality of healthcare envisioned by these new revenue models.  A new and more open and connected solution is required.

# Solution Overview

- AllRad Direct (AllRad) understands the changing needs of the healthcare community and we have developed a technology solution that delivers a connected clinical network which meets the emerging needs for patient tracking, monitoring, and scheduling.  Our solution enables you to manage the welfare of your patients by connecting you to a network of providers (hospitals, labs, pharmacies, physical therapists, specialists, long term care facilities, etc.) allowing you to view and manage the continuity and coordination of care for your patients.  Our solution can be seamlessly integrated with payer systems and provider's PM and EMR systems through easy to configure application programming interfaces API's.  We have also included API's for extending functionality as new requirements are identified.

- The AllRad solution provides state of the art technology to ensure that patients, providers, and payers have complete access and insight into every aspect of the diagnosis, treatment, and follow-up for each patient.  The data base has been designed to facilitate population wellness management solutions of the future by consolidating and storing clinical assessments, diagnostic laboratory and imaging results, prescribed treatment regimens and care plans and their clinical outcomes for each patient.

- Provider profitability will be based on their success in delivering high-quality and effective care to their patients. Providers already realize that it is a financial necessity to be able to improve patient outcomes and healthcare experiences.  Fortunately, AllRad Health Network Management Solution has been designed with this objective in mind.

- In addition to our comprehensive connectivity with a wide range of ancillary healthcare providers and payers our solution provides secure online portals for patients, providers, and payers along with management dashboards for providers and patients.  Our portals facilitate patient payments, status and historical reporting, and every type of scheduling and referral transaction.

# Solution Overview - Continued

AllRad's Health Network Management Solution delivers the following critical capabilities to network participants.

- o Referrals
    - o Specialists
    - o Imaging and Labs
    - o Hospitals, Surgery Centers, and Long Term Care Facilities
    - o Physical Therapy
    - o Pharmacies
- o Patient Scheduling and Pre-Authorization
- o Billing and Follow-up
    - o Insurance both primary and secondary
    - o HCFA and EOB features
- o Payer Management
    - o Contracts and Fee Schedules
    - o Claim Submission
    - o PPO management
- o Alerts and Notifications
    - o Patients
    - o Providers
- o Robust Reporting Capabilities

# Solution Overview - Continued



# Capabilities and Benefits - Provider

## **Capabilities**

❑ Automatically Schedule Referred Patients

❑ Pre-authorize patients prior to scheduling

❑ Provider Portal

- o Management and Status Reporting
- o Schedule Change Management
- o Payment Tracking and Reporting

❑ Data Collection and Storage

- o Patient Demographics
- o Patient Procedure and Clinical Documentation
- o Billing and Payment Processing and Reporting

# Capabilities and Benefits - Provider

## Benefits

- Automate, streamline, and dramatically reduce the cost of managing scheduling and referrals for the following
  - Specialists,
  - Lab and Imaging orders,
  - Prescriptions, and
  - Physical Therapy
- Support reporting for population health management
- Enhance the quality and effectiveness of patient care and deliver documented improvements for treatment outcomes through coordination of references and results at the point of care.

# Capabilities and Benefits - Patient

### Capabilities

- Automatically Schedules Patient Procedures
    - Contacts patients via fax, e-mail, mail, and phone
    - Enables patient call in and real time scheduling with provider
- Patient Portal
    - Medical History Request and Reporting
    - Payments and Payment Reporting
    - Appointment Request and Scheduling/Re-scheduling
    - Demographic Data and Insurance Coverage Maintenance
- Automated notifications and reminders of appointments
- Automated Alerts when schedules are changed

# Capabilities and Benefits - Payer

## Capabilities

- Gathers and Maintains Demographic Data
- Gathers and Consolidates Clinical Documentation
- Provides easy access to data for claims or value based wellness metrics
- Maintain PPO fee schedules and networks

## Benefits

- Reduces re-work due to missing or inaccurate demographic data or clinical documentation
- Reduces cost and expedites claims and value based wellness penalties audits
- Manage cost for the care by utilizing the network

# Technology Overview

The AllRad Health Network Management Solution is built on a Microsoft technology platform which delivers a highly versatile and dynamic architecture to ensure the highest levels of security, compliance, reliability, and performance.  The architecture is designed to be a cloud based SaaS solution to support any scalability, performance, and availability requirements.  The following are the key components of the architecture:

**Components**
- SQL Server
- .NET 4.5
- HL7 interfaces
- EDI and Secure FTP file transfer and communications
- Fully HIPAA compliant

# Technology Overview



**Practice Management Systems**

**Payer Systems**

**Security Layer**
- ❑ Intrusion Detection
- ❑ Access Control
- ❑ Encryption

**Network Architecture**
- ❑ HL7
- ❑ EDI
- ❑ Secure FTP

SQL Server

**Application Architecture**
- ❑ .NET 4.5
- ❑ C#
- ❑ API's

**Electronic Management Records**

**Patient, Provider, and Payer Portals**

1470

# Summary

The AllRad Health Network Management Solution is poised to be the industry standard platform for the new network based value based wellness management healthcare business model. With state of the art technology, and functionality that meets the current and known future needs of Health Network Management defined by HCFA/CMS, AllRad's solution delivers a secure, compliant, versatile, and dynamic platform to ensure providers maximize revenues, minimize costs, and deliver the highest quality patient care in the new population wellness management environment. By providing customized portals and dashboards for providers, patients, and payers in a cloud based environment the AllRad solution simplifies, automates, and reduces the cost of scheduling, monitoring, tracking, and reporting on the complex network of ancillary services involved in the diagnosis and treatment of patient healthcare issues.

Most importantly, the AllRad solution has been designed to meet both known and unknown future requirements driven by a population wellness management business model. The solution is easily scalable to meet the needs of rapidly growing IPA's and ACO's. It is fully compliant and secure with intrusion detection, access control, and encryption as integral design features of the solution. Innovative API's are available to ensure seamless integration with current PM and EMR systems and Business Intelligence Systems that will deliver the reporting and metrics necessary to meet the requirements from HCFA/CMS and private payers going forward.

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>ORION HEALTHCORP, INC. *et al.*,[1]<br><br>     Debtors. | Chapter 11<br><br>Case No. 18-71748 (AST) |
| HOWARD M. EHRENBERG, IN HIS CAPACITY AS LIQUIDATING TRUSTEE OF ORION HEALTHCORP, INC., ET AL.,<br><br>     Plaintiff,<br>v.<br><br>ARVIND WALIA; NIKNIM MANAGEMENT INC.,<br><br>     Defendants. | Adv. Proc. No. 20-08049 (AST) |

**DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, SUMMARY ADJUDICATION AS AGAINST DEFENDANTS ARVIND WALIA AND NIKNIM MANAGEMENT, INC.**

---

[1] The debtors in these chapter 11 cases are: Orion Healthcorp, Inc.; Constellation Healthcare Technologies, Inc.; NEMS Acquisition, LLC; Northeast Medical Solutions, LLC; NEMS West Virginia, LLC; Physicians Practice Plus Holdings, LLC; Physicians Practice Plus, LLC; Medical Billing Services, Inc.; Rand Medical Billing, Inc.; RMI Physician Services Corporation; Western Skies Practice Management, Inc.; Integrated Physician Solutions, Inc.; NYNM Acquisition, LLC; Northstar FHA, LLC; Northstar First Health, LLC; Vachette Business Services, Ltd.; Phoenix Health, LLC; MDRX Medical Billing, LLC; VEGA Medical Professionals, LLC; Allegiance Consulting Associates, LLC; Allegiance Billing & Consulting, LLC; and New York Network Management, LLC.

## TABLE OF CONTENTS

Summary of Argument.......................................................................................1, 2

Procedural Statement....................................................................................2

Statement of Facts..........................................................................................3

    The Transfers.............................................................................................3

    The Two Year Transfer..............................................................................3-6

    The One Year Transfers.............................................................................6-10

    Claims under the NYDCL...........................................................................10

    Judgment against Walia............................................................................10

Argument.......................................................................................................11

    Legal Standard..........................................................................................11

    Disputed Material Facts............................................................................11-14

Conclusion.....................................................................................................15

# TABLE OF AUTHORITIES

Pages

## Cases

*Adickes v. S.H. Kress & Co.*
    398 U.S. 144, 167, 90 S.Ct.1598, 26 L. ED. 2d 142 (1970)......................................................2, 11

*Anderson v. Liberty Lobby, Inc.*
 447 U.S. 242, 248, 105 S.Ct.2505, 91 L. Ed 2d 302 (1986)....................................................   2, 11

*Damianos Reality Group, LLC v. Francchia*
885 N.Y.S. 2d 270, 274  ( 2d Dept. 2006), N.Y. App. Div. Lexis 14542..........................................14

*First Bank of Americas v. Motor Funding*
257 A.D. 287, 294, ^90 N.Y.S. 2d 17 (1999)    ................................................................................14

*Jacobs v. D'Allesando (In re Dewey & LeBoeuf, LLP*
2014 Bankr. Lexis 4051, 17.................................................................................................................  13

*Salomon v. Kaiser (In re Kaiser)*
222 F.2d 1574, 1582-83 (2s Cir. 1983)..............................................................................................12

*Se. Investor Prot. Corp. v. Bernard Madoff Inv. Sec, LLC*
564 B.R. 737, 2017 Bankr. Lexis 245, 63 Bank Ct. Dec. 202 (2017).............................................14

## Statutes

11 U.S.C. §548 (a)(1)(A)......................................................................................................................11

11 U.S.C. §550(b)(1)............................................................................................................................14

## Other Authorities

New York Debt. & Cred. Law §273 (a).........................................................................................10, 13

New York Debt. & Cred. Law §276...................................................................................................12

i

**Rules**

Fed. R. Civ. Proc. 56......................................................................................................................11

Fed. R. Bankr. P. 2056..................................................................................................................11

ii

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | |
| | Chapter 11 |
| ORION HEALTHCORP, INC. *et al*.,[1] | |
| HOWARD M. EHRENBERG, IN HIS CAPACITY AS LIQUIDATING TRUSTEE OF ORION HEALTHCORP, INC., ET AL., | Case No. 18-71748 (AST) |
| Plaintiff, | |
| v. | |
| ARVIND WALIA; NIKNIM MANAGEMENT INC., | Adv. Proc. No. 20-08049 (AST) |
| Defendants. | |

**BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR**
**SUMMARYJUUDGMENT OR IN THE**
**ALTERNATIVE SUMMARY ADJUDICATION**

**SUMMARY OF ARGUMENT**

---

[1] The debtors in these chapter 11 cases are: Orion Healthcorp, Inc.; Constellation Healthcare Technologies, Inc.; NEMS Acquisition, LLC; Northeast Medical Solutions, LLC; NEMS West Virginia, LLC; Physicians Practice Plus Holdings, LLC; Physicians Practice Plus, LLC; Medical Billing Services, Inc.; Rand Medical Billing, Inc.; RMI Physician Services Corporation; Western Skies Practice Management, Inc.; Integrated Physician Solutions, Inc.; NYNM Acquisition, LLC; Northstar FHA, LLC; Northstar First Health, LLC; Vachette Business Services, Ltd.; Phoenix Health, LLC; MDRX Medical Billing, LLC; VEGA Medical Professionals, LLC; Allegiance Consulting Associates, LLC; Allegiance Billing & Consulting, LLC; and New York Network Management, LLC.

1. The Plaintiff has failed to show an absence of material facts with respect to each substantive argument of his motion for summary judgment or in the alternative summary adjudication. The Affidavit of Defendant Arvind Wallia submitted herewith (**Walia Aff.)** shows that there are either controverted material facts or a lack of evidence supporting Plaintiff's with respect to each ground of Plaintiff's motion. Indeed, the first case cited by the Plaintiff, *Adickes v. S.H. Kress & Co,* 398 U.S.144, 157, 90 S.Ct, 1598, 26 L. Ed 2d 342 (1970) sets the standard which must be, but has not been, met by Plaintiff with respect to the motion. "The moving party has the burden of demonstrating the absence of any genuine issue of material fact, and all     favorable to the party opposing the motion." Here, Defendants have met their burden of

showing by specific evidence that genuine issues of material fact exist or that the Plaintiff failed to provide material evidence sufficient to shift the burden of coming forward  to Defendant. The affidavit of Walia submitted herewith provides sufficient evidence to meet Defendants' burden of showing that "a reasonable jury could return a verdict for [Defendants]" and to require that the motion be denied. *Anderson v. Liberty Lobby, Inc,* 447 U.S. 242, 248, 105 S .Ct. 2505,  (1986).

### Procedural Background

2. The procedural background is contained in the affidavit of defendant Walia filed herewith. (**Walia Aff. 2-20**).

### Statement of Facts

3. In or about 2015 and earlier  Defendant Walia was the sole officer, director, and shareholder of  his co-defendant, Niknim Management Inc. (collectively, "**Defendants**").

-2-

1477

4.   In or about 2015 and earlier, Walia was the majority owner and Chief Executive Officer of Porteck Corporation ("**Porteck**").

5.   In or about March 2015, the Debtor, Physicians Practice Plus, LLC ("**Physicians Practice**"), acquired the assets of Porteck pursuant to an asset purchase agreement made and entered into as of March 2015 (the "**Porteck Asset Purchase Agreement**").  A copy of the Porteck Asset Purchase Agreement is annexed to the **Walia Aff.** as Exhibit A.

6.   In or about June 2017, Physicians Healthcare Network Management Solutions LLC ("**Physicians Healthcare**"), a non-debtor, acquired Walia's membership interests in Objectech Holdings, LLC pursuant to a Membership Interests Purchase Agreement made and entered into as of June 2017 (the "**Objectech Membership Purchase Agreement**"). A copy of the Objectech Membership Purchase Agreement is annexed to the **Walia Aff.**  as Exhibit B.

<u>The Transfers</u>

7.   On or about June 23, 2017, within one (1) year prior to the commencement of the bankruptcy, Constellation Healthcare made two payments to Niknim; one for $1,500,000 and another for $20,000 (collectively, the "**One-Year Transfers**"), representing the Closing Payment pursuant to the terms of the Objectech Membership Purchase Agreement. **(Walia Aff. 24)**

8.   On or about April 15, 2016, within two (2) years prior to the commencement of the bankruptcy cases, Constellation Healthcare and/or Orion paid Niknim $2,500,000 (the "**Two-Year Transfer**") (collectively, the One-Year Transfers and the Two-Year Transfer are referred to as the "**Transfers**"). **(Walia Aff. 25)**

9. Plaintiff has produced no evidence as to the identity of the transferor of the Two-Year Transfer; he merely alleges funds were transferred from the Debtors' counsel's IOLA account, into which Constellation Healthcare and/or Orion made deposits. (**Walia Aff. 26**)

The Two-Year Transfer

10. Plaintiff challenges the value of Porteck's assets and makes much of the fact that Parmar characterized Porteck as a "joke". Plaintiff has taken the statement out of context and distorts its meaning without any evidentiary support.

11. Parmar's comment was made to the broker Walia obtained to represent Porteck. It was made as part of Parmar's attempt to negotiate with the broker a lesser price for Porteck's assets than Walia was asking. Walia testified in this litigation that Parmar misstated the purchase price to the broker because Parmar thought "he could get a better deal for us." Parmar made the comment on December 1, 2014, three months prior to the March 2015 execution of the Porteck Asset Purchase Agreement and almost one and one-half years before the Two-Year Transfer of April 15, 2016. (**Walia Aff. 26**) Only Parmar, whose testimonial evidence Plaintiff has not obtained, knows exactly what he meant. In any case, as explained in the Walia Affidavit (**Walia Aff. 35),** the statement is irrelevant.

12. Parmar and Walia ultimately agreed that the value of Porteck's assets was approximately five times its 2014 EBITDA of $2.2 million, or $11 million. (The stated purchase price was $10.8 million.) Based on his experience Walia knew that was a reasonable valuation. (**Walia Aff. 37**)

13. While Porteck, as seller under the Porteck Asset Purchase Agreement, received $10.8 million, the Porteck Asset Purchase Agreement provided for a purchase price of $12.8 million based on a request by Parmar that the purchase price be increased by $2 million to fund related deal fees. Palmar stated he wanted to pay the fees out of the proceeds of sale

-4-

instead of paying them as a separate expense. Palmar stated that he wanted the purchase price to reflect the total cost of the transaction. Walia did not believe there was anything unusual about this. (**Walia Aff. 38**)

14. Although plaintiff notes that according to the IOLA Account, $3 million of the purchase price was paid to First United Health ("**FUH**"), a Parmar controlled entity, Plaintiff assumes that the payment was nefarious without furnishing any evidence. Walia had no knowledge the payment may have been inappropriate. Walia was never privy to information concerning the IOLA account and had no knowledge of any disbursements other than to Porteck. Indeed, Walia did not learn of any payment to FUH until this litigation. (**Walia Aff. 39**)

15. Plaintiff does not directly challenge the value of the Porteck Asset Purchase agreement.

16. Pursuant to Article 3 of the Porteck Asset Purchase Agreement, Porteck, as seller, made certain representations and warranties. Pursuant to Article 4, the selling shareholders also made certain representations and warranties. Pursuant to Article 7, Porteck and the selling shareholders jointly and severally agreed to indemnify and hold harmless Physicians Practice and certain of its affiliates against claims arising from breaches of, among other things, such representations and warranties, (**Walia Aff. 41**)

17. Section 1.6(c) of the Porteck Asset Purchase Agreement, which incorporated a funding mechanism to secure the performance by selling shareholders of their indemnification obligations, provides:

> For the purpose of partially securing Seller's obligations pursuant, and without limiting Seller's obligations thereunder, the amount of two million five hundred thousand Dollars ($2,500,000) in cash (the "**Escrow Amount**") shall be delivered by Buyers [sic] at the closing to the Escrow Agent by wire transfer of immediately available funds' to an account (the "**Escrow Account**") to be designated and administered by the Escrow Agent pursuant to an escrow agreement substantially in the form of Exhibit A ("the **Escrow Agreement**"), which Escrow Agrement shall provide, among other things, that any

-5-

> amounts remaining in the Escrow Account shall be released to Seller
> twelve (12) months after the Closing, to the extent not subject to any
> clams made prior to that time. Seller and Buyer agree that for all Tax
> purposes, any amounts in the Escrow Account released to the Seller
> pursuant to this Section 2.7 [sic] shall be treated as additional purchase
> price, unless otherwise required by applicable Law. The Escrow
> Payment Working Capital Deficiency [sic].

18. The stated purpose of the escrow arrangement was to protect the rights of Physicians

Practice, as purchaser under the Agreement, to receive $2.5 million, to the extent such funds

were required to indemnify Physicians Practice. No indemnity claims arose entitling the

purchaser to any such funds [and Walia that the sellers be paid the entire amount of its

purchase price?]. Either Cosnstellation Healthcare or Orion paid Niknim $2,500,000 (the

"Two-Year" transfer.) (**Walia Aff. 43**)

19. Walia did not learn until this litigation that the escrow was not created. Nor did he ever

claim that the funds were otherwise set aside to fund the deferred payment. (**Walia Aff.44**)

20. Walia did not maintain or control the Debtors' books and records. The fact that the Debtors'

books did not reflect a debt nor payment of such debt is not attributable to Walia. Plaintiff

has submitted no evidence that such entries on the books of the Debtors would have been

appropriate under the circumstances. (**Walia Aff. 45**)

21. The email to Walia from Parmar stating "I am willing to give you 3.5MM in return for you

to allow me to structure it properly internally which requires I close the file with a [@m?]

payment" related to the $2,500,000. owed as payment under the Porteck Asset Purchase

Agreement, and $1,000,000 that Porteck collected for accounts receivable that were not

sold under that Agreement. (**Walia 46**)

22. Despite his status as an officer of Orion, Walia was not involved in the alleged purchase of

MDRX Medical Billing, LLC on February 2016. (**Walia 47**)

The One Year Transfers

23. Payment of $1,520,000 to Niknim under the Objectech Membership Purchase Agreement represented the One Year Transfers.

24. Section 1.1 of the Objectech Membership Purchase Agreement provides that:

> "On the Closing Date and subject to the terms and conditions set forth in this Agreement, [Walia] will sell, assign, and transfer to [Physicians Healthcare], and [Physicians Healthcare ] will purchase and acquire, all of the Interests, free and clear of all Liens, for and in consideration of (A) (1) the sum of those amounts actually paid to one or more of the Selling Parties and Selling Member Representative (i) as Closing Payment, (ii) any Earn-Out payments, and (iii) in respect of the adjustment of the Company's working capital in accordance with Section 1.5, less (B) any Required Repayments paid in accordance with Section 1.6 (collectively, the "Purchase Price")."

25. Section 1.2 of the Objectech Membership Purchase Agreement provides that the Closing Payment of $1,520,000 (the "**Closing Payment**") shall be paid at the closing.

26. Objectech owned AllRad Direct, LLC ("**AllRad**"). AllRad's property consisted of certain software that was advantageous to the Debtors. It provides state of the art technology to ensure that patients, providers, and payers have complete access and insight into every aspect of the diagnosis, treatment, and follow-up for each patient. The data base was designed to facilitate population wellness management solutions by consolidating and storing clinical assessments, diagnostic laboratory and imaging results, prescribed treatment regimens and care plans and their clinical outcomes for each patient. More detailed descriptions of the software are annexed as Exhibits C and D to the **Walia Aff.**.

27. Constellation Healthcare was a medical billing company that had acquired New York Network Management, LLC ("**NYNM**") an IPA company. NYNM needed a major technology overhaul by replacing its existing network management system from Evicore ($1M per year recurring cost) and building custom automation including integration with PARCS (Constellation Healthcare's billing system). (**Walia Aff. 52**)

28. AllRad software is a network management system that has the following advantages.

-7-

- It had most of the network management features needed for NYNM.
- The technology was the same as the PARCS system.
- The AllRad team was very familiar with PARCS system as they were from the same company.
- The operational efficiency and cost saving for replacing existing software with AllRad software once adapted by NYNM would be over $3M a year.
- The enhancement and cost to the adaption of AllRad software for NYNM was considerably low since the existing Constellation Healthcare technology team was familiar with the software and it had the same technology as PARCS. (**Walia Aff. 53**)

29. Constellation Healthcare paid Niknim $1,520,000 representing the Closing Payment pursuant to the terms of the Objectech Membership Purchase Agreement. (**Walia Aff. 54**)

30. The amount of the consideration paid under the Objectech Membership Purchase Agreement was the result of a bilateral negotiation and represented the exercise of the parties' respective business judgment, in good faith. No evidence has been produced that the Debtors received less than reasonably equivalent value. (**Walia Aff. 55**)

31. The Debtors' counsel prepared the draft of the Objectech Membership Purchase Agreement. At the time they prepared it they were not familiar with Objectech or its assets and both Parmar and Walia treated the draft as a working template to memorialize the transaction. (**Walia Aff. 56**)

32. As a company, Objectech did nothing, had no revenue, and had no assets other than very valuable software that Objectech had developed through a substantial capital investment. Consequently, various schedules, projections, and other financial information had no relevance to the transaction. Throughout the negotiations, Walia responded to all requests for information relating to the software, its value, and its utility to the Debtors and believed the Debtors were fully satisfied with such information at the time the transaction closed, Walia was unaware that the Orion Board had not approved the transaction. (**Walia Aff. 57**)

33. Plaintiff has alleged no evidence to support the conclusion that Parmar was acting with fraudulent intent with respect to this transaction sufficient to sustain Plaintiff's burden for obtaining summary judgment.

34. Plaintiff statements that the Debtors' books and records do not evidence an antecedent debt owed under the Objectech Membership Purchase Agreement and that after the One-Year Transfer, the Debtors' books and records do not evidence the satisfaction of such debt or an increase in net assets through the acquisition is another red herring. No such entry would have been made by the Debtors because Physicians Healthcare, a non-debtor, was the counterparty to the Objectech Membership Purchase Agreement. Any such entry would have been recordable in its books and records. In any event, Plaintiff has not submitted any evidence that there actually was an antecedent debt (of Physicians Healthcare) created under the Objectech Membership Purchase Agreement. In fact, there was none because the execution and closing under the Objectech Membership Purchase Agreement occurred simultaneously.

35. The Debtors received reasonably equivalent value even though the buyer under the Objectech Membership Purchase Agreement was Physicians Healthcare, a non-debtor entity and Constellation Healthcare, a debtor, paid the purchase price. (**Walia Aff. 60**)

36. Walia did not know the identity of the members of Physicians Healthcare. Physicians Healthcare purported to be a Delaware limited liability company in the Objectech Membership Purchase Agreement. It was typical in the ordinary course of the Debtors' businesses to create (and own the equity of) an entity for the special purpose of making an acquisition, and Walia believed that such was the case with respect to the Objectech Membership Purchase Agreement. (**Walia Aff. 61**)

37. The assets of Objectech were delivered to Orion, one of the Debtors, at the closing and Walia, presided over the development and integration of the software for the exclusive benefit of the Debtors.  The value of this benefit was reasonably equivalent to the amount paid in exchange for it under the Objectech Membership Purchase Agreement. Plaintiff has not submitted any evidence to the contrary. (**Walia Aff. 62**)

38. Plaintiff has presented no competent evidence that either of the Transfers was made with actual intent to hinder, delay, or defraud a creditor. Neither the Porteck Asset Purchase Agreement nor the Objectech Membership Purchase Agreement manifests any false statement, misrepresentation, or backdating.

39. Plaintiff requested copies of certain tax returns filed by Objectech. Such returns were not produced because they do not exist. Objectech did nothing, had no revenue, and had no assets other than valuable software. Having no revenue to report, it filed no tax return. (**Walia Aff. 64**)

Claims Under NYDCL 273-a

40. Constellation Healthcare Debtor paid fair equivalent value under the Objectech purchase and Plaintiff has not submitted evidence to the contrary.

Judgment Against Walia

41. Plaintiff has produced no evidence to show that Walia was in complete domination of Niknim with respect to the Transfers, nor that Walia used such domination to commit a fraud or wrong against Plaintiff which resulted in Plaintiff's injury.

42. Walia took any payments from Niknim, for value, in good faith, and without knowledge of the voidability of the Transfers. (**Walia Aff. 70**)

## **Argument**

-10-

## Legal Standard

43. The Standard for summary judgement, pursuant to Rule 7056 of the Federal Rules of

    Bankruptcy Procedure is stated in Rule 56 of the Federal Rules of Civil Procedure. As

    noted in the summary of argument above that standard may be articulated as requiring

    movant to show that "there is no genuine dispute as to any material fact and the moving

    party is entitled to judgment as a matter of law. The moving party bears the burden of

    demonstrating the absence of any genuine issue of material fact, and all inferences to be

    drawn from the underlying facts must be viewed in the light most favorable to the party

    opposing the motion." *Adickes v S.H. Kress & Co.,* 398 U.S.144, 157, 90 S. Ct, 1598, 26

    L.Ed. 2d (1970). Summary judgment may not be granted if the "evidence is such that a

    reasonable jury could return a verdict for the nonmoving party" *Anderson v. Liberty*

    *Lobby, Inc.,* 477 U.S. 343, 348, 106 S. Ct. 2505, 91 L. Ed 2d 302 (1986).

44. Here, Plaintiff has failed to show lack of such dispute as to each branch of its motion.

## Disputed Material Facts

45. While Plaintiff states that it is "not disputed that the Debtors' property was involved in

both transfers" (Plaintiff's Brief para 47), that is incorrect. See Paragraph 9 above noting that

Plaintiff has failed specify the source of the IOLA disbursement with particularity, thereby

creating a material dispute fact.

### The Two Year Transfer

46. 11 U.S.C. 548(a)(1)(A) requires that for a transfer to be avoidable it must have been made

with an "actual intent to hinder, delay or defraud" present or future creditors of the debtor. So

too does New York Debtor and Creditor Law ("NYDCL") 276.

-11-

47. Plaintiff refers to the "fake acquisition of MDRX" to prove the Debtors' intent to defraud, but even if that transaction was indeed "fake" it does not indicate that transfers made to Niknim or Walia for the purchase of Porteck were also intended to hinder, delay of defraud the creditors of the debtors. That is simply conjecture, not relevant fact.

48. Likewise, Plaintiff's attempts to characterize the documentation of the Porteck Asset Purchase Agreement is no more than conjecture and is specifically refuted by Walia in his affidavit filed herewith. (See paragraphs 10-14 above.)

49. The $2,500,000 transfer was explained by Walia as a withheld payment to protect the rights of the Porteck purchaser and was withheld as part of a contemporaneous transaction to secure the sellers' performance of their representations and warranties. When those representations and warranties were fulfilled, the withheld amount was transferred. (See paragraph 18 above.)

50. The cases cited by Plaintiff with respect to intentional fraud or attempts to hinder or delay payment to creditors are simply in apposite as Defendant Walia has fulling explained and controverted the facts used by Plaintiff to support his argument, The alleged  "badges of fraud" allowing an inference of fraudulent intent (See for example *Salomon v Kaiser (In re Kaiser),* 722 F.2d 1574, 1582-83 (2d Cir. 1983) are simply either not present, or are in dispute as noted above.

<u>The One Year  Transfer</u>

51. Plaintiff's statement that Walia's claim that the One Year Transfer was for value "is baseless" is, in itself baseless. As explained above (paragraphs 23-39) and in the affidavit of Walia filed herewith, each and every alleged badge of fraud was explained and refuted by Walia as facts in context rather than conclusions built on inference after inference. A

clear reading of the facts stated above, based on the Walia affidavit, create a series of

disputed material facts precluding summary judgement with respect to the claims of

intentional fraud.

52. Much is made of the fact that Walia was an insider and thus the transfer violates NYDCL

273-A regardless of intent, as a constructive fraud.  However, the question of whether

Walia was an insider for purposes of the statute is not a simple exercise based on title.

Rather an analysis of insider status is "fact specific" and "can turn on a case-by case basis

from the totality of the circumstances." *Jacobs v. D'allessandro (in re Dewey & Leboeuf*

*LLP),* 2014Bankr.Lexis 4051, 17. "Although the definition of insider is to be flexibly

construed, courts generally require evidence of 'actual management' or 'extensive

control." Id. The purported ***insider*** must have 'a controlling interest in the ***debtor***

or…exercise sufficient authority over the ***debtor*** so as to unqualifiedly dictate corporate

policy and the disposition of corporate assets." Id at 18. The cases cited by Plaintiff do not

negate the fundamental principles noted in *Jacobs.* Here there has been no evidence

proffered that Walia was engaged in actual management of or had sufficient authority

over the Debtor to be able to dictate corporate policy or the disposition of corporate

assets. Indeed, the opposite is true. Walia has stated in his affidavit that the purchase of

Objectech was the result of a bilateral negotiation between the parties and was in good

faith. Throughout the transaction Walia reported to Parmar, did not control the books and

records of the Debtors, and had no knowledge of the Orion Board's action with respect to

the transaction. (See above paragraphs 30-37.)

53. Based on the facts contained herein, and the lack of evidence to the contrary, Walia's sale

of Objectech was not lacking in fair value as a matter of law, and a *per se* holding that the

-13-

purchase of Objectech was not for fair value or was in bad faith is unwarranted at this stage of the proceedings.

<u>Personal Liability</u>

54. Plaintiff has failed to meet its burden with respect to Walia's personal liability for Transfers to Niknim. "Generally, piercing the corporate veil requires a showing that the individual (1) had complete domination and control over the corporation, and (2) used such domination and control to commit a fraud against the plaintiff which results in injury to plaintiff. *Damianos Realty Group, LLC v. Fracchia,* 885 N.Y.S 2d 270,274 (2d Dept. 2006), NY App. Div. Lexis 14542. Further, the court noted that "Veil piercing is a fact-laden claim that is not well suited for summary judgment resolution (*First Bank of Americas v. Motor Car Funding,* 257 AD 2d,287, 294, 690 N.Y.S.2d 17.)" Plaintiff has failed to show Niknim was used by Walia to commit a fraud against the Debtor and Walia cannot be held personally liable for the Transfers. (Niknim denies it committed any fraud based on the facts elucidated above.)

55. As the transferee of Niknim, Walia is not liable as any monies he received from Niknim were for value, in good faith, and without knowledge of the voidability of the transfer to Niknim. He is thus shielded under section 550(b)(1). *Sec. Investor Prot. Corp v. Bernard Madoff Inv. Sec, LLC,* 564 B.R. 737, 2017 Bankr.Lexis 245, 63 Bank CT. Dec.202. (2017) "550(b)(1) provides a complete defense to a subsequent transferee to the extent he 'takes for value…in good faith, without knowledge of the voidability of the tranfer. Here Walia has stated in his affidavit that he "took for value, in good faith, and without knowledge of the voidability of the Transfers." (**Walia Aff. 70)**

## Conclusion

-14-

**Wherefore,** Defendants respectfully pray that the Court enter an order denying

Plaintiff's motion in its entirety and awarding costs and/or fees by motion and according

to proof.

Dated: February 23, 2023

Respectfully submitted,


The Law Office of Eugene R. Scheiman, PLLC

Co-counsel for Defendants


By: /s/ Eugene R. Scheiman

      Eugene R. Scheiman

570 Lexington Avenue.
Suite 1600
New York, NY 10022
Tel: (646) 280-9000

And

Rosen & Associates, P.C.
Co-counsel for Defendants
747 Third Avenue
New York, NY 10017
Tel: (2120 223-1100

-15-

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>ORION HEALTHCORP, INC. *et al.*,[1]<br><br>               Debtors. | Chapter 11<br><br>Case No. 18-71748 (AST) |
| HOWARD M. EHRENBERG, IN HIS CAPACITY AS LIQUIDATING TRUSTEE OF ORION HEALTHCORP, INC., ET AL.,<br><br>               Plaintiff,<br>v.<br><br>ARVIND WALIA; NIKNIM MANAGEMENT INC.,<br><br>               Defendants. | Adv. Proc. No. 20-08049 (AST) |

**AFFIRMATION OF SANFORD P. ROSEN IN SUPPPORT OF DEFENDANTS'**
**OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Sanford P. Rosen, Esq., under penalty of perjury hereby affirms as follows:

1.    I am the principal shareholder of Rosen & Associates, P.C. ("**Rosen & Associates**"), which firm maintains offices for the practice of law at 747 Third Avenue, New York, NY 10017-2803.

2.    I am admitted to practice before the courts of the state of New York, the United States District Courts for the Southern and Eastern Districts of New York, the United States Court of Appeals for the Second Circuit, and the Supreme Court of the United States.

3.    I submit this affirmation in support of Defendants' Opposition to Plaintiff's Motion for Summary Judgment.

---

[1] The debtors in these chapter 11 cases are: Orion Healthcorp, Inc.; Constellation Healthcare Technologies, Inc.; NEMS Acquisition, LLC; Northeast Medical Solutions, LLC; NEMS West Virginia, LLC; Physicians Practice Plus Holdings, LLC; Physicians Practice Plus, LLC; Medical Billing Services, Inc.; Rand Medical Billing, Inc.; RMI Physician Services Corporation; Western Skies Practice Management, Inc.; Integrated Physician Solutions, Inc.; NYNM Acquisition, LLC; Northstar FHA, LLC; Northstar First Health, LLC; Vachette Business Services, Ltd.; Phoenix Health, LLC; MDRX Medical Billing, LLC; VEGA Medical Professionals, LLC; Allegiance Consulting Associates, LLC; Allegiance Billing & Consulting, LLC; and New York Network Management, LLC.

4.    Attached hereto is a proposed order denying Plaintiff's Motion for

Summary Judgment.

Dated: Shelter Island, New York
       February 24, 2023

                                            _____

                                            Sanford P. Rosen

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>ORION HEALTHCORP, INC. *et al.*,[1]<br><br>             Debtors. | Chapter 11<br><br>Case No. 18-71748 (AST) |
| HOWARD M. EHRENBERG, IN HIS CAPACITY AS<br>LIQUIDATING TRUSTEE OF ORION HEALTHCORP, INC.,<br>ET AL.,<br><br>             Plaintiff,<br><br>v.<br><br>ARVIND WALIA; NIKNIM MANAGEMENT INC.,<br><br>             Defendants. | Adv. Proc. No. 20-08049 (AST) |

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE SUMMARY ADJUDICATION AS AGAINST DEFENDANTS ARVIND WALIA AND NIKNIM MANAGEMENT INC.

The Court, having considered the motion for summary judgment, or in the alternative

summary adjudication as against defendants Arvind Walia and Niknim Management Inc. ("the

"**Motion**") [Docket No. ] dated January __, 2023, of Plaintiff, Howard M. Ehrenberg in his

capacity as Liquidating Trustee of Orion Healthcorp, Inc., *et al.* seeking entry of judgment

against Defendants Arvind Walia and Niknim Management Inc.; the accompanying *Joint*

*Statement Of Uncontroverted Facts; Plaintiff's Statement Of Additional Uncontroverted Facts*

---

[1] The debtors in these chapter 11 cases are: Orion Healthcorp, Inc.; Constellation Healthcare Technologies, Inc.; NEMS Acquisition, LLC; Northeast Medical Solutions, LLC; NEMS West Virginia, LLC; Physicians Practice Plus Holdings, LLC; Physicians Practice Plus, LLC; Medical Billing Services, Inc.; Rand Medical Billing, Inc.; RMI Physician Services Corporation; Western Skies Practice Management, Inc.; Integrated Physician Solutions, Inc.; NYNM Acquisition, LLC; Northstar FHA, LLC; Northstar First Health, LLC; Vachette Business Services, Ltd.; Phoenix Health, LLC; MDRX Medical Billing, LLC; VEGA Medical Professionals, LLC; Allegiance Consulting Associates, LLC; Allegiance Billing & Consulting, LLC; and New York Network Management, LLC.

*In Support Of Motion For Summary Judgment* [Docket No. ]; *Affidavit Of Jeff Nolan In Support Of Plaintiff's Motion For Summary Judgment* [Docket No. ]; *Affidavit Of Edith Wong In Support Of Plaintiff's Motion For Summary Judgment* [Docket No. ]; *Request For Judicial Notice In Support Of Plaintiff's Motion For Summary* [Docket No. ]; *Affidavit Of Arvind Walia In Opposition To Plaintiff's Motion For Summary Judgment* [Docket No. ] *and the Brief In Opposition To Plaintiff's Motion For Summary Judgment or In The Alternative Summary Adjudication* [Docket No. ]; and the Court having duly considered the argument of counsel at the Hearing; and after due deliberation thereon; and good and sufficient cause appearing therefor as stated on the record at the Hearing to Issue Ruling on Plaintiff's Motion [Docket No. ] (the "**Ruling Hearing**"); and upon sufficient cause appearing therefore

1.      The Motion is denied as stated in particular on the record of the Ruling Hearing.

2.      The Bankruptcy Court retains jurisdiction to enforce and implement this order.

-2-

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>ORION HEALTHCORP, INC. *et al.*,<br><br>        Debtors.[1] | Chapter 11<br><br>Case No. 18-71748 (AST) |
| HOWARD M. EHRENBERG, IN HIS<br>CAPACITY AS LIQUIDATING TRUSTEE OF<br>ORION HEALTHCORP, INC., ET AL.,<br><br>        Plaintiff,<br><br>v.<br><br>ARVIND WALIA; NIKNIM MANAGEMENT<br>INC.,<br><br><br>        Defendants. | Adv. Proc. No. 20-08049 (AST) |

**REPLY OF DEFENDANTS ARVIND WALIA AND NIKNIM MANAGEMENT INC.**
**IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT DISMISSING**
**CERTAIN CLAIMS ASSERTED IN THE COMPLAINT**

        Defendants Arvind Walia and Niknim Management Inc. (the "**Defendants**"), by

their co-counsel, Rosen & Associates, P.C., and the Law Offices of Eugene R. Scheiman, PLLC,

hereby reply to Plaintiff's response in opposition to Defendants' motion for entry of an order

granting partial summary judgment and dismissing the claims asserted in the complaint under 11

U.S.C. §544 [Doc. No. 51] (the "**Motion**"), and respectfully state as follows:

---

[1] The debtors in these chapter 11 cases are: Orion Healthcorp, Inc.; Constellation Healthcare Technologies, Inc.; NEMS Acquisition, LLC; Northeast Medical Solutions, LLC; NEMS West Virginia, LLC; Physicians Practice Plus Holdings, LLC; Physicians Practice Plus, LLC; Medical Billing Services, Inc.; Rand Medical Billing, Inc.; RMI Physician Services Corporation; Western Skies Practice Management, Inc.; Integrated Physician Solutions, Inc.; NYNM Acquisition, LLC; Northstar FHA, LLC; Northstar First Health, LLC; Vachette Business Services, Ltd.; Phoenix Health, LLC; MDRX Medical Billing, LLC; VEGA Medical Professionals, LLC; Allegiance Consulting Associates, LLC; Allegiance Billing & Consulting, LLC; and New York Network Management, LLC.

**Failure to Plead the Existence of an Actual Creditor
Through Which Plaintiff Makes its Claims is Fatal to
the Claims Brought Under Bankruptcy Code §544(B)**

1.      By its own terms, an essential element of recovery through Bankruptcy

Code section 544 ("**§544(b)**") is the existence of an actual creditor holding an allowable

unsecured claim, who, but for the bankruptcy, could recover the subject transfers from the

defendant(s),[2] often referred to as a "qualifying creditor". A trustee's right to recovery under

§544(b) derives from and through that creditor. Therefore, the existence of such a creditor must

be "pled" in the complaint pursuant to Federal Rule of Bankruptcy Procedure 7008, through

which Rule 8 of the Federal Rules of Civil Procedure is applicable. Fed. R. Bankr. Proc. 7008.

Rule 8 provides, in part, "(a) Claim for Relief. A pleading that states a claim for relief must

contain….(2) a short and plain statement of the claim showing that the pleader is entitled to

relief…." Fed. R. Civ. Proc. Rule 8.

2.      In this case, Plaintiff failed to plead the existence of a creditor through

which it could make a §544(b) claim. In the First Amended Complaint for Avoidance and

Recovery of: (1) Fraudulent Transfers; (2) Preferential Transfers; (3) Recovery of Avoided

Transfers; (4) Objection to Claim No. 10067; Pursuant to 11 U.S.C. §§ 502, 544, 547, 548 and

550 (Doc. No. 22) (the "**Amended Complaint**"), Plaintiff merely recites that he was appointed

pursuant to a confirmed plan and authorized "to oversee distributions to holders of Allowed

Claims and Allowed Interests and to pursue retained Causes of Action of the Debtors' Estates".

---

[2] Code §544(b) provides in pertinent part, "the trustee may avoid any transfer of an interest of the debtor in
property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an
unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e)
of this title." 11 U.S.C. §544(b)(1).

See Amended Complaint at p. 2 ¶ 7-8. While these statements define Plaintiff's role in the case, they do not plead the existence of a creditor that could avoid the transfer(s) at issue and into whose shoes the Plaintiff could step to make a claim under §544(b). Defendants do not contend that the Amended Complaint must identify such creditor by name, only that it must include an allegation that such creditor exists. The Amended Complaint is devoid of such allegation.

3.    Plaintiff asserts that he "need not identify in the complaint a single unsecured claimant, but rather, must only plead facts from which it can be plausibly concluded that there is at least one legitimate creditor of the estate." *Opposition to Motion of Defendants Arvind Walia and Niknim Management Inc. for Partial Summary Judgment Dismissing Claims Asserted in The Complaint under 11 U.S.C. §544* [Doc. No. 60] (the "**Opposition**"), at page 4, ¶6, *citing*, *Mendelsohn v. Kovalchuk (In re APCO Merch. Servs.)*, 585 B.R. 306, fn. 11 (Bankr. E.D.N.Y. 2018) ("**APCO**"). However, Plaintiff did not plead facts from which it could be concluded that a qualifying creditor exists; his allegations as to his role in the case at most give rise to the inference that there are creditors in the case, and possibly unsecured creditors, as is true in most bankruptcy cases. But Plaintiff pled no fact supporting the existence of a creditor who meets the requirements of §544(b); i.e., the existence of a creditor who, but for bankruptcy, could avoid the transfers at issue.

4.    Plaintiff's reliance on APCO is misplaced because APCO requires that a plaintiff allege the existence of a qualifying creditor in its pleadings. Only then should the Court consider evidence supporting the existence of that creditor. Plaintiff's submission of facts with the Opposition, without having made any underlying allegation, is insufficient to cure his initial failure to have pled the existence of a qualifying creditor.

3

5.      The Court in *Musicland Holding v. Best Buy Co. (In re Musicland Holding Corp.)*, 398 B.R. 761, 780-81 (Bankr. S.D.N.Y. 2008), addressing the issue of whether a plaintiff claiming under §544(b) is required to plead the existence of a qualifying creditor generally or with specificity, quotes a pleading that it considered to be sufficient under §544(b) and states as follows:

> [T]he Fifth and Sixth Claims allege that '[t]here exists one or more creditors of the Debtors (including, without limitation, landlords, taxing authorities and trade creditors) whose claim(s) arose prior to the Cash Transfers and the execution of the Debt Instruments, and who have claims against the Debtors' estates as of the Petition Date.' (¶¶ 116, 122.) These allegations specifically identify three categories of unsecured creditors that purport to trigger the plaintiff's standing. They satisfy *RCM's* standard [described herein below], and also meet the stricter "category" standard articulated in *Global Crossing*[described herein below]. The identification provides fair notice of how the plaintiff intends to prove his standing, and allows Best Buy to take discovery.

> In re Musicland Holding Corp. at 780-781.

6.      The *In re Musicland Holding Corp.* opinion describes the District Court's opinion in *Global Crossing Estate Representative v. Winnick*, No. 04 Civ. 2558(GEL), 2006 WL 2212776 (S.D.N.Y. Aug.3, 2006) as follows:

> There, the complaint identified a category of creditors — noteholders that had engaged in an exchange offer, still held the exchange notes and were creditors in the bankruptcy — with standing under applicable nonbankruptcy law to challenge the transaction. See id. at *11. Rejecting the defendants [*sic*] argument that the Estate Representative must specifically identify "one such creditor" because "it has had access to the proofs of claim filed by all creditors," the District Court ruled: "However, there is no authority for the proposition that the Estate Representative must be more specific than to identify the category of creditors with potentially viable claims. This is unquestionably enough to put defendants on notice of the creditors who supply the basis for the right to sue, and will permit them to answer, seek relevant discovery, and defend against these claims...." Id.

> In re Musicland Holding Corp. at 779-80.

7.     The *In re Musicland Holding Corp.* opinion also discusses *In re RCM Global Long Term Capital Appreciation Fund, Ltd.*, 200 B.R. 514, 524 (Bankr. S.D.N.Y. 1996) ("**RCM**"). In RCM, the plaintiff alleged in the complaint that "(iv) as of the date of the purported fraudulent conveyance, the Debtor had one or more creditors holding unsecured claims against it." In re RCM Global Long Term Capital Appreciation Fund, Ltd. at 519. There the court concluded that the complaint was sufficient.

8.     In each of the above-referenced cases, the complaints contained allegations of the existence of a creditor through which the plaintiff was asserting its rights to assert a claim under §544(b). In this case, because the Amended Complaint contains no such allegation, Plaintiff failed to provide sufficient notice to Defendants of his claim against them.

9.     In APCO, the defendant did not raise the issue of plaintiff's standing to bring the action, yet the court addressed the requirement that the existence of a creditor described in §544(b) be pled, and ultimately proven, as follows:

> "[t]he Court is obligated to raise an issue implicating standing *sua sponte*, even if the parties fail to raise it, because it implicates the Court's subject matter jurisdiction." Densmore v. Litton Loan Servicing, L.P. (In re Densmore), 445 B.R. 307, 312 (Bankr. D. Vt. 2011); see Thompson v. Cty. of Franklin, 15 F.3d 245, 248 (2d Cir. 1994)); see Shearson Lehman Hutton, Inc. v. Wagoner, 944 F.2d 114, 117 (2d Cir. 1991) (standing "is a threshold issue in all cases since putative plaintiffs lacking standing are not entitled to have their claims litigated in federal court."). The burden is on plaintiff to show that he has standing under § 544(b) to bring this action. Young, 178 B.R. at 945 [*Young v. Paramount Commc'ns, Inc. (In re Wingspread Corp.)*, 178 B.R. 938 (Bankr. S.D.N.Y. 1995)]; see also Silverman v. Sound Around, Inc. (In re Allou Distribs., Inc.), 392 B.R. 24, 31 (Bankr. E.D.N.Y. 2008). Here, plaintiff did not identify the qualifying creditor in his Amended Complaint,[11] nor did he prove the existence of an actual, qualifying creditor at trial.[12] Because the power given to a trustee under § 544(b) permits the trustee to stand in the shoes and assert the rights of an actual, existing creditor holding an allowable unsecured claim, proof of the existence of a creditor who could have avoided the Transfers under the NYDCL is central to plaintiff's actual and constructive fraudulent conveyance causes of action under § 544(b) and NYDCL §§ 273-276 and

278. <u>See</u> <u>Young</u>, 178 B.R. at 946 ("'[B]efore a trustee is able to utilize applicable state or federal law referred to in Section 544(b), there must be an allegation and ultimately a proof of the existence of at least one unsecured creditor of the Debtor who at the time the transfer occurred could have, under applicable local law, attacked and set aside the transfer under consideration.'") (<u>quoting</u> <u>Smith v. Shoemaker (In re Smith)</u>, 120 B.R. 588, 590 (Bankr. M.D. Fla. 1990)). Plaintiff has not satisfied this requirement. Accordingly, the Court finds that plaintiff has failed to present evidence sufficient to establish standing to bring this action under state fraudulent conveyance law against defendant.

<u>In re APCO Merch. Svcs.</u> at 315.

10.    The Court must address an issue related to standing regardless of whether the defendant raised the issue, and therefore it is not relevant that the Defendants did not raise the issue in a motion to dismiss. Here, where the Amended Complaint does not allege an element of the cause of action either generally or specifically, factual evidence cannot cure that defect; facts cannot be used to prove an allegation that is not in the complaint.

## **CONCLUSION**

WHEREFORE, Defendants respectfully request that this Court (i) enter an order, substantially in the form annexed to the Motion as Exhibit "D", dismissing the claims asserted in the Amended Complaint under 11 U.S.C. § 544; and (ii) grant them such other and further relief as is just and proper.

Dated: New York, NY
     March 10, 2023

                                     Respectfully Submitted,

                                     ROSEN & ASSOCIATES, P.C.
                                     *Counsel to Arvind Walia and*
                                          *Niknim Management Inc.*

                                     By: <u>/s/ Sanford P. Rosen      </u>
                                          Sanford P. Rosen

                                   747 Third Avenue
                                   New York, NY 10017-2803
                                   (212) 223-1100

LAW OFFICES OF EUGENE R. SCHEIMAN, PLLC
*Co-counsel to Arvind Walia and*
  *Niknim Management Inc.*

570 Lexington Avenue, Suite 1600
New York, NY 10022
(646) 280-9000

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| ORION HEALTHCORP, INC.,[1] | Case No. 18-71748 (AST) |
| Debtors. | (Jointly Administered) |
| HOWARD M. EHRENBERG IN HIS CAPACITY AS LIQUIDATING TRUSTEE OF ORION HEALTHCORP, INC., ET AL., | Adv. Pro. No. 20-08049 (AST) |
| Plaintiff, | |
| v. | **[Filed Concurrently with Reply Brief in Support of Plaintiff's Motion for Summary Judgment]** |
| ARVIND WALIA; NIKNIM MANAGEMENT, INC., | |
| Defendant. | |

**OBJECTION AND REQUEST TO STRIKE THE AFFIDAVIT OF
ARVIND WALIA SUBMITTED IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT,
OR IN THE ALTERNATIVE, SUMMARY ADJUDICATION**

Plaintiff, Howard M. Ehrenberg in his capacity as Liquidating Trustee of Orion

Healthcorp, Inc., *et al.*, (the "**Plaintiff**" or the "**Liquidating Trustee**"), for the estates of the

above-captioned debtors, by and through by and through his undersigned counsel, hereby files

the *Objection and Request to Strike the Affidavit of Arvind Walia* (the "**Affidavit**") *in Support of*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Orion Healthcorp, Inc. (7246); Constellation Healthcare Technologies, Inc. (0135); NEMS Acquisition, LLC (7378); Northeast Medical Solutions, LLC (2703); NEMS West Virginia, LLC (unknown); Physicians Practice Plus Holdings, LLC (6100); Physicians Practice Plus, LLC (4122); Medical Billing Services, Inc. (2971); Rand Medical Billing, Inc. (7887); RMI Physician Services Corporation (7239); Western Skies Practice Management, Inc. (1904); Integrated Physician Solutions, Inc. (0543); NYNM Acquisition, LLC (unknown) Northstar FHA, LLC (unknown); Northstar First Health, LLC (unknown); Vachette Business Services, Ltd. (4672); Phoenix Health, LLC (0856); MDRX Medical Billing, LLC (5410); VEGA Medical Professionals, LLC (1055); Allegiance Consulting Associates, LLC (7291); Allegiance Billing & Consulting, LLC (7141); New York Network Management, LLC (7168). The corporate headquarters and the mailing address for the Debtors listed above is 1715 Route 35 North, Suite 303, Middletown, NJ 07748.

*Defendant's Brief in Opposition to Plaintiff's Motion for Summary Judgment, or in the*

*Alternative, Summary Adjudication* (the "**Objection**"), which was filed on February 22, 2023

[Dkt. No. 64][2] on the following grounds:

## I.

## MEMORANDUM OF POINTS AND AUTHORITIES

A.   **Exhibits C And D Lack Foundation, Are Not Authenticated And Nothing More Than Unreliable Summaries That Are Not A Valid Substitute For The Sale Document**

1.    Documentary evidence is admissible to prove the existence, or non-existence, of a

disputed fact if the evidence is: (1) relevant, (2) properly authenticated, (3) meets the

requirement of the best evidence rule (or falls within an exception), and (4) is not otherwise

inadmissible under an established exclusionary rule (e.g. hearsay; or discretionary exclusion

under FRE 403).  See *Jones, Rosen, Jones, Wegner & Wegner, Rutter Group Prac. Guide:*

*Federal Civil Trials & Evidence (The Rutter Group* 2022), Ch. 8, 8:425.  Authentication is a

condition precedent to admissibility.  *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773 (9th

Cir. 2002) Authentication promotes accuracy in fact finding by excluding documents that might

be false or otherwise unreliable.  *United States v. Perlmuter,* 693 F.2d 1290, 1292-93 (9th

Cir.1982); *Ricketts v. City of Hartford,* 74 F.3d 1397, 1409-1410 (2nd Cir. 1996) (evidence

lacking authentication has no probative value).  The judge makes a preliminary determination as

to whether there is sufficient evidence to sustain a jury finding of authenticity. (FRE 104(b));

*Ricketts v. City of Hartford, supra*, 1410.

---

[2] It appears that Defendant refiled a duplicate Affidavit on March 2, 2023 [Dkt. No. 67].

2

2.      No factual foundation was established for the submission of Exhibits C and D. No foundation is laid for the identification, authenticity or reliability of the document. *Colon v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 68 (S.D.N.Y. 2001).

3.      Similarly, Exhibits C and D are secondary evidence.  Secondary evidence is admissible where the original is lost or destroyed, or not available to the proponent and not produced after notice. *Federal Civil Trials & Evidence*, The <u>Rutter Group</u>, supra, 8:526 citing to *United States v. Shriver,* 842 F.2d 968, 976 (7th Cir. 1988).  A summary must be based on foundation testimony connecting it with the underlying evidence summarized, and must be based upon and fairly represent competent evidence already before the jury. *Fagiola v. National Gypsum Co. AC & S., Inc.*, 906 F.2d 53, 57 (2nd Cir. 1990)  It is a joint stipulated fact that the MIPA contained no schedule of assets.  (Dkt. No. 54, JSOF, #68)  The Objecttech Membership Purchase Agreement ("**MIPA**") is the best evidence of what was allegedly bought or sold for 1.52MM.  (See MIPA, Dkt. No. 55, Ex. 5, to Aff'd of J. Nolan.)

4.      Lastly, writings, as well as spoken words, may be hearsay. *Federal Civil Trials & Evidence*, The <u>Rutter Group</u>, *supra*, 8:1774.  Summaries offered to prove the existence of a disputed fact are subject to the hearsay rule.  FRE 1006.  FRE 1006 is not a back-door vehicle for the introduction of evidence which is otherwise inadmissible. *PEAT, Inc. v. Vanguard Research, Inc.*, 378 F.3d 1154, 1160 (11th Cir. 2004)  Exhibits C and D are also properly excluded as unreliable hearsay i.e., written statements offered to prove the truth of the matter asserted. (FRE 801(a)).

DOCS_LA:347549.6 65004/003

## B.    The Seventeen Page Affidavit Violates Multiple Federal Rules Of Evidence

| Paragraph Number | Affidavit of Arvind Walia | Plaintiff's Evidentiary Objection |
|---|---|---|
| 1-71 | The facts stated herein are of my own personal knowledge. | Objection: <u>FRE 603</u>. Testimony must be given under oath or affirmation. Plaintiff objects on the grounds that the witness's statement does not satisfy requirements of 28 U.S.C. §1746 because the witness did not certify that the unsworn statement was true under penalty of perjury (**witness's unsworn statement was inadmissible for purposes of summary judgment**.) *Hill v. Southeastern Freight Lines, Inc.*, 877 F. Supp. 2d 375, 384, 2012 U.S. Dist. LEXIS 90976 (M.D.N.C. 2012), aff'd, 523 Fed. Appx. 213, *118 Fair Empl. Prac. Cas. (BNA)* 63, 2013 U.S. App. LEXIS 7471 (4th Cir. 2013); *Williams v. Frank Martz Coach Co.,* 2014 U.S. Dist. LEXIS 66411, *11-*15 (E.D.N.Y. 2104) (witness statement properly rejected as the Second Circuit has made clear 28 U.S.C. §1746 demands certification of the truth of the matter be under the penalty or perjury. |
| 35 | Plaintiff makes much of the fact that Parmar characterized Porteck as a "joke". However, the statement is taken out of context and its meaning is ordained by Plaintiff without any evidentiary support. Regardless, the statement is irrelevant. | Objection: <u>Rule 701</u>. Witness offering a lay opinion must base his opinion on his own personal knowledge, which must be established to the court and jury. "When a witness has not identified the objective bases for his opinion, the proffered opinion obviously fails completely to meet the requirements of <u>Rule 701</u> . . . because there is no way for the court to assess whether it is rationally based on the witness's perceptions . . .." *United States v. Garcia*, 291 F.3d 127, 140 (2nd Cir. 2002). Defendant was not a party to the email, Dkt. No. 56-4, Exhibit D.  The exhibit speaks for itself. |

4

| Paragraph Number | Affidavit of Arvind Walia | Plaintiff's Evidentiary Objection |
|---|---|---|
| 36 | Parmar's comment was made to the broker I had obtained to represent Porteck. It was a manifestation of Parmar's (appropriate) attempt to negotiate with the broker a lesser price for Porteck's assets than I was asking. I previously testified in this litigation that Parmar misstated the purchase price to the broker because Parmar thought "he could get a better deal for us." Parmar made the comment on December 1, 2014, three months prior to the March 2015 execution of the Porteck Asset Purchase Agreement and almost one and one-half years before the Two-Year Transfer of April 15, 2016. Regardless, only Parmar, whose testimonial evidence Plaintiff has not obtained, knows exactly what he meant. Here, Plaintiff's argument is nothing more than a self-serving guess, which is wrong. | Objection: Rule 701. Witness offering a lay opinion must base his opinion on his own personal knowledge, which must be established to the court and jury. "When a witness has not identified the objective bases for his opinion, the proffered opinion obviously fails completely to meet the requirements of Rule 701 . . . because there is no way for the court to assess whether it is rationally based on the witness's perceptions . . ." *United States v. Garcia*, 291 F.3d 127, 140 (2nd Cir. 2002).<br><br>Defendant was not a party to the email, Dkt. No. 56-4, Exhibit D. The testimony also misstates the email chain which reflects the statement about the "Haha this is a joke, please find me a real billing company" being made in response to the statement PCA was acquired less than 30 days ago.<br><br>The exhibit speaks for itself. |
| 37 | Parmar and I ultimately agreed that the value of Porteck's assets was approximately five times its 2014 EBITDA of $2.2 million, or $11 million. (The stated purchase price was $10.8 million.) Having bought and sold many companies during my career, I know that a purchase price based upon this multiple of EBITDA is not unusual. The inference Plaintiff draws from Parmar's comment - that the purchase price exceeded the reasonable value of the assets, is a bridge too far. | Objection: Rules 701 & 802. No evidence is submitted as to EBITDA in 2014, the appropriateness of employing a multiple of 5x, or qualification of the witness to render any opinion as to value. Rather than submit the written agreement of 10.8MM as the purchase price, Defendant makes unsubstantiated conclusory statements. The statements are simply hearsay. *SEC v. Espuelas*, 905 F. Supp. 2d 507, 520 (S.D.N.Y. 2012) (When a witness has not identified the objective bases for his opinion, the proffered opinion obviously fails completely to meet the requirements of Rule 701, first, because there is no way |

| Paragraph Number | Affidavit of Arvind Walia | Plaintiff's Evidentiary Objection |
|---|---|---|
| | | for the court to assess whether it is rationally based on the witness's perceptions, and second, because the opinion does not help the jury but only tells it in conclusory fashion what it should find. Rule 701(a) reflects, in part, the Rule's more general requirement that a witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.)<br><br>Lastly, the statement is irrelevant under Rule 401.  In determining value, the Court makes a two-fold inquiry:  first, whether the debtor received any value at all in exchange for the transfer, i.e. any realizable commercial value as a result of the transaction, and second, whether that value was in fact reasonably equivalent.  *See Devon Mobile Communs. Liquidating Trust v. Adelphia Communs. Corp. (In re Adelphia Communs. Corp*.), No. 02-41729 (CGM), 2006 Bankr. LEXIS 4600, 2006 WL 687153, at *11 (Bankr. S.D.N.Y. Mar. 6, 2006).  What the Defendant and Parmar agreed is not a substitute for the burden to produce admissible evidence of "reasonably equivalent value". |
| 38 | Plaintiff also makes much of the fact that Porteck, as seller under the Porteck Asset Purchase Agreement, received $10.8 million, although the Porteck Asset Purchase Agreement provides for a purchase price of $12.8 million. At the time, Parmar asked that the purchase price be increased by $2 million to fund related deal fees because he wanted to pay the fees out of the proceeds of | Objection:  Rules 701 & 802.  *See Amerisource Corp. v. RxUSA Int'l, Inc.*, 2009 U.S. Dist. LEXIS 6864, *3-4 (E.D.N.Y. 2009) (First, witnesses' statement to the declarant properly excluded as hearsay unless there is an exception).  Defendant's statement as to what Parmar wanted lacks foundation. |

6

| Paragraph Number | Affidavit of Arvind Walia | Plaintiff's Evidentiary Objection |
|---|---|---|
| | sale instead of paying them as a separate expense. He wanted the purchase price to reflect the total cost of the transaction. I did not believe there was anything unusual about this. | Second, the statement regarding "transaction fees" lacks any foundation whatsoever and is simple speculation. *SEC v. Espuelas,* 905 F. Supp. 2d 507, 520 (S.D.N.Y. 2012) (When a witness has not identified the objective bases for his opinion, the proffered opinion obviously fails completely to meet the requirements of <u>Rule 701</u>, first, because there is no way for the court to assess whether it is rationally based on the witness's perceptions, and second, because the opinion does not help the jury but only tells it in conclusory fashion what it should find.) |
| 39 | Plaintiff notes that according to the IOLA Account, $3 million of the purchase price was paid to First United Health ("**FUH**"), a Parmar controlled entity, and he assumes that it was inappropriate, though he offers no evidence of that fact. And he assumes that I had knowledge at the time that it was inappropriate. I had no such knowledge. Nor was I ever privy to information regarding the IOLA Account. I had no knowledge of any disbursement of closing proceeds other than with respect to the payments made to Porteck. Indeed, I did not learn until this litigation that funds were paid to FUH. Here too, the inference Plaintiff draws - that I was complicit in a fraudulent transaction - is a bridge too far. | Objection:  FRCP <u>Rule 56(c)(1)(A)</u>. The statement is an inaccurate and self-serving summary of the Motion and not a statement of fact as supported by material in the record. *See Hollander v. American Cyanamid Co.,* 172 F.3d 192, 198 (2nd Cir. 1999) (The district court was correct in holding that the affidavit flagrantly disregarded the requirements of <u>Rule 56(e)</u>,was riddled with inadmissible hearsay, conclusory statements and arguments, and "more resembled an adversarial memorandum than a *bona fide* affidavit".) |
| 40 | Plaintiff's arguments directed at the Porteck Asset Purchase Agreement are a red herring. The price of Porteck's assets under the Porteck Asset Purchase Agreement is | Objection:  FRCP <u>Rule 56(c)(1)(A)</u>. The statement is an inaccurate and self-serving summary of the Motion and not a statement of fact as supported by material in the record. *See Hollander v. American* |

7

| Paragraph Number | Affidavit of Arvind Walia | Plaintiff's Evidentiary Objection |
|---|---|---|
| | irrelevant because, importantly, Plaintiff is not challenging the price or the Porteck Asset Purchase Agreement itself as a fraudulent conveyance; he is challenging only the Two-Year Transfer, which was a deferred payment made pursuant to the Porteck Asset Purchase Agreement a year after it was executed. | *Cyanamid Co.*, 172 F.3d 192, 198 (2nd Cir. 1999) (The district court was correct in holding that the affidavit flagrantly disregarded the requirements of Rule 56(e), was riddled with inadmissible hearsay, conclusory statements and arguments, and "more resembled an adversarial memorandum than a *bona fide* affidavit".) |
| 43 | The stated purpose of the escrow arrangement was to protect the rights of Physicians Practice, as purchaser under the Porteck Asset Purchase Agreement, to receive $2.5 million, to the extent such funds were required to indemnify Physicians Practice. But as a practical matter, the arrangement was not necessary to protect Physicians Practice because it simply withheld payment of the $2.5 million. The arrangement provided more meaningful benefit to the sellers because it would have secured their rights to obtain such funds in the future to the extent they were not required to fund their indemnity obligation. No indemnity claims arose entitling the purchaser to any such funds, and I therefore asked that the sellers be paid the entire amount. Constellation Healthcare and/or Orion paid Niknim $2,500,000; i.e., the Two-Year Transfer. | Objection: Rule 701; FRCP Rule 56(c)(1)(A). The statement is not a statement of fact as supported by material in the record, but legal argument of the witness. It is a stipulated fact no escrow existed and no monies were deposited. (Dkt. No. 54, JSOF 48, 49) *See Hollander v. American Cyanamid Co.*, 172 F.3d 192, 198 (2nd Cir. 1999) (The district court was correct in holding that the affidavit flagrantly disregarded the requirements of Rule 56(e),was riddled with inadmissible hearsay, conclusory statements and arguments, and "more resembled an adversarial memorandum than a *bona fide* affidavit".)<br><br>Rule 401: The statement is irrelevant. In determining value, the Court makes a two-fold inquiry: first, whether the debtor received any value at all in exchange for the transfer, i.e. any realizable commercial value as a result of the transaction, and second, whether that value was in fact reasonably equivalent. *See Devon Mobile Communs. Liquidating Trust v. Adelphia Communs. Corp. (In re Adelphia Communs. Corp.)*, No. 02-41729 (CGM), 2006 Bankr. LEXIS 4600, 2006 WL 687153, at *11 (Bankr. S.D.N.Y. Mar. 6, 2006). What the Defendant and Parmar allegedly said to one another is not a substitute for the burden to produce admissible evidence of "reasonably |

8

| Paragraph Number | Affidavit of Arvind Walia | Plaintiff's Evidentiary Objection |
|---|---|---|
| | | equivalent value". |
| 44 | Plaintiff argues that the failure of the Debtors to create the escrow compels the conclusion that Porteck was not entitled to the deferred payment and that the Two-Year Transfer was a fraudulent conveyance. However, as a feature that would have served to enhance the sellers' rights to receive the deferred payment, Porteck's failure to enforce the provision at closing was an oversight that was averse to its interests alone. I did not learn until this litigation that the escrow was not created, and I never claimed that funds were otherwise set aside to fund the deferred payment. As an officer of Orion and Constellation Healthcare, I was confident that the deferred payment would be made if required. In any event, the absence of the escrow does not militate in favor of the conclusion that the payment was not due or that it was a fraudulent conveyance. | Objection: Rule 701; FRCP Rule 56(c)(1)(A).  The statement is not a statement of fact as supported by material in the record, but legal argument of the witness attempting to explain a stipulated fact that no escrow was established or discussed. (Dkt. No. 54, JSOF 48) (See *Hollander v. American Cyanamid Co.*, 172 F.3d 192, 198 (2nd Cir. 1999) (The district court was correct in holding that the affidavit flagrantly disregarded the requirements of Rule 56(e),was riddled with inadmissible hearsay, conclusory statements and arguments, and  "more resembled an adversarial memorandum than a *bona fide* affidavit".)

**Admission against interest**: Defendant claims in the Opposition he did not control business or disposition of assets of the Debtor and was not an "insider". Yet, he makes the statement "As an officer of Orion and Constellation Healthcare, I was confident that the deferred payment would be made if required." |
| 45 | Plaintiff's statement that at December 31, 2015, the Debtors' books did not reflect an antecedent debt of $2.5 million owed to the sellers of Porteck and their books evidence no satisfaction of an antecedent debt or increase in net assets as a result of making the Two-Year Transfer is of no moment. I had nothing to do with maintaining the Debtors' books and records.  More importantly, Plaintiff has submitted no evidence that either of such entries would have been appropriate under the circumstances. These are just facts from which Plaintiff draws an illogical inference. | Objection: Rule 701; FRCP Rule 56(c)(1)(A).  The statement is not a statement of fact as supported by material in the record, but legal argument of the witness attempting to explain facts not rebutted. (Dkt. No. 54; ASOF 88, 89) (See *Hollander v. American Cyanamid Co.*, 172 F.3d 192, 198 (2nd Cir. 1999)  (The district court was correct in holding that the affidavit flagrantly disregarded the requirements of Rule 56(e),was riddled with inadmissible hearsay, conclusory statements and arguments, and "more resembled an adversarial memorandum than a *bona fide* affidavit".) |

9

| Paragraph Number | Affidavit of Arvind Walia | Plaintiff's Evidentiary Objection |
|---|---|---|
| | | |
| 46 | Plaintiff points to Parmar's email to me saying that "I am willing to give you 3.5MM in return for you to allow me to structure it properly internally which requires I close the file with a 2M payment." The $3.5 million related to a discussion I had been having with Parmar regarding the $2.5 million owed as a deferred payment under the Porteck Asset Purchase Agreement, plus $1 million that the purchaser owed Porteck because it had collected that amount of accounts receivable, which were not sold under the Porteck Asset Purchase Agreement. Plaintiff's interpretation of the email is a self-serving misinterpretation that does not support a grant of summary judgment. | Objection: Rules 701 & 802.  The attempt to reference an out-of-court statement, rather than produce admissible evidence, is hearsay. *SEC v. Espuelas*, 905 F. Supp. 2d 507, 520 (S.D.N.Y. 2012)  (When a witness has not identified the objective bases for his opinion, the proffered opinion obviously fails completely to meet the requirements of Rule 701, first, because there is no way for the court to assess whether it is rationally based on the witness's perceptions, and second, because the opinion does not help the jury but only tells it in conclusory fashion what it should find. Rule 701(a) reflects, in part, the Rule's more general requirement that a witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.)<br><br>Rule 401: the statement is irrelevant.  In determining value, the Court makes a two-fold inquiry: first, whether the debtor received any value at all in exchange for the transfer, i.e. any realizable commercial value as a result of the transaction, and second, whether that value was in fact reasonably equivalent. *See Devon Mobile Communs. Liquidating Trust v. Adelphia Communs. Corp. (In re Adelphia Communs. Corp.)*, No. 02-41729 (CGM), 2006 Bankr. LEXIS 4600, 2006 WL 687153, at *11 (Bankr. S.D.N.Y. Mar. 6, 2006).  What the Defendant claims the email means is not a substitute for the burden to produce admissible evidence of "reasonably equivalent value". |
| 51 | Objectech owned AllRad Direct, LLC ("**AllRad**"). AllRad's property consisted of certain software that was advantageous to the Debtors. It provides state of the art technology | Objection:  Rule 701.  Witness offering a lay opinion must base his opinion on his own personal knowledge, which must be established to the court and jury. "When a witness has not identified the objective |

10

| Paragraph Number | Affidavit of Arvind Walia | Plaintiff's Evidentiary Objection |
|---|---|---|
| | to ensure that patients, providers, and payers have complete access and insight into every aspect of the diagnosis, treatment, and follow-up for each patient. The data base was designed to facilitate population wellness management solutions of by consolidating and storing clinical assessments, diagnostic laboratory and imaging results, prescribed treatment regimens and care plans and their clinical outcomes for each patient. More detailed descriptions of the software are annexed hereto as *Exhibits "C" and "D"*. | bases for his opinion, the proffered opinion obviously fails completely to meet the requirements of <u>Rule 701</u> . . . because there is no way for the court to assess whether it is rationally based on the witness's perceptions . . .." *United States v. Garcia*, 291 F.3d 127, 140 (2nd Cir. 2002).  No foundation presented for the statements that Objectech owned AllRad or that AllRad's property consisted of certain software.<br><br>*See Reynolds v. Am. Airlines, Inc.*, 2017 U.S. Dist. LEXIS 198949, *4-5 (Bankr. E.D.N.Y, 2017) (Incident report properly stricken where proponent failed to offer foundation for document offered.)<br><br>Lastly, the oral testimony seeks to contradict a fact admitted by Defendant that the Objecttech MIPA included no assets. (Dkt. No. 54; JSOF 68)  Now, the witness claims an asset, software, was conveyed. |
| 53 | ALLRad software is a network management system that had the following advantages.<br><br>• It had most of the network management features needed for NYNM.<br>• The technology was the same as the PARCS system.<br>• The AllRad team was very familiar with PARCS system as they were from the same company.<br>• The operational efficiency and cost saving for replacing existing software with ALLRad software once adapted by NYNM would be over $3M a year.It had most of the network management features needed for NYNM.<br>• The technology was the same as the PARCS system. | Objection:  <u>Rule 701</u>.  Witness offering a lay opinion must base his opinion on his own personal knowledge, which must be established to the court and jury. "When a witness has not identified the objective bases for his opinion, the proffered opinion obviously fails completely to meet the requirements of <u>Rule 701</u> . . . because there is no way for the court to assess whether it is rationally based on the witness's perceptions . . .."  *United States v. Garcia*, 291 F.3d 127, 140 (2nd Cir. 2002).  No foundation is presented for any of the statements.<br><br>*SEC v. Espuelas*, 905 F. Supp. 2d 507, 520 (S.D.N.Y. 2012)  (When a witness has not identified the objective bases for his opinion, the proffered opinion obviously fails completely to meet the requirements of <u>Rule 701</u>, because the opinion does not |

DOCS_LA:347549.6 65004/003

| Paragraph Number | Affidavit of Arvind Walia | Plaintiff's Evidentiary Objection |
|---|---|---|
| | • The AllRad team was very familiar with PARCS system as they were from the same company.<br>• The operational efficiency and cost saving for replacing existing software with ALLRad software once adapted by NYNM would be over $3M a year. | help the jury but only tells it in conclusory fashion what it should find. |
| 55 | The amount of the consideration paid under the Objectech Membership Purchase Agreement was the result a bilateral negotiation and represents the exercise of the parties' respective business judgment, in good faith. Plaintiff has produced no evidence that the Debtors received less than reasonably equivalent value; he offers only a negative inference from self-serving speculation. | Objection: Rule 701; FRCP Rule 56(c)(1)(A).  The statement is not a statement of fact as supported by material in the record, but legal argument of the witness. (*See Hollander v. American Cyanamid Co.*, 172 F.3d 192, 198 (2nd Cir. 1999) (The district court was correct in holding that the affidavit flagrantly disregarded the requirements of Rule 56(e),was riddled with inadmissible hearsay, conclusory statements and arguments, and "more resembled an adversarial memorandum than a *bona fide* affidavit".)<br><br>Opinion testimony concluding Defendant exercised "good faith" or received "value" are unsubstantiated opinions and improper. Opinion testimony whether conduct at issue was "unlawful" or "willful" is clearly objectionable.  *US v. Espino*, 32 F.3d 253, 257 (7th Cir. 1994). |
| 56 | The Debtors' counsel prepared the draft of the Objectech Membership Purchase Agreement. At the time they prepared it they were not familiar with Objectech or its assets and both Parmar and I treated it as a working template to memorialize the transaction. Plaintiff attempts to paint the transaction as fraudulent by observing that the various schedules | Objection: Rule 701; FRCP Rule 56(c)(1)(A).  The statement is not a statement of fact as supported by material in the record, but legal argument of the witness.<br><br>No foundation is offered for the claim the lawyers are to blame for the MIPA not supporting Defendant's claims. |

12

| Paragraph Number | Affidavit of Arvind Walia | Plaintiff's Evidentiary Objection |
|---|---|---|
|  | referenced in the Objectech Membership Purchase Agreement were never completed or attached, no revenue projections, working capital, balance sheets or statement of assets and liabilities referenced therein were attached, the Orion board of directors' resolution approving the sale was never obtained, and the Due Diligence report was never finalized. |  |
| 57 | As a company Objectech had [software] developed through a substantial capital investment. Consequently, the various schedules, projections, and other financial information to which Plaintiff refers had no relevance to the transaction at hand and Plaintiff's conclusion that the absence of such documents means the transaction was fraudulent is baseless. Throughout the negotiations, I responded to all requests for information relating to the software, its value, and its utility to the Debtors and I believe the Debtors had become fully satisfied with such information at the time the transaction closed. I also assumed the Orion board of directors had approved the sale and was unaware that it had not. | Objection: Rule 701; FRCP Rule 56(c)(1)(A).  The statement is not a statement of fact as supported by material in the record, but speculative clams lacking admissible evidence.  No admissible evidence is submitted to support a claim "Objectech had [software] developed through a substantial capital investment".

It is an undisputed fact Plaintiff requested financial records regarding Objectech and/or AllRad and Defendant failed to produce records which would evidence if such software existed and any value it may have had.  (Dkt. No. 54, JSOF 66, ASOF 94, 95)  *See* **Adverse Inference Rule**.  A party's failure to produce evidence which, under the circumstances, would be expected leads to an inference that the evidence not produced would <u>not</u> have buttressed the party's position and indeed would have undercut it.  *In re Bruce,* 2005 Bankr. LEXIS 3085, *45 (Bankr. Mon. 2005), citing to *Golden State Bottling Co. v. NLRB,* 414 U.S. 168, 174, 94 S.Ct. 414, 420, 38 L.Ed.2d 388 (1973); *See also P.R. Mallory Co. v. NLRB,* 400 F.2d 956, 959 (7th Cir. 1968). |
| 58 | Here as well, Plaintiff's inference - that the transaction was somehow fraudulent, or that I was complicit in perpetrating some fraud - is a bridge | Objection: Rule 701; FRCP Rule 56(c)(1)(A).  The statement is not a statement of fact as supported by material in the record, but argument. |

| Paragraph Number | Affidavit of Arvind Walia | Plaintiff's Evidentiary Objection |
|---|---|---|
|  | too far. Nor do any of Plaintiff's alleged facts support the conclusion that Parmar himself was acting with any kind of fraudulent intent sufficient to sustain Plaintiff's burden for obtaining summary judgment. |  |
| 59 | Plaintiff's statement that the Debtors' books and records do not evidence an antecedent debt owed under the Objectech Membership Purchase Agreement and that after the One-Year Transfer, the Debtors' books and records do not evidence the satisfaction of such debt or an increase in net assets through the acquisition is another red herring. No such entry would have been made by the Debtors because Physicians Healthcare, a non-debtor, was the counter-party to the Objectech Membership Purchase Agreement, so any such entry would have been recordable in its books and records. In any event, Plaintiff has not submitted any evidence that there actually was an antecedent debt (of Physicians Healthcare) created under the Objectech Membership Purchase Agreement. In fact, there was none because the execution and closing under the Objectech Membership Purchase Agreement occurred simultaneously. | Objection: <u>Rule 701</u>; FRCP <u>Rule 56(c)(1)(A)</u>.  The statement is not a statement of fact as supported by material in the record, but argument. |
| 61 | It was typical in the ordinary course of the Debtors' businesses to create (and own the equity of) an entity for the special purpose of making an acquisition, and I believe that such was the case with respect to the Objectech Membership Purchase Agreement. | Objection:  <u>Rule 701</u>; FRCP <u>Rule 56(c)(1)(A)</u>.  The statement is not a statement of fact as supported by material in the record, but legal argument of the witness.  No foundation is offered for the claim the lawyers are to blame for the MIPA not supporting Defendant's claims. |

14

| Paragraph Number | Affidavit of Arvind Walia | Plaintiff's Evidentiary Objection |
|---|---|---|
| 62 | Regardless, the assets of Objectech were delivered to Orion, one of the Debtors, at the closing and I, as the President and Chief Executive Officer of the Orion, presided over the development and integration of the software for the exclusive benefit of the Debtors. I believe that the value of this benefit was reasonably equivalent to the amount paid in exchange for it under the Objectech Membership Purchase Agreement. The Plaintiff has not submitted any evidence to the contrary. | Objection: Rule 401: The conclusory self-serving opinion of the witness is irrelevant. In determining value, the Court makes a two-fold inquiry: first, whether the debtor received any value at all in exchange for the transfer, i.e. any realizable commercial value as a result of the transaction, and second, whether that value was in fact reasonably equivalent. *See Devon Mobile Communs. Liquidating Trust v. Adelphia Communs. Corp. (In re Adelphia Communs. Corp.)*, No. 02-41729 (CGM), 2006 Bankr. LEXIS 4600, 2006 WL 687153, at *11 (Bankr. S.D.N.Y. Mar. 6, 2006).

The affidavit seeks to contradict a fact admitted by Defendant that the Objecttech MIPA included no assets. (Dkt. No. 54; JSOF, 68)  Now, the witness claims an asset, software, was conveyed and that PHNMS, a non-party, who received "Interests" conveyed those "Interests" to the Debtor.  No foundation is introduced for any of the multiple statements. When a witness has not identified the objective bases for his opinion, the proffered opinion obviously fails completely to meet the requirements of Rule 701 . . . because there is no way for the court to assess whether it is rationally based on the witness's perceptions . . .." *United States v. Garcia*, 291 F.3d 127, 140 (2nd Cir. 2002). |
| 63 | Plaintiff has presented no competent evidence that either of the Transfers was made with actual intent to hinder, delay, or defraud a creditor. Neither the Porteck Asset Purchase Agreement nor the Objectech Membership Purchase Agreement manifests any false statement, misrepresentation, or backdating. | Objection: Rule 701; FRCP Rule 56(c)(1)(A).  The statement is not a statement of fact as supported by material in the record, but legal argument of the witness. |

DOCS_LA:347549.6 65004/003

| Paragraph Number | Affidavit of Arvind Walia | Plaintiff's Evidentiary Objection |
|---|---|---|
| | Grossing up the purchase price under the Porteck Asset Purchase Agreement to include related transaction fees was neither a false statement nor a misrepresentation. Plaintiff has merely drawn conclusions by inferring them from facts that are insufficient to support the respective inferences. Plaintiff's statement that I was "complicit" in any of Parmar's schemes is a figment of his imagination. | |
| 64 | Plaintiff argues that I failed to produce evidence in the form of certain tax records, and infers the failure is evidence that I had something to hide. Plaintiff requested copies of certain tax returns filed by Objectech. As Plaintiff is aware, such returns were not produced because they do not exist. As mentioned, Objectech did nothing, had no revenue, and had no assets other than valuable software. Having no revenue to report, it filed no tax return | Objection:  FRE Rule 801(d)(2).  The new unsworn testimony contradicts Defendant's prior sworn deposition testimony that tax records existed and were not produced. *See Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F.2d 566, 572 (2nd Cir. 1991), citing to *Mack v. United States*, 814 F.2d 120, 124 (2nd Cir. 1987) (party cannot create genuine issue of material fact with affidavit contradicting prior deposition testimony in attempt to defeat summary judgment motion).  See Plaintiff's Reply Brief. |
| 65 | As already mentioned, Defendants have cross-moved for partial summary judgment dismissing Plaintiff's claims asserted under NYDCL 273-a based upon Plaintiff's failure to plead that there existed so-called "triggering creditors." | Objection: Rule 701; FRCP Rule 56(c)(1)(A).  The statement is not a statement of fact as supported by material in the record, but legal argument of the witness. |
| 66 | Assuming, however, the claim under NYDCL 273-a is viable, in order to succeed under this section, I understand that Plaintiff has the burden of proving the transferor's receipt of less than fair equivalent value in the exchange. Plaintiff argues that he meets this burden | Objection: Rule 701; FRCP Rule 56(c)(1)(A).  The statement is not a statement of fact as supported by material in the record, but legal argument of the witness. |

16

| Paragraph Number | Affidavit of Arvind Walia | Plaintiff's Evidentiary Objection |
|---|---|---|
| | because in New York, fair equivalent value also requires good faith and a transaction between insiders lacks good faith. Therefore, according to Plaintiff, the Transfers are per se avoidable as a matter of law. However, as discussed in the memorandum of law in opposition to Plaintiff's motion, this is a misstatement of New York law. Insider status alone does not render a transfer fraudulent. Plaintiff must still prove the transferor's receipt of less than fair equivalent value in the exchange. | |
| 69 | My status as an initial transferee depends upon Plaintiff proving that Niknim is my alter ego. I understand that in New York, in order to state a claim for alter-ego liability, plaintiff is generally required to allege "complete domination of the corporation in respect to the transaction attacked" and "that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury." Plaintiff has offered no evidence to support such allegations and I submit there is none. | Objection: Rule 701; FRCP Rule 56(c)(1)(A).  The statement is not a statement of fact as supported by material in the record, but legal argument of the witness. |
| 70 | As to my status as an immediate or mediate transferee of the Transfers, Plaintiff has made no allegation with respect to any transfer by Niknim. Regardless, assuming I was a transferee of Niknim, my liability would be shielded under section 550(b)(1) because I took for value, in good faith, and without knowledge of the voidability of the Transfers. | Objection: Rule 701; FRCP Rule 56(c)(1)(A).  The statement is not a statement of fact as supported by material in the record, but legal argument of the witness. |

17

Dated:  March 10, 2023                PACHULSKI STANG ZIEHL & JONES LLP

                                      By:    */s/ Jeffrey P. Nolan*
                                             Ilan D. Scharf, Esq.
                                             Jeffrey P. Nolan, Esq. (admitted *pro hac vice*)
                                             780 Third Avenue, 34th Floor
                                             New York, New York 10017
                                             Telephone:    (212) 561-7700
                                             Facsimile:    (212) 561-7777

                                             Counsel for the Plaintiff, Howard M.
                                             Ehrenberg in his capacity as Liquidating
                                             Trustee of Orion Healthcorp, Inc., *et al*.

18

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐ :

In re:                                    :   Chapter 11
                                          :
ORION HEALTHCORP, INC.,[1]                :   Case No. 18-71748 (AST)
                                          :
                        Debtors.          :   (Jointly Administered)
                                          :
‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐ :
                                          :
HOWARD M. EHRENBERG IN HIS CAPACITY       :   Adv. Pro. No. 20-08049 (AST)
AS LIQUIDATING TRUSTEE OF ORION           :
HEALTHCORP, INC., ET AL.,                 :   [Filed Concurrently with Objection
                                          :   And Request To Strike the Affidavit
                        Plaintiff,        :   of Arvind Walia]
                                          :
v.                                        :
                                          :
                                          :
ARVIND WALIA; NIKNIM MANAGEMENT, INC.,    :
                                          :
                        Defendants.       :
                                          :
‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐ :


**REPLY BRIEF IN SUPPORT OF PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT, OR IN THE
ALTERNATIVE, SUMMARY ADJUDICATION AS AGAINST
DEFENDANTS ARVIND WALIA AND NIKNIM MANAGEMENT, INC.**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Orion Healthcorp, Inc. (7246); Constellation Healthcare Technologies, Inc. (0135); NEMS Acquisition, LLC (7378); Northeast Medical Solutions, LLC (2703); NEMS West Virginia, LLC (unknown); Physicians Practice Plus Holdings, LLC (6100); Physicians Practice Plus, LLC (4122); Medical Billing Services, Inc. (2971); Rand Medical Billing, Inc. (7887); RMI Physician Services Corporation (7239); Western Skies Practice Management, Inc. (1904); Integrated Physician Solutions, Inc. (0543); NYNM Acquisition, LLC (unknown) Northstar FHA, LLC (unknown); Northstar First Health, LLC (unknown); Vachette Business Services, Ltd. (4672); Phoenix Health, LLC (0856); MDRX Medical Billing, LLC (5410); VEGA Medical Professionals, LLC (1055); Allegiance Consulting Associates, LLC (7291); Allegiance Billing & Consulting, LLC (7141); New York Network Management, LLC (7168). The corporate headquarters and the mailing address for the Debtors listed above is 1715 Route 35 North, Suite 303, Middletown, NJ 07748.

## TABLE OF CONTENTS

**Page**

I.     SUMMARY OF ARGUMENT ON REPLY ....................................................................... 1

II.    LEGAL STANDARD ON SUMMARY JUDGMENT OR ADJUDICATION ..................... 3

A.    Plaintiff's Additional Statement Of Facts In Support Of The Motion Are
Deemed Admitted ........................................................................................................... 4

B.    The Walia Affidavit and Two Exhibits Violate Numerous Federal Rules of
Evidence Indicating its Unreliability and Exclusion from the Record .................................. 5

III.   THE MOTION PRESENTED A *PRIMA FACIE* CASE OF INTENTIONAL
FRAUD PURSUANT TO NYDCL §276,  AS THE APA WAS PURPOSEFULLY
MISSTATED AND NO EVIDENCE SUPPORTS A LEGITIMATE
EXPLANATION FOR THE DIVERSION OF 2.5MM OUT OF THE ESTATE ................. 5

    A.    Lack of a Legitimate Explanation ............................................................................. 6

    B.    Defendant's Participation In The Scheme Or Indifference To The Truth ................. 8

    C.    The Close Relationship Between The Parties To The Transaction ........................... 9

    D.    Control Of The Property And Personal Benefit ...................................................... 10

    E.    Transferor's Knowledge Of Creditor's Claims ....................................................... 10

IV.   THE MOTION PRESENTED A *PRIMA FACIE* CASE OF INTENTIONAL
FRAUD PURSUANT TO NYDCL §276 FOR THE DIVERSION OF THE
SECOND TRANSFER OF $1,520,000 AS THE MIPA IS REPLETE WITH
FALSE STATEMENTS IN AN EFFORT TO MAKE THE PURCHASE OF
A SHELL COMPANY APPEAR LEGITIMATE ........................................................... 11

    A.    Conclusions And Legal Opinions Are Not A Substitute For Admissible
Evidence .................................................................................................................. 12

    B.    Exhibits C & D Are Properly Stricken As Inadmissible Hearsay Lacking
in Any Reliability .................................................................................................... 13

    C.    Self-Serving Affidavits That Contradict The Underlying Facts Of Prior
Testimony Are Properly Stricken On Summary Judgment ..................................... 13

    D.    The MIPA Was Falsely Stated In An Effort To Make An Illegitimate
Transaction Appear Legitimate ............................................................................... 15

        i.    Fraudulent Intent Established Under Badges of Fraud ................................ 15

| | | | |
|---|---|---|---|
| | ii. | Lack of a Legitimate Explanation | 16 |
| | iii. | The Close Relationship Between the Parties to the Transaction | 16 |
| | iv. | Transferor's Knowledge of Creditor's Claims | 16 |
| V. | | THE MOTION PRESENTED A *PRIMA FACIE* CASE OF CONSTRUCTIVE FRAUD PURSUANT TO NY DCL §273-A, AS JUDGMENT CREDITORS EXISTED BEFORE THE TRANSFERS AND THE TRANSFERS WERE MADE TO AN OFFICER AND INSIDER OF THE DEBTOR | 17 |
| | A. | First Transfer: | 17 |
| | B. | Second Transfer | 19 |
| VI. | | WALIA IS INDIVIDUALLY LIABLE FOR THE DEBTORS MONIES HE DIVERTED TO DEFENDANT NIKNIM AWAY FROM LEGITIMATE CREDITORS OF THE ESTATE | 21 |
| VII. | | CONCLUSION | 24 |

# TABLE OF AUTHORITIES

**Pages**

## Cases

*Am. Panel Tec v Hyrise, Inc.*
31 AD3d 586, 819 N.Y.S.2d 768 (2d Dept 2006)............................................20

*Anstine v. Carl Zeiss Meditec AG (In re U.S. Medical, Inc.)*
531 F.3d 1272 (10th Cir. 2008)...............................................................19

*BellSouth Telecomms v. W.R. Grace & Co.*
77 F.3d 603 (2nd Cir. 1996) ...................................................................5

*Berlenbach v. Bischoff*
137 Misc. 719, 244 N.Y.S. 369 (N.Y.Sup.Ct. Spec. Term 1930) ...........................8

*City of Almaty v. Ablyazov*
2019 U.S. Dist. LEXIS 55183, *14 (Bankr. S.D.N.Y. 2019) ...............................21

*Deutsche Financial Services Corp. v. Osborne (In re Osborne)*
257 B.R. 14 (Bankr. C.D. Cal. 2000) .......................................................14

*Devon Mobile Communs. Liquidating Trust v. Adelphia Communs. Corp.*
*In re Adelphia Communs. Corp.)*
No. 02-41729 (CGM), 2006 Bankr. LEXIS 4600, 2006 WL 687153, at *11
(Bankr. S.D.N.Y. Mar. 6, 2006) .............................................................15

*East Hampton Union Free School Dist. v Sandpebble Bldrs., Inc.*
66 AD3d 122, 884 NYS2d 94 (2009) ........................................................21

*Eberhard v. Marcu*
530 F.3d 122 (2nd Cir. 2008) ................................................................7

*Evans v. Port Authority of N.Y. & N.J.*
192 F. Supp. 2d 247 (S.D.N.Y. 2002).......................................................13

*Fannie Mae v. Olympia Mortg. Corp.*
792 F. Supp. 2d 645 (Bankr. E.D.N.Y. 2011) ..........................................7, 8, 16

*Farm Stores, Inc. v. Sch. Feeding Corp.*
102 A.D.2d 249, 477 N.Y.S.2d 374 (2d Dept 1984)........................................18

*Gonzales v. Albuquerque Tortilla Co. (In re Furrs Supermarkets, Inc.)*
2008 Bankr. LEXIS 946,*26 (Bankr. N.M. 2008) .........................................14

*HBE Leasing Corp. v. Frank*
48 F.3d 623 (2d Cir. 1995)..................................................................18

*Hollander v. American Cyanamid Co.*
172 F.3d 192 (2nd Cir. 1999)...............................................................12

*In re Diorio*
407 F.2d 1330 (2d Cir. 1969)................................................................9

*In re Leneve*
341 B.R. 53 (Bankr. S.D. Fla. 2006) .......................................................21

*In re Vebeliunas*
332 F.3d 85 (2d Cir. 2003)..................................................................23

*International Aircraft Trading Co. v. Manufacturers Trust Co.*
297 N.Y. 285, 79 N.E.2d 249 (1948) .......................................................22

*Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.)*
    263 B.R. 406 (S.D.N.Y. 2001) ..................................................................... 19, 20

*Jacobs v. D'D'Alessandro (In re Dewey & Leboeuf LLP)*
    2014 Bankr. LEXIS 4051, *17) ........................................................................ 18

*Jaramillo v. Weyerhaeuser Co.*
    536 F.3d 140 (2d Cir. 2008) ............................................................................... 3

*Kiobel v. Royal Dutch Petroleum*
    621 F.3d 111 (2d Cir. 2010) ............................................................................. 21

*Lyman Commerce Solutions, Inc. v. Lung*
    2015 U.S. Dist. LEXIS 51447, 17 (S.D.N.Y, 2015) ........................................ 20

*Machado v. A. Canterpass*, LLC
    115 A.D.3d 652, 981 N.Y.S.2d 758 (2d Dept. 2014) ......................................... 7

*Mack v. United States*
    814 F.2d 120 (2d Cir. 1987) ............................................................................. 13

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*
    475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) ................................. 22

*Mellon Bank, N.A. v. Metro Communications, Inc.*
    945 F.2d 635 (3rd Cir. 1991) ........................................................................... 19

*Morris v. State Dep't of Taxation & Fin.*
    82 N.Y.2d 135 (1993) ...................................................................................... 22

*Music Royalty Consulting, Inc. v. Reservoir Media Mgmt.*
    598 F. Supp. 3d 158 (S.D.N.Y. 2022) ................................................................ 4

*National Labor Relations Bd. v Greater Kan. City Roofing*
    2 F.3d 1047 (10th Cir. 1993) ........................................................................... 22

*Nora Bevs., Inc. v. Perrier Group of Am. Inc.*
    164 F.3d 736 (2d Cir. 1998) ............................................................................. 12

*P.A. Bldg. Co. v Silverman*
    298 AD2d 327, 750 N.Y.S.2d 13 (1st Dept 2002) ........................................... 20

*Prabir v. Bukhara Indian Cuisine, Inc.*
    2018 U.S. Dist. LEXIS 94563, *9 (S.D.N.Y. 2018) .......................................... 8

*Priestley v. Panmedix Inc.*
    18 F. Supp. 3d 486 (S.D.N.Y. 2014) ................................................................ 17

*Reynolds v. Am. Airlines, Inc.*
    2017 U.S. Dist. LEXIS 198949, *4-5 (Bankr. E.D.N.Y. 2017) ....................... 13

*Salim v. VW Credit, Inc.*
    577 B.R. 615 (E.D.N.Y. 2017) .......................................................................... 8

*SEC v. Espuelas*
    905 F. Supp. 2d 507 (S.D.N.Y. 2012) ............................................................... 4

*Seymour v. Hull & Moreland Eng'g*
    605 F.2d 1105 (9th Cir. 1979) ......................................................................... 22

*Sharp Int'l Corp. v. State St. Bank & Trust Co.*
    403 F.3d 43 (2d Cir. 2005) ............................................................................... 18

*Togut v. RBC Dain Correspondent Servs. (In re S.W. Bach & Co.)*
    435 B.R. 866 (Bankr. S.D.N.Y. 2010) 2010 Bankr. LEXIS 2469, *24-25,
    53 Bankr. Ct. Dec. 148 ................................................................................ 16

*Trans-Orient Marine Corp. v. Star Trading & Marine, Inc*.
    925 F.2d 566 (2nd Cir. 1991) ................................................................. 13

*Tronox Inc. v. Kerr McGee Corp., (In re Tronox Inc.)*
    503 B.R. 239 (S.D.N.Y, 2013) ..................................................................... 6

*U.S. v. Spencer*
    2012 U.S. Dist. LEXIS 142195, 2012 WL 4577927 at *7 ..................... 10

*United States v. Evseroff*
    270 Fed. Appx. 75 (2nd Cir. 2008) ......................................................... 23

*United States v. Garcia,*
    291 F.3d 127 (2nd Cir. 2002) ................................................................ 5

*United States v. Maciejewski*
    70 F. Supp. 2d 129 (Bankr. N.D.N.Y. 1999) ........................................... 15

*United States v. VanDiviner*
    822 F.2d 960 (10th Cir. 1987) .................................................................. 22

*William Iselin & Co., Inc. v. Boardwalk Regency Corp.*
    703 F. Supp. 1084 (S.D.N.Y. 1989) ......................................................... 15

*Williams v. Frank Martz Coach Co.*
    2014 U.S. Dist. LEXIS 66411, *11-*15 (E.D.N.Y. 2104) ........................ 5

*Wimbledon Fin. Master Fund v. Wimbledon Fund, SPC*
    2016 N.Y. Misc. LEXIS 4805, *16, 2017 WL 3024259 ................. 7, 9, 10, 16

*Wright v. Undercover Officer*
    2018 U.S. Dist. LEXIS 143483, *9 (S.D.N.Y. 2018) ............................... 4

**Statutes**

11 U.S.C. §101 ........................................................................................... 19

28 U.S.C. §1746 ........................................................................................... 5

**Other Authorities**

13 Romualdo P. Eclavea, Carmody-Wait 2d New York Practice with Forms
    §§85-29 & 85-30 (2002) ............................................................................ 8

N.Y. Debt & Cred. Law §272 ................................................................. 2, 23

N.Y. Debt & Cred. Law §273 ................................................. 2, 17, 18, 19, 20

N.Y. Debt & Credit Law §276 .............................................................. 7, 10, 15

N.Y. Debt & Cred. Law §278 ..................................................................... 1, 8

## Rules

Federal Practice & Procedure §2738 (1983)..............................................................................4

Federal Rules of Evidence 1101 ............................................................................................13

Federal Rules of Evidence 801 ..............................................................................................13

Federal Rules of Evidence 803 ..............................................................................................13

Joint Rules of Civil Procedure S.D.N.Y./E.D.N.Y. 56 .........................................................4, 5, 12

## Rules

Federal Practice & Procedure §2738 (1983)................................................................................4

Federal Rules of Evidence 1101 ...........................................................................................13

Federal Rules of Evidence 801 .............................................................................................13

Federal Rules of Evidence 803 .............................................................................................13

Joint Rules of Civil Procedure S.D.N.Y./E.D.N.Y. 56 ..........................................................4, 5, 12

COMES NOW, Plaintiff, Howard M. Ehrenberg in his capacity as Liquidating Trustee of Orion Healthcorp, Inc., et al. (the "Plaintiff" or the "Liquidating Trustee"), for the estates of the above-captioned debtors to the Opposition of Defendants (the "Opposition") filed by Defendants Arvind Walia And Niknim Management, Inc. (the "Defendants") and submits his *Reply Brief in support of Plaintiff's Motion For Summary Judgment Or In The Alternative, Summary Adjudication* [Dkt. No. 53][2]

## I.

## SUMMARY OF ARGUMENT ON REPLY

1.      The Opposition gets it wrong.  Once the Trustee carried his initial burden through the submission of 97 uncontroverted facts evidencing that the Debtors' funds were diverted out of the estate to an officer of the Debtors for no consideration, the burden shifted to Defendant to come forward with admissible evidence of "fair consideration."  Instead, the Opposition comes forward with two documents, Exhibits C & D, and a 17 page affidavit from Defendant supported only by legal arguments and conclusions.  The 17 page affidavit (the "Walia Affidavit") is classic hearsay, complete with self-serving arguments and lacking foundation.  The Walia Affidavit is not signed under penalty of perjury and the two exhibits, which appear to be summaries, are submitted without foundation or authentication.  The law in the Second Circuit is clear.  As the gatekeeper, the Court properly excludes inadmissible evidence in violation of the Federal Rules of Evidence as it is deemed "unreliable".  Defendant offers no admissible evidence for a jury to make a finding of value, let alone "reasonably equivalent", given to the Debtors.

2.      Where a transferee participated or acquiesced in the fraudulent design of a transfer, either knowingly or recklessly, "actual fraudulent intent" is satisfied under N.Y. Cred. & Debt Law ("NYDCL") §278(2).  Here it is not disputed that 2.5MM was transferred to Defendant (the "First Transfer") based on a single email dated April 15, 2016.  On the same day, 2.5MM was wired out of the estate for the stated reason, "I am willing to give you 3.5MM in

---

[2] Defined terms are given the same meaning as utilized in the Motion (Dk No. 53 (hereinafter "Dkt. No. _")).

return for you to allow me to structure it properly internally…"  The Opposition responds that the Portack Asset Purchase Agreement ("APA") created a debt and the First Transfer was in satisfaction of a legitimate "antecedent debt" resolving escrowed funds and indemnity claims. Yet, the Opposition submits no admissible evidence for the finding of an establishment of an escrow, deposit of monies into escrow, indemnity claims, or reconciliation of indemnity rights. The only evidence which Defendant references is the stated purchase price of the APA which Defendant admits was intentionally misstated.[3]  Similarly, it is an undisputed fact that all sums owed to Defendant were paid at closing.  (Joint of Statement of Uncontroverted Facts ("JSOF") 46) and no antecedent debt for 2.5MM was recorded, or satisfied, on the Debtor's books and records.  The claim of an "antecedent debt" is entirely unsupported by admissible evidence. However, the argument fails for an even more fundamental reason.  Even assuming for a moment the APA memorialized a legitimate "antecedent debt", it would indisputably be paid to an Officer of the Debtors rather than existing judgment creditors.  Pursuant to NYDCL §272 and 273-a, transfers to Officers in satisfaction of an antecedent debt are constructively fraudulent as a matter of law as they are not made in "good faith".

    3.      The argument in the Opposition to justify payment of 1.52MM (the "Second Transfer") is even more dependent on unsubstantiated speculation and conjecture.  The undisputed facts evidence a non-debtor third-party, PHNMS, received "membership interests" in, Objecttech Holdings LLC, a company with no stated revenue.  The operative document reflecting the acquisition, the Membership Purchase Agreement ("MIPA"), included no statement of assets and no reference to software.  (JSOF 68)  In response, the Opposition concedes Objecttech had no revenue, was a merely a shell, and the Debtor was not a party to the MIPA.  However, as the story goes, Objecttech owned AllRad, AllRad owned software, the software was conveyed to the Debtor, and such software was "reasonably equivalent" to what the Debtor paid.  The argument is made without the benefit of a single piece of admissible evidence. The unsworn Walia Affidavit is not evidence.  Tax returns or financial documents supporting the

---

[3] Defendant admits Porteck had a stated value of $1,824,000 when the Debtor paid $7,000,000, but submits no evidence of EBITDA or any other valuation method to support his claim of an antecedent debt. (JSOF 40-45)

operations of Objecttech, AllRad, the existence of software, its ownership or its value were requested but not produced by Defendant during discovery. The failure to produce such records creates an adverse inference that such documents would not support the argument in the Walia Affidavit. The failure to rebut the undisputed statements of fact by referencing materials in the record demonstrates Defendant has no evidence.

      4.      Lastly, the Opposition does not rebut the evidence submitted in the Motion establishing that Defendant NIKNIM was a mere instrument, dominated by its sole officer, director and shareholder, Defendant Walia. Defendant concedes that NIKNIM followed no corporate formalities, was inadequately capitalized, operated out of Defendant's house, and was a mere instrument for Walia to pay his personal expenses. However, the Opposition is incorrect in asserting that *fraud per se* is the legal test to pierce the corporate veil. Piecing the corporate veil is invoked to prevent fraud or to achieve equity, and either test is satisfied here. NYDCL presumes transfers without Fair Consideration or made to officers and insiders are fraudulent *per se*. Defendant perpetrated a fraud on judgment creditors of the estate when, rather than paying their legitimate debts, the Debtors improperly paid officers and insiders. To employ a legal fiction that Defendants NIKNIM and Walia are not one and the same on these facts would perpetrate a fraud on creditors.

      5.      The Motion pierces the pleadings to demonstrate that arguments made by Defendant have no foundation in fact and do not justify a costly trial.

## II.

## LEGAL STANDARD ON SUMMARY JUDGMENT OR ADJUDICATION

      6.      Once the moving party has met its burden, the nonmoving party "must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) The purpose of summary judgment is to weed out cases in which there is no genuine issue as to any material fact. *SEC v. Espuelas*, 905 F. Supp. 2d 507, 520-521 (S.D.N.Y. 2012) Ultimate or

conclusory facts and conclusions of law cannot be utilized on a summary judgment motion." *Id.* citing to 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure §2738, at 486, 489 (1983). Such conclusory statements are insufficient to raise a triable issue of material fact and properly disregarded. *Id.  Music Royalty Consulting, Inc. v. Reservoir Media Mgmt.*, 598 F. Supp. 3d 158, 174 (S.D.N.Y. 2022) (only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment). *Wright v. Undercover Officer*, 2018 U.S. Dist. LEXIS 143483, *9 (S.D.N.Y. 2018)

7.      Seventy-six (76) Joint Statements of Facts ("JSOF") and twenty-one 21 unopposed Additional Statement of Facts ("ASOF") (See Dkt. No. 54) document over 4MM diverted out of the estate to an officer of the Debtors while judgment creditors went unsatisfied.

**A.      Plaintiff's Additional Statement Of Facts In Support Of The Motion Are Deemed Admitted**

8.      Local Civil Rule 56.1. Statements of Material Facts on Motion for Summary Judgment, sets forth in pertinent part:

> (c) Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party.

> (d) Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).

[See Rule 56.1 of the Joint Rules for Civil Proceedings for the United States District Courts for the Southern and Eastern Districts of New York].

9.      Additional Statement of Facts 77-97 (Dkt. No. 54) were not opposed and are properly admitted as undisputed evidence.  The Opposition submitted no statement of material facts pursuant to Local Civil Rule 56(d).

**B.** **The Walia Affidavit and Two Exhibits Violate Numerous Federal Rules of Evidence Indicating its Unreliability and Exclusion from the Record**

10.     The party opposing a motion summary judgment must set forth "concrete particulars" rather than an affiant's self-serving belief. *BellSouth Telecomms v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2nd Cir. 1996). It is not sufficient to merely assert a conclusion without supporting with facts. *Id.* A witness offering a lay opinion must base his opinion on his own personal knowledge, which must be established to the court and jury. "When a witness has not identified the objective bases for his opinion, the proffered opinion obviously fails completely to meet the requirements of Rule 701 . . . because there is no way for the court to assess whether it is **rationally based** on the **witness's** perceptions . . . "*United States v. Garcia*, 291 F.3d 127, 140 (2nd Cir. 2002), citing to *Rea*, 958 F.2d at 1216. Similarly, the Second Circuit has made clear that 28 U.S.C. §1746 demands that to be admissible as evidence, an affidavit must be executed under the penalty or perjury as to the truth of the matters. *Williams v. Frank Martz Coach Co.*, 2014 U.S. Dist. LEXIS 66411, *11-*15 (E.D.N.Y. 2104)

11.     The Walia Affidavit is not executed under penalty of perjury. The Affidavit violates the most fundamental rules governing the admissibility of evidence. Rather than submitting admissible evidence, the Walia Affidavit offers the Court unreliable hearsay, legal conclusions, and self-serving statements not grounded on any objective identifiable fact. Plaintiff's *Objection and Request to Strike the Affidavit of Arvind Walia,* filed concurrently herewith, addresses each inadmissible statement which the Opposition claims creates a material issue of fact. The Opposition is submitted with no admissible evidence.

**III.**

**THE MOTION PRESENTED A *PRIMA FACIE* CASE OF INTENTIONAL FRAUD PURSUANT TO NYDCL §276,  AS THE APA WAS PURPOSEFULLY MISSTATED AND NO EVIDENCE SUPPORTS A LEGITIMATE EXPLANATION FOR THE DIVERSION OF 2.5MM OUT OF THE ESTATE**

12.     The Motion carried its initial burden by stating material facts that confirm the diversion of 2.5MM of the Debtor's funds on April 15, 2016 (JSOF 6) to the CEO of Orion by the CEO of CHT (JSOF 4) for a transaction in which no consideration was exchanged on April

15, 2016. (ASOF 90) It is undisputed that no antecedent debt existed or was satisfied on the books and records of the Debtor in either 2015 or 2016. (JSOF 88, 89) The Motion establishes that Defendant sold his company (Porteck) to the Debtor in March 2015 with a stated value of $1,824,000 (JSOF 40-45) and in exchange received 7MM. (JSOF 39) It is also not disputed that Parmar and Defendant represented to the brokers before closing that the purchase price was 7.8MM (JSOF 30) and then one week later signed an APA with a purchase price of 12.8MM. (JSOF 33, 35) The misstated purchase price in the APA is an undisputed fact and allowed Parmar to divert 3MM as paid to FUH, his solely controlled company. (ASOF 85-87)

13.    The Motion established Defendant knew of the scheme and was fine with it as long as he got his promised payout. (JSOF 36, 37). One year later, the undisputed facts evidence Parmar indicated he would give Defendant, the CEO of Orion, 3.5MM, in return for the Defendant allowing his fellow executive to structure it internally as he desired. On that same day, the Debtor wired 2.5MM to Defendant. (ASOF 90)

14.    The Opposition makes a litany of statements to claim the First Transfer was business as usual: there is nothing wrong with "grossing up" a purchase price to include "related transaction fees" (Walia Aff'd., ¶63), Defendant was not complicit in Parmar's scheme and had no knowledge it was inappropriate (Walia Aff'd., ¶39), the purchase price of Porteck and what was purchased is irrelevant (Walia Aff'd., ¶40), and the 2.5MM First Transfer was a legitimate debt owed pursuant to Section 1.6(e) of the APA (Walia Aff'd., ¶40). No evidence, let alone admissible evidence, is submitted in support of the various arguments. The explanations do not even find support in the APA. It is an undisputed fact that no escrow was established and no funds deposited. (JSOF 48, 49) The general reference to the APA purchase price is not credible or probative since it was admittedly false. The badges of fraud evidence the First Transfer was made with fraudulent intent, viz., with the purpose of placing a debtor's assets out of the reach of creditors. *See Tronox Inc. v. Kerr McGee Corp., (In re Tronox Inc.),* 503 B.R. 239, 282-283 (S.D.N.Y, 2013)

A.    **Lack of a Legitimate Explanation**

15.    Early New York decisions made clear that "[e]very sale or other transfer of goods

made with intent to defraud creditors, though valid as between the parties to the transaction, is utterly void as to creditors. *Eberhard v. Marcu*, 530 F.3d 122, 130 (2nd Cir. 2008)  Where Defendants' fail to proffer a legitimate explanation for the conveyance, defendants' actual fraudulent intent can readily be inferable on the facts, and the plaintiff is entitled to summary judgment setting those conveyances aside under NYDCL §276. *Machado v. A. Canterpass*, LLC, 115 A.D.3d 652, 654, 981 N.Y.S.2d 758 (2d Dept. 2014).  *Wimbledon Fin. Master Fund v. Wimbledon Fund, SPC*, 2016 N.Y. Misc. LEXIS 4805, \*16, 2017 WL 3024259 (On summary judgment, upon "defendants' failure to proffer any legitimate explanation for the conveyances, the defendants' actual fraudulent intent is readily inferable and the plaintiff is entitled to a judgment setting those conveyances aside under [DCL § 276])"

16.     In *Fannie Mae v. Olympia Mortg. Corp.*, 792 F. Supp. 2d 645, 653-654 (Bankr. E.D.N.Y. 2011), summary judgment was awarded on the NYDCL §276 claims where defendant's proffered explanation for the receiving the transfers could not be established in the opposition. *Id*. at 653 (The evidence did not support defendants' explanation the transfers were either part of defendant's compensation or that they were profits for his ownership interest.)  *Id*. (The facts established a scheme, not in the usual course of business, to pay relatives rather than pay its creditors demonstrating multiple badges of the existence of fraud). *Id*. at 654 (And, if, as the defendant argues, these transfers were part of his compensation, "the amounts of the transfers each year would have been, but were not, included on defendant's forms, which the debtor prepared".)  *Id*.

17.     Here, the proffered explanation for receiving the 2.5MM conveyance fails under its own weight.  First, the Opposition claims the "the purchase price of the Porteck assets is irrelevant" (Walia Aff'd., ¶40).  Next, Defendant claims he was paid 2.5MM from an escrow established for indemnity obligations however, no escrow or monies were set aside in escrow. (JSOF 48-49) Similarly, the Opposition comes forth with no admissible evidence of a discussion of escrow indemnity rights or the payment of 2.5MM on account of indemnity rights.  The argument is made out of thin air.  The undisputed facts confirm the 2.5MM payment was not

made in the ordinary course of business as it was made without supporting documentation between executives and on the same day as their email exchange. *Prabir v. Bukhara Indian Cuisine, Inc.*, 2018 U.S. Dist. LEXIS 94563, *9 (S.D.N.Y. 2018) (Other badges of fraud includes whether it was a secret and hasty transfer not in the usual course of business). As stated in *Fannie Mae v. Olympia Mortg. Corp., supra, 65,* if the transaction was as defendant contends, it would have been properly documented in the Debtor's records. *Id.* at 654. Here, the same holds true. If the liability existed based on a contingent obligation owed by the Debtor as claimed by Defendant, it would have been documented as a contingent liability. (ASOF 88, 89) Two senior executives paying themselves millions of dollars based on an email for unrecorded transactions is outside the ordinary course of business. Three badges of fraud; lack of legitimate explanation, hastily performed, and outside the ordinary course of business, are satisfied.

**B,**      **Defendant's Participation In The Scheme Or Indifference To The Truth**

18.      The Motion, at ¶52 correctly cites the law that false statements, motive, opportunity to commit fraud, or reckless indifference to the truth, support a finding of fraud. "Actual fraudulent intent" under NYDCL §278(2) has been construed such that it is satisfied if a "transferee participated or acquiesced in the transferor's fraudulent design." 13 Romualdo P. Eclavea, Carmody-Wait 2d New York Practice with Forms §§85-29 & 85-30 (2002) (emphasis added); *Berlenbach v. Bischoff*, 137 Misc. 719, 244 N.Y.S. 369, 371 (N.Y.Sup.Ct. Spec. Term 1930).

19.      Defendant contends that he did not participate or was not complicit in Parmar's scheme to defraud. (Walia Aff'd., ¶39) According to Defendant, Parmar "grossing up a purchase price" to include "related transaction fees" to benefit FUH was not false or a misrepresentation. (Walia Aff'd., ¶63) However, the Opposition cites to no document or evidence to support a legitimate role of FUH in the transaction. None of the documents before the Court evidence a role played by FUH. The assertion is merely argument. *See Salim v. VW Credit, Inc.*, 577 B.R. 615, 621 (E.D.N.Y. 2017) (The nonmoving party cannot avoid summary judgment by "rely[ing] on conclusory allegations or unsubstantiated speculation," but must offer

"hard evidence showing that its version of the events is not wholly fanciful.")  The admissible

evidence before the Court indicates that the broker, Abstract Business Advisors, was paid

$192,500, for its involvement in the Porteck transaction.  Yet, 2MM or 3MM for transaction fees

is appropriate?  (See Aff'd. of. E. Wong, Dkt. No. 56-5, Letter dated 2/20/15, Ex. E)  Contrary to

the position now claimed by the Walia Affidavit as to the "reasonableness "of the payment to

FUH, Walia testified in his deposition that he paid no attention to what Parmar was doing. (JSOF

37)

> "Q.  So when you were negotiating with Mr. Parmar or Orion, was the
> purchase price supposed to be 10.8 million?
>
> A.  Correct.
>
> Q.  and when did it change to 12.8 million?
>
> A.  At some point Mr. Parmar stated that there are fees to close this
> deal that have to be included in the purchase price.  I said as long as
> my share of the purchase price doesn't change, it doesn't concern
> me."

(See Aff'd. of J. Nolan, Ex. 15, Deposition of Walia, p. 134, lns. 9-19)

20.      At a minimum, the statements evidences Defendant's reckless indifference to the

truth.  See In re Kaiser, 722 F.2d 1574, 1578 (2d Cir. 1983) citing to *In re Diorio*, 407 F.2d 1330,

1331 (2d Cir. 1969) ("reckless indifference to the truth . . . is the equivalent of fraud"[4])

Defendant did not have to go along with Parmar's scheme.

**C.**      **The Close Relationship Between The Parties To The Transaction**

21.      The badges of fraud include circumstances such as 'a close relationship between

the parties to the alleged fraudulent transaction. *Wimbledon Fin. Master Fund v. Wimbledon*

*Fund, SPC*, 2016 N.Y. Misc. LEXIS 4805, *16, 2017 WL 3024259.  The Opposition does not

dispute both Parmar and Walia were senior executive officers of the Debtors at the time of the

Transfers. Parmar was the CEO of CHT. Walia was the CTO of CHT, and the CEO of the

Debtor, Orion.  (JSOF 4) The two knew each other prior to 2015.  (JSOF 25) In fact, Walia

confirms his close relationship with the Debtors in the Opposition with statements such as: "as

---

[4] Ft note 4: "Appellant's attempts to justify his misconduct by the actions of others and his own inadvertence are
unpersuasive. *See In re Diorio*, 407 F.2d 1330, 1331 (2d Cir. 1969) (per curiam) ("reckless indifference to the truth
. . . is the equivalent of fraud");

an officer of Orion and CHT, I was confident" the 2.5MM payment would be made without the necessity of establishing an escrow.  (Walia Aff'd., ¶44)  Walia confirms he was in the inner circle at the Debtor.

**D.**    **Control Of The Property And Personal Benefit**

22.    Walia also testified that he was aware Parmar was misstating the accuracy of the APA "in order to get a better deal for us", which indicates Parmar's misrepresentations were designed to benefit them.  (JSOF 31) E-mail exchanges between Parmar and Walia in 2016, that Parmar would pay Walia if he allowed him to structure it properly internally (ASOF 90), or in 2017 when Walia demanded the Objecttech sale be done "today", despite Parmar not knowing what they were buying.  (See Aff'd. of E. Wong, Dkt. No. 56-10, Ex "J", Ehren-Walia 004004) The two executives controlled the Debtor as their fiefdom.

**E.**    **Transferor's Knowledge Of Creditor's Claims**

23.    As set forth in the Motion, this factor also favors a finding of fraud under NYDCL §276.  Walia knew about the unsatisfied creditors of CHT and Orion in existence. A judgment was entered in 2015 against Orion, one year before the Transfers. (JSOF 73)  On March 9, 2016, CHT was sued for 1MM in Texas. (JSOF 71)  Walia was named personally as a Defendant in the Texas lawsuit. The lawsuit resulted in a judgment against CHT. (See Req. For Jud. Notice, Dkt. No. 58, Verified Complaint, Ex. 3)  Rather than pay their debts, the Debtor transferred 2.5MM in 2016 and a further 1.52MM in June 2017 to Defendants.  The judgment creditors remained unpaid as of the filing date of the petition in bankruptcy. Plaintiff submits *prima facie* evidence satisfying multiple badges of fraud.  *U.S. v. Spencer*, 2012 U.S. Dist. LEXIS 142195, 2012 WL 4577927 at *7 ("A single [badge of fraud] may stamp the transaction as fraudulent and, when several are found in combination, strong and clear evidence on the part of the upholder of the transaction will be required to repel the conclusion of fraud.") (emphasis added) *Wimbledon Fin. Master Fund v. Wimbledon Fund, SPC*, 2016 N.Y. Misc. LEXIS 4805.  The Opposition responds with no admissible evidence.

## IV.

## THE MOTION PRESENTED A *PRIMA FACIE* CASE OF INTENTIONAL FRAUD PURSUANT TO NYDCL §276 FOR THE DIVERSION OF THE SECOND TRANSFER OF $1,520,000 AS THE MIPA IS REPLETE WITH FALSE STATEMENTS IN AN EFFORT TO MAKE THE PURCHASE OF A SHELL COMPANY APPEAR LEGITIMATE

24.    The Motion carried its initial *prima facie* burden by establishing Debtor paid 1.52MM to Defendant, NIKNIM, and in exchange received nothing of stated value. The Debtor maintained an IOLA account at Robinson Brog where it deposited monies of the Debtors' CHT and Orion. (JSOF 77-83) The Second Transfer was made out of the Debtors' IOLA account to Defendant on June 23 and 28, 2017. (JSOF 7) The Opposition claims that what was purchased in 2017 was a legitimate company, Objecttech, as memorialized by the MIPA. (JSOF 51) Objecttech was a shell company with no stated revenue. (Walia Aff'd., ¶57). The MIPA sold "interests" of Objecttech to a non-debtor, PHNMS. (JSOF 51, 67) This was an inside deal between the two executives as it was never put out for competitive bid to others (JSOF 70), and it was never approved by the Board of Orion. (JSOF 70). The two executives prepared a due diligence report with help of Ted Brindamour who worked for Parmar's brother-in-law, Salil Sharma. (JSOF 53) Mr. Brindamour prepared the due diligence reports for other acquisitions by Orion, including the admitted "sham acquisition" of MDRX. (JSOF 20, 52, 53). Brindamour wanted Walia to insert the factual information with respect to Objecttech, AllRad, its operation and assets. (JSOF 54) The schedules attached to the MIPA did not exist, i.e., were never prepared and the due diligence report supporting the acquisition were never finalized. (JSOF 60-62) No stated assets, liabilities, or working capital of Objecttech was included in the MIPA. (JSOF 68). The Debtors' books and records do <u>not</u> evidence the satisfaction of an antecedent debt or increase in net assets through the acquisition of an asset such as Objecttech, AllRad or PHNMS for $1,520,000. (ASOF 91, 92) Defendant Walia, the owner of Objecttech and AllRad, (JSOF 95) failed to produce tax returns for either entity as requested during discovery. (ASOF 66, 94) These facts are not in dispute.

25.     In Opposition, Defendant confirms that what was purchased for 1.52MM, Objectech, "did nothing and had no revenue" (Walia Aff'd., ¶¶57, 64). Defendant concedes its interests were assigned to a non-debtor third party (Walia Aff'd., ¶61) But, the Opposition contends, while Objectech had no revenue, it did own "valuable software that Objecttech developed through substantial capital investment." Regardless of who took title, Objecttech assets were delivered to the Debtor Orion, since Defendant, as President presided over the development and integration of the software. (Walia, ¶¶62, 63) All of the aforementioned explanations are arguments unsubstantiated and asserted without any admissible evidence. On a summary judgment motion, courts may consider "only evidence that would be admissible at trial." *Nora Bevs., Inc. v. Perrier Group of Am. Inc*., 164 F.3d 736, 746 (2d Cir. 1998) Conclusory statements of Walia, do not establish facts or that the payment was equivalent to the 1.52MM paid.

A.     **Conclusions And Legal Opinions Are Not A Substitute For Admissible Evidence**

26.     The Walia Affidavit is replete with self-serving conclusions of law by Walia which are properly disregarded. With respect to the 1.52MM Second Transfer, such conclusions include: (1) Objecttech owned AllRad, (2) AllRad's property consisted of "valuable software", (3) Objecttech invested "substantial capital" to develop the software, (4) the software was "reasonably equivalent" to the amount exchanged under the Objecttech MIPA, and (5) the Objecttech MIPA did not include false statements or misrepresentations of fact. After three years of litigation, the attempt to substitute a self-serving Affidavit in the place of admissible evidence demonstrates Defendant cannot carry its burden to identify and support the existence of a material issue of fact for trial. *Hollander v. American Cyanamid Co*., 172 F.3d 192, 198 (2nd Cir. 1999) (The district court was correct in holding that the affidavit flagrantly disregarded the requirements of Rule 56(e), was riddled with inadmissible hearsay, conclusory statements and arguments, and "more resembled an adversarial memorandum than a *bona fide* affidavit.) As in *Hollander*, the Walia Affidavit resembles an adversarial brief rather than statements of fact.

**B.    Exhibits C & D Are Properly Stricken As Inadmissible Hearsay Lacking in Any Reliability**

27.     The proponent of the written statement, has the burden to show the applicability of an exception or exemption to the prohibition on hearsay. *See Evans v. Port Authority of N.Y. & N.J.*, 192 F. Supp. 2d 247, 263, n.121 (S.D.N.Y. 2002).

28.     The Opposition attaches two documents, *Exhibits C & D*, which Defendant claims proves the existence of state of the art technology" which was "valuable". Both documents appear to be informational brochures. Both documents are hearsay as written statements offered to prove the truth of the matter asserted, i.e. that software existed and it was valuable. Both documents are subject to the Federal Rules of Evidence. (FRE 801(a); FRE 1101(b))  No foundation is offered as to the source of the documents. The Walia Affidavit offers no foundation for the creation, existence or accuracy of the brochures. *See Reynolds v. Am. Airlines, Inc*., 2017 U.S. Dist. LEXIS 198949, *4-5 (Bankr. E.D.N.Y. 2017) (Incident report properly stricken where proponent failed to offer foundation for document offered). Similarly, the undisputed facts corroborate the lack of trust-worthiness of documents surrounding Objecttech and summaries viewed with skepticism. FRE 803(6)(E). Defendant concedes that documents surrounding the 1.52MM sale of the Objecttech membership interests are incomplete. (Incomplete Due Diligence Report) (JSOF 60), MIPA agreement with multiple sections never completed (JSOF 61), schedules that never existed (JSOF 62). Exhibits C and D are properly excluded as lacking foundation.

**C.    Self-Serving Affidavits That Contradict The Underlying Facts Of Prior Testimony Are Properly Stricken On Summary Judgment**

29.     The rule is well-settled in the Second Circuit that a party may not, in order to defeat a summary judgment motion, create a material issue of fact by submitting an affidavit disputing his own prior sworn testimony. *Trans-Orient Marine Corp. v. Star Trading & Marine, Inc*., 925 F.2d 566, 572 (2nd Cir. 1991), citing to *Mack v. United States*, 814 F.2d 120, 124 (2d Cir. 1987) (party cannot create genuine issue of material fact with affidavit contradicting prior deposition testimony in attempt to defeat summary judgment motion).  The Affidavit of Walia claims no tax records of Objecttech and AllRad existed because Objecttech and AllRad had no

revenue. Defendant claims the failure to produce tax records and schedules in response to discovery requests is excused and there is no application of the Adverse Inference Rule. (Walia Aff'd., ¶64)  The explanation can be dismissed outright as it contradicts Defendant's deposition testimony where he stated (a) <u>the companies did file tax returns and (b) had revenue</u>.

> Q.  Did *AllRad Direct* file federal tax returns?
>
> A.  Yes.
>
> Q.  How about state tax returns?
>
> A.  I am not sure

(Deposition of Walia p. 37, lns. 2-7, see Ex. 13 attached to Reply Aff'd. of J. Nolan)

> Q.  Has *Objecttech* ever filed tax returns?
>
> A.  I have to check.  I believe so.  I do know my accountants were aware of Objecttech, and I'll have to check that.

(Deposition of Walia p. 293, lns. 17-21, see Ex.15 attached to Reply Aff'd. of J. Nolan)

30.    Walia also testified under penalty of perjury, after the demise of AllRad Direct, LLC, sometime in 2013, Objecttech did a licensing deal with a software company called Integra Partners, <u>and derived revenue</u>. (Deposition of Walia p. 293-295, lns. 17-21, see Ex. 15, attached to Aff'd. of J. Nolan)  The adverse inference rule is triggered by the failure of a party to provide evidence peculiarly available to that party and supports an inference that the truth in those documents would be damaging to that party.  *Gonzales v. Albuquerque Tortilla Co. (In re Furrs Supermarkets, Inc*.), 2008 Bankr. LEXIS 946,*26 (Bankr. N.M. 2008), citing to *Deutsche Financial Services Corp. v. Osborne (In re Osborne)*, 257 B.R. 14, 19, n.7 (Bankr. C.D. Cal. 2000).  If produced, financial or tax records of Objecttech or AllRad would confirm that Objecttech or AllRad owned no software, or if it did exist, was valueless.  Defendant admits he was asked for these financial documents and did not produce them. (JSOF 66; ASOF 94, 95)  The Adverse Inference Rule is properly exercised in this instance as the records existed and were not produced.

31.     Similarly, Defendant's conclusion that a company without revenue would not file tax returns is speculation at best lacking any foundation whatsoever. (Walia Aff'd., ¶64)[5]  The IRS Code and guidelines state that all corporations, except non-profits, must file a return regardless of revenue.

**D.     The MIPA Was Falsely Stated In An Effort To Make An Illegitimate Transaction Appear Legitimate**

**i.     Fraudulent Intent Established Under Badges of Fraud**

32.     Direct evidence of fraud such as where false statements, or misrepresentations are made with documents is evidence of intent to defraud and an effort to make an illegitimate transaction appear legitimate. See *United States v. Maciejewski*, 70 F. Supp. 2d 129, 134 (Bankr. N.D.N.Y. 1999).  With respect to the Second Transfer, the stipulated facts are that Parmar, Walia and Brindamour prepared yet another inaccurate and patently false due diligence reports to justify the Second Transfer.  (JSOF 52, 53, 54)  Walia pushed the acquisition even though Parmar did know what the Debtor was buying. (JSOF 55-60).   The various schedules to attach to the MIPA were not completed. (JSOF 61-62).   The record is replete with false statements, or misrepresentations in an effort to make an illegitimate transaction look legitimate.

33.     Under section §276, an intent to defraud is assumed where the conveyance is made without consideration ".  See *William Iselin & Co., Inc. v. Boardwalk Regency Corp.*, 703 F. Supp. 1084, 1088 (S.D.N.Y. 1989) In determining value, the Court makes a two-fold inquiry: *whether the debtor received any value* at all in exchange for the transfer, i.e. any realizable commercial value as a result of the transaction, and second whether that value was in fact reasonably equivalent. See *Devon Mobile Communs. Liquidating Trust v. Adelphia Communs. Corp. (In re Adelphia Communs. Corp.)*, No. 02-41729 (CGM), 2006 Bankr. LEXIS 4600, 2006 WL 687153, at *11 (Bankr. S.D.N.Y. Mar. 6, 2006); *Togut v. RBC Dain Correspondent Servs. (In re S.W. Bach & Co.)*, 435 B.R. 866, 876, (Bankr.  S.D.N.Y. 2010) 2010 Bankr. LEXIS 2469,

---

[5] Department of Treasury, Internal Revenue Service, Form 1120; See Request For Judicial Notice: Who Must File; Unless exempt under section 501, all domestic corporations (including corporations in bankruptcy) must file an income tax return whether or not they have taxable income. Domestic corporations must file Form 1120, unless they are required, or elect to file a special return.  (See Reply Aff'd. of J. Nolan, attached as "Who Must File," Ex. 12)

*24-25, 53 Bankr. Ct. Dec. 148. The purchase of "membership interests" in a shell company with no stated assets as transferred to a non-debtor, PHNMS, is prima facie evidence of lack of fair consideration. In response, the Opposition presents no tangible evidence of value.

### ii.    Lack of a Legitimate Explanation

34.    The documents to justify the existence of an asset, and that it had value, were within Defendant's control. The financial records of AllRad or Objecttech were not produced. It is an undisputed fact that the MIPA references <u>no assets</u> and made <u>no reference to AllRad</u>. (JSOF 62, 68) Defendant's explanation, to blame the attorneys for not drafting an accurate agreement, is an admission the MIPA is without value. (Walia Aff'd., ¶56) Summary judgment is properly granted under NYDCL §276 where defendant's proffered explanation for the receiving the transfers could not be established in the opposition. *Fannie Mae v. Olympia Mortg. Corp.*, 792 F. Supp. 2d 645, 653 (Bankr. E.D.N.Y. 2011)

### iii.    The Close Relationship Between the Parties to the Transaction

35.    As set forth above with respect to the First Transfer, the close relationship between Defendant, the Debtor, and Parmar existed in 2016 and 2017. A badge of fraud includes circumstances such as 'a close relationship between the parties to the alleged fraudulent transaction. *Wimbledon Fin. Master Fund v. Wimbledon Fund, SPC*, 2016 N.Y. Misc. LEXIS 4805, *16, 2017 WL 3024259.

### iv.    Transferor's Knowledge of Creditor's Claims

36.    As set forth above with respect to the First Transfer, Defendant knew lawsuits and judgment creditors existed in February 2016 when Orion and he personally, were sued in the Texas lawsuit. One year later in June 2017, even more lawsuits were filed. The Debtors' CHT and Orion filed their petition of bankruptcy in March 2018, with lawsuits and unpaid judgments pending against it. (JSOF 72, 75-76)

37.    The Opposition does not dispute the fact the Debtor is not a party to the MIPA, the inaccuracies in the MIPA, the fictional schedules referenced therein or a due diligence report ginned up by the executives with the assistance of Ted Brindamour. The Opposition submits no

admissible evidence to repel the strong inference of fraud and complete lack of consideration resulting in $1,520,000 diverted away from creditors.

**V.**

**THE MOTION PRESENTED A *PRIMA FACIE* CASE OF CONSTRUCTIVE FRAUD PURSUANT TO NY DCL §273-A, AS JUDGMENT CREDITORS EXISTED BEFORE THE TRANSFERS AND THE TRANSFERS WERE MADE TO AN OFFICER AND INSIDER OF THE DEBTOR**

38.    The Opposition does not dispute the legal standard set forth in the Motion to be applied under NYDCL §§273 and §273-a.  To prevail on a claim under §273-a, a plaintiff must establish that:  (1) the conveyance was made without fair consideration; (2) at the time of transfer, the transferor was a defendant in an action for money damages or a judgment in such action had been docketed against him; and (3) a final judgment has been rendered against the transferor that remains unsatisfied.  *Priestley v. Panmedix Inc*., 18 F. Supp. 3d 486, 497 (S.D.N.Y. 2014). (Motion, Dkt. No. 53, §69-7)  The Opposition concedes the Motion established the last two elements of the test, but contends a disputed facts exists as to "Fair Consideration".

**A.**    **First Transfer:**

39.    The Opposition contends that the release of escrow monies in exchange for valid indemnity rights, was equivalent to the 2.5MM depleted from the Debtor's estate.  (Opposition, Dkt. No. 49)  The contention fails for two reasons:  (1) No admissible evidence has been submitted to support the First Transfer was made for release of indemnity rights.  In fact the undisputed facts establish that no escrow was created or funded pursuant to Section 1.6(e). (JSOF 48, 49) The contention is made in an unsworn affidavit and in violation of FRCP Rule 56(c)(1) which commands that a party asserting a factual is dispute must cite to particular parts of material in the record; and (2) Even if the Court entertained an argument that the APA created an antecedent debt owed to Defendant, NYDCL stigmatizes repayment of an antecedent debt owed to an officer, director or major shareholder as lacking "good faith" and <u>as a matter of law</u> lacking "fair consideration".  *See Sharp Int'l Corp. v. State St. Bank & Trust Co.*, 403 F.3d 43,

53-54 (2d Cir. 2005); *Farm Stores, Inc. v. Sch. Feeding Corp.,* 102 A.D.2d 249, 477 N.Y.S.2d

374 (2d Dept 1984). When preferences are given to a debtor corporation's shareholders, officers,

or directors, such transfers are *per se* violations of the good faith requirement. *Id.* (citing *HBE*

*Leasing Corp. v. Frank*, 48 F.3d 623, 634 (2d Cir. 1995).

40.      The Opposition contends that NYDCL 273-a, stigmatizes only transfers to

"insiders" not "officers, directors or major shareholders of the transferor" as lacking good faith,

and the determination of "insider" status is a question of fact not for determination on motion for

summary judgment. (Opposition, ¶52, citing to *Jacobs v. D'D'Alessandro (In re Dewey &*

*Leboeuf LLP)*, 2014 Bankr. LEXIS 4051, *17).  The contention is misplaced. *In re Dewey &*

*Leboeuf LLP*, *supra*., did not involve a claim made under NYDCL 273-a, where an officer's

antecedent debt was given priority over antecedent debt owed to judgment creditors.  As set forth

by the Second Circuit:

> "One exception has been recognized by the New York courts to the rule that the
> repayment of an antecedent debt constitutes fair consideration: where "the transferee is an
> officer, director, or major shareholder of the transferor." Atlanta Shipping, 818 F.2d at
> 249; see also HBE Leasing I, 48 F.3d at 634 HN21 ("New York courts have carved out
> one exception to the rule that preferential payments of pre-existing obligations are not
> fraudulent conveyances: preferences to a debtor corporation's shareholders, officers, or
> directors are deemed not to be transfers for fair consideration."). See *Sharp Int'l Corp. v.*
> *State St. Bank & Trust Co.*, 403 F.3d 43, 54(2d Cir. 2005)

41.      Defendant was both an officer of CHT and Orion and the attempt to pay his

claimed antecedent debt over the debt of judgment creditors is not "fair consideration" under

NYDCL §273-a.  The First Transfer fails as a matter of law.  The undisputed facts and Walia's

own statements evidence Defendant Walia exercised sufficient authority over the Debtor,

managed its affairs, and/or controlled the disposition of assets such that the record establishes

Defendant was an "insider".  As set forth in the Walia Affidavit: "I, as the President and Chief

Executive Officer of the [sic] Orion, presided over the development and integration of the

software for the exclusive benefit of the Debtors."  (Walia Aff'd., ¶62).  According to the

witness, he managed, oversaw and controlled the disposition of a major asset.  As set forth in the

Motion at page 30, the term insider includes "a person in control of the debtor" or an "officer of

the debtor". 11 U.S.C. §101(31)(B) (ii) and (iii). An "insider" is one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at [arm's] length with the debtor." *Anstine v. Carl Zeiss Meditec AG (In re U.S. Medical, Inc.)*, 531 F.3d 1272, 1277 (10th Cir. 2008) Defendant further claims, "As an Officer of Orion and CHT, I was confident the deferred payment would be made" such that he did not need an escrow. (Walia Aff'd., ¶44). Here the witness claims as the CEO, he had a "sufficiently close relationship with the Debtor" that he did not have to worry about formalities for getting paid. Lastly, Walia controlled corporate policy at some level at it is an undisputed fact that Parmar, CEO of CHT, sought Defendant's consent as CEO of Orion, the operating entity, to allow him to characterize million dollar transactions ("I am willing to give you 3.5MM in return for you to allow me to structure it properly internally..") (ASOF 90) Walia controlled corporate strategy for the Debtor;

> Q. what were your day to day responsibilities at Orion?
>
> A. "… I had all—I was responsible as the CEO of the strategy, revenue, you know, client satisfaction, pretty much what a CEO responsibilities are."

(Deposition of Walia, p. 140-141, lns. 19-8, see Ex. 13, attached to Reply Aff'd. of J. Nolan)

42.     The undisputed facts establish Defendant was an officer of the Debtors. The facts and the testimony of Defendant confirm his close relationship and management over the Debtors' affairs.

**B.    Second Transfer:**

43.     In the fraudulent conveyance context, the basic question is - has the estate been depleted without exchanging property of similar value to the Debtor as a result of the Transaction to the prejudice of the Debtor's unsecured creditors? (*Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635, 644 (3rd Cir. 1991) NYDCL §273 requires that the debtor must have "received" the value in question "in exchange" for the transfer or obligation at stake. *Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.)*, 263 B.R. 406, 467 (S.D.N.Y, 2001)

The requirement that the debtor must have "received" the value in question expresses a temporal condition demanding an element of contemporaneity in the determination of whether something close to the reasonable equivalence has been exchanged. *Id*. at 467. Every conveyance made <u>without fair consideration</u> when the person making it is a defendant in an action for money damages or a judgment in such an action has been docketed against him, <u>is fraudulent as to the plaintiff in that action without regard to the actual intent of the defendant</u> if, after final judgment for the plaintiff, the defendant fails to satisfy the judgment. *Lyman Commerce Solutions, Inc. v. Lung*, 2015 U.S. Dist. LEXIS 51447, 17 (S.D.N.Y, 2015) citing to NYDCL § 273-a (McKinney 2002).

44.     As elaborated in the Intentional Fraud claim, it is an undisputed fact that the Debtor paid the Second Transfer, to purchase "membership interests" for a non-debtor in a shell company, Objecttech, with no stated assets. (JSOF 51, 67, 68)  These facts are not in dispute and the Motion on the face of the underlying documents carries its prima facie burden evidencing the Second Transfer made for no consideration. Transactions lacking proof of fair or adequate consideration when creditors exist are not made in "good faith".  The fraud is committed against existing judgment creditors who went unpaid while assets were diverted out of the estate.  The requirement of good faith is not fulfilled through preferential transfers of corporate funds to directors, officers or shareholders of a corporation that is, or later becomes, insolvent, in derogation of the rights of general creditors.  *Am. Panel Tec v Hyrise, Inc.*, 31 AD3d 586, 587, 819 N.Y.S.2d 768 (2d Dept 2006); *P.A. Bldg. Co. v Silverman*, 298 AD2d 327, 328, 750 N.Y.S.2d 13 (1st Dept 2002).

45.     No admissible evidence supports the Debtors receiving value, let alone reasonably equivalent value, for the $1,520.000 diverted out of the estate.  The Second Transfer was not conducted at arm's length.  (JSOF 70)  Parmar did not know what the Debtor was purchasing. (JSOF 56) Defendant was involved in preparing a "due diligence report" which contained fake or inaccurate revenue projections, for a company, Objecttech. (JSOF 52-54) The figures could only come from Defendant Walia.  (JSOF 59) Walia inserted revenue figures for Objecttech of

$161,000, for 2013, and $70,000 for 2014. (See Dkt. No. 56-11, Ex. K) Now, in opposition to

the Motion, Walia signs an Affidavit and claims Objecttech had no revenue. *See, e.g., In re*

*Leneve*, 341 B.R. 53 (Bankr. S.D. Fla. 2006) (essential comparison in constructive fraudulent

transfer inquiry is "what went out" with "what was received").

46.      The Motion establishes by irrefutable evidence that $1,520,000, went out of the

estate, and no value, let alone reasonable equivalent value, was received. Both good fair and fair

consideration are lacking. Based on the undisputed facts before the Court summary judgment is

proper as the Transfers were constructively fraudulent.

## VI.

### WALIA IS INDIVIDUALLY LIABLE FOR THE DEBTORS MONIES HE DIVERTED TO DEFENDANT NIKNIM AWAY FROM LEGITIMATE CREDITORS OF THE ESTATE

47.      The Opposition does not dispute the legal standard set forth in the Motion. Alter

ego liability exists under New York law "when a parent or owner uses the corporate form to

achieve fraud, or when the corporation has been so dominated by an individual or another

corporation . . . and its separate identity so disregarded that it primarily transacted the

dominator's business rather than its own." *City of Almaty v. Ablyazov*, 2019 U.S. Dist. LEXIS

55183, *14 (Bankr. S.D.N.Y. 2019); *Kiobel v. Royal Dutch Petroleum*, 621 F.3d 111, 195 (2d

Cir. 2010) (internal quotation marks and citation omitted). "Factors to be considered in

determining whether the owner has 'abused the privilege of doing business in the corporate form'

include whether there was a 'failure to adhere to corporate formalities, inadequate capitalization,

commingling of assets, and use of corporate funds for personal use'." *East Hampton Union Free*

*School Dist. v Sandpebble Bldrs., Inc.*, 66 AD3d 122, 127, 884 NYS2d 94 (2009).

48.      The Motion outlined eight factors and submitted admissible evidence that was not

disputed demonstrating that Defendant NIKNIM lacked a legitimate business purpose: created to

foster Walia's private affairs, paid his personal expenses, failed to maintain corporate minutes or

records, was inadequately capitalized, operated out of Walia's house, and received the Transfers

solely at Walia's direction for his personal benefit.  (Motion, Dkt. No. 53, p. 32-34) Plaintiff claims the finding of veil piercing or alter ego is a fact laden event and not well suited for summary judgment. (Opposition, ¶54) However, once there is a showing of the absence of an issue of fact, the party opposing summary judgment must come forth with specific evidence that raises a genuine issue of fact. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).  Neither Defendants Walia nor NIKNIM present evidence to dispute any of the aforementioned factors.  Rather, the Opposition contends that Plaintiff must prove that NIKNIM was used by Walia to commit a fraud against the Debtor for Walia to be held personally liable. (Opposition, ¶54)  The statement is not accurate.

49.      The federal common law doctrine of piercing the corporate veil under an alter ego theory can best be described by the following two-part test: (i) was there such unity of interest and lack of respect given to the separate identity of the corporation by its shareholders that the personalities and assets of the corporation and the individual are indistinct, and (ii) would adherence to the corporate fiction sanction a fraud, promote injustice, or lead to an evasion of legal obligations. *National Labor Relations Bd. v Greater Kan. City Roofing*, 2 F.3d 1047, 1052-1053, (10th Cir. 1993), citing to *United States v. VanDiviner*, 822 F.2d 960, 964-65 (10th Cir. 1987); *Seymour v. Hull & Moreland Eng'g*, 605 F.2d 1105, 1111 (9th Cir. 1979) (Furthermore, the individual who is sought to be charged personally with corporate liability must have shared in the moral culpability or injustice that is found to satisfy the second prong of the test; and such party must have been an actor in the course of conduct constituting the abuse of corporate privilege.)  Broadly speaking, New York courts will disregard the corporate form, or, to use accepted terminology, "pierce the corporate veil", whenever necessary "to prevent fraud or to achieve equity". *Morris v. State Dep't of Taxation & Fin.*, 82 N.Y.2d 135, 140 (1993), citing to (*International Aircraft Trading Co. v. Manufacturers Trust Co.*, 297 N.Y. 285, 292, 79 N.E.2d 249 (1948).)" (*Id.* at 417.)  Under New York law, however, the critical issue in resolving an alter ego claim is not motive, but control, and whether the defendant used this control to commit a fraud or other wrong resulting in an unjust loss or injury to the plaintiff. *United States*

*v. Evseroff*, 270 Fed. Appx. 75, 77-78 (2nd Cir. 2008), citing to e.g., *In re Vebeliunas*, 332 F.3d

85, 91-92 (2d Cir. 2003)

50.      It is not disputed that Defendant NIKNIM's sole responsibility in the questioned

transactions was to in receive the Transfers as a "personal accommodation for Walia". (JSOF 12)

Walia as the sole officer, employee and shareholder of NIKNIM (JSOF 8) controlled NIKNIM

for his personal affairs.  (JSOF 8, 9) Walia "personally directed the Transfers identified in the

Complaint be directed into the NIKNIM bank account". (JSOF 17) The person to be charged

individually, Walia, is the sole actor with respect to the corporate liability and the conduct in

question.  Walia is also the sole actor failing to follow any semblance of corporate formalities

inadequately capitalized NIKNIM and created a hollow shell.

51.      The fraud and inequities visited on unsecured creditors of the estate is clear.

Walia, an Officer of the Debtor, preferred his personal interest over that of legitimate creditors of

the estate.  Former employees Jack McBride and Alan Nottingham, who sued the Debtors in

2014 and litigated the lawsuit to judgment in 2015, got nothing while the two executives diverted

millions to themselves.  (JSOF 73) "[E]very conveyance made without fair consideration when

the person making it is a defendant in an action for money damages or a judgment in such an

action has been docketed against him, is fraudulent …." §273-a.  Defendants knew of the

existence of these creditors yet diverted $4,020,000 out of the Debtors' estate for no tangible

value leaving the Debtors in bankruptcy.  The Motion satisfies both tests enumerated under state

and federal law.  Judgment against Defendant Walia is not only proper, but serves the very

purpose for which the doctrine to pierce the corporate veil was created.

## VII.

## <u>CONCLUSION</u>

For the reasons submitted in the Motion and herein, the Motion is ripe for determination based on these undisputed facts.

Dated:  March 10, 2023                          Respectfully submitted,

                                          PACHULSKI STANG ZIEHL & JONES LLP

                                          <u>/s/ Jeffrey P. Nolan</u>
                                          Ilan D. Scharf, Esq.
                                          Jeffrey P. Nolan, Esq. *(admitted pro hac vice)*
                                          PACHULSKI STANG ZIEHL & JONES LLP
                                          780 Third Avenue, 34th Floor
                                          New York, New York 10017
                                          Telephone:     (212) 561-7700
                                          Facsimile:     (212) 561-7777

                                          Counsel for Plaintiff, Howard M. Ehrenberg in his
                                          capacity as the Liquidating Trustee of Orion
                                          Healthcorp, Inc., *et al.*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------

In re:                                                    :   Chapter 11
                                                          :
ORION HEALTHCORP, INC.[1],                                :   Case No. 18-71748 (AST)
                                                          :
                                                Debtors. :   (Jointly Administered)

----------------------------------------

HOWARD M. EHRENBERG IN HIS CAPACITY                       :
AS LIQUIDATING TRUSTEE OF ORION                           :   Adv. Pro. No. 20-08049 (AST)
HEALTHCORP, INC., ET AL.,                                 :
                                                          :
                               Plaintiff, :
                                                          :
v.                                                        :
                                                          :
ARVIND WALIA; NIKNIM MANAGEMENT,                          :
INC.,                                                     :
                                                          :
                          Defendants. :
                                                          :

----------------------------------------


### AFFIDAVIT OF JEFFREY P. NOLAN
### IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, SUMMARY ADJUDICATION

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Orion Healthcorp, Inc. (7246); Constellation Healthcare Technologies, Inc. (0135); NEMS Acquisition, LLC (7378); Northeast Medical Solutions, LLC (2703); NEMS West Virginia, LLC (unknown); Physicians Practice Plus Holdings, LLC (6100); Physicians Practice Plus, LLC (4122); Medical Billing Services, Inc. (2971); Rand Medical Billing, Inc. (7887); RMI Physician Services Corporation (7239); Western Skies Practice Management, Inc. (1904); Integrated Physician Solutions, Inc. (0543); NYNM Acquisition, LLC (unknown) Northstar FHA, LLC (unknown); Northstar First Health, LLC (unknown); Vachette Business Services, Ltd. (4672); Phoenix Health, LLC (0856); MDRX Medical Billing, LLC (5410); VEGA Medical Professionals, LLC (1055); Allegiance Consulting Associates, LLC (7291); Allegiance Billing & Consulting, LLC (7141); New York Network Management, LLC (7168). The corporate headquarters and the mailing address for the Debtors listed above is 1715 Route 35 North, Suite 303, Middletown, NJ 07748.

STATE OF CALIFORNIA      )
                            )    ss.:

COUNTY OF LOS ANGELES    )

JEFFREY P. NOLAN, being duly sworn, deposes and says:

1.      I am an attorney at law duly licensed to practice before all courts in the State of California. I am an attorney with the law firm of Pachulski Stang Ziehl & Jones LLP, attorneys of record for Plaintiff, Howard M. Ehrenberg in his capacity as Liquidating Trustee of Orion Healthcorp, Inc., *et al.*, for the estates of the above-captioned Debtors, counsel of record in this adversary proceeding. The facts stated herein are of my own personal knowledge, or made known to me from a review of the files and pleadings in this action which are maintained in the ordinary course of business. If called upon as a witness to any facts set forth herein, I could and would competently testify thereto.

2.      Attached hereto as **Exhibit 12** is a true and correct copy of Form 1120, Instructions, pp. 1-2, printed from the website of the Internal Revenue Service at https://www.irs.gov/instructions/i1120.

3.      Attached hereto as **Exhibit 13** are true and correct copies of pages of the deposition transcript of Arvind Walia, as maintained in the regular course of business in the offices of Plaintiff.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 8th day of March, 2023, at Los Angeles, California.

Jeffrey P. Nolan

SWORN TO AND SUBSCRIBED before me this
10th day of March, 2023.

Nancy H. Brown

Nancy H. Brown, Notary Public



NANCY H. BROWN
Notary Public - California
Los Angeles County
Commission # 2427958
My Comm. Expires Dec 19, 2026

DOCS_LA:347523.1 65004/003              2

# EXHIBIT 12

**Instructions for Form 1120 (2022)**

**U.S. Corporation Income Tax Return**

Section references are to the Internal Revenue Code unless otherwise noted.

2022

## Who Must File

Unless exempt under section 501, all domestic corporations (including corporations in bankruptcy) must file an income tax return whether or not they have taxable income. Domestic corporations must file Form 1120, unless they are required, or elect to file a special return. See Special Returns for Certain Organizations , later.

### Entities electing to be taxed as corporations.

A domestic entity electing to be classified as an association taxable as a corporation must file Form 1120, unless it is required to or elects to file a special return listed under Special Returns for Certain Organizations . The entity must also file Form 8832, Entity Classification Election, and attach a copy of Form 8832 to Form 1120 (or the applicable return) for the year of the election. For more information, see Form 8832 and its instructions.

### Limited liability companies (LLC).

If an entity with more than one owner was formed as an LLC under state law, it is generally treated as a partnership for federal income tax purposes and files Form 1065, U.S. Return of Partnership Income. Generally, a single-member LLC is disregarded as an entity separate from its owner and reports its income and deductions on its owner's federal income tax return. The LLC can file a Form 1120 only if it has filed Form 8832 to elect to be treated as an association taxable as a corporation. For more information about LLCs, see Pub. 3402, Taxation of Limited Liability Companies.

### Corporations engaged in farming.

A corporation (other than a corporation that is a subchapter T cooperative) that engages in farming should use Form 1120 to report the income (loss) from such activities. Enter the income and deductions of the corporation according to the instructions for lines 1 through 10 and 12 through 29.

### Ownership interest in a Financial Asset Securitization Investment Trust (FASIT).

Special rules apply to a FASIT in existence on October 22, 2004, to the extent that regular interests issued by the FASIT before October 22, 2004, continue to remain outstanding in accordance with their original terms.

If a corporation holds an ownership interest in a FASIT to which these special rules apply, it must report all items of income, gain, deductions, losses, and credits on the corporation's income tax return (except as provided in

Case 2:25-cv-02032-RPK    Document 5-13    Filed 05/12/25    Page 111 of 112 PageID #: 1658

section 860H). Show a breakdown of the items on an attached statement. For more information, see sections 860H and 860L (repealed with certain exceptions).

**Foreign-owned domestic disregarded entities.**

If a foreign person, including a foreign corporation, wholly owns a domestic disregarded entity (DE), the domestic DE is treated as a domestic corporation separate from its owner (the foreign corporation) for the limited purposes of the requirements under section 6038A that apply to 25% foreign-owned domestic corporations. While a DE is not required to file a U.S. income tax return, a DE covered by these rules is required to file a pro forma Form 1120 with Form 5472 attached by the due date (including extensions) of the return. See the Instructions for Form 5472 for additional information and coordination with Form 5472 reporting by the domestic DE.

**Qualified opportunity fund.**

To certify as a qualified opportunity fund (QOF), the corporation must file Form 1120 and attach Form 8996, even if the corporation had no income or expenses to report. See Schedule K, Question 25, later. Also, see the Instructions for Form 8996.

**Qualified opportunity investment.**

If the corporation held a qualified investment in a QOF at any time during the year, the corporation must file its return with Form 8997 attached. See the instructions for Form 8997.

2

# EXHIBIT 13